REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**McDERMOTT WILL & EMERY LLP**
Jason D. Strabo (SBN #246426)
jstrabo@mwe.com
2049 Century Park East, 38th Floor
Los Angeles, CA 90067-3218
Telephone: +1 310 788 4125
Facsimile: +1 310 277 4730

Kerry Alan Scanlon (admitted *pro hac vice*)
kscanlon@mwe.com
Jeremy M. White (admitted *pro hac vice*)
jmwhite@mwe.com
Julie H. McConnell (admitted *pro hac vice*)
jmcconnell@mwe.com
The McDermott Building
500 North Capitol Street, NW
Washington, D.C. 20001
Telephone: +1 202 756 8000
Facsimile: +1 202 785 8087

Attorneys for Defendant Walt Disney Parks and
Resorts U.S., Inc.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.P., by and through S.P., as next friend, parent, and natural guardian; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WALT DISNEY PARKS AND RESORTS U.S., INC.,<br><br>Defendant. | CASE 2:15-cv-05346-CJC-E<br><br>**DISNEY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON V.J.B.'S AND S.L.B.'S CLAIMS**<br><br>Date: November 9, 2020<br>Time: 1:30 p.m.<br>Judge: Hon. Cormac J. Carney<br>Courtroom: 9B |

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims

(No. 2:15-cv-05346-CJC-E)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................iii

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ............................................................................. 4

    A.   The Guest Experience at Disneyland and Walt Disney World ............... 4

    B.   The GAC System Led to Widespread Fraud and Abuse ...................... 5

    C.   Development and Implementation of DAS ........................................... 6

    D.   Other Guest Services That Supplement DAS ....................................... 8

ARGUMENT ..................................................................................................... 8

I.    PLAINTIFFS' CLAIMS MUST FAIL BECAUSE THEY CANNOT ESTABLISH AN ADA OR UNRUH ACT VIOLATION ............................... 9

    A.   Plaintiffs Cannot Satisfy Title III's "Necessary" Requirement .............. 9

        1.   Modifying DAS Is Not Necessary for VJB To Access the Parks ............................................................................................ 11

            a.   V.J.B. Can Wait in Line and Defer Gratification ........... 11

            b.   V.J.B. Has More Than Equal Access at Disney's Parks. 13

    B.   Plaintiffs Have Failed To Prove That Immediate and Unrestricted Access to Rides and Attractions Is Reasonable ................................... 16

    C.   Plaintiffs' Request for GAC-Type Access Would Fundamentally Alter the Theme Park Experience ....................................................... 19

        1.   Disney's Experience with GAC Shows the Problems that Would Occur If Plaintiffs' Relief Was Granted ...................... 20

        2.   Plaintiffs' Requested Relief Would Impact Wait Times for the Vast Majority of Guests ..................................................... 21

        3.   Guest Intent to Return to the Parks is Heavily Influenced By Wait Times ................................................................................ 22

    D.   Plaintiffs Cannot Establish an Unruh Act Violation .............................. 23

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims

- i -

(No. 2:15-cv-05346-CJC-E)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

II.     SUMMARY JUDGMENT IS ALSO WARRANTED ON S.L.B.'s

        BREACH OF CONTRACT CLAIM ............................................................24

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.L. by and through D.L. v. Walt Disney Parks & Resorts U.S., Inc.*,
  900 F.3d 1270 (11th Cir. 2018) ................................................................ *passim*

*A.L. v. Walt Disney Parks and Resorts U.S., Inc.*,
  No. 6:14-cv-01544-ACC-GJK, Doc. 345 (June 22, 2020) ................................... 3

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ................................................................................. 9

*Ault v. Walt Disney World Co.*,
  254 F.R.D. 680 (M.D. Fla. 2009), *vacated*, 2009 WL 3242028
  (M.D. Fla. Oct. 9, 2009), *vacated per curiam on other grounds*, 405
  F. App'x 401 (11th Cir. 2010) .................................................................. 16

*Avalos v. Baca*,
  596 F.3d 583 (9th Cir. 2010) ..................................................................... 9

*Badgett v. Alabama High School Athletic Ass'n*,
  2007 WL 2461928 (N.P. Ala. May 3, 2007) ................................................... 18

*Baughman v. Walt Disney World Co.*,
  159 Cal. Rptr. 3d 825 (Ct. App. 2013) ........................................................ 23

*Bird v. Lewis & Clark Coll.*,
  303 F.3d 1015 (9th Cir. 2002) ................................................................... 16

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................. 9

*Coleman v. Phoenix Art Museum*,
  2009 WL 1097540 (D. Ariz. Apr. 22, 2009) .................................................. 10

*Dobard v. S.F. Bay Area Rapid Transit Dist.*,
  1993 WL 372256 (N.D. Cal. Sept. 7, 1993), *aff'd*, 56 F.3d 71 (9th
  Cir. 1995) ........................................................................................... 16

*Dryer v. Flower Hosp.*,
  383 F. Supp. 2d 934 (N.D. Ohio 2005) ................................................. 11, 18

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Galvan v. Walt Disney Parks and Resorts U.S., Inc.*,
  425 F. Supp. 3d 1234 (C.D. Cal. 2019) ............................................ 16, 19, 22, 25

*Hankins v. El Torito Rests., Inc.*,
  74 Cal. Rptr. 2d 684 (Ct. App. 1998) ................................................ 23

*Larsen v. Carnival Corp.*,
  242 F. Supp. 2d 1333 (S.D. Fl. 2003) ................................................ 16

*Logan v. Am. Contract Bridge League*,
  173 F. App'x 113 (3d Cir. 2006) ........................................................ 11

*Loving v. Princess Cruise Lines, Ltd.*,
  2009 WL 7236419 (C.D. Cal. Mar. 5, 2009) .................................... 23

*Munson v. Del Taco, Inc.*,
  208 P.3d 623 (Cal. 2009) .................................................................. 23

*Murphy v. Bridger Bowl*,
  150 F. App'x 661 (9th Cir. 2005) ...................................................... 10

*PGA Tour, Inc. v. Martin*,
  532 U.S. 661 (2001) ........................................................ 10, 11, 12, 16

*Richman v. Hartley*,
  169 Cal. Rptr. 3d 475 (Ct. App. 2014) ............................................. 24

*Scales v. Six Flags, Inc.*,
  2004 WL 1870499 (Ohio Ct. App. Aug. 20, 2004) .......................... 25

*Scott v. W. State Univ. Coll. of Law*,
  1997 WL 207599 (9th Cir. Apr. 25, 1997) ........................................ 19

*Sousanis v. Nw. Airlines, Inc.*,
  2000 WL 34015861 (N.D. Cal. Mar. 3, 2000) .................................. 23

*Troyk v. Farmers Grp., Inc.*,
  90 Cal. Rptr. 3d 589 (Ct. App. 2009) ............................................... 24

*Warner v. Tinder Inc.*,
  105 F. Supp. 3d 1083 (C.D. Cal. 2015) ............................................ 23

*White v. Divine Invs.*,
  286 F. App'x 344 (9th Cir. 2008) ...................................................... 10

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims
- iv -
(No. 2:15-cv-05346-CJC-E)

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Statutes**

42 U.S.C. § 12182(b)(2)(A)(i)-(v) ............................................................................. 10

42 U.S.C. § 12182(b)(2)(A)(ii) ........................................................................... 10, 19

Cal. Civ. Code § 51(b) ............................................................................................. 23

Cal. Civ. Code § 51(f) .............................................................................................. 23

**Rules**

Fed. R. Civ. P. 56(a) .................................................................................................. 8

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**PRELIMINARY STATEMENT**

Plaintiffs assert a variety of claims premised on allegedly not receiving the equal access to a public accommodation for persons with disabilities to which they are entitled -- but plaintiffs were never excluded from or denied access to anything during their visits to Walt Disney World ("WDW") and the Disneyland Resort ("Disneyland") (collectively, "Disney's parks" or "the parks").  In fact, under Disney's Disability Access Service ("DAS"), which allows guests with autism and other cognitive disabilities to hold a place in line for rides without standing in the actual line -- thereby giving them time to go to other attractions while waiting virtually -- plaintiff V.J.B. and his mother, S.L.B., experienced all the same or even more rides and attractions than the majority of other guests at Disney's parks and with much less wait time.  Thus, as the late Judge Manuel Real previously concluded in four separate decisions (*see* Doc. 224-225, 312, 355), DAS provided equal access to plaintiffs, as it does for all patrons with cognitive disabilities.

