REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1
2
3
4

**McDERMOTT WILL & EMERY LLP**
Jason D. Strabo (SBN# 246426)
jstrabo@mwe.com
2049 Century Park East, Suite 3200
Los Angeles, CA 90067-3206
Telephone: +1 310 788 4125
Facsimile: +1 310 317 5221

5
6
7
8
9

Kerry Alan Scanlon (admitted *pro hac vice*)
kscanlon@mwe.com
Jeremy M. White (admitted *pro hac vice*)
jmwhite@mwe.com
Julie H. McConnell (admitted *pro hac vice*)
jmcconnell@mwe.com
500 North Capitol Street, NW
Washington, D.C. 20001-1531
Telephone: +1 202 756 8000
Facsimile: +1 202 756 8087

10
11

Attorneys for Defendant Walt Disney Parks
and Resorts U.S., Inc.

12
13
14

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

15
16
17
18
19
20
21
22
23
24
25
26
27
28

| | |
|---|---|
| T.P., by and through S.P., as next friend, parent, and natural guardian, et al.,<br><br>               Plaintiff,<br><br>    v.<br><br>Walt Disney Parks and Resorts U.S., Inc.,<br><br>             Defendant. | Case No. 2:15-cv-05346-CJC-E<br><br>**DISNEY'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON V.J.B.'S AND S.L.B.'S CLAIMS**<br><br>Date: November 9, 2020<br>Time: 1:30 p.m.<br>Judge: Hon. Cormac J. Carney<br>Courtroom: 9B |

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Defendant Walt Disney Parks and Resorts U.S., Inc. ("Disney") hereby submits the following statement of uncontroverted facts and conclusions of law in support of its motion for summary judgment on the claims of V.J.B. and S.L.B., which Disney is concurrently filing herewith.  *See* C.D. Cal. R. Civ. P. 56-1.

## UNCONTROVERTED FACTS

1.     In spring 2012, Disney began considering changes to the Guest Assistance Card ("GAC") system, and an Attractions Access working group was assembled.  *See* Ex. 1-B, Armor Dep. (A.L.) at 15:22-16:16; Ex. 2-K, Armor-Hale et al. Email at 1-2.  Disney's Attractions Access working group, which included leaders from various departments, including Services for Guests with Disabilities, Park Operations, Guest Relations, Public Affairs, and Legal, among others, spent many months analyzing ways to reduce the fraud and abuse under the GAC system and carefully considering how to develop a new program that would provide a complete accommodation to guests with disabilities who could not stand and wait in a line.  Ex. 1-B, Armor Dep. (A.L.) at 17:24-19:23, 23:7-16, 131:14-132:4, 133:8-134:7, 135:21-136:2.  The group consulted various autism organizations and considered their suggestions.  Ex. 1-C, Jones Dep. (A.L.) at 48:15-17.  This extensive work led to replacing GAC with the Disability Access Service ("DAS") on October 9, 2013.  Ex. 1-B, Armor Dep. (A.L.) at 24:4-6, 29:18-23, 45:1-46:12; Ex. 2-A, Crofton Ltr.

2.     DAS allows guests with autism and other cognitive disabilities to hold a place in line for rides without standing in the actual line.  This gives them time to go to other attractions while they wait virtually (*see* Ex. 2, Sweetman Decl. ¶ 3) -- which V.J.B.'s father, B.W.B., agrees "is a benefit compared to what most guests have to do, which is to stand in the line."  Ex. 1-T, B.W.B. Dep. at 84:1-7.  In general, the return time with DAS is the posted wait time for that ride or attraction minus 10 minutes.  Ex. 2-B, DAS Fact Sheet; Ex. 1-D, Hale Dep. (A.L.) at 72:14-73:5.  There are many different rides, attractions, parades, shows, concerts, characters, shops, restaurants and special events located throughout the Disney parks that guests can experience

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1   during their virtual wait.  Ex. 1-C, Jones Dep. (A.L.) at 68:14-23; Ex. 1-D, Hale Dep.

2   (A.L.) at 69:5-10; Ex. 2-C, DAS Guide and FAQs.

3      3.      If the wait time posted at a ride or attraction is 15 minutes or less, DAS

4   cardholders and their parties are typically given access right away.  *See, e.g.*, Ex. 1-

5   D, Hale Dep. (A.L.) at 85:1-3 ("[For DAS card holders] ten minutes is deducted from

6   the time.  So, typically, if the wait is less than 15 minutes, they are allowed right

7   in."); Ex. 2, Sweetman Decl. ¶ 4.  Sometimes DAS guests and each member of their

8   party also may receive re-admission passes, or "re-ads," which allow them to

9   immediately enter the shorter FastPass line at any attraction at any time without

10   having to wait virtually for a return time to enter the line.  Ex. 1-C, Jones Dep. (A.L.)

11   at 79:14-80:9; Ex. 1-D, Hale Dep. (A.L.) at 79:1-12.

12      4.      ██████████████████████████████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████   Ex. 1-J, Laval

15   Decl. ¶ 27; Ex. 1-K, DAS Usage at 1.  More than a million guests have directly

16   benefited from DAS since its inception.  Ex. 2, Sweetman Decl. ¶ 8.

