REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**McDERMOTT WILL & EMERY LLP**
Jason D. Strabo (SBN #246426)
jstrabo@mwe.com
2049 Century Park East, 38th Floor
Los Angeles, CA 90067-3218
Telephone:   +1 310 788 4125
Facsimile:    +1 310 277 4730

Kerry Alan Scanlon (admitted *pro hac vice*)
kscanlon@mwe.com
Jeremy M. White (admitted *pro hac vice*)
jmwhite@mwe.com
Julie H. McConnell (admitted *pro hac vice*)
jmcconnell@mwe.com
The McDermott Building
500 North Capitol Street, NW
Washington, D.C. 20001
Telephone:   +1 202 756 8000
Facsimile:    +1 202 785 8087

Attorneys for Defendant Walt Disney Parks and
Resorts U.S., Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.P., by and through S.P., as next friend, parent, and natural guardian; et al.,<br><br>Plaintiffs,<br><br>v.<br><br>WALT DISNEY PARKS AND RESORTS U.S., INC.,<br><br>Defendant. | CASE 2:15-cv-05346-CJC-E<br><br>**DISNEY'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON K.A.C.'S AND J.L.C.'S CLAIMS**<br><br>Date: November 9, 2020<br>Time: 1:30 p.m.<br>Judge: Hon. Cormac J. Carney<br>Courtroom:  9B |

Mem. ISO Disney's Mot. for Summ. J. on
K.A.C.'s and J.L.C.'s Claims

(No. 2:15-cv-05346-CJC-E)

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...................................................................................ii

PRELIMINARY STATEMENT ............................................................................1

FACTUAL BACKGROUND .................................................................................4

    A.   The Guest Experience at Walt Disney World ...........................................4

    B.   The GAC System Led to Widespread Fraud and Abuse ..........................4

    C.   Development and Implementation of DAS .................................................5

ARGUMENT .........................................................................................................7

I.     PLAINTIFFS' UNRUH ACT CLAIM SHOULD BE DISMISSED
      BECAUSE THE ALLEGED INCIDENTS ALL OCCURRED OUTSIDE
      OF CALIFORNIA ........................................................................................7

II.    ALL OF PLAINTIFFS' CLAIMS MUST FAIL BECAUSE THEY
      CANNOT ESTABLISH AN ADA OR UNRUH ACT VIOLATION ..............7

    A.   Plaintiffs Cannot Satisfy Title III's "Necessary" Requirement ...............8

    B.   Plaintiffs Have Failed To Prove That Immediate and Unrestricted
        Access to Rides and Attractions Is Reasonable ..................................13

    C.   Plaintiffs' Request for GAC-Type Access Would Fundamentally
        Alter the Theme Park Experience ......................................................16

III.   SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS'
      COMMON LAW CLAIMS..........................................................................20

    A.   J.L.C. Cannot Establish the Elements of Her Contract Claim ..............20

    B.   Plaintiffs Cannot Prove that Disney Negligently Inflicted Emotional
        Distress Upon Them..........................................................................21

    C.   Plaintiffs Cannot Prove Their IIED Claims.........................................24

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

Mem. ISO Disney's Mot. for Summ. J. on
K.A.C.'s and J.L.C.'s Claims
- i -
(No. 2:15-cv-05346-CJC-E)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A.L. v. Walt Disney Parks & Resorts U.S., Inc.*,
  900 F.3d 1270 (11th Cir. 2018) ...................................................................*passim*

*A.L. v. Walt Disney Parks and Resorts U.S., Inc.*,
  2020 WL 3415008 (M.D. Fla. June 22, 2020), *appeal docketed*, No.
  20-12720 (11th Cir. July 22, 2020) ...........................................................*passim*

*Akey v. Placer Cty.*,
  2015 WL 5138152 (E.D. Cal. Sept. 1, 2015) ....................................................22

*Badgett v. Alabama High School Athletic Ass'n*,
  2007 WL 2461928 (N.D. Ala. May 3, 2007) ....................................................15

*Baughman v. Walt Disney World Co.*,
  159 Cal. Rptr. 3d 825 (Ct. App. 2013) ..............................................................8

*Bird v. Lewis & Clark Coll.*,
  303 F.3d 1015 (9th Cir. 2002) ..........................................................................13

*Coleman v. Phoenix Art Museum*,
  2009 WL 1097540 (D. Ariz. Apr. 22, 2009), *aff'd*, 372 F. App'x
  793 (9th Cir. 2010) ..............................................................................................9

*Davis v. Ma*,
  848 F. Supp. 2d 1105 (C.D. Cal. 2012), *aff'd*, 568 F. App'x 488
  (9th Cir. 2014) ..................................................................................................24

*Dobard v. S.F. Bay Area Rapid Transit Dist.*,
  1993 WL 372256 (N.D. Cal. Sept. 7, 1993), *aff'd*, 56 F.3d 71 (9th
  Cir. 1995) ..........................................................................................................13

*Galvan, et al. v. Walt Disney Parks and Resorts U.S., Inc.*,
  No. 8:18-cv-01721-AB-FFM (C.D. Cal. Nov. 27, 2019) ............................*passim*

*Hankins v. El Torito Rests., Inc.*,
  74 Cal. Rptr. 2d 684 (Ct. App. 1998) ................................................................8

Mem. ISO Disney's Mot. for Summ. J. on
K.A.C.'s and J.L.C.'s Claims

(No. 2:15-cv-05346-CJC-E)

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

*Larsen v. Carnival Corp.*,
    242 F. Supp. 2d 1333 (S.D. Fl. 2003) ...............................................14

*Loving v. Princess Cruise Lines, Ltd.*,
    2009 WL 7236419 (C.D. Cal. 2009) ...................................................7

*Martin v. Cal. Dep't of Veterans Affairs*,
    560 F.3d 1042 (9th Cir. 2009) ...........................................................24

*McElroy v. Pac. Autism Ctr. for Educ.*,
    2016 WL 3029782 (N.D. Cal. 2016) ...................................................23

*Munson v. Del Taco, Inc.*,
    208 P.3d 623 (Cal. 2009) .....................................................................8

*Murphy v. Bridger Bowl*,
    150 F. App'x 661 (9th Cir. 2005) ...................................................9, 10

*Nally v. Grace Cmty. Church of the Valley*,
    763 P.2d 948 (Cal. 1988) ..............................................................24, 25

*PGA Tour, Inc. v. Martin*,
    532 U.S. 661 (2001) .........................................................8, 9, 10, 13

*Richman v. Hartley*,
    169 Cal. Rptr. 3d 475 (Ct. App. 2014) .............................................20

*Scales v. Six Flags, Inc.*,
    2004 WL 1870499 (Ohio Ct. App. Aug. 20, 2004) ..........................20

*Schneider v. TRW, Inc.*,
    938 F.2d 986 (9th Cir. 1991) .......................................................22, 23

*Scott v. W. State Univ. Coll. of Law*,
    1997 WL 207599 (9th Cir. Apr. 25, 1997).......................................16

*Trerice v. Blue Cross*,
    257 Cal. Rptr. 338 (Ct. App. 1989) ..................................................25

*Troyk v. Farmers Grp., Inc.*,
    90 Cal. Rptr. 3d 589 (Ct. App. 2009) ...............................................20

*Warner v. Tinder Inc.*,
    105 F. Supp. 3d 1083 (C.D. Cal. 2015)...............................................7

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

*Wong v. Tai Jing*,
    117 Cal. Rptr. 3d 747 (Ct. App. 2010) ............................................................. 21

**Statutes**

42 U.S.C. § 12182(b)(2)(A)(ii) ..................................................................... 8, 16

Cal. Civ. Code § 51(b) .................................................................................. 2, 7

Mem. ISO Disney's Mot. for Summ. J. on
K.A.C.'s and J.L.C.'s Claims

-iv-

(No. 2:15-cv-05346-CJC-E)

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# PRELIMINARY STATEMENT

Plaintiffs assert a variety of claims premised on allegedly not receiving the equal access to a public accommodation for persons with disabilities to which they are entitled -- but plaintiffs were never excluded from or denied access to anything during their visits to the Walt Disney World Resort ("WDW") in Orlando, Florida. In fact, under Disney's Disability Access Service ("DAS"), which allows guests with autism and other cognitive disabilities to hold a place in line for rides without standing in the actual line -- thereby giving them time to go to other attractions while waiting virtually -- plaintiff K.A.C. and his mother, J.L.C., experienced all the same or even more rides and attractions than the majority of other guests at Disney's parks and with much less wait time.  Thus, as the late Judge Manuel Real previously concluded in four separate decisions, DAS provided equal access to plaintiffs, as it does for all patrons with cognitive disabilities.