Even though their claims are couched in the language of equal access under the Americans with Disabilities Act ("ADA") and California's Unruh Civil Rights Act ("Unruh Act"), it is clear that what plaintiffs really want is for Disney to accommodate V.J.B.'s personal preference for instant and unlimited repeat access to the rides of his choice -- regardless of how popular the rides are or how long other guests (including persons with disabilities) have to wait in line for those rides.  The ADA and Unruh Act require no such thing, either to favor a particular person or to disadvantage other patrons.  Because plaintiffs' claims are all rooted in allegedly unfulfilled personal preferences, they fail as a matter of law.

There is no evidence that V.J.B. -- who graduated with honors from Valparaiso University with a degree in meteorology -- was prevented from accessing the rides at Disney's parks or that the relief sought is "reasonable" and "necessary" to afford him access, which are the required elements of a claim under the reasonable modification provision of Title III of the ADA and, in turn, the

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims

(No. 2:15-cv-05346-CJC-E)

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

Unruh Act.  To the contrary, since DAS was implemented on October 9, 2013, V.J.B. and S.L.B. have spent four days at Disney's parks on two different visits (including one visit last year), during which they were able to experience numerous rides and attractions.  In fact, using DAS during their most recent visit, V.J.B. went on the most popular ride at WDW *twice* in less than two hours, while non-DAS guests had to ████████████████████████████ Plaintiffs' party actually abused the system by requesting two DAS cards, which gave them double the advantage, proving just how valuable DAS was to them.  As V.J.B.'s mother admits, V.J.B. would benefit from taking breaks between rides at Disney's parks, which is exactly what he can do during his "virtual wait" under DAS if he chooses.  Despite all of the benefits of DAS, plaintiffs filed this lawsuit alleging they were discriminatorily denied access to the very rides they experienced.

What plaintiffs are actually seeking to achieve is not "access" -- which they already had -- but fulfillment of their subjective desire to experience all their favorite rides, without having to wait anywhere at any time.  This desire is not based on a medical need or inherent attribute of autism, as plaintiffs assert.  Indeed, it is undisputed that V.J.B. (who has gone on several ten-day-long storm-chasing trips when he waited for tornadoes that sometimes never came) is more than capable of waiting long enough to access rides and attractions at Disney's parks with or without DAS.[1]  Courts have consistently ruled that a plaintiff is not entitled to the precise accommodation of his choice.  In fact, in November 2019, Judge André Birotte Jr. granted summary judgment in Disney's favor, dismissing the same type of claims asserted here, and in doing so recognized that under the ADA,

---

[1]  V.J.B. is capable of waiting at least 20 minutes in line and for at least 8 hours to reach a destination, as he did during an overseas trip to Europe, as well as multiple four-hour car trips from his home in Frankfort, Illinois to Carbondale, Illinois. Disney's Statement of Uncontroverted Facts ("DSUF") ¶¶ 14, 17.

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims

- 2 -

(No. 2:15-cv-05346-CJC-E)

McDermott Will & Emery LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1  Disney is "not required to make the preferred accommodation of plaintiffs'

2  choice."[2]

3      A recent decision by the Middle District of Florida is highly instructive of the

4  issues now before this Court.  The court in that case had previously granted

5  summary judgment in favor of Disney in a DAS case prosecuted by the same

6  counsel who brought this case.  That decision, and 29 related cases, were remanded

7  by the Eleventh Circuit to resolve what the appellate court held were disputed facts

8  regarding several alleged behavioral characteristics of severe autism.  *A.L. v. Walt*

9  *Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1297-98 (11th Cir. 2018).  A

10  bench trial was held in the first of those cases in February 2020, and on June 22,

11  2020, Judge Anne C. Conway issued a 51-page opinion which showed there was no

12  genuine dispute of fact in the first place and that the requested relief was neither

13  necessary nor reasonable, and would result in a fundamental alteration of Disney's

14  theme park operations.  *A.L. v. Walt Disney Parks and Resorts U.S., Inc.*, 2020 WL

15  3415008, at *25 (M.D. Fla. June 22, 2020), *appeal docketed*, No. 20-12720 (11th

16  Cir. July 22, 2020).

17      The decision in *A.L.* is the most comprehensive examination on the merits of

18  autism in the context of theme park experiences that has ever been written.  Much

19  of the evidence presented at trial by Disney was undisputed, and the findings

20  reaffirmed the dozens of summary judgment rulings entered against plaintiffs by

21  Judge Real, Judge Birotte, and Judge Conway.  Of particular significance here, the

22  evidence presented through live fact and expert witnesses during the trial in *A.L.* is

23  in many respects the same evidence offered in support of the instant motion for

24  summary judgment (through reports, declarations and deposition testimony).

25  Although the facts related to each plaintiff's disabilities and park experiences differ

26

27  [2]  Ex. 1-R, *Galvan, et al. v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:18-cv-
    01721-AB-FFM (C.D. Cal. Nov. 27, 2019), Doc. 86, Order Granting Disney's
28  Motion for Summary Judgment at 13 (internal quotations omitted).

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims
- 3 -
(No. 2:15-cv-05346-CJC-E)

1  to some degree, the detailed analysis of the claims in *A.L.*, together with the facts

2  which discovery in the instant case has revealed, leave no doubt that V.J.B. was not

3  discriminated against when he visited Disneyland.  Because V.J.B. cannot prove

4  that the relief he requests is either necessary or reasonable, and because Disney can

5  prove that it would result in a fundamental alteration of its business, Disney is

6  entitled to summary judgment in its favor.

7  **FACTUAL BACKGROUND**

8  **A.   The Guest Experience at Disneyland and Walt Disney World**

9  Disneyland features two separate theme parks:  Disneyland Park and

10  Disney's California Adventure.  WDW features four theme parks:  Magic Kingdom,

11  Epcot, Disney's Hollywood Studios ("Hollywood Studios"), and Disney's Animal

12  Kingdom ("Animal Kingdom").  Throughout the day, guests at these parks can

13  experience shows, parades, and concerts, without having to wait in a line.  *See*

14  Disney's Statement of Uncontroverted Facts ("DSUF") ¶ 2.  There are also

15  numerous shops, restaurants and special events located in close proximity to the

16  rides and other attractions.  *Id.*[3]  To experience attractions, guests generally stand in

17  a line, called the standby line, and wait until they move to the front of the line to

18  enter the attraction.  Ex. 2-H, DLR Guide at 32; Ex. 2-I, WDW Guide at 34.  The

19  majority of attractions also have a separate line -- the so-called "FastPass" line --

20  which typically has a very short wait.  Ex. 2-H, DLR Guide at 32; Ex. 2-I, WDW

21  Guide at 34.  This line is available to guests who take advantage of the FastPass

22  system, essentially saving their place in line so that they do not have to stand in an

23  actual line.  Ex. 1-J, Laval Decl. ¶¶ 10-11; Ex. 1-D, Hale Dep. (A.L.) at 57:18-25.