17      5.      Plaintiff is a 28 year-old man and resident of Will County, Illinois, who

18   is alleged to have "autism and . . . an anxiety disorder."  Doc. 1, Compl. ¶¶ 759, 763;

19   Ex. 1-S, S.L.B. Dep. at 10:11-13.  V.J.B. was an honor roll student in high school and

20   a member of the National Honor Society, and he graduated with honors from

21   Valparaiso University with a degree in meteorology.  Ex. 1-S, S.L.B. Dep. at 67:5-21,

22   69:2-3, 146:12-18.  V.J.B. has worked part-time as a cashier and a bagger at a

23   grocery store, several days per week, for "between four hours to eight hours" per

24   shift.  *Id.* at 11:13-20, 12:2-4, 12:22-13:8, 15:5-7.

25      6.      When V.J.B. was in college, he received extra time to take exams as an

26   accommodation for his disability.  Ex. 1-S, S.L.B. Dep. at 76:13-18, 77:2-4.  S.L.B.

27   testified that "he usually [took] advantage of the [extra] time," but sometimes he

28

1    finished the exams early and did not need the additional time he was provided.  *Id.* at

2    77:5-16.

3        7.    V.J.B. has visited Disneyland in Anaheim, California, and WDW in

4    Orlando, Florida, each one time since DAS was implemented, including a visit to

5    WDW last year in April of 2019.  Ex. 2-O, V.J.B. Entitlement Report (DisneyCA-

6    TP0132261) at 1; Ex. 2-P, V.J.B. Updated Entitlement Report (DisneyCA-

7    TP0134571) at 1.

8        8.    V.J.B. first used DAS during an August 7-8, 2014 trip to Disneyland

9    with his parents, sister D.B., and two family friends.  Ex. 2-O, V.J.B. Entitlement

10   Report at 1.  On the first day of his visit, V.J.B. received a DAS for one day for a

11   party of six, and the following day, he received another one-day DAS card for a party

12   of six, plus ███████████████     Ex. 2-O, V.J.B. Entitlement Report at 1; Ex. 2-

13   P, V.J.B. Updated Entitlement Report at 1; Ex. 2-Q, V.J.B. Magic File (DisneyCA-

14   TP0132202) at 1.  V.J.B. used his DAS cards and ███████████ to access rides

15   at Disneyland, but S.L.B. does not recall which rides they were.  Ex. 1-S, S.L.B.

16   Dep. at 231:22-232:8, 233:14-17.  She only remembers that they experienced Tower

17   of Terror, Space Mountain and the "cars ride" and that "if there was a short wait time,

18   [he] might have jumped on a ride" without needing to use DAS or ███████████

19   ███████████.  *Id.* at 231:22-232:1, 235:11-18.  The family did not use FastPass

20   during the trip even though it was strongly recommended as a means of reducing

21   wait times.  *Id.* at 274:24-275:7; Ex. 2-C, DAS Guide and FAQs.

22       9.    S.H., a member of V.J.B.'s six-person party who visited Disneyland in

23   April 2014 and who ███████████, received his own DAS card for a party of six on the

24   first day of the group's visit to the park.  Ex. 1-T, B.W.B. Dep. at 100:6-101:13.

25   According to B.W.B., the group "would get a return time using [V.J.B.'s] DAS pass

26   and then . . . [they] could also get a different return time for S.H.'s pass" for a

27   "different ride[]."  *Id.* at 101:17-25.  V.J.B. was thus able to "kind of double up in a

28   way."  *Id.* at 102:1-4.  According to Jennifer Sweetman, Disney's Senior Manager-

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    Attractions & Custodial in Park Operations Experience Integration, by using two

2    DAS cards during this August 2014 visit, V.J.B. would have been able to experience

3    twice the number of rides using DAS as someone who only had one DAS card and

4    many more rides than a guest without a DAS.   Ex. 2, Sweetman Decl. ¶ 6.  What

5    B.W.B. did, according to Jennifer Sweetman, was "cheating the system."  *Id.*

6         10.    On April 2-3, 2019, V.J.B. used DAS for a second time when he visited

7    WDW in Florida with his parents and sister.  Ex. 2-P, V.J.B. Entitlement Report at 1.

8    He received a DAS on April 2, 2019 and used the DAS that day to experience Avatar

9    Flight of Passage twice in less than two hours, even though ████████████████████

10   ████████████████████████████████████████  *Id.*; Ex. 2-O, Wait Time

11   Reports.  During the second day of his trip, he used DAS to experience Space

12   Mountain twice and "it's a small world" twice, as well as FastPass to experience

13   Space Mountain a third time.  Ex. 2-P, V.J.B. Updated Entitlement Report at 1.

14        11.    Plaintiffs allege that V.J.B. is a "repeat rider," who "will experience a

15   particular ride or attraction, such as Buzz Lightyear Astro Blasters, over and over, for

16   several hours at a time" (Doc. 1, Compl. ¶ 764), but there is no evidence that V.J.B.