Even though their claims are couched in the language of equal access under the Americans with Disabilities Act ("ADA") and California's Unruh Civil Rights Act ("Unruh Act"), it is clear that what plaintiffs really want is for Disney to accommodate K.A.C.'s personal preference for instant and unlimited repeat access to the rides of his choice -- regardless of how popular the rides are or how long other guests (including persons with disabilities) have to wait in line for those rides. The ADA and Unruh Act require no such thing, either to favor a particular person or to disadvantage other patrons.  Because plaintiffs' claims are all rooted in allegedly unfulfilled personal preferences, they fail as a matter of law.

In fact, the Unruh Act does not even apply to the plaintiffs here because the alleged events involving their claim of discrimination all occurred at WDW in Florida and not "within the jurisdiction of [California]," as required by the statute. However, even if the Unruh Act did apply to K.A.C. (which it does not), there is no evidence that he was prevented from accessing the rides at WDW or that the relief sought is "reasonable" and "necessary" to afford him access -- the required

Mem. ISO Disney's Mot. for Summ. J. on
K.A.C.'s and J.L.C.'s Claims

(No. 2:15-cv-05346-CJC-E)

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  elements of a claim under the reasonable modification provision of Title III of the

2  ADA and, in turn, the Unruh Act.  To the contrary, since DAS was implemented on

3  October 9, 2013, K.A.C. and J.L.C. have spent 10 days at WDW on three different

4  visits, during which they experienced numerous rides and attractions.  As K.A.C.'s

5  parents have admitted, K.A.C. was able to ride *all the attractions he wanted to go*

6  *on* -- including at least 8 rides at Magic Kingdom -- using DAS, ████████

7  ████  and the regular standby lines.  His mother, J.L.C., conceded that one trip

8  was a "relatively satisfying experience" and that during their most recent visit to

9  WDW, K.A.C. "did fairly well."  Despite these favorable experiences, plaintiffs

10  filed this lawsuit alleging they were denied access to the very rides they

11  experienced.

12       What plaintiffs are actually seeking to achieve is not "access" -- which they

13  already had -- but fulfillment of their subjective desire to experience all their

14  favorite rides, without having to wait anywhere at any time.  This desire is not

15  based on a medical need or inherent attribute of autism, as plaintiffs assert.  Indeed,

16  it is undisputed that K.A.C. is capable of waiting long enough to access rides and

17  attractions at WDW with or without DAS.[1]  Courts have consistently ruled that a

18  plaintiff is not entitled to the precise accommodation of his choice.  In fact, in

19  November 2019, Judge André Birotte Jr. granted summary judgment in Disney's

20  favor, dismissing the same type of claims asserted here, and in doing so recognized

21  that under the ADA, Disney is "not required to make the preferred accommodation

22  of plaintiffs' choice."[2]

23       A recent decision by the Middle District of Florida is highly instructive of the

_____

24  [1]  K.A.C. is capable of waiting up to 15 minutes in line and for at least 6 hours to
25  reach a destination, as he did during each of the family's drives from their home in
   Mesquite, Texas to Lafayette, Louisiana.  Disney's Statement of Uncontroverted
26  Facts ("DSUF") ¶ 17.

27  [2]  Ex.1-R, *Galvan, et al. v. Walt Disney Parks and Resorts U.S., Inc.*, No. 8:18-cv-
   01721-AB-FFM (C.D. Cal. Nov. 27, 2019), Doc. 86, Order Granting Disney's
28  Motion for Summary Judgment at 13 (internal citations omitted).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1  issues now before this Court.  The court in that case had previously granted

2  summary judgment in favor of Disney in a DAS case prosecuted by the same

3  counsel who brought this case.  That decision, and 29 related cases, were remanded

4  by the Eleventh Circuit to resolve what the appellate court held were disputed facts

5  regarding several alleged behavioral characteristics of severe autism.  *A.L. v. Walt*

6  *Disney Parks & Resorts U.S., Inc.*, 900 F.3d 1270, 1297-98 (11th Cir. 2018).  A

7  bench trial was held in the first of those cases in February 2020, and on June 22,

8  2020, Judge Anne C. Conway issued a 51-page opinion which showed there was no

9  genuine dispute of fact in the first place and that the requested relief was neither

10  necessary nor reasonable, and would result in a fundamental alteration of Disney's

11  theme park operations.  *A.L. v. Walt Disney Parks and Resorts U.S., Inc.*, 2020 WL

12  3415008, at *25 (M.D. Fla. June 22, 2020), *appeal docketed*, No. 20-12720 (11th

13  Cir. July 22, 2020).

14       The decision in *A.L.* is the most comprehensive examination on the merits of

15  autism in the context of theme park experiences that has ever been written.  Much

16  of the evidence presented at trial by Disney was undisputed, and the findings

17  reaffirmed the dozens of summary judgment rulings entered against plaintiffs by

18  Judge Real, Judge Birotte, and Judge Conway.  Of particular significance here, the

19  evidence presented through live fact and expert witnesses during the trial in *A.L.* is

20  in many respects the same evidence offered in support of the instant motion for

21  summary judgment (through reports, declarations and deposition testimony).

22  Although the facts related to each plaintiff's disabilities and park experiences differ

23  to some degree, the detailed analysis of the claims in *A.L.*, together with the facts

24  which discovery in the instant case has revealed, leave no doubt that K.A.C. was

25  not discriminated against when he visited Disneyland.  Because K.A.C. cannot

26  prove that the relief he requests is either necessary or reasonable, and because

27  Disney can prove that it would result in a fundamental alteration of its business,

28  Disney is entitled to summary judgment in its favor.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# FACTUAL BACKGROUND

### A.     The Guest Experience at Walt Disney World

To experience attractions at the Walt Disney World Resort, guests generally stand in a line, called the standby line, and wait until they move to the front of the line to enter the attraction.  Ex. 2-I, WDW Guide at 34.  The majority of attractions also have a separate line -- the so-called "FastPass" line -- which typically has a very short wait.  *Id.*  This line is available to guests who take advantage of the FastPass system, essentially saving their place in line so they do not have to stand in an actual line.  Ex. 1-J, Laval Decl. ¶¶ 10-11; Ex. 1-D, Hale Dep. (A.L.) at 57:18-25.  At the return time, guests can enter the FastPass line.  █████████████

████████████████████████████████████████████████████████████████

████████████████████

### B.     The GAC System Led to Widespread Fraud and Abuse

Until October 9, 2013, the former GAC system generally provided guests with disabilities and their families unlimited, repeated and on-demand access to rides and attractions through alternative "backdoor" entrances or FastPass lines without requiring them to wait in the regular attraction lines.  Ex. 1-B, Armor Dep. (A.L.) at 30:10-13, 46:13-17.  Because Disney is not allowed to ask about a guest's disability -- thus making it difficult for the employees to effectively filter guests into the various tiers or to deny them GAC cards altogether -- GAC became an unlimited front-of-the-line pass for anyone asserting a need for it, which resulted in widespread abuse.  *Id.* at 46:13-15, 46:23-47:5, 55:17-22, 56:9-11; DSUF ¶ 13.