24  At the return time, guests can enter the FastPass line.  ████████████████

25  ████████████████████████████████████████████████

26  ████████████████████████████████████████

27  _____

28  [3]  The intention is that every guest feel immersed during their visit in a constantly
changing fantasy world played out on an enormous three-dimensional stage.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1 ████████████████████████████████████████████

2 ███████████████████████████████████████████████. 1-J,

3 Laval Decl. ¶¶ 10-14.

### B. The GAC System Led to Widespread Fraud and Abuse

Until October 9, 2013, the former GAC system generally provided guests with disabilities and their families unlimited, repeated and on-demand access to rides and attractions through alternative "backdoor" entrances or FastPass lines without requiring them to wait in the regular attraction lines. Ex. 1-B, Armor Dep. (A.L.) at 30:10-13, 46:13-17.  GAC had six different tiers of assistance. *Id.* at 46:23-47:1.  However, through social media and other sources, guests increasingly learned about the top tier and demanded it, even if they did not need it. *Id.* at 47:1-12.  Because Disney is not allowed to ask about a guest's disability -- thus making it difficult for the employees to effectively filter guests into the various tiers or to deny them GAC cards altogether -- GAC became an unlimited front-of-the-line pass for anyone asserting a need for it, which resulted in widespread abuse. *Id.* at 46:13-15, 46:23-47:5, 55:17-22, 56:9-11; DSUF ¶ 25; *see also* Ex. 1-A, Sweetman Dep. (May 8, 2017) at 80:12-81:11 (testifying that due to fraud relating to GAC, guests who "really needed the assistance weren't getting it").

The most common abuse consisted of guests' fabrication of their need for a pass at all. *See* DSUF ¶ 25.[4]  More egregiously, some guests created counterfeit GACs, posted Craigslist ads offering the use of GACs -- at the cost of thousands of dollars -- for unauthorized "tours" of the parks, and used the internet to sell unexpired GACs. *Id.*  This misuse became notorious; in May 2013, the New York Post, NBC News, Fox News and other media outlets ran stories documenting

---

[4]  This exaggeration or fabrication of need for GAC reached a point where a ride sometimes had more guests in the GAC line than in the standby line.  DSUF ¶ 25. For example, at Disneyland, guests would ask for a GAC card to bypass the GAC line because the GAC line was too long and at times it exceeded the regular wait for the attraction. *Id.*

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL



1 accounts of wealthy mothers from New York City paying disabled tour guides to

2 lead them through Disney's theme parks so they could skip lines.[5]

5 *Id.* ¶ 26.[6]

8 *Id.*

9 **C.  Development and Implementation of DAS**

10 In spring 2012, Disney began considering changes to GAC and assembled an

11 Attractions Access working group.  DSUF ¶ 1.  This group comprised leaders from

12 various departments, including Services for Guests with Disabilities, Park

13 Operations, Guest Relations, Public Affairs, and Legal, among others.  *Id.*  The

14 group wanted to reduce the fraud and abuse under GAC, while providing a

15 sustainable, optimal level of service to guests with disabilities who are unable to

16 _____

17 [5] *See* Ex. 1-NN, Tara Palmeri, *Rich Manhattan Moms Hire Handicapped Tour Guides so Kids Can Cut Lines at Disney World*, N.Y. Post, May 14, 2013

18 (DisneyCA-TP0021870 to DisneyCA-TP0021871); Ex. 1-OO, *Moms Pay $1,000-a-Day To Hire Disabled Members To Skip Lines at Disney*, FoxNews.com, May 14,

19 2013 (DisneyCA-TP0003816 to DisneyCA-TP0003818); Ex. 1-PP, Jeff Rossen & Josh Davis, *Undercover at Disney: "Deplorable" Scheme To Skip Lines*,

20 Today.com, May 31, 2013) (AL,DL001701-AL,DL001703).

21 [6]

23 DSUF ¶ 26.

27 *Id.*

28 *Id.*

McDermott Will & Emery LLP
ATTORNEYS AT LAW
LOS ANGELES

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims
- 6 -
(No. 2:15-cv-05346-CJC-E)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    wait in a normal queue environment. *Id*. They analyzed the abuses of GAC

2    (including the results of the GAC Study) and carefully considered how to develop a

3    program that would provide a complete accommodation to guests with disabilities

4    who could not stand and wait in a line. *Id*. The team also consulted various autism

5    organizations and considered their suggestions. *Id*.

6    This extensive work led to replacing GAC with the DAS system on October

7    9, 2013. *Id*. As with FastPass, DAS cardholders may wait for their entry virtually

8    instead of physically standing in line. *Id*. ¶ 2. Unlike FastPass, however, DAS

9    return times never run out for the day and can always be requested. Ex. 1-J, Laval

10   Decl. ¶ 19.[7] DAS return times, which are the posted ride wait times minus ten

11   minutes, are issued at kiosks or attractions located through the parks, although the

12   first one may be issued when the DAS card is received. DSUF ¶ 2; Ex. 2-C, DAS

13   Guide and FAQs at 3; Ex. 1-J, Laval Decl. ¶¶ 18-19. Once the return time arrives

14   and the DAS return time is redeemed, a guest may then obtain another return time

15   for the same attraction or for any other attraction. Ex. 2-C, DAS Guide and FAQs

16   at 1. While DAS guests wait virtually for the return time (after which they can

17   enter the shorter FastPass line), they can avail themselves of the many other

18   attractions throughout the park -- other rides, shows, attractions, concerts,

19   characters, restaurants, and stores. *See* DSUF ¶ 2.

20   Another benefit of DAS is that it provides near-immediate access to rides

21   with short wait times. *Id.* ¶ 3. If the wait time posted at the attraction is 15 minutes

22   or less, DAS cardholders are typically given access right away. *Id.* Thus they can

23   use DAS to go on rides with shorter wait times while they wait virtually for the

24   return time on a ride with a longer wait time. Combined with the FastPass system,

25   this gives DAS guests the opportunity to experience a high number of attractions in

26

---

27   [7] While FastPass provides guests with return times that expire, DAS return times
     are valid until redeemed prior to park closing. *See, e.g.*, Ex. 2-B, DAS Fact Sheet at

28   1; Ex. 2-C, DAS Guide and FAQs at 1; Ex. 2-H, DLR Guide at 32.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims
- 7 -
(No. 2:15-cv-05346-CJC-E)

1    a single day -- far more than most guests could without DAS.  *Id.* ¶ 29; Ex. 1-D,

2    Hale Dep. (A.L.) at 78:3-79:12; *infra* Section I.A.1.b.  ████████████████████

3    ████████████████████████████████████████████████████████████████████

4    ████████████████████████████████████████████    DSUF ¶ 4.

5         **D.    Other Guest Services That Supplement DAS**

6         In addition to DAS, other services are available to assist guests with

7    disabilities.  Ex. 2-H, DLR Guide at 2-6; Ex. 2-I, WDW Guide at 2-4.  For example,

8    Guest Relations employees help guests with itinerary planning based on guests'

9    interests, providing advice about the best route to follow and other ways to

10   maximize their experience.  Ex. 1-A, Sweetman Dep. (May 8, 2017) at 72:2-10.