17   ever did so.  V.J.B.'s alleged preference to experience certain rides or attractions

18   multiple times is not a requirement of his disability.  Ex. 1-F, Kelderman Decl. ¶¶ 19-

19   20, 22, 26, 41, 46.  Similarly, although V.J.B. may prefer to "go[] to the front of the

20   line as many times as [he] want[s] with no wait whatsoever," Ex. 1-S, S.L.B. Dep. at

21   309:8-20, this preference is not a requirement of his disability, *see* Ex. 1-F,

22   Kelderman Decl. ¶¶ 19-20, 22, 26, 41, 46.

23        12.    "Due to [his] disability," V.J.B. allegedly "has low muscle tone and

24   becomes fatigued very easily" (Doc. 1, Compl. ¶ 767), but his mother also attributes

25   his fatigue to the fact that he stays up until 2 or 3 a.m. playing videogames or just

26   "can't shut his mind down" and then has difficulty waking up the next morning.  Ex.

27   1-S, S.L.B. Dep. at 85:3-21.  Because V.J.B. is often tired during the day, "he benefits

28   from taking breaks," including while working at his job as a cashier and bagger.  Ex.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1-S, S.L.B. Dep. at 157:16-19; Ex. 1-T, B.W.B. Dep. at 96:9-13.  His mother has actually wanted him to take more breaks at work because they are "beneficial to him" and admitted at her deposition that if he were to "go to a crowded place that has lots of people and lots of commotion like a theme park, it would be a good idea for him to take breaks" there, too.  Ex. 1-S, S.L.B. Dep. at 201:11-16, 320:2-7.  B.W.B. similarly testified that V.J.B. "could benefit from [taking] breaks" at Disneyland or WDW while waiting for DAS return times.  Ex. 1-T, B.W.B. Dep. at 96:14-25.

13.    Contrary to the allegations in the complaint, V.J.B.'s medical records show that V.J.B. has "demonstrated an awareness of time both with and without cues to look at the clock."  Ex. 1-V, V.J.B. Medical Record (S.L.B. Dep. Ex. 3) at 3P-VJB-000154; Ex. 1-S, S.L.B. Dep. at 174:22-175:1.

14.    On August 7, 2014, after V.J.B. received a DAS at Disneyland, the ██████████████████████████████████████████████████████████  ██████████████████████████████ Ex. 1-S, S.L.B. Dep. at 278:13-15, 279:6-7.  According to V.J.B. himself, he can stand up for 20 minutes at a time.  *Id.* at 278:16-19.  Thus, V.J.B. could have experienced ███████████ without any accommodation when he was at the park that day.  *Id.* at 278:20-279:9; Ex. 1-T, B.W.B. Dep. at 66:22-67:3.

15.    V.J.B. has gone on several ten day-long storm-chasing trips with his father, during which he and a group track potential storms "and then . . . wait for it to happen" -- or not to happen.  Ex. 1-T, B.W.B. Dep. at 172:2-173:14.  While waiting, "[t]hey have a variety of things to do" to preoccupy them, such as to play Frisbee or football, "because sometimes you're really going to wait.  You're there at noon, and [the storm] ain't going to happen until 6:00."  *Id.* at 174:9-17.  According to B.W.B., "a lot of times" the storm that V.J.B. and the storm-chasing group wait for "doesn't happen."  *Id.* at 173:10-14.  In fact, except for during one storm-chasing trip that began in South Dakota, V.J.B. has not seen any storms during the multi-day storm-chasing trips that he has been on.  *Id.* at 173:23-174:6.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

16.    V.J.B. routinely preoccupies himself by playing video games "when he ha[s] to wait or when he has to go to the doctor's office, anything where a typical person has to wait and has time that is not well planned." Ex. 1-S, S.L.B. Dep. at 93:7-24.  And while waiting for his events to be called during a two-day state pentathlon, "depending on the gap between the events" -- which could be an hour or more apart -- V.J.B. "would sit on the field, maybe go get something to eat," and "[w]hen [the events are] farther apart, [he] would go back to where [he was] staying sometimes.  Sometimes he would sleep, and sometimes [he] would go out," such as to a local pool.  Ex. 1-T, B.W.B. Dep. at 144:6-145:6.

17.    V.J.B. has also been on several trips and vacations within the past five years that required him to travel by car and plane, including an overseas trip to Europe last summer, for which he flew from Chicago to London, took a train to Paris, and then took a direct flight home from Paris to Chicago, a flight which S.L.B. indicated was probably six or eight hours long; multiple car trips from his home in Frankfort, Illinois, to Carbondale, Illinois, which took 4.5 hours, each way; and multiple car trips from his home to Bloomington, Illinois, for state pentathlon championships, which took 2 hours of driving time, each way.  Ex. 1-S, S.L.B. Dep. at 371:8-21, 372:5-11; Ex. 1-T, B.W.B. Dep. at 137:9-17, 138:12-15.