The most common abuse consisted of guests' fabrication of their need for a pass at all.  *See* DSUF ¶ 31.[3]  More egregiously, some guests created counterfeit GACs, posted Craigslist ads offering the use of GACs -- at the cost of thousands of dollars -- for unauthorized "tours" of the parks, and used the internet to sell

---

[3]  This exaggeration or fabrication of need for GAC reached a point where a ride sometimes had more guests in the GAC line than in the standby line.  DSUF ¶ 31

McDermott Will & Emery LLP
Attorneys At Law
Irvine



1    unexpired GACs. *Id.* This misuse became notorious; in May 2013, numerous

2    media outlets ran stories documenting accounts of wealthy mothers from New York

3    City paying disabled tour guides to lead them through Disney's theme parks so they

4    could skip lines.[4]

5

6

7    *Id.* ¶ 32.[5]

8

9                                  *Id.*

10    **C.**    **Development and Implementation of DAS**

11       In spring 2012, Disney began considering changes to GAC and assembled an

12    Attractions Access working group. DSUF ¶ 1. This group analyzed the abuses of

13    GAC (including the results of the GAC Study) and carefully considered how to

14    develop a program that would provide a complete accommodation to guests with

15    disabilities who could not stand and wait in a line. *Id.* The team also consulted

16

17   [4]   *See* Ex. 1-NN, Tara Palmeri, *Rich Manhattan Moms Hire Handicapped Tour Guides so Kids Can Cut Lines at Disney World*, N.Y. Post (May 14, 2013)

18   (DisneyCA-TP0021870 to DisneyCA-TP0021871); Ex. 1-OO, *Moms Pay $1,000-a-Day To Hire Disabled Members To Skip Lines at Disney*, FoxNews.com (May 14,

19   2013) (DisneyCA-TP0003816 to DisneyCA-TP0003818); Ex. 1-PP, Jeff Rossen & Josh Davis, *Undercover at Disney: "Deplorable" Scheme To Skip Lines*, Today.com

20   (May 31, 2013) (AL,DL001701-AL,DL001703).

21   [5]

22

23                     DSUF ¶ 32.

24

25

26

27         *Id.*

28                           *Id.*

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   various autism organizations and considered their suggestions.  *Id*.  This extensive

2   work led to replacing GAC with the DAS system on October 9, 2013.  *Id*.  As with

3   FastPass, DAS cardholders may wait for their entry virtually instead of physically

4   standing in line.  *Id*. ¶ 2.  Unlike FastPass, however, DAS return times never run out

5   for the day and can always be requested.  Ex. 1-J, Laval Decl. ¶ 19.  DAS return

6   times, which are the posted ride wait times minus ten minutes, are issued at kiosks

7   and attractions located inside WDW, although the first one may be issued when the

8   DAS card is received.  DSUF ¶ 2; Ex. 1-J, Laval Decl. ¶¶ 18-19.  Once the return

9   time arrives and the DAS return time is redeemed, a guest may then obtain another

10  return time for the same attraction or for any other attraction.  Ex. 2-C, DAS Guides

11  at 1.  While DAS guests wait virtually for the return time (after which they can

12  enter the shorter FastPass line), they can avail themselves of the many other

13  attractions throughout the park -- other rides, shows, attractions, concerts,

14  characters, restaurants, and stores.  DSUF ¶ 2.

15      Another benefit of DAS is that it provides near-immediate access to rides

16  with short wait times.  *Id*. ¶ 3.  If the wait time posted at the attraction is 15 minutes

17  or less, DAS cardholders are typically given access right away.  *Id*.  Thus they can

18  use DAS to go on rides with shorter wait times while they wait virtually for the

19  return time on a ride with a longer wait time.  Combined with the FastPass system,

20  this gives DAS guests the opportunity to experience a high number of attractions in

21  a single day -- far more than most guests could without DAS.  *Id*. ¶ 32; Ex. 1-D,

22  Hale Dep. (A.L.) at 78:3-79:12.[6]  ██████████████████████

23  ────────────────

24  [6]  In addition to DAS, other services are available to assist guests with disabilities,
    such as itinerary planning and quiet areas.  *See* Ex. 2-I, WDW Guide at 2-4; Ex. 1-
25  A, Sweetman Dep. (May 8, 2017) at 72:2-10.  Sometimes DAS guests and each
    member of their party also may receive re-admission passes, or "re-ads," which
26  allow them to immediately enter the shorter FastPass line at any attraction at any
    time without having to wait virtually for a return time to enter the line.  DSUF ¶ 3.
27  Around the same time DAS was implemented, Disney developed, in collaboration
    with Autism Speaks, a trip-planning guide for WDW for guests with disabilities,
28  including autism.  Ex. 2-I, WDW Guide; Ex. 1-D, Hale Dep. (A.L.) at 33:11-21.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1 ██████████████████████████████████████████████████

2 ████████████████████ DSUF ¶ 4.

3                               **ARGUMENT**

4 **I.   PLAINTIFFS' UNRUH ACT CLAIM SHOULD BE DISMISSED**

5      **BECAUSE THE ALLEGED INCIDENTS ALL OCCURRED**

6      **OUTSIDE OF CALIFORNIA**

7      Plaintiffs claim that Disney violated the Unruh Act because they were denied

8 access to WDW in Orlando, Florida.  Doc. 1, Compl.  However, the Unruh Act

9 only covers claims of discrimination that occur inside California's borders.  *See*,

10 *e.g.*, Cal. Civ. Code § 51(b) (applying to all persons within the jurisdiction of

11 [California]"); *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1099 (C.D. Cal. 2015)

12 ("[B]y its own terms, [the Unruh Act] is expressly limited to discrimination that

13 takes place within California's borders."); *Loving v. Princess Cruise Lines, Ltd.*,

14 2009 WL 7236419, at *8 (C.D. Cal. 2009) ("It is well settled that the Unruh Act

15 applies only within California.") (citing cases).  Because plaintiffs admit that all of

16 the alleged incidents relating to K.A.C.'s Unruh Act claim occurred exclusively in

17 Florida and none of them took place in California ( DSUF ¶ 5), that claim should be

18 dismissed as a matter of law.

19 **II.  ALL OF PLAINTIFFS' CLAIMS MUST FAIL BECAUSE THEY**

20      **CANNOT ESTABLISH AN ADA OR UNRUH ACT VIOLATION**

21      As plaintiffs have acknowledged, all of their claims "are predicated upon

22 proving a violation of" Title III of the ADA.  Doc. 224, Order Summ. J. (P.F.E.) at

23 2; Doc. 225, Order Summ. J. (E.A.P.) at 2; Doc. 355, Order Summ. J. (Bellwether

24 III) at 5; Doc. 1, Compl. ¶ 8.  California state courts have interpreted and applied

25 the Unruh Act in accordance with the burdens of proof and defenses available under

26 ────────────────────────

27 This guide provides strategies for parents to use when visiting WDW, including
planning ahead, utilizing a visual schedule, and bringing along a device or activity

28 to use as a distraction if necessary.  Ex. 2-I, WDW Guide at 2, 6.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

the ADA. *See, e.g.*, *Baughman v. Walt Disney World Co.*, 159 Cal. Rptr. 3d 825, 830-31 (Ct. App. 2013) (holding that "Baughman's evidence does not show Disney failed to make reasonable modifications in its policies, practice, or procedures, or that the modification she requested was necessary to afford goods, services, privileges, advantages, or accommodations to individuals with disabilities"); *Hankins v. El Torito Rests., Inc.*, 74 Cal. Rptr. 2d 684, 693 (Ct. App. 1998); (recognizing that California imposes "at least the same requirements as are imposed by the Americans with Disabilities Act"); *Munson v. Del Taco, Inc.*, 208 P.3d 623, 630 (Cal. 2009). Because the undisputed facts show that Disney did not violate the ADA, K.A.C.'s Unruh Act claim necessarily fails and none of their claims can be sustained. *See* Doc. 224 at 5; Doc. 225 at 5; Doc. 355 at 4.