11   Sometimes DAS guests and each member of their party also may receive re-

12   admission passes, or "re-ads," which allow them to immediately enter the shorter

13   FastPass line at any attraction at any time without having to wait virtually for a

14   return time to enter the line.  DSUF ¶ 3.  Around the same time DAS was

15   implemented, Disney developed, in collaboration with Autism Speaks, trip-

16   planning guides for both WDW and Disneyland for guests with disabilities,

17   including autism.  Ex. 2-I, WDW Guide; Ex. 2-H, DLR Guide; Ex. 1-D, Hale Dep.

18   (A.L.) at 33:11-21.  These guides provide strategies for parents to use when visiting

19   WDW and Disneyland.  *See* Ex. 2-H, DLR Guide; Ex. 2-I, WDW Guide.[8]

20                               **ARGUMENT**

21        Summary judgment is appropriate where, as here, "the movant shows that

22   there is no genuine dispute as to any material fact and the movant is entitled to

23   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material"

24

25   _____

     [8]  For example, they suggest planning ahead, utilizing a visual schedule, and
26   bringing along a device or activity to use as a distraction if necessary.  Ex. 2-H,
     DLR Guide at 6, 8: Ex. 2-I, WDW Guide at 2, 6.  The guides also identify quiet
27   areas, describe the park entry process, and include a detailed chart highlighting
     features of rides that may affect a guest with cognitive disabilities.  Ex. 2-H, DLR
28   Guide at 17-34; Ex. 2-I, WDW Guide at 15-36.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   only if its resolution could affect the outcome of the suit, and it is "genuine" if the

2   evidence is such that a reasonable jury could return a verdict for either party.

3   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking

4   summary judgment bears the initial burden of demonstrating the absence of a

5   genuine issue of material fact through affirmative evidence or by showing that there

6   is an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v.*

7   *Catrett*, 477 U.S. 317, 323 (1986); *Avalos v. Baca*, 596 F.3d 583, 593-94 (9th Cir.

8   2010).  When the burden shifts to the nonmoving party to designate specific facts

9   showing that there is a genuine issue for trial, the nonmoving party cannot rely on

10  "a mere scintilla of evidence" supporting its position but rather must establish that

11  it is able to prove evidence sufficient for a reasonable jury to return a verdict in its

12  favor.  *Anderson*, 477 U.S. at 249.  No such circumstances exist here.

13  **I.    PLAINTIFFS' CLAIMS MUST FAIL BECAUSE THEY**

14  **CANNOT ESTABLISH AN ADA OR UNRUH ACT VIOLATION**

15      Plaintiffs do not purport to state a cause of action under Title III of the ADA

16  but all of their claims "are predicated upon proving a violation of the statute."  Doc.

17  224, Order Summ. J. (P.F.E.) at 2; Doc. 225, Order Summ. J. (E.A.P.) at 2; Doc.

18  355 Order Summ. J. (Bellwether III) at 5.  As plaintiffs have acknowledged,

19  liability under the Unruh Act is coextensive with ADA liability.  *See* Doc. 1,

20  Compl. ¶ 8 (stating that the Unruh Act provides that "[a] violation of the right of

21  any individual under the Americans with Disabilities Act shall also constitute a

22  violation of this section [§ 51]") (quoting Cal. Civ. Code § 51(f)).  Because the

23  undisputed facts show that Disney did not violate the ADA, none of plaintiffs'

24  claims can be sustained.

25      **A.    Plaintiffs Cannot Satisfy Title III's "Necessary" Requirement**

26      To establish a violation of Title III of the ADA, plaintiffs must show that a

27  reasonable modification of Disney's policy is *necessary to afford access* to its

28  parks, unless doing so would fundamentally alter the nature of the goods, services,

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1  facilities, privileges, advantages, or accommodations offered at the parks.  42

2  U.S.C. § 12182(b)(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001);

3  *White v. Divine Invs.*, 286 F. App'x 344, 346 (9th Cir. 2008) (explaining that a Title

4  III violation requires discrimination that falls within the ambit of at least one of the

5  five "specific prohibitions" set forth in 42 U.S.C. § 12182(b)(2)(A)(i)-(v)).  In order

6  to show that changing DAS is "necessary," plaintiffs must prove that it is "beyond

7  [V.J.B.'s] capacity" to access the rides at Disney's parks with the DAS system in

8  place.  *Martin*, 532 U.S. at 682; Doc. 224 at 4; Doc. 225 at 5.  Because the

9  undisputed facts and record evidence show that V.J.B. can access the rides at

10 Disney's parks under the DAS system, plaintiffs cannot establish an ADA violation.

11          Contrary to Supreme Court precedent, in August 2018, the U.S. Court of

12 Appeals for the Eleventh Circuit reversed 30 Middle District of Florida summary

13 judgment decisions involving Disney's alleged failure to accommodate certain

14 guests' cognitive disabilities, and remanded the cases to the district court to

15 consider two disputed characteristics of autism, as applied to each plaintiff's case.

16 *See A.L.*, 900 F.3d at 1297.  After a three-day bench trial in the matter involving

17 plaintiff A.L., Judge Conway held that A.L.'s "proposed modification of ten

18 readmission passes or unlimited access to the FastPass lines is not necessary to

19 accommodate A.L.'s preference to follow a route or a pre-set list of rides," and that

20 "[c]ompared to nondisabled guests, A.L. with the DAS card can access the same

21 rides in less time and without physically standing in line."  *A.L.*, 2020 WL 3415008,

22 at *21.

23          Under *Martin* and controlling Ninth Circuit precedent,[9] and consistent with

24 ──────────────────────────

[9]  Several courts in the Ninth Circuit -- and throughout the country -- have

25 determined that a requested modification is not "necessary to afford access" to
   defendant's facilities if there are other available means of insuring access.  *See, e.g.*,

26 *Coleman v. Phoenix Art Museum*, 2009 WL 1097540, at *3 (D. Ariz. Apr. 22, 2009)
   (citing *Martin* and holding that the plaintiff failed to meet his burden of showing

27 that his own hip chair device was necessary to accommodate his disability when the
   museum offered to provide two different kinds of wheelchairs), *aff'd*, 372 F. App'x

28 793 (9th Cir. 2010); *Murphy v. Bridger Bowl*, 150 F. App'x 661, 663 (9th Cir. 2005)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

the Middle District of Florida's recent decision in *A.L.*, plaintiffs cannot prove that it is "beyond [V.J.B.'s] capacity" to access the rides at Disney's parks with the DAS system in place. *Martin*, 532 U.S. at 682. As Judge Real previously concluded in granting Disney's motions for summary judgment as to the claims of the Bellwether II and III plaintiffs, V.J.B. and S.L.B.'s requested modification -- a requirement that Disney provide instant and unrestricted access to the rides of their choice -- is not "necessary" to afford them access to Disney's parks under Title III or the Unruh Act "[u]nder well-settled legal precedent in this Circuit." *See* Doc. 126; Doc. 224 at 4-5 (citing *Martin*, 532 U.S. at 682); Doc. 225 at 4-5 (same); Doc. 355 at 5-6. Here, V.J.B.'s maladaptive behaviors are not caused by DAS, occur regularly and in many different environments, and would not be prevented by any order of this Court. DSUF ¶ 18. Moreover, V.J.B does not have a routine at the parks, does not have severe autism and is able to wait for at least 20 minutes. DSUF ¶¶ 5, 11, 14. The undisputed facts show that access to Disney's rides is not beyond V.J.B.'s capacity such that the requested modification of DAS could be "necessary" under *Martin*.