18.    V.J.B. has regularly exhibited inappropriate behaviors in many different environments other than Disneyland and WDW.  For example, V.J.B. regularly lies or sits down at inappropriate times and in inappropriate places, including while working and during doctors' appointments, and whether he is tired, or not.  *See, e.g.*, Ex. 1-S, S.L.B. Dep. at 150:5-24; Ex. 1-U, V.J.B. Medical Record (S.L.B. Dep. Ex. 2) at 3P-VJB-000175; Ex. 1-V, V.J.B. Medical Record (S.L.B. Dep. Ex. 3) at 3P-VJB-000153; Ex. 1-W, V.J.B. Medical Record (S.L.B. Dep. Ex. 23) at 3P-VJB-000107.  According to S.L.B., V.J.B. will lie on a floor or bench "a lot of times having nothing to do with Disney."  Ex. 1-S, S.L.B. Dep. at 315:2-8.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

19.     DAS provides accommodations that mirror strategies outlined in the medical literature and utilized by parents, educators and clinicians working with individuals with autism and other cognitive disabilities.  These accommodations are consistent with the accepted treatments for challenging behaviors associated with autism.  Ex. 1-F, Kelderman Decl. ¶¶ 45, 47, 54.  Indeed, it is "obvious to anyone familiar with the field that Disney incorporated behavioral principles consistent with best practices" in its DAS system and guidebooks, which "is indicative of a conscious effort to help maximize the positive experiences" of guests with disabilities visiting the Disney parks.  *Id*. ¶ 54.

20.     The wait time reports for the 2 days V.J.B. has spent at Disneyland since October 2013 show that ███████████████████████████████ ███████████████████████████████████████ ███████████████████████████████████████ ████████████████████  Ex. 2-N, Wait Time Reports (V.J.B. Visits).  Based on these wait times, on August 7, 2014, the first day of V.J.B.'s August 2014 visit to Disneyland, V.J.B. could have experienced Buzz Lightyear Astro Blasters (one of his preferred rides) at least ██████████████  while virtually waiting for a return time at another one of his preferred rides, Space Mountain.  Ex. 1-T, B.W.B. Dep. at 90:16-23, 91:12-94:6.

21.     The inability to wait or the need for immediate gratification is not a diagnostic criteria or requirement of autism.  Ex. 1-F, Kelderman Decl. ¶¶ 12, 41, 46, 98; Ex. 1-E, Kelderman Dep. (A.L.) at 71:5-11.  V.J.B. has the capacity to wait and defer gratification for long periods of time.  Ex. 1-F, Kelderman Decl. ¶ 91.

22.     Neuropsychologists who routinely observe children with autism having meltdowns will sometimes purposefully trigger these behaviors and allow them to progress.  Ex. 1-F, Kelderman Decl. ¶ 59.

23.     Plaintiffs failed to submit any expert disclosures or reports by the Court's December 31, 2019, expert disclosure deadline.  White Decl. ¶ 3; *see* Doc.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

395-1, Declaration of Barbara U. Uberoi in Support of Plaintiffs' *Ex Parte* Motion To

Extend Expert Disclosure Deadline (requesting an extension of the deadline to

submit expert reports in the Bellwether IV phase of this case); Doc. 397, Order

Denying Without Prejudice Plaintiffs' *Ex Parte* Application for an Order Granting

Motion To Extend Disclosure Deadline (denying plaintiffs' motion to extend the

discovery deadlines).

24.     S.L.B. agrees that the terms and conditions of the DAS cards that

Disney provided V.J.B. during his visits to the Disney parks "included a provision

that said, '[Disney is] not guaranteeing any particular length of time that [V.J.B. is]

going to have to wait using [the] pass," and that "[w]hen utilizing [the DAS] service .

. . it is possible to experience waits greater than the posted wait time." Ex. 1-S,

S.L.B. Dep. at 331:6-24.  S.L.B. also testified that she could not "identify, based on

[her] knowledge of the terms and conditions of the park admission pass or anything

like that . . . any term that would" require "Disney [to] provide [her] or [V.J.B.] with

a specific level of enjoyment in the parks." *Id.* at 353:8-354:10.

25.     There were various forms of documented abuse of the GAC system,

including that some guests fabricated their need for a pass, created counterfeit GACs,

posted Craigslist ads offering the use of GACs -- at the cost of thousands of dollars --

for unauthorized "tours" of Disneyland, and used the internet to sell unexpired

GACs.  Ex. 1-B, Armor Dep. (A.L.) at 9:1-15; 9:21-10:15, 55:13-14, 17-22; Ex. 2-D,

Jones-Sanchez et al. Email; Ex. 2-E, Craigslist Ad GAC; Ex. 2-F, Armor-Ennis

Email.  The most common abuse consisted of guests' fabrication of their need for a

pass at all.  Ex. 1-B, Armor Dep. (A.L.) at 55:17-22.  Shortly after assuming the role

of Director of Park Operations, Alison Armor consistently received feedback from

Disney's park operators that the GAC system was being abused.  *Id.* at 9:1-15.  In

fact, guests at Disneyland would ask for a GAC card to bypass the GAC line because

the GAC line was too long and at times it exceeded the regular wait for the attraction.

Ex. 1-A, Sweetman Dep. (May 8, 2017) at 80:12-81:11.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

26. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 1-B,
Armor Dep. (A.L.) at 58:18-59:17; Ex. 2-G, GAC Study; Ex. 1-J, Laval Decl. ¶¶ 43-
46. For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2-J, GAC Impact Toy Story Mania. Based on
these results, IE concluded that, ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮ *Id.*; Ex. 1-B, Armor Dep. (A.L.) at 58:24-59:9. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 2-J, GAC
Impact Toy Story Mania; Ex. 1-B, Armor Dep. (A.L.) at 100:9-16. ▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮ Ex. 1-J, Laval Decl. ¶ 45; Ex. 1-B, Armor Dep. (A.L.) at
58:20-59:9.

27. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮ Ex. 1-J, Laval Decl. ¶¶ 47-49; Ex. 1-Q, July 2015 Incremental Analysis 1;
*see* Ex. 1-I, Laval Dep. (A.L.) at 87:15-92:11, 97:7-98:17. ▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Ex. 1-Q, July 2015 Incremental Analysis at 1.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles



28. ███████████████████████████████████████████

████████████████████████████████████████████████

██████████ Ex. 1-I, Laval Dep. (A.L.) at 20:15-21:24; Ex. 1-J, Laval Decl. ¶ 12.

████████████████████████████████████████████

████████████████████████████████████████████████

████████ Ex. 1-J, Laval Decl. ¶¶ 34-40.  The study showed that ████████

███████████████████████████████████████████ *Id.* ¶

34.  For example, █████████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████████████████████████

*Id.* ¶¶ 39-40; Ex. 1-P, Attraction Experience Comparison at 1.  Similarly, at WDW, a

study conducted █████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

████████████ Ex. 1-J, Laval Decl. ¶ 37.

## CONCLUSIONS OF LAW

1.    Summary judgment is appropriate where "the movant shows that there

is no genuine dispute as to any material fact and the movant is entitled to judgment

as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" only if its

resolution could affect the outcome of the suit, and it is "genuine" if the evidence is

such that a reasonable jury could return a verdict for either party.  *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment

bears the initial burden of demonstrating the absence of a genuine issue of material

fact through affirmative evidence or by showing that there is an absence of evidence

to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

(1986); *Avalos v. Baca*, 596 F.3d 583, 593-94 (9th Cir. 2010).  When the burden

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1    shifts to the non-moving party to designate specific facts showing that there is a

2    genuine issue for trial, the non-moving party cannot rely on "a mere . . . scintilla of

3    evidence" supporting its position. *Anderson*, 477 U.S. at 252; *accord City of*

4    *Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014). Rather, for a

5    court to find a genuine issue for trial, the non-moving party must establish, through

6    the record presented to the court, that it is able to prove evidence sufficient for a

7    reasonable jury to return a verdict in its favor. *Anderson*, 477 U.S. at 249.

8         2.    S.L.B. predicates her common-law breach of contract claim on the

9    existence of an ADA and Unruh Act violation by Disney. *E.g.*, Doc. 355, Order

10   Summ. J. (Bellwether III Pls.) at 6 ("Plaintiffs' NIED claims, particularly the

11   elements of duty and breach, are derivative of their ADA claims."); *id.* at 7

12   ("Plaintiffs IIED claims are derivative of their claims under the ADA."); Doc. 224,

13   Order Summ. J. (P.F.E.) at 2 ("Although Plaintiffs do not explicitly state a cause of

14   action under the Americans with Disabilities Act ("ADA"), all of Plaintiffs' claims

15   are predicated upon proving a violation of that statute."); Doc. 225, Order Summ. J.

16   (E.A.P.) at 2 (same); Ex. 1-R, *Galvan v. Walt Disney Parks and Resorts U.S., Inc.*,

17   Case No. 8:18-cv-01721-AB-FFM, Doc. 87, Order Granting Disney's Motion for

18   Summary Judgment at 14-16 (C.D. Cal. Nov. 27, 2019) (granting summary judgment

19   for Disney and holding that plaintiffs could not prevail on their common-law breach

20   of contract and emotional distress claims because they were predicated on plaintiffs'

21   ADA and Unruh Act claims, which had failed). Accordingly, she has made the

22   showing of an ADA and Unruh Act violation a prerequisite for recovery on her

23   common-law claim, and a failure to establish an ADA or Unruh Act violation entitles

24   Disney to summary judgment on her common-law breach of contract claims. Doc.

25   355 at 6-7; Doc. 224 at 5-6; Doc. 225 at 5-6; Ex. 1-R, *Galvan* Order at 14-16.

26        3.    Liability under the Unruh Act is coextensive with ADA liability. *See,*

27   *e.g.*, Doc. 355 at 5; Doc. 224 at 5 (quoting Cal. Civ. Code § 51(f) (stating that an

28   ADA violation is also a violation of Section 51(f) the Unruh Act); Doc. 225 at 5

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

1   (same); *see also Munson v. Del Taco, Inc.*, 208 P.3d 623, 630 (Cal. 2009) ("Because

2   the Unruh Act has adopted the full expanse of the ADA, it must follow, that the same

3   standards for liability apply under both Acts." (internal quotation marks omitted)).

4   As plaintiffs acknowledge, section 51(f) of the Unruh Act provides that "[a] violation

5   of the right of any individual under the Americans with Disabilities Act shall also

6   constitute a violation of this section." Doc. 1, Compl. ¶ 8 (quoting Cal. Civ. Code §

7   51(f)); *see, e.g.*, Doc. 355 at 5; Doc. 224 at 5 (same); Doc. 225 at 5 (same).  And

8   California state courts apply the Unruh Act in accordance with the burdens of proof

9   and defenses available under the ADA. *See, e.g.*, *Hankins v. El Torito Rests., Inc.*, 74

10  Cal. Rptr. 2d 684, 693 (Ct. App. 1998) (recognizing that California law imposes "at

11  least the same requirements as are imposed by the Americans with Disabilities Act");

12  *see also Baughman v. Walt Disney World Co.*, 159 Cal. Rptr. 3d 825, 830-31 (Ct.