### A. Plaintiffs Cannot Satisfy Title III's "Necessary" Requirement

To establish a violation of Title III of the ADA, plaintiffs must show that a reasonable modification of Disney's policy is *necessary to afford access* to its parks, unless doing so would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations offered at WDW. 42 U.S.C. § 12182(b)(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001). In order to show that changing DAS is "necessary," plaintiffs must prove that it is "beyond [K.A.C.'s] capacity" to access the rides at WDW with the DAS system in place. *Martin*, 532 U.S. at 682; Doc. 224 at 4; Doc. 225 at 5. They cannot do so.

Contrary to Supreme Court precedent, in August 2018, the U.S. Court of Appeals for the Eleventh Circuit reversed 30 Middle District of Florida summary judgment decisions involving Disney's alleged failure to accommodate certain guests' cognitive disabilities, and remanded the cases to the district court to consider two disputed characteristics of autism, as applied to each plaintiff's case. *See A.L.*, 900 F.3d at 1297. After a three-day bench trial in *A.L.*, Judge Conway held that A.L.'s "proposed modification of ten readmission passes or unlimited access to the FastPass lines is not necessary to accommodate A.L.'s preference to

McDermott Will & Emery LLP
Attorneys At Law
Irvine

follow a route or a pre-set list of rides," and that "[c]ompared to nondisabled guests, A.L. with the DAS card can access the same rides in less time and without physically standing in line." *A.L.*, 2020 WL 3415008, at *21.

Under *Martin* and controlling Ninth Circuit precedent,[7] and consistent with the Middle District of Florida's recent decision in *A.L.*, plaintiffs cannot prove that it is "beyond [K.A.C.'s] capacity" to access the rides at WDW with the DAS system in place. *Martin*, 532 U.S. at 682. As Judge Real previously concluded in granting Disney's motions for summary judgment as to the claims of the Bellwether II and III plaintiffs, K.A.C. and J.L.C.'s requested modification -- a requirement that Disney provide instant and unrestricted access to the rides of their choice -- is not "necessary" to afford them access to Disney's parks under Title III or the Unruh Act "[u]nder well-settled legal precedent in this Circuit." *See* Doc. 126; Doc. 224 at 4-5 (citing *Martin*, 532 U.S. at 682); Doc. 225 at 4-5 (same); Doc. 355 at 5-6. Here, K.A.C.'s maladaptive behaviors are not caused by DAS, occur multiple times every day and in all environments, and would not be prevented by any order of this Court. DSUF ¶¶ 22, 30. Moreover, K.A.C. does not have a routine at the parks and is able to wait for at least 15 minutes. DSUF ¶¶ 15-16. The undisputed facts show that access to Disney's rides is not beyond K.A.C.'s capacity such that the requested modification of DAS could be "necessary" under *Martin*.

### 1. Modifying DAS Is Not Necessary for K.A.C. to Access WDW

#### a. K.A.C. Can Wait in Line and Defer Gratification

During each of K.A.C.'s three multi-day trips to WDW under DAS (i.e., March 2014, November 2014 and March 2016), he was able to experience all of the rides and attractions he wanted to experience -- including some of the most popular rides and at least 8 attractions at Magic Kingdom. DSUF ¶¶ 8, 11-12, 14. K.A.C.'s

---

[7] *See, e.g., Coleman v. Phoenix Art Museum*, 2009 WL 1097540, at *3 (D. Ariz. Apr. 22, 2009), *aff'd*, 372 F. App'x 793 (9th Cir. 2010); *Murphy v. Bridger Bowl*, 150 F. App'x 661, 663 (9th Cir. 2005).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

mother admitted that their November 2014 visit was a "relatively satisfying experience" and that K.A.C. "did fairly well" during their May 2016 visit. *Id*. ¶¶ 11, 13. Out of his 10 days in the parks under DAS, K.A.C. had one meltdown while he was standing in the regular line (not using DAS), but his mother acknowledged that she did not know what caused the meltdown and admitted that it could have been because he was tired or wanted to sit in his wheelchair. *Id*. ¶ 9.[8] J.L.C. also admitted that K.A.C. continued to wait in that line and ultimately experienced the attraction (which he enjoyed), and proceeded to go on other rides afterwards. *Id*. In addition, K.A.C. waited in standby lines for up to 15 minutes on three to four rides during their first visit under DAS. *Id*. ¶ 18. And based on the parents' testimony, K.A.C. had significantly fewer meltdowns at WDW (merely identifying three over the course of 10 days), as compared to a typical school day, where his average rate of aggressions was 32.38 per day. *Id*. ¶ 22.

Like in Bellwether II and III, it is clear that plaintiffs' request for unrestricted, "immediate access to the rides at its parks" is not necessary or required by the ADA because an alternative accommodation -- the DAS system -- provides K.A.C. access to WDW. Doc. 224 at 5; Doc. 225 at 5; Doc. 355 at 5; *A.L.*, 2020 WL 3415008, at *21. Specifically, it is undisputed that under DAS, plaintiff K.A.C., instead of having to wait in the standard line at popular rides, can experience other rides and attractions during a "virtual wait," such as watching a parade, meeting Disney characters, shopping, eating meals, and going on rides with shorter wait times, before returning to enter the premium ride. DSUF ¶ 2. In the complaint, plaintiffs alleged that "K.A.C. is a 'repeat rider'" and "will experience a particular ride or attraction . . . over and over, for several hours at a time." Doc. 1,

---

[8] K.A.C. also had a meltdown while watching the American Idol Experience but this had nothing to do with DAS. *Id*. That same day, he tried to run away from his family while they were speaking with a Disney Cast Member about entering an attraction, but a manager accommodated them by ensuring that they experienced the attraction, even though they did not have a DAS return time for it. *Id*.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Compl. ¶ 799. However, during her deposition, J.L.C. admitted that this allegation is inaccurate because K.A.C. is not a repeat rider, does not go on certain rides over and over again, and does not need to experience rides in any specific order. DSUF ¶ 15. Based on this admission, it is clear that K.A.C. does not have to follow a particular order of rides to experience the parks.

There is no evidence that K.A.C. is incapable of waiting or that he could not have accessed WDW under DAS. To the contrary, plaintiffs utilize their own form of a "virtual wait" system at the airport while waiting to board a flight where K.A.C. and his father will walk around the terminal, get a snack, and go to the bathroom until it is the family's turn to board. DSUF ¶ 17. Moreover, over the course of his three visits and 10 days at WDW since DAS was implemented, K.A.C. went on all the rides he wanted to go on, and they spent the same amount of (if not more) time in the parks under DAS as they had done before the accommodation program was changed. *Id.* ¶¶ 6, 11-12, 14.

It is also undisputed that K.A.C. has an ability to wait for at least 15 minutes in a line for a ride and in other environments (such as church or a doctor's office) for more than an hour without any problems. *Id.* ¶ 16. On one occasion, K.A.C. waited in an emergency room for over *6 hours* to have his forehead laceration treated and the medical records for that ER visit described K.A.C. as "active and playful in room and easily directed by parents . . . ." *Id.* There is also no dispute that K.A.C. has an ability to defer gratification for long periods of time, as shown by the fact that he tolerates long drives on family vacations, including six-hour road trips from their home in Mesquite, Texas to Louisiana, and went on multiple cruises including an Alaskan cruise that departed from Seattle, Washington. *Id.* ¶ 17. The gratification from these trips -- reaching the desired destination -- was anything but instant. Furthermore, it is the uncontroverted opinion of Disney's expert, Dr. Jill Kelderman, that K.A.C. is not incapable of waiting and that the need for immediate gratification is not a requirement of K.A.C.'s disabilities. Ex. 1-F, Kelderman Decl.