### 1. Modifying DAS Is Not Necessary for VJB To Access the Parks

#### a. V.J.B. Can Wait in Line and Defer Gratification

V.J.B. is a 28 year-old man who was an honor roll student in high school and a member of the National Honor Society; he graduated with honors from Valparaiso University with a degree in meteorology. DSUF ¶ 5.[10] V.J.B. has worked as a part-

---

(citing *Martin*, the Ninth Circuit held that the requested modification of allowing a companion to accompany an individual with a cognitive disability on a ski bike was not necessary to improve her skills because there were alternative methods available); *Logan v. Am. Contract Bridge League*, 173 F. App'x 113, 117 (3d Cir. 2006) (applying *Martin* and finding that the plaintiff's contention that "he can't play to the maximum of [his] potential" without the requested modification failed to set forth a meritorious claim under Title III); *Dryer v. Flower Hosp.*, 383 F. Supp. 2d 934, 941 (N.D. Ohio 2005) (plaintiff's requested modification of the hospital's policy prohibiting visitors from using its oxygen ports was not "necessary" under *Martin* because she was allowed to bring her own oxygen tank into the hospital).

[10] V.J.B.'s intellectual abilities fall at the ███████████████████████████ ████████ and when assessed at the age of 18, he earned the highest possible score on

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims
- 11 -
(No. 2:15-cv-05346-CJC-E)

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1  time cashier and bagger at a grocery store with shifts of four to eight hours. *Id.*

2  When he is not working, V.J.B. enjoys going on multi-day storm-chasing trips

3  during which he and a group track potential storms "and then . . . wait for it to

4  happen" -- or not to happen. *Id.* ¶ 15.  V.J.B. also participated in a two-day state

5  pentathlon where he had to wait for his event to be called, during which time he

6  would sit on the field, leave to get something to eat, or go back to his room and

7  sleep (if the times of the events were farther apart). *Id.* ¶ 16.  V.J.B. routinely

8  preoccupies himself by playing video games "when he ha[s] to wait or when he has

9  to go to the doctor's office, anything where a typical person has to wait and has

10  time that is not well planned."  *Id.*  During V.J.B.'s two multi-day trips to Disney's

11  parks under DAS (August 7-8, 2014 and April 2-3, 2019), he was able to

12  experience all of the rides and attractions he wanted to experience -- including some

13  of the most popular rides. *Id.* ¶¶ 8, 10, 14.

14        Like in Bellwether II and III, it is clear that plaintiffs' request for

15  unrestricted, "immediate access to the rides at its parks" is not necessary or required

16  by the ADA because an alternative accommodation -- the DAS system -- provides

17  V.J.B. access to Disney's parks.  Doc. 224 at 5; Doc. 225 at 5; Doc. 355 at 5; *A.L.*,

18  2020 WL 3415008, at *21.  Specifically, it is undisputed that under DAS, plaintiff

19  V.J.B., instead of having to wait in the standard line at popular rides, can experience

20  other rides and attractions during a "virtual wait," such as watching a parade,

21  meeting Disney characters, shopping, eating meals, and going on rides with shorter

22  wait times, before returning to enter the premium ride.  DSUF ¶ 2.  There is also no

23  evidence that V.J.B. is incapable of waiting or that he could not have accessed

24  Disney's parks under DAS.

25  _____

26  a subtest assessing his ability to solve complex "mental math" problems.  Ex. 1-F,
    Kelderman Decl. ¶ 88.  In light of his superior intellectual abilities, the allegation

27  that V.J.B. has difficulty understanding the concept of time is not credible (*id.*), and
    undermined by his own medical records which show that V.J.B. has "demonstrated

28  an awareness of time both with and without cues to look at the clock."  DSUF ¶ 13.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  Plaintiffs allege that V.J.B. is a "repeat rider" who "will experience a

2  particular ride or attraction, such as Buzz Lightyear Astro Blasters, over and over,

3  for several hours at a time" (Doc. 1, Compl. ¶ 764), but there is no evidence that

4  V.J.B. ever did or even attempted to do so.  DSUF ¶ 11.  Nor is there a reasonable

5  expectation, let alone any legal requirement, that plaintiffs experience rides in their

6  preferred way every time they visit the park.  Moreover, V.J.B. has gone on rides

7  only one time and not repeatedly; thus his purported routine is neither consistent

8  nor required by his autism.  *Id.*  It is also undisputed that V.J.B. has an ability to

9  wait for at least 20 minutes in a line for a ride, as conceded by his mother.  *Id.* ¶ 14.

10  In addition, there is no dispute that V.J.B. has an ability to defer gratification

11  for long periods of time, as shown by the fact that he tolerates long flights and

12  drives on family vacations, including an eight-hour overseas trip to Europe (which

13  included flying to London and then taking a train to Paris), multiple four-hour road

14  trips from his home in Frankfort, Illinois to Carbondale, Illinois, and many two-

15  hour drives to Bloomington, Illinois for state pentathlon championships.  *Id.* ¶ 17.

16  The gratification from these trips -- reaching the desired destination -- was anything

17  but instant.  Furthermore, it is the uncontroverted opinion of Disney's expert, Dr.

18  Jill Kelderman, that V.J.B. is not incapable of waiting and that the need for

19  immediate gratification is not a diagnostic criteria or requirement of V.J.B.'s

20  disabilities.  *Id.* ¶¶ 11, 21; *see also A.L.*, 2020 WL 3415008, at *20 ("[T]he inability

21  to wait or defer gratification is not in the diagnostic criteria for autism and

22  individuals with autism are capable of deferring gratification, based on research

23  studies finding that children with autism can defer gratification.").

24  Because V.J.B. has no routine and can wait for a sufficient amount of time to

25  access the rides and attractions at Disney's parks, his claims that DAS does not

26  provide him access must fail.

27  **b.  V.J.B. Has More Than Equal Access at Disney's Parks**

28  V.J.B. is capable of waiting in lines for at least 20 minutes, and therefore he

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims
- 13 -
(No. 2:15-cv-05346-CJC-E)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  can wait (and has waited) long enough to go on numerous rides and attractions at

2  Disney's parks.  During his August 2014 visit to Disneyland, V.J.B. received a DAS

3  and ▮▮▮▮▮▮▮▮▮▮▮ which he used to access many rides, including Tower

4  of Terror, Space Mountain and the "cars ride," and while his mother could not recall

5  the other ones, she explained that "if there was a short wait time, [V.J.B.] might

6  have jumped on a ride," without using any accommodation at all.  DSUF ¶ 8.

7  Indeed, on August 7, 2014, after V.J.B. received a DAS at Disneyland, ▮▮▮▮▮▮

8  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

9  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ during his

10 "virtual wait" under DAS.  *Id.* ¶ 14.[11]  Any rides with longer wait times could have

11 been accessed with a DAS return time.[12]  And V.J.B. could have gone on even more

12 rides using the FastPass system, which was strongly recommended as a means of

13 reducing wait times, but he failed to utilize it.  *Id.* ¶ 8.  Notably, during his April

14 2019 visit to WDW, V.J.B. went on Avatar Flight of Passage -- the most popular

15 ride at the time -- twice in less than two hours, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, on average, to experience that ride just

17 once.  *Id.* ¶ 10.