13  App. 2013) (noting that plaintiff's Unruh Act claim relied on a violation of the

14  ADA). Therefore, like the ADA, California law requires a plaintiff suing for a failure

15  to accommodate to prove that his "requested accommodation [is] necessary and

16  reasonable."  Doc. 224 at 5; Doc. 225 at 5; *see* Doc. 355 at 5; *Baughman*, 159 Cal.

17  Rptr. 3d at 831 (holding that "Baughman's evidence does not show Disney failed to

18  make reasonable modifications in its policies, practice, or procedures, or that the

19  modification she requested was necessary to afford goods, services, privileges,

20  advantages, or accommodations to individuals with disabilities").  In effect, if

21  plaintiffs cannot establish an ADA claim, none of their claims can be sustained.

22       4.     To establish a violation of Title III of the ADA and in turn a violation of

23  the Unruh Act, plaintiffs must show that a reasonable modification of Disney's

24  policy is *necessary to afford access* to Disneyland, unless doing so would

25  fundamentally alter the nature of the goods, services, facilities, privileges,

26  advantages, or accommodations offered at Disneyland. 42 U.S.C. § 12182(2)(A)(ii);

27  *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001); *White v. Divine Invs., Inc.*, 286

28  F. App'x 344, 346 (9th Cir. 2008) (explaining that Title III violation requires

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

1    discrimination that falls within the ambit of at least one of the five specific

2    prohibitions set forth in 42 U.S.C. § 12182(b)(2)(A)(i)-(v)); *A.L. v. Walt Disney*

3    *Parks and Resorts U.S.*, *Inc.*, 2020 WL 3415008, at *14-15 (M.D. Fla. June 22,

4    2020), *appeal docketed*, No. 20-12720 (11th Cir. July 22, 2020).

5          5.      In order to show that changing DAS is "necessary," plaintiffs must

6    prove that it is "beyond [V.J.B.'s] capacity" to access the rides at the Disney parks

7    with the DAS system in place.  *Martin*, 532 U.S. at 682; Doc. 224 at 4; Doc. 225 at

8    5.

9          6.      Several courts in the Ninth Circuit -- and throughout the country -- have

10   held that a requested modification is not "necessary to afford access" to defendant's

11   facilities under Title III if there are other available means of insuring access.  *See,*

12   *e.g.*, *Coleman v. Phoenix Art Museum*, 2009 WL 1097540, at *3 (D. Ariz. Apr. 22,

13   2009) (citing *Martin* and holding that the plaintiff failed to meet his burden of

14   showing that his own hip chair device was necessary to accommodate his disability

15   when the museum offered to provide two different kinds of wheelchairs), *aff'd*, 372

16   F. App'x 793 (9th Cir. 2010); *Murphy v. Bridger Bowl*, 150 F. App'x 661, 663 (9th

17   Cir. 2005) (citing *Martin*, the Ninth Circuit held that the requested modification of

18   allowing a companion to accompany an individual with a cognitive disability on a ski

19   bike was not necessary to improve her skills because there were alternative methods

20   available); *Logan v. Am. Contract Bridge League*, 173 F. App'x 113, 117 (3d Cir.

21   2006) (applying *Martin* and finding that the plaintiff's contention that "he can't play

22   to the maximum of [his] potential" without the requested modification failed to set

23   forth a meritorious claim under Title III (internal quotation marks omitted)); *Dryer v.*

24   *Flower Hosp.*, 383 F. Supp. 2d 934, 941 (N.D. Ohio 2005) (plaintiff's requested

25   modification of the hospital's policy prohibiting visitors from using its oxygen ports

26   was not "necessary" under *Martin* because she was allowed to bring her own oxygen

27   tank into the hospital).

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

7.      Plaintiffs' request for front of the line, unrestricted "immediate access to the rides at its parks" is not necessary or required by the ADA because an alternative accommodation -- the DAS system -- provided V.J.B. access to the Disney parks. Doc. 224 at 5; Doc. 225 at 5.  Indeed, "DAS not only reasonably accommodates and provides equal access to guests with disabilities, for whom it may be difficult to wait in a traditional queue," but it provides more than equal access to such guests overall "because they can experience the most popular attractions faster and, if they desire, in greater number than what ████████ of guests [i.e., non-DAS guests] at [Disneyland] can do without DAS."  Ex. 1-J, Laval Decl. ¶ 52.  A reasonable juror could not find that plaintiffs' requested accommodation is necessary to afford V.J.B. access to the Disney parks because V.J.B. already has access.