Mem. ISO Disney's Mot. for Summ. J. on K.A.C.'s and J.L.C.'s Claims

-11-

(No. 2:15-cv-05346-CJC-E)

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1 ¶¶ 48, 64-66, 84; *see A.L.*, 2020 WL 3415008, at \*20 ("[T]he inability to wait or

2 defer gratification is not in the diagnostic criteria for autism and individuals with

3 autism are capable of deferring gratification, based on research studies finding that

4 children with autism can defer gratification.").

5                     **b.   K.A.C. Has More Than Equal Access at Disney**

6        K.A.C. is capable of waiting for at least 15 minutes, and therefore he can

7 wait (and has waited) long enough to go on numerous rides and attractions at

8 WDW.  Indeed, the wait time reports for the 10 days K.A.C. visited WDW, show

9 that on average ███████████████████████████████████

10 ████████████████████████████████████████

11 ████████████████████████████████████████████

12 ████████████████  DSUF ¶ 24.  And on March 12, 2014, all of K.A.C.'s favorite

13 rides at Magic Kingdom had ██████████████████████  *Id.* ¶ 9.  Any

14 rides with longer wait times could have been accessed with a DAS return time.

15        According to his father, F.C., K.A.C. was able to go on "just about

16 everything" during their 2014 and 2016 visits to WDW, including "[q]uite a few

17 rides.  As many as [they] could fit in" at Magic Kingdom, as well as all of the rides

18 K.A.C. wanted to go on at Epcot and Animal Kingdom.  *Id.* ¶ 14.  K.A.C.'s

19 experience at WDW is consistent with other evidence showing that guests with

20 DAS can experience significantly more rides in a day than guests without DAS,  *id.*

21 ¶ 35, including a study Disney conducted in which testers familiar with the parks

22 used the ride passes available to them (i.e., DAS, FastPasses, or re-ads) to

23 experience as many attractions as possible during three days.  Ex. 1-J, Laval Decl.

24 ¶¶ 29-31. ████████████████████████████████

25 ████████████████████████████████████████

26 ███████████████████████████████████████

27 ████████████████████████████████████████████

28 ███████████████████████████████  *Id.* ¶ 31.  In other words, DAS

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    guests can experience significantly more attractions and spend much less time

2    waiting in queues than non-DAS guests.  *Id*. ¶ 41.

3          As Disney's industrial engineering expert Bruce Laval concluded, "DAS not

4    only reasonably accommodates and provides equal access to guests with

5    disabilities, for whom it may be difficult to wait in a traditional queue," but it

6    provides more than equal access to such guests overall "because they can

7    experience the most popular attractions faster and, if they desire, in greater number

8    than what ▮▮▮▮▮ of guests at [WDW] can do without DAS."  Ex. 1-J, Laval

9    Decl. ¶ 52.  This is consistent with court decisions applying a "like experience"

10   standard, which have concluded that Disney has provided disabled guests an

11   opportunity to have an experience comparable to (if not better than) non-disabled

12   guests.[9]  A reasonable juror could not find that the requested accommodation is

13   necessary to afford K.A.C. access to WDW.[10]  He already has access.

14         **B.     Plaintiffs Have Failed To Prove That Immediate and Unrestricted**

15         **Access to Rides and Attractions Is Reasonable**

16         To establish an ADA violation, plaintiffs must also prove that their requested

17   _____

18   [9]  *See*, *e.g.*, Doc. 355 at 5-6; *A.L.*, 2020 WL 3415008, at *23 ("The Court finds that
     Disney's DAS card provides [plaintiff] with a 'like,' if not better, experience and

19   equal enjoyment than nondisabled guests experience."); *cf.* Ex. 1-R, *Galvan* Order
     at 12 (granting summary judgment in Disney's favor and holding that plaintiff did

20   not show that "his request for priority ride access is necessary under the ADA
     because he has access to Disneyland comparable to able-bodied persons").

21   [10]  Under well-established legal precedent, K.A.C.'s preference for GAC-type

22   access does not meet his burden to establish a violation of Title III of the ADA.
     *See*, *e.g.*, *Martin*, 532 U.S. at 682; *A.L.*, 2020 WL 3415008, at *21; *Dobard v. S.F.*

23   *Bay Area Rapid Transit Dist.*, 1993 WL 372256, at *3-4 (N.D. Cal. Sept. 7, 1993)
     (finding that plaintiff failed to state a claim for an ADA violation because defendant

24   was not required to provide the most advanced technology to those who are
     hearing-impaired if it allows for some means of effective communication), *aff'd*, 56

25   F.3d 71 (9th Cir. 1995); *Bird v. Lewis & Clark Coll.*, 303 F.3d 1015, 1021 (9th Cir.

26   2002) (affirming judgment for college in Title III case because it "offered ample
     evidence of having accommodated Bird's disability" and "[t]he College did not

27   necessarily fail to make reasonable modifications simply because some aspects of
     the program did not conform to Bird's expectations").

28

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

modification is "reasonable." The "reasonable" requirement goes beyond whether the modification is necessary to afford access and focuses on the totality of the circumstances, including the practicality, cost, effectiveness or feasibility of the proposed modification, among other factors, in determining reasonableness. *Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1343 (S.D. Fl. 2003). Plaintiffs have the burden of proving reasonableness, and they cannot do so here.

First, it is unreasonable to require Disney to return to a policy that resulted in the type of large-scale fraud and abuse that existed under GAC. *See A.L.*, 2020 WL 3415008, at *23 (finding that A.L.'s proposed modification of ten readmission passes "is not a reasonable modification because it would lengthen the wait times for all other riders, severely impacting the remaining non-DAS users, it would increase their wait time significantly, and potentially lead to the same fraud and overuse that existed with the GAC system, which required a complete overhaul to the more-controllable DAS system"). The undisputed evidence shows that guests fabricated or exaggerated their need to get a GAC, paid people with GACs to be counterfeit tour guides to provide non-disabled guests with top tier access to WDW, sold unexpired GACs on the internet, and created counterfeit GACs to bypass all lines. *See* DSUF ¶ 31.[11]

Returning to a GAC system would be even less manageable today with the opening of new high-demand rides such as the Star Wars attraction "Rise of the Resistance," which required a new queuing system at WDW in response to unprecedented guest demand. *A.L.*, 2020 WL 3415008, at *24. As Judge Conway in *A.L.* recognized, "[t]he word spreading on social media that one disabled individual received an accommodation of ten readmission passes will increase demand to be treated similarly by every disabled individual once they find out, as

---

[11] Shortly after assuming the role of Director of Park Operations, Alison Armor consistently received feedback from Disney's park operators that the GAC system was being abused. DSUF ¶ 31.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1    well as those willing to misrepresent they are disabled, until the exception for a

2    'reasonable' request for readmission passes ends up swallowing the whole disability

3    access system, once again, as it did with GAC." *Id*.  As Disney experienced with

4    GAC, "when a popular new ride at Disneyland opened, it drove a 40% increase in

5    demand for GAC passes.  When 3% of the guests admitted with GAC passes use a

6    disproportionate 30% of a popular ride's capacity, the system is not working the

7    way it was designed and it is certainly working to the disadvantage of the non-GAC

8    holding guests." *Id*.  For the same reasons that Judge Conway found A.L.'s

9    modification of DAS to be unreasonable, plaintiff's requested relief will similarly

10   "displace those without DAS cards" as shown by the evidence presented here. *Id*.