18       V.J.B.'s experience at the parks is consistent with other evidence showing

19 that guests with DAS can experience significantly more rides in a day than guests

20 without DAS.  *Id.* ¶ 29.  This point was confirmed by studies Disney conducted at

21

22 [11]  V.J.B. is often tired during the day from staying up late playing video games and
therefore his mother admitted that he "could benefit" from DAS, which would

23 allow him to take breaks between rides without losing his place in the virtual queue.
DSUF ¶ 12.

24
[12]  In addition, V.J.B.'s group received two DAS cards and would get a return time

25 for both passes, enabling them to "kind of double up in a way."  DSUF ¶ 9.
According to Jennifer Sweetman, Disney's Senior Manager-Attractions &

26 Custodial in Park Operations Experience Integration, by using two DAS cards
during his visit, thereby "cheating the system," V.J.B. would have been able to

27 experience twice the number of rides as someone who had only one DAS card and
many more rides than a guest without a DAS. Ex. 2, Sweetman Decl. ¶ 6.

28

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1    Disneyland and WDW, in which testers familiar with the parks used the ride passes

2    available to them (i.e., DAS, FastPasses, or re-ads) to experience as many

3    attractions as possible during the day. *Id.*

4

5

6

7

8    ████████████    *Id.*[13]  In other words, DAS guests can experience

9    significantly more attractions and spend much less time waiting in queues. *Id.*

10          As Disney's industrial engineering expert Bruce Laval concluded, "DAS not

11   only reasonably accommodates and provides equal access to guests with

12   disabilities, for whom it may be difficult to wait in a traditional queue," but it

13   provides more than equal access to such guests overall "because they can

14   experience the most popular attractions faster and, if they desire, in greater number

15   than what ████████ of guests at WDW and DLR can do without DAS." Ex. 1-J,

16   Laval Decl. ¶ 52. This is consistent with the decisions by courts applying a "like

17   experience" standard, which have concluded that Disney has provided disabled

18   guests an opportunity to have an experience comparable to (if not better than) non-

19   disabled guests. *See, e.g.,* Doc. 355 at 5-6 (granting Disney's motion for summary

20   judgment in Bellwether III and concluding that "[b]y providing a program which

21   ensures that families of guests with cognitive disabilities can schedule ride times in

22   advance, have near-immediate access to rides with wait times of less than 15

23   minutes, and never have to wait in a physical line, Defendant's DAS program

24

25   [13] ████████████████████████████████

26   ████████████████████████████████

27   ████████████████████████████████

28   ████ DSUF ¶ 28.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1   adequately provides its disabled guests with a 'like experience' which is

2   'comparable to that of able-bodied patrons'"); *A.L.*, 2020 WL 3415008, at *23

3   ("The Court finds that Disney's DAS card provides [plaintiff] with a 'like,' if not

4   better, experience and equal enjoyment than nondisabled guests experience."); *cf.*

5   Ex. 1-R, *Galvan* Order at 12 (granting summary judgment in Disney's favor and

6   holding that plaintiff did not show that "his request for priority ride access is

7   necessary under the ADA because he has access to Disneyland comparable to able-

8   bodied persons").

9        A reasonable juror could not find that the requested accommodation is

10  necessary to afford V.J.B. access to Disney's parks.[14]  He already has access.

11       **B.    Plaintiffs Have Failed To Prove That Immediate and Unrestricted**

12            **Access to Rides and Attractions Is Reasonable**

13       To establish an ADA violation, plaintiffs must also prove that their requested

14  modification is "reasonable."  The "reasonable" requirement goes beyond whether

15  the modification is necessary to afford access and focuses on the totality of the

16  circumstances, including the practicality, cost, effectiveness or feasibility of the

17  proposed modification, among other factors, in determining reasonableness.  *Larsen*

18  ───────────────

19  [14]  Under well-established legal precedent, V.J.B.'s supposed preference for
    immediate, unrestricted access does not meet his burden to establish a violation of

20  Title III of the ADA.  *See, e.g.*, *Martin*, 532 U.S. at 682; *A.L.*, 2020 WL 3415008, at
    *21; *Ault v. Walt Disney World Co.*, 254 F.R.D. 680, 688 (M.D. Fla.) (explaining

21  that a preference to use a Segway over other types of mobility devices need not be
    accommodated under the ADA as a matter of law), *vacated*, 2009 WL 3242028

22  (M.D. Fla. Oct. 9, 2009), *vacated per curiam on other grounds*, 405 F. App'x 401
    (11th Cir. 2010); *Dobard v. S.F. Bay Area Rapid Transit Dist.*, 1993 WL 372256, at

23  *3-4 (N.D. Cal. Sept. 7, 1993) (finding that plaintiff failed to state a claim for an
    ADA violation because defendant was not required to provide the most advanced

24  technology to those who are hearing-impaired if it allows for some means of
    effective communication), *aff'd*, 56 F.3d 71 (9th Cir. 1995); *Bird v. Lewis & Clark*

25  *Coll.*, 303 F.3d 1015, 1021 (9th Cir. 2002) (affirming judgment for college in Title

26  III case because it "offered ample evidence of having accommodated Bird's
    disability" and "[t]he College did not necessarily fail to make reasonable

27  modifications simply because some aspects of the program did not conform to
    Bird's expectations").

28

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1343 (S.D. Fl. 2003).  Plaintiffs have the burden of proving reasonableness, and they cannot do so here.

First, it is unreasonable to require Disney to return to a policy that resulted in the type of large-scale fraud and abuse that existed under GAC.  *See A.L.*, 2020 WL 3415008, at *23 (finding that A.L.'s proposed modification of ten readmission passes "is not a reasonable modification because it would lengthen the wait times for all other riders, severely impacting the remaining non-DAS users, it would increase their wait time significantly, and potentially lead to the same fraud and overuse that existed with the GAC system, which required a complete overhaul to the more-controllable DAS system").  The undisputed evidence shows that guests fabricated or exaggerated their need to get a GAC, paid people with GACs to be counterfeit tour guides to provide non-disabled guests with top tier access to the parks, sold unexpired GACs on the internet, and created counterfeit GACs to bypass all lines.  *See* DSUF ¶ 25.[15]

Returning to a GAC system would be even less manageable today with the opening of new high-demand rides such as the Star Wars attraction "Rise of the Resistance," which required a new queuing system at WDW in response to unprecedented guest demand.  *A.L.*, 2020 WL 3415008, at *24.  As Judge Conway in *A.L.* recognized, "[t]he word spreading on social media that one disabled individual received an accommodation of ten readmission passes will increase demand to be treated similarly by every disabled individual once they find out, as well as those willing to misrepresent they are disabled, until the exception for a 'reasonable' request for readmission passes ends up swallowing the whole disability access system, once again, as it did with GAC."  *Id*.  "As Disney experienced with the GAC system, when a popular new ride at Disneyland opened, it drove a 40%

---

[15]  Shortly after assuming the role of Director of Park Operations, Alison Armor consistently received feedback from Disney's park operators that the GAC system was being abused.  DSUF ¶ 25.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

increase in demand for GAC passes.  When 3% of the guests admitted with GAC passes use a disproportionate 30% of a popular ride's capacity, the system is not working the way it was designed and it is certainly working to the disadvantage of the non-GAC holding guests." *Id*.  For the same reasons that Judge Conway found A.L.'s modification of DAS to be unreasonable, plaintiff's requested relief will similarly "displace those without DAS cards" as shown by the evidence presented here. *Id*.