8.      Under well-established legal precedent, and consistent with the Middle District of Florida's recent decision in *A.L. v. Walt Disney Parks and Resorts U.S., Inc.*, 2020 WL 3415008 (M.D. Fla. June 22, 2020), V.J.B.'s preference for immediate, repeated access does not meet his burden to establish a violation of Title III of the ADA.  *See, e.g.*, *Martin*, 532 U.S. at 682; *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1021 (9th Cir. 2002) (affirming judgment for college in Title III case because it "offered ample evidence of having accommodated Bird's disability" and "[t]he College did not necessarily fail to make reasonable modifications simply because some aspects of the program did not conform to Bird's expectations"); *A.L.*, 2020 WL 3415008, at *21 (holding that A.L.'s "proposed modification of ten readmission passes or unlimited access to the FastPass lines is not necessary to accommodate A.L.'s preference to follow a route or a pre-set list of rides," and that "[c]ompared to nondisabled guests, A.L. with the DAS card can access the same rides in less time and without physically standing in line"); *Ault v. Walt Disney World Co.*, 254 F.R.D. 680, 688 (M.D. Fla.) (explaining that a preference to use a Segway over other types of mobility devices need not be accommodated under the ADA as a matter of law), *vacated on other grounds*, 2009 WL 3242028, at *7 (M.D. Fla. Oct.

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

6, 2009), *vacated per curiam on other grounds*, 405 F. App'x 401 (11th Cir. 2010);
*Dobard v. S.F. Bay Area Rapid Transit Dist.*, 1993 WL 372256, at *3-4 (N.D. Cal.
Sept. 7, 1993) (finding that plaintiff failed to state a claim for an ADA violation
because defendant was not required to provide the most advanced technology to
those who are hearing-impaired if it allows for some means of effective
communication).  "[T]he inability to wait or defer gratification is not in the
diagnostic criteria for autism and individuals with autism are capable of deferring
gratification, based on research studies finding that children with autism can defer
gratification." *A.L.*, 2020 WL 3415008, at *20.

9.      Courts applying a "like experience" standard have concluded that
Disney has provided disabled guests an opportunity to have an experience
comparable to (if not better than) non-disabled guests. *See*, *e.g.*, Doc. 355 at 5-6
(granting Disney's motion for summary judgment in Bellwether III and concluding
that "[b]y providing a program which ensures that families of guests with cognitive
disabilities can schedule ride times in advance, have near-immediate access to rides
with wait times of less than 15 minutes, and never have to wait in a physical line,
Defendant's DAS program adequately provides its disabled guests with a 'like
experience' which is 'comparable to that of able-bodied patrons'"); *cf.* Ex. 1-R,
*Galvan* Order at 12 (granting summary judgment in Disney's favor and holding that
plaintiff did not show that "his request for priority ride access is necessary under the
ADA because he has access to Disneyland comparable to able-bodied persons");
*A.L.*, 2020 WL 3415008, at *23 (concluding based on the characteristics of plaintiff
A.L.'s autism that "Disney's DAS card provides A.L. with a 'like,' if not better,
experience and equal enjoyment than nondisabled guests experience").

10.      To establish a Title III violation, plaintiffs must also prove that their
requested modification is "reasonable."  The "reasonable" requirement goes beyond
whether the modification is necessary to afford access and focuses on the totality of
the circumstances, including the practicality, cost, effectiveness or feasibility of the

McDermott Will & Emery LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  proposed modification, among other factors, in determining reasonableness. *Larsen*

2  *v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1343 (S.D. Fla. 2003); *A.L.*, 2020 WL

3  3415008, at *16. Plaintiffs have the burden of proving reasonableness.

4        11.    In considering reasonableness, courts examine whether alternative

5  accommodations have been made available to the plaintiff. For example, in *Badgett*

6  *v. Alabama High School Athletic Ass'n*, the court explained that the ADA does not

7  require an entity "to adopt the 'best' modification or the modification requested by a

8  person with a disability;" it only requires a *reasonable* modification. 2007 WL

9  2461928, at *4 (N.D. Ala. May 3, 2007) (internal quotation marks omitted). And in

10  *Dryer*, the court held that plaintiff's requested modification was not reasonable

11  because she had other alternatives available to her but *chose not to use them*. 383 F.

12  Supp. 2d at 940-41; *see* Ex. 1-R, *Galvan* Order at 13 (holding that because Disney

13  had provided a disabled plaintiff with a different reasonable accommodation, he was

14  not entitled to his preferred accommodation of "priority disability access").

15        12.    It is unreasonable to require Disney to return to a failed policy that

16  resulted in the type of large-scale fraud and abuse that existed under GAC,

17  particularly given that V.J.B. already has access to the Disney parks under DAS,

18  which provides the maximum accommodation required by law. *See A.L.*, 2020 WL

19  3415008, at *23-24 ("The Court finds that an automatic ten readmission passes for

20  A.L. and everyone is his party—a total of up to 60 for a party of six—is not a

21  reasonable modification because it would lengthen the wait times for all other riders,

22  severely impacting the remaining non-DAS users, it would increase their wait time

23  significantly, and potentially lead to the same fraud and overuse that existed with the

24  GAC system, which required a complete overhaul to the more-controllable DAS

25  system. A.L.'s proposed modification of ten readmission passes would essentially be

26  like returning to the unlimited access to FastPass lines similar to the GAC system.").

27        13.    Returning to a GAC-like system would be even less manageable today

28  with the opening of new high-demand rides such as the Star Wars attraction "Rise of

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  the Resistance," which required a new queuing system at WDW in response to

2  unprecedented guest demand. *A.L.*, 2020 WL 3415008, at *24 (acknowledging that

3  "[t]he word spreading on social media that one disabled individual received an

4  accommodation of ten readmission passes will increase demand to be treated

5  similarly by every disabled individual once they find out, as well as those willing to

6  misrepresent they are disabled, until the exception for a 'reasonable' request for

7  readmission passes ends up swallowing the whole disability access system, once

8  again, as it did with GAC").