11          Second, plaintiffs cannot prove that their requested modification is

12   "reasonable" because DAS already provides K.A.C. access to WDW.  In

13   considering reasonableness, courts consider whether alternative accommodations

14   have been made available to the plaintiff.  For example, in *Badgett v. Alabama High*

15   *School Athletic Ass'n*, the court explained that the ADA does not require an entity

16   "to adopt the 'best' modification or the modification requested by a person with a

17   disability;" it only requires a *reasonable* modification.  2007 WL 2461928, at *4

18   (N.D. Ala. May 3, 2007); *see Dryer*, 383 F. Supp. 2d at 940-41 (holding that the

19   requested modification was not reasonable because other alternatives were available

20   to plaintiff but she *chose not to use them*).

21          Finally, plaintiffs cannot show that their request is "reasonable" when Disney

22   has already provided an accommodation with DAS that relieves waiting in standby

23   lines -- a tremendous benefit that allows guests to experience other attractions

24   within WDW during a virtual wait and avoid completely the lines in which ███ of

25   all guests wait.  Only an unreasonable guest would expect immediate access to all

26   of his favorite rides at one of the world's most popular theme parks, including rides

27   that most guests may have to wait more than an hour to experience.  Indeed, if

28   plaintiffs' requested modification were reasonable, the same would necessarily be

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1    true at any place of public accommodation -- movie theaters, restaurants, grocery

2    stores, and malls.  That is not what Congress intended when it enacted Title III.

3    **C.    Plaintiffs' Request for GAC-Type Access Would Fundamentally**

4    **Alter the Theme Park Experience**

5    Even if the Court were to determine that plaintiffs have met their burden of

6    proving that their requested modification is both "necessary" and "reasonable," they

7    would still fall short of establishing an ADA violation because the modification

8    would impact wait times for other guests so adversely as to constitute a

9    fundamental alteration of their ride experience.  Disney has a complete defense to

10   an ADA violation if the requested modification would "fundamentally alter" the

11   nature of the services provided.[12]  Just two other courts in DAS cases have

12   considered the evidence and ruled on Disney's fundamental alteration defense, both

13   of which unequivocally found that modifying DAS would fundamentally alter

14   Disney's park operations and business model.  *See* Ex. 1-R, *Galvan* Order at 9

15   (concluding that Disney's uncontroverted evidence demonstrates that plaintiff's

16   requested accommodation would "fundamentally alter the theme park experience at

17   Disneyland") (internal quotations omitted); *A.L.*, 2020 WL 3415008, at *25

18   ("[R]equiring the modification, based on the history of the former system, would

19   lead to fraud and overuse, lengthen the wait times significantly for nondisabled

20   guests, and fundamentally alter Disney's business model.")

21   The live testimony presented in *A.L.* on the fundamental alteration issue

22   encompasses the same uncontroverted evidence that is now before this Court.  Like

23   in *A.L.*, the evidence here demonstrates that plaintiffs' requested relief -- which is

24   akin to a return to the failed GAC system -- █████████████████████

25   _____

26   [12]  The ADA does not require that an entity employ any and all means to make
     services accessible to persons with disabilities, but rather only requires "reasonable

27   modifications" that would not "'fundamentally alter the nature of [its] . . .
     services.'"  *Scott v. W. State Univ. Coll. of Law*, 1997 WL 207599, at *1 (9th Cir.

28   Apr. 25, 1997) (quoting with alteration 42 U.S.C. § 12182(b)(2)(A)(ii)).

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

1

2

3 ████████████████████████.  Moreover, Disney cannot grant plaintiffs'

4 requested relief only to plaintiffs because it is impossible for Disney to provide an

5 accommodation to one guest and then deny the accommodation to all others who

6 request it.  This point was underscored by Judge Conway in explaining that "[a]ny

7 additional accommodation supplementing a DAS card . . . would have to be

8 uniformly applied to the hundreds of disabled guests receiving a DAS card each day

9 at all of the parks."  *A.L.*, 2020 WL 3415008, at *24 n.37.  If this Court were to

10 grant plaintiffs' requested relief, nothing would prevent other guests from

11 requesting the same accommodation or filing a lawsuit if they did not receive it.

**1.      Disney's Experience with GAC Shows the Problems that
Would Occur If Plaintiffs' Relief Was Granted**

14            Plaintiffs' request for immediate, unrestricted access to Disney's attractions

15 is "like returning to the unlimited access to FastPass lines similar to the GAC

16 system" which would cause the same type of large-scale fraud, abuse and overuse

17 that existed under the prior GAC program.  *See A.L.*, 2020 WL 3415008, at *24.  As

18 confirmed by the GAC Study (DSUF ¶ 32), this abuse caused the number of guests

19 using the FastPass lines at premium rides to increase the wait times in the standby

20 lines and produced a disparity between the number of rides a guest with a GAC

21 could experience compared with guests without one.  *See supra* Factual

22 Background Section B, n.5.

23            The impact on wait times, as reflected in the GAC Study, "were felt most

24 strongly on the most popular or premium rides which were the most important to

25 the guests."  *A.L.*, 2008 WL 3415008, at *7.  For this reason, a GAC-like system

26 would be equally, if not more, unsustainable in today's environment than it was

27 before Disney implemented DAS.  *Id.* at *8.  That is because most of Disney's park

28 guests are repeat visitors, and Disney invests a tremendous amount of capital into

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

1   opening new rides and attractions "which is the core of Disney's business" and one

2   of the key components to achieving repeat attendance. *Id.* at *6. Given the wait

3   times at just one new attraction, it is inconceivable how new attractions would

4   function today under GAC, and most guests in that scenario would likely not be

5   able to experience the new premier rides even once. *Id.* at *8. The *A.L.* court found

6   that this "observation is consistent with the results of the April 2013 GAC Study"

7   and was further evidence of the adverse impact of plaintiff's requested modification

8   on Disney's business model. *Id.* The same is true here.

9         **2.**    **Plaintiffs' Requested Relief Would Impact Wait Times for**

10          **the Vast Majority of Guests**

11      Prior research and studies show that



DSUF ¶ 34.

DSUF ¶ 33.

*Id.*

23      As Judge Conway found in *A.L.*, this "incremental analysis" study showed

24   that the wait times would increase even more significantly if the percentage of DAS

25   guests increased -- a likely scenario as more guests learn about the increased

26   benefits. *A.L.*, 2020 WL 3415008, at *13. "Thus, for example, if all DAS guests

27   were given two readmission passes for their party, a 1 % increase in daily DAS

28   users would cause the standby wait time at Seven Dwarfs Mine train to increase by

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1  nearly an hour, from 69 minutes to 124 minutes.  Similarly, there were significant

2  increases in wait time for the other popular rides the industrial engineering team

3  studied."  *Id*.

4

5  Ex. 1-J, Laval Decl. ¶ 49.

6  **3.  Guest Intent to Return to the Parks is Heavily Influenced By**

7  **Wait Times**

8  Disney has conducted many studies over the years which demonstrate that

9  wait times for rides "has a direct impact on guest satisfaction and whether guests

10  intend to return" to the parks.  *A.L.*, 2020 WL 3415008, at *24; DSUF ¶ 34.

11  Consistent with the findings in *A.L.* and *Galvan*, the relief plaintiffs request would

12  increase wait times for most guests, thus interfering with their ability to access

13  attractions at the parks, and decreasing their trip satisfaction and intent to return.