Second, plaintiffs cannot prove that their requested modification is "reasonable" because DAS already provides V.J.B. access to Disney's parks.  In considering reasonableness, courts consider whether alternative accommodations have been made available to the plaintiff.  For example, in *Badgett v. Alabama High School Athletic Ass'n*, the court explained that the ADA does not require an entity "to adopt the 'best' modification or the modification requested by a person with a disability;" it only requires a *reasonable* modification.  2007 WL 2461928, at *4 (N.D. Ala. May 3, 2007); *see Dryer*, 383 F. Supp. 2d at 940-41 (holding that the requested modification was not reasonable because other alternatives were available to plaintiff but she *chose not to use them*).

Finally, plaintiffs cannot show that their request is "reasonable" when Disney has already provided an accommodation with DAS that relieves waiting in standby lines -- a tremendous benefit that allows guests to experience other attractions within Disney's parks during a virtual wait and avoid completely the lines in which ██████ of all guests wait.  Only an unreasonable guest would expect immediate access to all of his favorite rides at one of the world's most popular theme parks, including rides that most guests may have to wait more than an hour to experience. Indeed, if plaintiffs' requested modification were reasonable, the same would necessarily be true at any place of public accommodation -- movie theaters, restaurants, grocery stores, and malls.  That is not what Congress intended when it enacted Title III.

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims

- 18 -

(No. 2:15-cv-05346-CJC-E)

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

### C. Plaintiffs' Request for GAC-Type Access Would Fundamentally Alter the Theme Park Experience

Even if the Court were to determine that plaintiffs have met their burden of proving that their requested modification is both "necessary" and "reasonable," they would still fall short of establishing an ADA violation because the modification would impact wait times for other guests so adversely as to constitute a fundamental alteration of their ride experience. Disney has a complete defense to an ADA violation if the requested modification would "fundamentally alter" the nature of the services provided.[16] Just two other courts in DAS cases have considered the evidence and ruled on Disney's fundamental alteration defense, both of which unequivocally found that modifying DAS would fundamentally alter Disney's park operations and business model. *See* Ex. 1-R, *Galvan* Order at 9 (concluding that Disney's uncontroverted evidence demonstrates that plaintiff's requested accommodation would "fundamentally alter the theme park experience at Disneyland") (internal quotations omitted); *A.L.*, 2020 WL 3415008, at *25 ("[R]equiring the modification, based on the history of the former system, would lead to fraud and overuse, lengthen the wait times significantly for nondisabled guests, and fundamentally alter Disney's business model.").

The live testimony presented in *A.L.* on the fundamental alteration issue encompasses the same uncontroverted evidence that is now before this Court. Like in *A.L.*, the evidence here demonstrates that plaintiffs' requested relief -- which is akin to a return to the failed GAC system -- ███████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

[16]  The ADA does not require that an entity employ any and all means to make services accessible to persons with disabilities, but rather only requires "reasonable modifications" that would not "'fundamentally alter the nature of [its] . . . services.'" *Scott v. W. State Univ. Coll. of Law*, 1997 WL 207599, at *1 (9th Cir. Apr. 25, 1997) (quoting with alteration 42 U.S.C. § 12182(b)(2)(A)(ii)).

McDermott Will & Emery LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    ████████████████████████   Moreover, Disney cannot grant plaintiffs'

2    requested relief only to plaintiffs because it is impossible for Disney to provide an

3    accommodation to one guest and then deny the accommodation to all others who

4    request it.  This point was underscored by Judge Conway in explaining that "[a]ny

5    additional accommodation supplementing a DAS card . . . would have to be

6    uniformly applied to the hundreds of disabled guests receiving a DAS card each day

7    at all of the parks."  *A.L.*, 2020 WL 3415008, at *24 n.37.  If this Court were to

8    grant plaintiffs' requested relief, nothing would prevent other guests from

9    requesting the same accommodation or filing a lawsuit if they did not receive it.

10        **1.    Disney's Experience with GAC Shows the Problems that**

11        **Would Occur If Plaintiffs' Relief Was Granted**

12        Plaintiffs' request for immediate, unrestricted access to Disney's attractions

13   is "like returning to the unlimited access to FastPass lines similar to the GAC

14   system" which would cause the same type of large-scale fraud, abuse and overuse

15   that existed under the prior GAC program.  *See A.L.*, 2020 WL 3415008, at *24.

16   As confirmed by the GAC Study (DSUF ¶ 26), this abuse caused the number of

17   guests using the FastPass lines at premium rides to increase the wait times in the

18   standby lines and produced a disparity between the number of rides a guest with a

19   GAC could experience compared with guests without one.  *See supra* Factual

20   Background Section B, n.6.

21        The impact on wait times, as reflected in the GAC Study, "were felt most

22   strongly on the most popular or premium rides which were the most important to

23   the guests."  *A.L.*, 2008 WL 3415008, at *7.  For this reason, a GAC-like system

24   would be equally, if not more, unsustainable in today's environment than it was

25   before Disney implemented DAS.  *Id.* at *8.  That is because most of Disney's park

26   guests are repeat visitors, and Disney invests a tremendous amount of capital into

27   opening new rides and attractions "which is the core of Disney's business" and one

28   of the key components to achieving repeat attendance.  *Id.* at *6.  Given the wait

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   times at just one new attraction, it is inconceivable how new attractions would

2   function today under GAC, and most guests in that scenario would likely not be

3   able to experience the new premier rides even once.  *Id.* at *8.  The *A.L.* court found

4   that this "observation is consistent with the results of the April 2013 GAC Study"

5   and was further evidence of the adverse impact of plaintiff's requested modification

6   on Disney's business model.  *Id*.  The same is true here.

   **2.      Plaintiffs' Requested Relief Would Impact Wait Times for
            the Vast Majority of Guests**

9   Prior research and studies show that



DSUF ¶ 28.

DSUF ¶ 27.

*Id.*

21   As Judge Conway found in *A.L.*, this "incremental analysis" study showed

22   that the wait times would increase even more significantly if the percentage of DAS

23   guests increased -- a likely scenario as more guests learn about the increased

24   benefits.  *A.L.*, 2020 WL 3415008, at *13.  "Thus, for example, if all DAS guests

25   were given two readmission passes for their party, a 1 % increase in daily DAS

26   users would cause the standby wait time at Seven Dwarfs Mine train to increase by

27   nearly an hour, from 69 minutes to 124 minutes.  Similarly, there were significant

28   increases in wait time for the other popular rides the industrial engineering team

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1   studied." *Id.* ███████████████████████████████████████████

2   ████████████████████████████████████████████████████████████

3   ████████████████████████████   Ex. 1-J, Laval Decl. ¶ 49.

4   **3.    Guest Intent to Return to the Parks is Heavily Influenced By**

5   **Wait Times**

6   Disney has conducted many studies over the years which demonstrate that

7   wait times for rides "has a direct impact on guest satisfaction and whether guests

8   intend to return" to the parks.  *A.L.*, 2020 WL 3415008, at *24; DSUF ¶ 28.

9   Consistent with the findings in *A.L.* and *Galvan*, the relief plaintiffs request would

10  increase wait times for most guests, thus interfering with their ability to access

11  attractions at the parks, and decreasing their trip satisfaction and intent to return.