9       14.    The ADA does not require that an entity employ any and all means to

10  make services accessible to persons with disabilities, but rather only requires

11  "reasonable modifications" that would not "'fundamentally alter the nature of [its]

12  . . . services.'" *Scott v. W. State Univ. Coll. of Law*, 1997 WL 207599, at *1 (9th Cir.

13  Apr. 25, 1997) (alteration in original) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

14      15.    Disney has a complete defense to an ADA violation because there is

15  uncontroverted evidence that reverting to a GAC system ██████████████████

16  ███████████████████████████████████████████████████████████████

17  ███████████████████████████████████████████████████████████████

18  *A.L.*, 2020 WL 3415008, at *24 (concluding based on Disney's expert's Bruce

19  Laval's uncontroverted testimony that "A.L.'s requested relief of additional

20  readmission passes in the aggregate would impact park operations by increasing wait

21  times in the standby lines for most other guests without DAS (96.7%), interfere with

22  their ability to access attractions at the parks, and decrease their trip satisfaction and

23  intention to return to the park," thus "'fundamentally alter[ing]' Disney's business

24  model by undermining its revenue base") (footnote omitted); *c.f.* Ex. 1-R, *Galvan*

25  Order at 8-9 (concluding there was no genuine dispute of material fact that providing

26  a DAS pass to every guest with anxiety, where "anxiety is a disorder that affects 30

27  percent of people, would "increase the inventory of DAS passes to an unsustainable

28  level, place significant pressure on the FastPass lines, and have an adverse impact on

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Park Operations," thus "fundamentally alter[ing] the theme park experience")
(internal quotation marks omitted).

16.     Plaintiffs' requested modification to DAS -- and the increased wait times
it would cause -- "relate directly to guest satisfaction and 'fundamentally alter'
Disney's business model by undermining its revenue base." *A.L.*, 2020 WL 3415008,
at \*24.  There can be no greater financial impact on Disney than a significant number
of its guests deciding not to return to the parks because they were unable to
experience Disney's most popular attractions and thus were dissatisfied with their
visits.  *Id.* ("[I]f guests' intention to return to the park decreases, future attendance
decreases which decreases future revenue from lost attendance, hotel stays, food
purchases, associated merchandise, and 'everything else.'").

17.     In order to prevail on her breach of contract claim, S.L.B. must establish
that:  (1) the parties entered into a contract; (2) Disney failed to do something the
contract required it to do; and (3) S.L.B. suffered damages as a result of Disney's
breach.  *See Richman v. Hartley*, 169 Cal. Rptr. 3d 475, 478 (Ct. App. 2014); *Troyk v.
Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 628 (Ct. App. 2009) ("Implicit in the
element of damage is that the defendant's breach *caused* the plaintiff's damage.").

18.     Disney is entitled to summary judgment on S.L.B.'s breach of contract
claim because plaintiffs cannot prove the first or second elements of the claim -- that
the parties entered into a contract or that Disney failed to do something a contract
required it to do.  Plaintiffs cannot show that immediate and unrestricted ride access
is a term or condition in any alleged contract they entered into with Disney, or that
Disney has any obligation to provide an experience that meets such a highly
individualized and subjective expectation.  Whatever contractual obligation Disney
has under this circumstance (even if one exists) would have to come from the ADA
because it sets the legal standard for accommodating persons with disabilities.
Because the undisputed facts show that plaintiffs were reasonably accommodated
and that Disney did not violate the ADA (Doc. 224 at 5; Doc. 225 at 5; Doc. 355 at

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

5), the breach of contract claim must fail as a matter of law.  Moreover, "Disney does not have an obligation to [Plaintiffs] or the millions of its other guests to provide an experience that met their personal expectations, let alone a contractual commitment, as the experience of each guest is inherently highly individualized, subjective, and unpredictable." Ex. 1-R, *Galvan* Order at 14-15.  It is undisputed that the terms and conditions of the DAS card that V.J.B. received does not include any such promise.  But even if a contractual obligation did exist (which it does not), it would have to be based on the legal standard for providing accommodations under the ADA.  S.L.B. cannot meet that standard because the undisputed evidence shows that plaintiff S.L.B. and her family were provided equal access to the parks under DAS and that Disney did not violate the ADA.  *Id.* at 14 ("As a threshold matter, Plaintiffs' [breach of contract] claims is predicated upon proving an ADA violation, which they have not done."); Doc. 224 at 5; Doc. 225 at 5.

Dated:  October 9, 2020

Respectfully submitted,

**McDERMOTT WILL & EMERY LLP**

By:    /s/ Kerry Alan Scanlon
       Kerry Alan Scanlon

       Attorney for Walt Disney Parks and
       Resorts U.S., Inc.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
LOS ANGELES

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CERTIFICATE OF SERVICE**

I certify that on October 9, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Central District of California, by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Jeremy M. White
Jeremy M. White

McDermott Will & Emery LLP
Attorneys At Law
Los Angeles