14  *See A.L.*, 2020 WL 3415008, at *24; Ex. 1-R, *Galvan* Order at 9 (concluding that

15  Disney's uncontroverted evidence -- which included a company witness declaration

16  explaining that "plac[ing] significant pressure on the FastPass lines [will] have an

17  adverse impact on Park Operations" -- demonstrates that plaintiff's requested

18  accommodation would "fundamentally alter the theme park experience at

19  Disneyland") (internal quotations omitted).

20  There can be no greater financial impact on Disney than a significant number

21  of its guests deciding not to return to the parks because they were unable to

22  experience Disney's most popular attractions and thus were dissatisfied with their

23  visits.  Indeed, as Judge Conway concluded, "if guests' intention to return to the

24  park decreases, future attendance decreases which decreases future revenue from

25  lost attendance, hotel stays, food purchases, associated merchandise, and

26  'everything else.'"  *A.L.*, 2020 WL 3415008, at *24.  As a result, like A.L.,

27  plaintiffs' requested modification to DAS -- and the increased wait times it would

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1  cause -- "relate directly to guest satisfaction and 'fundamentally alter' Disney's

2  business model by undermining its revenue base." *Id.*

## III.  SUMMARY JUDGMENT IS WARRANTED ON PLAINTIFFS' COMMON LAW CLAIMS

### A.  J.L.C. Cannot Establish the Elements of Her Contract Claim

In order to prevail on her breach of contract claim, J.L.C. must establish that:
(1) the parties entered into a contract; (2) Disney failed to do something the contract
required it to do; and (3) J.L.C. suffered damages as a result of Disney's breach.
*See Richman v. Hartley*, 169 Cal. Rptr. 3d 475, 478 (Ct. App. 2014); *Troyk v.
Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 628 (Ct. App. 2009) ("Implicit in the
element of damage is that the defendant's breach *caused* the plaintiff's damage.").
During her deposition, J.L.C. admitted that she did not sign any contract relating to
their visits to WDW.  DSUF ¶ 7.  Because it is undisputed that there is no contract,
J.L.C. cannot satisfy the first element of her breach of contract claim, and therefore
summary judgment is warranted on this basis alone.

Moreover, Disney does not have an obligation to plaintiffs or the millions of
its other guests to provide an experience that meets their personal expectations, let
alone a contractual commitment, as the experience of each guest is inherently
highly individualized, subjective, and unpredictable.  Nor can it be read into the
terms and conditions of the tickets that plaintiffs used to access WDW because
courts consistently refuse to add terms -- especially extremely subjective ones -- not
included in the contract.[13]  Even if a contractual obligation did exist (which it does

---

[13]  *See, e.g.*, Doc. 355, Order at 6 (concluding that the Bellwether III plaintiffs
"have not identified a particular contractual term that has allegedly been violated,
and Defendant does not promise, at the time of purchase or otherwise, that all
guests will receive their preferred, best possible, or even a satisfying experience.
The Court declines to read such an implied contractual term into the parties'
business relationship."); Ex. 1-R, *Galvan* Order at 14-15; *Scales v. Six Flags, Inc.*,
2004 WL 1870499, at *1, 3, 5 (Ohio Ct. App. Aug. 20, 2004) (affirming summary
judgment for Six Flags because "the 'terms and conditions' [of plaintiff's season
pass] represent a full and final expression of the parties' agreement," and the

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1   not), it would have to be based on the legal standard for providing accommodations

2   under the ADA.  It is undisputed that plaintiffs were provided equal access to the

3   parks and that Disney did not violate the ADA.  *See supra* Section II.  Therefore,

4   Disney is entitled to summary judgment on J.L.C.'s breach of contract claim.[14]

5   **B.    Plaintiffs Cannot Prove that Disney Negligently Inflicted**

6   **Emotional Distress Upon Them**

7   To establish a claim of negligent infliction of emotional distress ("NIED"),

8   plaintiffs must prove: (1) Disney has a duty of care to K.A.C.; (2) Disney breached

9   that duty; (3) Disney's breach of the duty of care threatened physical injury to

10  K.A.C., unless Disney's negligence was of a highly unusual type or K.A.C.'s

11  serious emotional distress was a predictable result of the breach; (4) plaintiffs

12  suffered serious emotional distress; (5) Disney's conduct was a substantial factor in

13  causing plaintiffs' serious emotional distress; and (6) plaintiffs suffered damages.

14  *Wong v. Tai Jing*, 117 Cal. Rptr. 3d 747, 768 (Ct. App. 2010).  Plaintiffs claim that

15  Disney's duty of care and breach of that duty is based on their allegation that

16  Disney violated the ADA.  Because it is undisputed that DAS provided K.A.C. and

17  J.L.C. equal access to WDW and that Disney did not violate the ADA, and, in turn,

18  the Unruh Act (*see supra* Section II), their NIED claims fail for this reason alone.[15]

19  However, even if K.A.C.'s ADA and Unruh Act claims could survive -- which they

20  ─────────────

21  amusement park "made no assurances that appellant, as a season pass holder, was
    entitled to 'reasonable access' to rides; rather, as a season pass holder, appellant was
22  entitled to admission into the park (subject to certain stipulated exceptions)").

23  [14]  Ex. 1-R, *Galvan* Order at 15 (dismissing plaintiffs' breach of contract claim
    "because Plaintiffs had access to the park's attractions" and therefore "they cannot
24  show that [Disney] failed to do something required by their respective contracts
    (passes and a ticket)").

25  [15]  *See* Doc. 224 at 5-6 (concluding that the Bellwether II plaintiffs' negligent
    infliction of emotional distress claim was specious and fails as a matter of law
26  because "Disney's DAS program in fact provided P.F.E. with equal access to its
    parks as required by the ADA and Unruh Act"); Doc. 225 at 5-6 (same); Doc. 355 at
27  6; Ex. 1-R, Doc. 86, *Galvan* Order at 16 (concluding that "because [Disney] did not
28  violate the ADA or Unruh Act here, Plaintiff's IIED claim necessarily fails").

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1   cannot -- plaintiffs' NIED claims still fail for several independent reasons.[16]

### 1.   Plaintiffs Did Not Suffer Serious or Severe Emotional Distress at WDW

Plaintiffs must prove more than just distress or discomfort; rather, they must prove "emotional distress of such substantial quantity or enduring quality that *no reasonable man in a civilized society should be expected to endure it*." *Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991) (emphasis added). Here, plaintiffs visited WDW three times under DAS, and during these visits, K.A.C. experienced all the rides he wanted to go on. DSUF ¶¶ 6, 11-12, 14. The fact that K.A.C. and J.L.C. continue to visit WDW and that K.A.C.'s father testified "we like going to Disney" (*id.* ¶ 14) demonstrates that they did not experience anything approaching severe emotional distress as the result of DAS.

There is no evidence that K.A.C. received treatment for emotional distress since DAS was implemented and his mother admitted that he has not seen a psychologist, psychiatrist or therapist for mental health issues. DSUF ¶ 20. Of the thousands of pages of medical records produced in this case, there is not a single document indicating that K.A.C. has visited a physician or mental health professional to be treated for emotional distress of any kind, much less received treatment for something that happened to him at WDW. *Id.* Shortly after returning from their May 2016 visit to WDW, K.A.C.'s parents told his psychiatrist, Dr. Elliot, that K.A.C. "did fairly well" and "generally tolerated the park." *Id.* ¶ 13.

K.A.C.'s maladaptive behaviors (such as aggressions) are unpredictable and occur across multiple environments, every day. *Id.* ¶¶ 22, 30. According to his father, there are times when they think one thing caused K.A.C. to suffer a

---

[16] J.L.C.'s bystander claim also fails because K.A.C. never had a physical injury at the parks, let alone in a way that required medical assistance. DSUF ¶ 10; *see Akey v. Placer Cty.*, 2015 WL 5138152, at *8 (E.D. Cal. Sept. 1, 2015) (noting that recovery for bystanders is not permitted where the bystander did not witness a *physical injury*).

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1   meltdown when it was really something else.  *Id.* ¶ 22.  Moreover, K.A.C.'s

2   parents' testimony show that his behavior has actually improved since his first visit

3   to WDW under the DAS program.  *Id.*  All of this evidence is consistent with the

4   unrebutted opinion of Dr. Kelderman, that K.A.C. did not suffer serious, severe, or

5   extreme emotional distress due to DAS or Disney.  Ex. 1-F, Kelderman Decl. ¶ 83.