12  *See A.L.*, 2020 WL 3415008, at *24; Ex. 1-R, *Galvan* Order at 9 (concluding that

13  Disney's uncontroverted evidence -- which included a company witness declaration

14  explaining that "plac[ing] significant pressure on the FastPass lines [will] have an

15  adverse impact on Park Operations" -- demonstrates that plaintiff's requested

16  accommodation would "fundamentally alter the theme park experience at

17  Disneyland") (internal quotations omitted).

18  There can be no greater financial impact on Disney than a significant number

19  of its guests deciding not to return to the parks because they were unable to

20  experience Disney's most popular attractions and thus were dissatisfied with their

21  visits.  Indeed, as Judge Conway concluded, "if guests' intention to return to the

22  park decreases, future attendance decreases which decreases future revenue from

23  lost attendance, hotel stays, food purchases, associated merchandise, and

24  'everything else.'"  *A.L.*, 2020 WL 3415008, at *24.  As a result, like A.L.,

25  plaintiffs' requested modification to DAS -- and the increased wait times it would

26  cause -- "relate directly to guest satisfaction and 'fundamentally alter' Disney's

27  business model by undermining its revenue base." *Id.*

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims
- 22 -
(No. 2:15-cv-05346-CJC-E)

### D. Plaintiffs Cannot Establish an Unruh Act Violation

Plaintiffs claim that Disney violated California's Unruh Act, Cal. Civ. Code § 51(b), because they were denied access to the parks.  Doc. 1, Compl. ¶ 1.  As plaintiffs acknowledge in their complaint, section 51(f) of the Unruh Act provides that "[a] violation of the right of any individual under the Americans with Disabilities Act shall also constitute a violation of this section."  *Id.* ¶ 8 (quoting Cal. Civ. Code § 51(f)).  And California state courts have interpreted and applied the Unruh Act in accordance with the burdens of proof and defenses available under the ADA.  *See, e.g.*, *Baughman v. Walt Disney World Co.*, 159 Cal. Rptr. 3d 825, 830-31 (Ct. App. 2013) (holding that "Baughman's evidence does not show Disney failed to make reasonable modifications in its policies, practice, or procedures, or that the modification she requested was necessary to afford goods, services, privileges, advantages, or accommodations to individuals with disabilities"); *Hankins v. El Torito Rests., Inc.*, 74 Cal. Rptr. 2d 684, 693 (Ct. App. 1998) (recognizing that California imposes "at least the same requirements as are imposed by the Americans with Disabilities Act").  Therefore, like the ADA, California law requires a plaintiff suing for a failure to accommodate to prove that his "requested accommodation [is] necessary and reasonable."  Doc. 224 at 5; Doc. 225 at 5; Doc. 355 at 4; *see also Munson v. Del Taco, Inc.*, 208 P.3d 623, 630 (Cal. 2009) ("Because the Unruh Act has adopted the full expanse of the ADA, it must follow, that the same standards for liability apply under both Acts.").  Because plaintiffs cannot establish an ADA violation, V.J.B.'s Unruh Act claim necessarily fails.[17]

---

[17]  The Unruh Act does not apply to V.J.B. and S.L.B.'s April 2019 visit to WDW under DAS because they are not residents of California and the alleged discrimination during these visits did not occur in California.  Cal. Civ. Code § 51(b); *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1099 (C.D. Cal. 2015) (dismissing Unruh Act claims brought by Florida resident where alleged discrimination did not occur in California); *Sousanis v. Nw. Airlines, Inc.*, 2000 WL 34015861, at *6-7 (N.D. Cal. Mar. 3, 2000) (explaining that the Unruh Act expressly limits the statute's reach to persons inside of the state); *Loving v. Princess Cruise Lines, Ltd.*, 2009 WL 7236419, at *2, 8 (C.D. Cal. Mar. 5, 2009)

MCDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims

- 23 -

(No. 2:15-cv-05346-CJC-E)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## II.    SUMMARY JUDGMENT IS ALSO WARRANTED ON S.L.B.'s BREACH OF CONTRACT CLAIM

In order to prevail on her breach of contract claim, S.L.B. must establish that: (1) the parties entered into a contract; (2) Disney failed to do something the contract required it to do; and (3) S.L.B. suffered damages as a result of Disney's breach. *See Richman v. Hartley*, 169 Cal. Rptr. 3d 475, 478 (Ct. App. 2014); *Troyk v. Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 628 (Ct. App. 2009) ("Implicit in the element of damage is that the defendant's breach *caused* the plaintiff's damage.").

Disney does not have an obligation to plaintiffs or the millions of its other guests to provide an experience that meets their personal expectations, let alone a contractual commitment, as the experience of each guest is inherently highly individualized, subjective, and unpredictable.  S.L.B. concedes that the terms and conditions of the DAS cards that Disney provided V.J.B. during his visits to the Disney parks "included a provision that said, '[Disney is] not guaranteeing any particular length of time that [V.J.B. is] going to have to wait using [the] pass," and that "[w]hen utilizing [the DAS] service . . . it is possible to experience waits greater than the posted wait time."  DSUF ¶ 24.  And she cannot identify any term of the individual tickets she and V.J.B. used to access the parks that would require "Disney [to] provide [her] or [V.J.B.] with a specific level of enjoyment in the parks."  *Id*.

Nor can such a requirement be read into the terms and conditions of the ticket that plaintiffs used to access Disney's parks because courts consistently refuse to add terms -- especially extremely subjective ones -- not included in the contract. *See, e.g.*, Doc. 355, Order at 6 (concluding that the Bellwether III plaintiffs "have not identified a particular contractual term that has allegedly been violated, and Defendant does not promise, at the time of purchase or otherwise, that all guests

(recognizing that the Unruh Act "do[es] not apply to claims of nonresidents of California injured by conduct occurring beyond California's borders").

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    will receive their preferred, best possible, or even a satisfying experience. The

2    Court declines to read such an implied contractual term into the parties' business

3    relationship."); Ex. 1-R, *Galvan* Order at 14; *Scales v. Six Flags, Inc.*, 2004 WL

4    1870499, at *1, 3, 5 (Ohio Ct. App. Aug. 20, 2004) (affirming summary judgment

5    for Six Flags because "the 'terms and conditions' [of plaintiff's season pass]

6    represent a full and final expression of the parties' agreement," and the amusement

7    park "made no assurances that appellant, as a season pass holder, was entitled to

8    'reasonable access' to rides; rather, as a season pass holder, appellant was entitled

9    to admission into the park (subject to certain stipulated exceptions)").

10       Even if a contractual obligation did exist (which it does not), it would have to

11   be based on the legal standard for providing accommodations under the ADA.  It is

12   undisputed here that V.J.B. and his family were provided equal access to the parks

13   under DAS and that Disney did not violate the ADA or the Unruh Act.  *See supra*

14   Section I.  Therefore, Disney is entitled to summary judgment on S.L.B.'s breach of

15   contract claim.  *See* Ex. 1-R, *Galvan* Order at 15 (dismissing plaintiffs' breach of

16   contract claim "because Plaintiffs had access to the park's attractions" and therefore

17   "they cannot show that [Disney] failed to do something required by their respective

18   contracts (passes and a ticket)").

19                                    **CONCLUSION**

20       For all the foregoing reasons, Disney respectfully requests that summary

21   judgment be granted in its favor.

22
23   Dated: October 9, 2020          **McDERMOTT WILL & EMERY LLP**

24
25                                   By: /s/ Kerry Alan Scanlon
                                     Kerry Alan Scanlon
26
                                     Attorney for Walt Disney Parks and
27                                   Resorts U.S., Inc.

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CERTIFICATE OF SERVICE**

I certify that on October 9, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Central District of California, by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


/s/ Jeremy M. White
Jeremy M. White

Mem. ISO Disney's Mot. for Summ. J. on
V.J.B.'s and S.L.B.'s Claims

(No. 2:15-cv-05346-CJC-E)