6        Similarly, the evidence shows that J.L.C., K.A.C.'s mother, has not suffered

7   any emotional distress, let alone any severe emotional distress caused by Disney.

8   While J.L.C. recalls being on an antianxiety medication (that her doctor thought

9   might help her high blood pressure) and speaking to her doctor about stress from

10  her job, she denied having any mental health problems or ever being treated for any

11  such problems.  Ex. 1-H, Schouten Decl. ¶ 19.  J.L.C. also has not visited a mental

12  health provider regarding depression, anxiety, or being distressed, and she has never

13  been diagnosed with or treated for a mental health problem.  *Id.* ¶ 24; DSUF ¶ 21.

14  Based on these undisputed facts, Dr. Ronald Schouten, concluded that J.L.C. has

15  not suffered from serious, severe, or extreme emotional distress caused by Disney's

16  conduct or the DAS system.  Ex. 1-H, Schouten Decl. ¶¶ 16, 28-29.

17        **2.    Plaintiffs Provide No Medical Evidence of Causation**

18        In order to establish their claim for emotional distress, plaintiffs must also

19  prove causation.  *McElroy v. Pac. Autism Ctr. for Educ.*, 2016 WL 3029782, at *5

20  (N.D. Cal. 2016).  To satisfy this element, "causation must be proven within a

21  reasonable medical probability based upon competent expert testimony."  *Id.* at *6.

22  Plaintiffs may claim that DAS caused K.A.C. to experience one or more meltdowns

23  at Disney, which in turn caused J.L.C. to suffer severe emotional distress.  But

24  plaintiffs have not offered any medical evidence on causation and offered no expert

25  opinions relating to either K.A.C.'s or J.L.C.'s physical or mental condition.  DSUF

26  ¶ 29.  And Disney has presented uncontroverted expert opinions, concluding that

27  none of the plaintiffs has suffered from serious, severe or extreme emotional

28  distress caused by Disney.  Ex. 1-F, Kelderman Decl.; Ex. 1-H, Schouten Decl.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

1    Because plaintiffs cannot prove causation, Disney is entitled to summary judgment.

2    ## C.    Plaintiffs Cannot Prove Their IIED Claims

3            Plaintiffs must satisfy an even higher standard to succeed on a claim of

4    intentional infliction of emotional distress ("IIED").  They must prove that:  (1)

5    Disney's conduct was extreme and outrageous; (2) Disney intended to cause

6    plaintiffs severe or extreme emotional distress or acted with reckless disregard of

7    the probability that plaintiffs would suffer severe or extreme emotional distress,

8    knowing that K.A.C. was present when the conduct occurred; (3) plaintiffs suffered

9    severe or extreme emotional distress; (4) Disney's outrageous conduct caused the

10   severe emotional distress; and (5) plaintiffs suffered damages.  *Nally v. Grace Cmty.*

11   *Church of the Valley*, 763 P.2d 948, 961 (Cal. 1988).  Because it is undisputed that

12   Disney did not violate the ADA or the Unruh Act (*see supra* Section II), plaintiffs'

13   IIED claims must fail.[17]  Moreover, as discussed in Section III.A above, plaintiffs

14   cannot prove that they suffered severe emotional distress, or that Disney's DAS

15   system caused any such alleged distress.  In any event, there is also no evidence that

16   Disney's replacement of GAC with DAS was "extreme and outrageous" or that it

17   "intentionally or recklessly" inflicted emotional distress on plaintiffs by doing so.

18           ### 1.    Disney's Conduct Is Not "Extreme and Outrageous"

19           To prevail on their IIED claim, plaintiffs must prove that Disney's conduct is

20

---

21   [17] *See e.g.,* Doc. 224 at 6 (concluding that the Bellwether II plaintiffs' IIED claims

22   fail and "are even more specious" because "Disney's DAS program in fact provided
     P.F.E. with equal access to its parks as required by the ADA and Unruh Act," and

23   "[t]here is simply no evidence . . . that demonstrates Defendant engaged in extreme
     and outrageous conduct or intended to causes severe emotional distress to

24   Plaintiffs"); Doc. 225 at 6 (same); Doc. 355 at 7 ("Plaintiffs have presented no
     factual or legal support for a finding that such conduct is 'outrageous.'"); *see also*

25   *Davis v. Ma*, 848 F. Supp. 2d 1105, 1116 (C.D. Cal. 2012) (granting defendants'
     motion for summary judgment because the ADA did not require defendants to

26   admit untrained puppy as a service dog, and consequently, such non-violative

27   conduct was not extreme or outrageous as required by a claim for IIED under
     California law), *aff'd*, 568 F. App'x 488 (9th Cir. 2014); *Martin v. Cal. Dep't of*

28   *Veterans Affairs*, 560 F.3d 1042, 1051 (9th Cir. 2009).

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    "outrageous" and "*so extreme as to exceed all bounds of that usually tolerated in a*

2    *civilized community*." *Nally*, 763 P.2d at 961. As Dr. Kelderman explained, "the

3    accommodations under DAS mirror evidence-based strategies utilized by parents,

4    educators, and clinicians working with people with ASD, which are based in the

5    literature." Ex. 1-F, Kelderman Decl. ¶ 47. This uncontroverted expert evidence

6    demonstrates that the accommodations provided to plaintiffs -- which allowed them

7    to experience many attractions -- are clearly not intolerable in a civilized

8    community; rather, they are consistent with the accepted treatments for challenging

9    behaviors associated with autism and the current research. DSUF ¶ 23. Summary

10   judgment is proper here because Disney's provision of DAS to K.A.C. to access

11   numerous rides and attractions and avoid waiting in long lines like everyone else

12   (DSUF ¶¶ 2-9) cannot be reasonably regarded as "extreme and outrageous" as a

13   matter of law. *Trerice v. Blue Cross*, 257 Cal. Rptr. 338, 340-41 (Ct. App. 1989).

## 2.  There Is No Evidence That Disney Intentionally or Recklessly Inflicted Emotional Distress Upon Plaintiffs

16       At the most fundamental level, plaintiffs allege that "Disney maliciously

17   caused injury to Plaintiffs" when that is just obviously not so. Doc. 1, Compl. ¶ 88.

18   There is absolutely no evidence that plaintiffs' visits to WDW resulted in any

19   severe or extreme emotional distress, much less that Disney intentionally or

20   recklessly inflicted such distress upon them. J.L.C. could identify no evidence to

21   support the allegations in the complaint of Disney's malicious intent in

22   implementing DAS. DSUF ¶ 25. In fact, J.L.C. admitted under oath that she has

23   *no evidence* that Disney intentionally committed any act to injure her son. *See* Ex.

24   1-X, J.L.C. Dep. at 287:25-288:12. Plaintiffs thus cannot satisfy the elements of

25   their IIED claims and summary judgment should be granted in Disney's favor.

## CONCLUSION

27       For all the foregoing reasons, Disney's motion should be granted.

28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   Dated: October 9, 2020                    **McDERMOTT WILL & EMERY LLP**

2

3                                            By: _/s/ Kerry Alan Scanlon_____
                                                 Kerry Alan Scanlon
4
                                                 Attorney for Walt Disney Parks and
5                                                Resorts U.S., Inc.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Mem. ISO Disney's Mot. for Summ. J. on                          (No. 2:15-cv-05346-CJC-E)
K.A.C.'s and J.L.C.'s Claims

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CERTIFICATE OF SERVICE**

I certify that on October 9, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Central District of California, by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


/s/ Jeremy M. White
Jeremy M. White

Mem. ISO Disney's Mot. for Summ. J. on
K.A.C.'s and J.L.C.'s Claims

(No. 2:15-cv-05346-CJC-E)