REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**McDERMOTT WILL & EMERY LLP**
Jason D. Strabo (SBN# 246426)
jstrabo@mwe.com
2049 Century Park East, Suite 3200
Los Angeles, CA  90067-3206
Telephone:  +1 310 788 4125
Facsimile:    +1 310 317 5221

Kerry Alan Scanlon (admitted *pro hac vice*)
kscanlon@mwe.com
Jeremy M. White (admitted *pro hac vice*)
jmwhite@mwe.com
Julie H. McConnell (admitted *pro hac vice*)
jmcconnell@mwe.com
500 North Capitol Street, NW
Washington, D.C.  20001-1531
Telephone:  +1 202 756 8000
Facsimile:    +1 202 756 8087

Attorneys for Defendant Walt Disney Parks
and Resorts U.S., Inc.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| T.P., by and through S.P., as next friend, parent, and natural guardian, et al.,<br><br>Plaintiff,<br><br>v.<br><br>Walt Disney Parks and Resorts U.S., Inc.,<br><br>Defendant. | Case No. 2:15-cv-05346-CJC-E<br><br>**DISNEY'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT ON K.A.C.'S AND J.L.C.'S CLAIMS**<br><br>Date:  November 9, 2020<br>Time:  1:30 p.m.<br>Judge:  Hon. Cormac J. Carney<br>Courtroom:  9B |

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Defendant Walt Disney Parks and Resorts U.S., Inc. ("Disney") hereby submits the following statement of uncontroverted facts and conclusions of law in support of its motion for summary judgment on the claims of K.A.C. and J.L.C., which Disney is concurrently filing herewith.  *See* C.D. Cal. R. Civ. P. 56-1.

## UNCONTROVERTED FACTS

1.      In spring 2012, Disney began considering changes to the Guest Assistance Card ("GAC") system, and an Attractions Access working group was assembled.  *See* Ex. 1-B, Armor Dep. (A.L.) at 15:22-16:16; Ex. 4-J, Armor-Hale et al. Email at 1-2.  Disney's Attractions Access working group, which included leaders from various departments, including Services for Guests with Disabilities, Park Operations, Guest Relations, Public Affairs, and Legal, among others, spent many months analyzing ways to reduce the fraud and abuse under the GAC system and carefully considering how to develop a new program that would provide a complete accommodation to guests with disabilities who could not stand and wait in a line. Ex. 1-B, Armor Dep. (A.L.) at 17:24-19:23, 23:7-16, 131:14-132:4, 133:8-134:7, 135:21-136:2.  The group consulted various autism organizations and considered their suggestions.  Ex. 1-C, Jones Dep. (A.L.) at 48:15-17.  This extensive work led to replacing GAC with the Disability Access Service ("DAS") on October 9, 2013. Ex. 1-B, Armor Dep. (A.L.) at 24:4-6, 29:18-23, 45:1-46:12; Ex. 2-A, Crofton Ltr.

2.      DAS allows guests with autism and other cognitive disabilities to hold a place in line for rides without standing in the actual line.  This gives them time to go to other attractions while they wait virtually.  Ex. 2, Sweetman Decl. ¶ 3.  In general, the return time with DAS is the posted wait time for that ride or attraction minus 10 minutes.  Ex. 2-B, DAS Fact Sheet; Ex. 1-D, Hale Dep. (A.L.) at 72:14-73:5.  There are many different rides, parades, attractions, shows, concerts, characters, shops, restaurants and special events located throughout Walt Disney World ("WDW") that guests can experience during their virtual wait.  Ex. 1-C, Jones Dep. (A.L.) at 68:14-23; Ex. 1-D, Hale Dep. (A.L.) at 69:5-10; Ex. 2-C, DAS Guide and FAQs.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

3.      If the wait time posted at a ride or attraction is 15 minutes or less, DAS cardholders and their parties are typically given access right away. *See, e.g.*, Ex. 1-D, Hale Dep. (A.L.) at 85:1-3 ("[For DAS card holders] ten minutes is deducted from the time.  Ex. 2, Sweetman Decl. ¶ 4.  So, typically, if the wait is less than 15 minutes, they are allowed right in.").  Sometimes DAS guests and each member of their party also may receive re-admission passes, or "re-ads," which allow them to immediately enter the shorter FastPass line at any attraction at any time without having to wait virtually for a return time to enter the line.  Ex. 1-C, Jones Dep. (A.L.) at 79:14-80:9; Ex. 1-D, Hale Dep. (A.L.) at 79:1-12.

4.      ██████████████████████████████████████████
████████████████████████████████████████  Ex. 1-J, Laval Decl. ¶ 27; Ex. 1-K, DAS Usage at 1.  More than a million guests have directly benefited from DAS since its inception.  Ex. 2, Sweetman Decl. ¶ 8.

5.      K.A.C. and his family have visited WDW three times since the implementation of the DAS system on October 9, 2013 -- in March 2014, November 2014, and May 2016.  Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8; Ex. 1-AA, Pls.' Suppl. Ans. to Def.'s Second Interrog., No. 18.  J.L.C. and K.A.C. have not visited Disney's parks in California since the implementation of DAS and all events at issue in this matter took place in Florida.  Ex. 1-X, J.L.C. Dep. at 268:5-25.

6.      K.A.C. has spent a total of ten days at WDW since the implementation of DAS.  Ex. 2-S, K.A.C. Ticket Usage; Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8; Ex. 1-AA, Pls.' Suppl. Ans. to Def.'s Second Interrog., No. 18.  When K.A.C. and his family visit WDW, they typically arrive at approximately 10:30 or 11:00 am, and spend the next five to six hours in the parks.  Ex. 1-X, J.L.C. Dep. at 280:19-281:3.  Prior to DAS, when K.A.C. and his family would visit the parks under the GAC program, they would spend time on rides for a couple of hours and then go back to the hotel.  Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

7.     J.L.C. did not sign any contract with Disney relating to any of these three visits to WDW.  Ex. 1-X, J.L.C. Dep. at 284:7-285:2.

8.     K.A.C.'s first visit to WDW under DAS occurred on March 10-14, 2014.  Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8; Ex. 1-X, J.L.C. Dep. at 245:19-22.  During the first day of the visit, on March 10, 2014, K.A.C. was issued a DAS card and ███████████████      Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8; Ex. 1-X, J.L.C. Dep. at 213:18-214:20, 260:15-19.  K.A.C. and J.L.C. did not use DAS during the first day, and instead used the ███████████████ to go on rides at Epcot.  Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8.  During the next three days, K.A.C. and J.L.C. used a combination of DAS, FastPass, ████████ ███ and standby lines to access many of K.A.C.'s favorite rides in the parks, including It's Tough to be a Bug!, Mad Tea Party, Dumbo, Tomorrowland Speedway, and Barnstormer.  *Id.*  In particular, on the third day, March 12, 2014, K.A.C. waited in the regular standby line for at least three rides.  *Id.*; Ex. 1-X, J.L.C. Dep. at 233:4-10, 281:19-282:3.  On the final day of their March 2014 visit, on March 14, 2014, K.A.C. stayed in the hotel room with his respite provider, as he has done during several other family vacations.  Ex. 1-X, J.L.C. Dep. at 245:19-22; Ex. 1-Y, F.C. Dep. at 87:1-17, 119:16-19.

9.     K.A.C. allegedly had three meltdowns during the family's March 2014 trip to WDW:  K.A.C. allegedly abandoned his wheelchair at It's Tough to be a Bug! while J.L.C. discussed the DAS system with a Disney Cast Member; he laid on the ground while standing in line for Mad Tea Party; and made noise during the American Idol Experience show.  Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8; Ex. 1-X, J.L.C. Dep. at 243:16-244:12, 271:17-272:2.  At Mad Tea Party, J.L.C. admitted that K.A.C. could have had a meltdown because he was tired or wanted to be in his wheelchair.  Ex. 1-X, J.L.C. Dep. at 233:4-234:8; 236:6-19.  After the alleged meltdowns at It's Tough to be a Bug! and Mad Tea Party, K.A.C. rode and enjoyed each ride.  *Id.* at 271:13-272:13.  Indeed, after Mad Tea Party, K.A.C. stayed

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    in the park and rode at least one more ride.  *Id*. at 240:7-19; Ex. 1-Z, Pls.' Ans. to

2    Def.'s First Interrog., No. 8.  In fact, on that day, all of K.A.C.'s favorite rides at

3    Magic Kingdom had posted wait times of ▮▮▮▮▮ or less.  Ex. 2-T, K.A.C. Wait

4    Time Reports; Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8.  K.A.C. was never

5    physically injured at the parks.  Ex. 1-X, J.L.C. Dep. at 272:22-273:1.

6          10.    After this trip, J.L.C. complained about the family's visit to WDW to

7    Disney.  *Id*. at 250:7-18.  In response, Disney gave J.L.C. two complimentary nights

8    in two hotel rooms and six complimentary five-day park hopper passes.  *Id*.

9          11.    K.A.C. next visited WDW from November 24-26, 2014.  Ex. 1-Z, Pls.'

10   Ans. to Def.'s First Interrog., No. 8.  K.A.C. received a DAS for the duration of the

11   visit.  Ex. 1-X, J.L.C. Dep. at 260:15-19.  On the first day, J.L.C. recalls using DAS

12   and ▮▮▮▮▮▮▮ to experience at least seven to eight rides at Magic Kingdom

13   and expressed having a "relatively satisfying experience."  *Id*. at 252:20-254:12.  On

14   the second day, at Animal Kingdom, guest services arranged wait times for K.A.C. to

15   experience all of the rides that he wanted to go on.  *Id*. at 254:13-255:13.  On the

16   third and final day, at Epcot, J.L.C. and K.A.C. used DAS and ▮▮▮▮▮▮ to

17   go on the rides that K.A.C. wanted to go on that day.  *Id*. at 255:22-257:3.

18         12.    K.A.C.'s third trip to WDW was on May 17, 18, and 20, 2016.  Ex. 1-

19   AA, Pls.' Suppl. Ans. to Def.'s Second Interrog., No. 18; Ex. 1-X, J.L.C. Dep. at

20   259:24-260:7.  For this visit, J.L.C. used the complimentary park-hopper tickets

21   provided by Disney. Ex. 1-X, J.L.C. Dep. at 262:13-263:4.  K.A.C. received a DAS

22   for the duration of the visit.  *Id*. at 260:15-19.  He used DAS and ▮▮▮▮▮▮▮

23   ▮▮▮▮ to experience rides at Epcot on May 17, and went on at least two more rides at

24   Animal Kingdom on May 18.  *Id*. at 263:5-264:25.  Other than going on Epcot Test

25   Track on the final day, J.L.C. does not recall any other rides during the May visit, but

26   admitted in her deposition that she and K.A.C. experienced all the rides they wanted

27   to go on during that trip.  *Id*. at 264:6-265:21.

28

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

13.     J.L.C. does not recall K.A.C. having any meltdowns during the family's November 2014 visit to WDW, nor can she recall any meltdowns at the park during K.A.C.'s May 2016 visit to WDW. *Id*. at 267:5-17, 271:1-6. Indeed, the day after the family returned from their May 2016 visit to WDW, J.L.C. called Dr. Elliott – K.A.C.'s current psychiatrist – and "report[ed] the family returned from their Disney trip and [K.A.C.] did fairly well." Ex. 1-BB, Elliott Dep. at 75:4-76:9. At another visit with Dr. Elliott on June 1, 2016, the family reported that K.A.C. "generally tolerated the park." *Id*. at 76:15-78:7.

14.     When reflecting on all three trips, F.C., K.A.C.'s father, stated that the family rode "[a]s many [rides] as [they] could get in" -- "just about everything in Magic Kingdom," including up to eight or nine rides that they "try to…get to all the time" -- as well as all of the rides K.A.C. wanted to go on at Epcot and Animal Kingdom. Ex. 1-Y, F.C. Dep. at 109:17-111:17. And this was without fully utilizing DAS or the FastPass program made available to plaintiffs. Ex. 1-X, J.L.C. Dep. at 213:3-214:9, 217:6-218:7, 220:4-25. When asked if the family intends to return to WDW, F.C. stated "I don't want to say [we've] 'Disneyed out,' but we've done pretty much, you know, everything at Disney…it's something we like doing, to be honest. I mean, we like going to Disney." Ex. 1-Y, F.C. Dep. at 91:7-14.

15.     Despite plaintiffs' allegation that K.A.C. is a "repeat rider," and must experience a particular ride or attraction over and over for several hours at time, J.L.C. admitted during her deposition that this allegation is inaccurate because K.A.C. is not a repeat rider. Doc. 1, Compl. ¶ 799; Ex. 1-X, J.L.C. Dep. at 109:5-110:2.  K.A.C. does not have a routine or order of rides that he must experience, nor does he prefer to ride certain rides over and over again.  Doc. 1, Compl. ¶ 799; Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 10; Ex. 1-X, J.L.C. Dep. at 259:12-23.

16.     K.A.C. has demonstrated that he has the ability to wait and defer gratification.  For example, K.A.C. waits for at least 15 minutes to eat french fries or chicken nuggets from McDonalds. Ex. 1-X, J.L.C. Dep. at 184:7-185:3.  Initially,

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

K.A.C.'s parents would give him the fries or nuggets right away in the drive-thru lane, but through the use of behavioral techniques, K.A.C.'s parents were able to get K.A.C. to wait until they drove home to eat the fries or nuggets. *Id*. at 181:7-185:8. K.A.C. has waited for extended periods of time in other environments as well, including at church for an hour and forty-five minutes, at his pediatrician's office for up to 30 minutes without accommodation (and not including the 20-30 minute exam), and in an Emergency Room for more than six hours to have a head laceration repaired, without evidence of any meltdowns. *Id*. at 75:6-13, 180:16-23; Ex. 1-CC, Meyer Dep. at 19:20-24, 45:22-46:3, 65:12-16.

17.    K.A.C. has been on several trips and vacations within the past several years that required him to travel by car and plane. Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 11; Ex. 1-AA, Pls.' Suppl. Ans. to Def.'s Second Interrog., No. 20. For example, K.A.C. went on numerous road trips with his family from his home in Mesquite, Texas to Louisiana, which takes approximately six hours, each way. Ex. 1-X, J.L.C. Dep. at 145:19-146:11. K.A.C. also flew with his family to Seattle, Washington, which involves approximately four hours of flight time (one way) on top of the time spent going through airport security and waiting to board at the airport. *Id*. at 153:1-9. While waiting to board the aircraft, F.C. will bide time with K.A.C. by walking around the terminal, getting a snack, and going to the restroom. *Id*. at 149:10-150:13. K.A.C. and his family have also gone on several cruises, including a seven-night Alaskan cruise that departed out of Seattle, Washington. Ex. 1-Y, F.C. Dep. at 84:11-15.

18.    K.A.C. has shown that he can and has waited in standby lines "with other, non-disabled, children" for rides at Disney's parks. Doc. 1, Compl. ¶ 809. On March 12, 2014, during the family's March 2014 trip to WDW, J.L.C. states that K.A.C. waited in the regular line for Mad Tea Party, Dumbo, and Tomorrowland Speedway. Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 8. F.C. acknowledged that the wait for both Mad Tea Party and Dumbo were approximately ██████

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    ▮▮▮▮▮ on March 12, 2014.  Ex. 1-Y, F.C. Dep. at 107:15-108:16; Ex. 2-T, K.A.C.

2    Wait Time Reports.  And according to Disney's posted wait time reports for March

3    12, 2014, the average wait time for Tomorrowland Speedway was approximately ▮

4    ▮▮▮▮▮     *Id*.

5         19.    J.L.C. has no evidence to support the allegations in her complaint that

6    Disney "designed the DAS with a goal or 'benefit' in mind of substantially reducing

7    the number of autistic and cognitively impaired persons who visit the Disney Parks"

8    (Doc. 1, Compl.  ¶ 32), trained its Guest Relations employees to "inconsistently,

9    arbitrarily and capriciously grant[] additional passes…to deter families in which

10   someone has a developmental disability or cognitive impairment from visiting the

11   Parks" (*id.* ¶ 78-79), or implemented DAS "to cleanse its Parks of …the anti-Magic"

12   of guests with autism (*id.* ¶ 86).  Ex. 1-X, J.L.C. Dep. at 287:5-20.  J.L.C. also has no

13   evidence that Disney intentionally tried to injure K.A.C.  *Id*. at 287:25-288:12.

14        20.    Of the thousands of medical records produced in this case, none

15   indicates that K.A.C. has visited a physician for the treatment of emotional distress.

16   Similarly, J.L.C. confirmed that K.A.C. has not seen a physician for any mental

17   health issues, such as anxiety or depression.  *Id*. at 96:12-15.  K.A.C. has seen a

18   psychiatrist, but for management of K.A.C.'s autism and ADHD, not for therapy.  *Id*.

19   at 82:14-83:21.  And K.A.C.'s primary pediatrician confirmed that the family has

20   never discussed their trips to WDW with her.  Ex. 1-CC, Meyer Dep. at 40:16-18.

21   For these reasons, among others, Dr. Kelderman concluded that K.A.C. did not suffer

22   serious, severe, or extreme emotional distress caused by Disney's conduct or the

23   DAS system.  Ex. 1-X, Kelderman Decl. ¶ 83.  Moreover, the only references to

24   Disney in K.A.C.'s psychiatry records state that K.A.C. "did fairly well" and

25   "generally tolerated" the parks following the family's May 2016 visit to WDW.  Ex.

26   1-BB, Elliott Dep. at 75:4-78:7.

27        21.    K.A.C.'s mother, J.L.C., reported that she has never been diagnosed

28   with or treated for anxiety, depression, or any other sort of mental health problem.

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  Ex. 1-X, J.L.C. Dep. at 100:16-20.  The only times J.L.C. recalls discussing anything

2  related to anxiety, depression, or feeling distressed with a medical provider was with

3  her primary care doctor in response to job-related stress and miscarriages, which has

4  nothing to do with DAS.  *Id.* at 99:3-100:9.  For these reasons, among others, Dr.

5  Ronald Schouten concluded that J.L.C. has not suffered from serious, severe, or

6  extreme emotional distress caused by Disney's conduct or the DAS system.  Ex. 1-H,

7  Schouten Decl. ¶ 29.

8      22.    K.A.C. has regularly exhibited negative behaviors, aggressions, and

9  meltdowns in many different environments other than WDW.  K.A.C.'s negative

10  behaviors occur every day, dozens of times per day.  Ex. 1-DD, Klutts Dep. at 99:8-

11  22; Ex. 1-F, Kelderman Decl. ¶ 80 ("the average rate of aggressions per day is 32.38

12  occurrences.").   K.A.C.'s meltdowns and negative behaviors can happen anywhere,

13  at any time, and occur across multiple environments, including at Target or Walmart,

14  in the car, at the airport, and at the doctor's office.  Ex. 1-X, J.L.C. Dep. at 200:12-

15  24; Ex. 1-Y, F.C. Dep. at 28:17-19, 33:16-34:6, 36:3-14, 48:6-49:17, 55:8-12.

16  However, K.A.C.'s parents concede that K.A.C.'s behaviors have improved over the

17  last several years since the family's first visit to WDW under DAS.  *Id.* at 44:22-

18  45:1; Ex. 1-X, J.L.C. Dep. at 136:23-137:3.

19      23.    DAS provides accommodations that mirror strategies outlined in the

20  medical literature and utilized by parents, educators and clinicians working with

21  individuals with autism and other cognitive disabilities.  These accommodations are

22  consistent with the accepted treatments for challenging behaviors associated with

23  autism.  Ex. 1-F, Kelderman Decl. ¶¶ 45, 47, 54.  Indeed, it is "obvious to anyone

24  familiar with the field that Disney incorporated behavioral principles consistent with

25  best practices" in its DAS system and guidebooks, and that it "is indicative of a

26  conscious effort to help maximize the positive experiences" of guests with

27  disabilities visiting Disney's parks.  *Id.* ¶ 54.

28

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

24.    The wait time reports for the 10 days K.A.C. spent at WDW since October 2013 show that, on average, for the days spent in Epcot, Animal Kingdom, and Magic Kingdom, ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████ Ex. 2-T, K.A.C. Wait Time Reports.  One of K.A.C.'s favorite rides, the PeopleMover, ████

███████████████ throughout K.A.C.'s time at Magic Kingdom.  *Id.*; Ex. 1-Z, Pls.' Ans. to Def.'s First Interrog., No. 10.

25.    The inability to wait or the need for immediate gratification is not a diagnostic criteria or requirement of autism.  Ex. 1-F, Kelderman Decl. ¶¶ 12, 41, 46; Ex. 1-E, Kelderman Dep. (A.L.) at 71:5-11.  K.A.C. has the capacity to wait and defer gratification for extended periods of time.  Ex. 1-F, Kelderman Decl. ¶¶ 64-66.

26.    Neuropsychologists who routinely observe children with autism having meltdowns will sometimes purposefully trigger these behaviors and allow them to progress.  *Id.* ¶ 59.

27.    Children do not suffer serious, severe, or extreme emotional distress from engaging in meltdown behavior.  *Id.* ¶ 56.  Indeed, the fact that a child with autism "may react to a benign stimulus by engaging in maladaptive meltdowns does not mean the meltdowns themselves represent serious, severe, or extreme emotional distress." *Id.*  Rather, maladaptive behaviors are "considered to represent a form of communication with others" and thus "do not represent a novel or extreme reaction." *Id.* ¶¶ 18, 56, 58.

28.    Dr. Kelderman has extensive experience working with families who have children with autism and interacts with them daily in her practice.  Ex. 1-F, Kelderman Decl. ¶ 57.  Based on her experience, Dr. Kelderman concluded that many parents of children with cognitive disabilities "have learned how to effectively

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

cope with their children's behavior" and that parents would not suffer severe emotional distress from their child having a meltdown. *Id*. ¶ 57, 59.

29. Plaintiffs failed to submit any expert disclosures or reports by the Court's December 31, 2019, expert disclosure deadline, including but not limited to any expert opinions regarding K.A.C.'s or J.L.C.'s claimed emotional distress. White Decl. ¶ 3; *see* Doc. 395-1, Declaration of Barbara U. Uberoi in Support of Plaintiffs' *Ex Parte* Motion To Extend Expert Disclosure Deadline (requesting an extension of the deadline to submit expert reports in the Bellwether IV phase of this case); Doc. 397, Order Denying Without Prejudice Plaintiffs' *Ex Parte* Application for an Order Granting Motion To Extend Disclosure Deadline (denying plaintiffs' motion to extend the discovery deadlines).

30. K.A.C.'s maladaptive behaviors occur across multiple environments and are not unique to Disney's parks. Ex. 1-F, Kelderman Decl. ¶ 74. Indeed, K.A.C.'s psychiatrist, Dr. Elliott, testified that K.A.C.'s aggressions happen in many environments and his irritability and outbursts are unpredictable. Ex. 1-BB, Elliott Dep. 44:6-45:4. And while K.A.C. may have engaged in meltdown behavior while at WDW (like he does everywhere else), this would have been far fewer than is typical for him; based on his parents' testimony, K.A.C.'s average rate of aggressions on a typical school day is 32.38 occurrences per day. Ex. 1-F, Kelderman Decl. ¶¶ 80, 81. For these reasons, among others, Dr. Jill Kelderman concluded that K.A.C. has not suffered from serious, severe, or extreme emotional distress caused by Disney's conduct or the DAS system. *Id*. ¶ 83.

31. There were various forms of documented abuse of the GAC system, including that some guests fabricated their need for a pass, created counterfeit GACs, posted Craigslist ads offering the use of GACs -- at the cost of thousands of dollars -- for unauthorized "tours" of Disneyland, and used the internet to sell unexpired GACs. Ex. 1-B, Armor Dep. (A.L.) at 9:1-15; 9:21-10:15, 55:13-14, 17-22; Ex. 4-D, Jones-Sanchez et al. Email; Ex. 4-E, Craigslist Ad GAC; Ex. 4-F, Armor-Ennis

McDermott Will & Emery LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  Email.  The most common abuse consisted of guests' fabrication of their need for a

2  pass at all.  Ex. 1-B, Armor Dep. (A.L.) at 55:17-22.  Shortly after assuming the role

3  of Director of Park Operations, Alison Armor consistently received feedback from

4  Disney's park operators that the GAC system was being abused.  *Id.* at 9:1-15.  In

5  fact, guests at Disneyland would ask for a GAC card to bypass the GAC line because

6  the GAC line was too long and at times it exceeded the regular wait for the attraction.

7  Ex. 1-A, Sweetman Dep. (May 8, 2017) at 80:12-81:11.

8      32.

11  Ex. 1-B,

12  Armor Dep. (A.L.) at 58:18-59:17; Ex. 2-G, GAC Study; Ex. 1-J, Laval Decl. ¶¶ 43-

13  46.  For example,

15  Ex. 2-J, GAC Impact Toy Story Mania.  Based on

16  these results, IE concluded that,

19  Ex. 2-J, GAC Impact Toy Story Mania; Ex. 1-B, Armor Dep. (A.L.) at

20  58:24-59:9.

22  Ex. 2-J, GAC Impact Toy Story Mania; Ex. 1-B,

23  Armor Dep. (A.L.) at 100:9-16.

25  Ex. 1-J, Laval

26  Decl. ¶ 45; Ex. 1-B, Armor Dep. (A.L.) at 58:20-59:9.

27      33.

1

2

3       ████████      Ex. 1-J, Laval Decl. ¶¶ 47-49; Ex. 1-Q, July 2015 Incremental

4    Analysis 1; *see* Ex. 1-I, Laval Dep. (A.L.) 87:15-92:11, 97:7-98:17.   ████████

5

6       ████████      Ex. 1-Q, July 2015 Incremental Analysis at 1.

7       34.     ████████

8

9       ████████      Ex. 1-I, Laval Dep. (A.L.) 20:15-21:24; Ex. 1-J, Laval Decl. ¶ 12.

10      35.     ████████

11

12      ████████         Ex. 1-J, Laval Decl. ¶¶ 34-40.  The study showed that

13

14    ███  *Id.* ¶ 34.  For example, ████████

15

16

17

18    ████  Ex. 1-J, Laval Decl. ¶ 37.

19                      **CONCLUSIONS OF LAW**

20          1.      Summary judgment is appropriate where "the movant shows that there

21    is no genuine dispute as to any material fact and the movant is entitled to judgment

22    as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" only if its

23    resolution could affect the outcome of the suit, and it is "genuine" if the evidence is

24    such that a reasonable jury could return a verdict for either party.  *Anderson v.*

25    *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The party seeking summary judgment

26    bears the initial burden of demonstrating the absence of a genuine issue of material

27    fact through affirmative evidence or by showing that there is an absence of evidence

28    to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   (1986); *Avalos v. Baca*, 596 F.3d 583, 593-94 (9th Cir. 2010).  When the burden

2   shifts to the non-moving party to designate specific facts showing that there is a

3   genuine issue for trial, the non-moving party cannot rely on "a mere . . . scintilla of

4   evidence" supporting its position.  *Anderson*, 477 U.S. at 252; *accord City of*

5   *Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014).  Rather, for a

6   court to find a genuine issue for trial, the non-moving party must establish, through

7   the record presented to the court, that it is able to prove evidence sufficient for a

8   reasonable jury to return a verdict in its favor.  *Anderson*, 477 U.S. at 249.

9        2.    K.A.C. and J.L.C. predicate each of their common law claims on the

10  existence of an ADA and Unruh Act violation by Disney.  *E.g.*, Doc. 355, Order

11  Summ. J. (Bellwether III Pls.) at 6 ("Plaintiffs' NIED claims, particularly the

12  elements of duty and breach, are derivative of their ADA claims."); *id.* at 7

13  ("Plaintiffs IIED claims are derivative of their claims under the ADA."); Doc. 224,

14  Order Summ. J. (P.F.E.) at 2 ("Although Plaintiffs do not explicitly state a cause of

15  action under the Americans with Disabilities Act ("ADA"), all of Plaintiffs' claims

16  are predicated upon proving a violation of that statute."); Doc. 225, Order Summ. J.

17  (E.A.P.) at 2 (same); Ex. 1-R, *Galvan v. Walt Disney Parks and Resorts U.S., Inc.*,

18  Case No. 8:18-cv-01721-AB-FFM, Doc. 87, Order Granting Disney's Motion for

19  Summary Judgment at 14-16 (C.D. Cal. Nov. 27, 2019) (granting summary judgment

20  for Disney and holding that plaintiffs could not prevail on their common-law breach

21  of contract and emotional distress claims because they were predicated on plaintiffs'

22  ADA and Unruh Act claims, which had failed).  Accordingly, plaintiffs have made

23  the showing of an ADA and Unruh Act violation a prerequisite for recovery on their

24  common-law claims, and a failure to establish an ADA or Unruh Act violation

25  entitles Disney to summary judgment on plaintiffs' common-law breach of contract

26  and emotional distress claims.  Doc. 355 at 6-7; Doc. 224 at 5-6; Doc. 225 at 5-6; Ex.

27  1-R, *Galvan* Order at 14-16.

28

3.    The Unruh Act only applies to discrimination that takes place within the borders of California. *See e.g.*, *Warner v. Tinder Inc.*, 105 F. Supp. 3d 1083, 1099 (C.D. Cal. 2015) ("[B]y its own terms, [the Unruh Act] is expressly limited to discrimination that takes place within California's borders."); *Loving v. Princess Cruise Lines, Ltd.*, No. CV 08-2898 JFW AJWX, 2009 WL 7236419, at *8 (C.D. Cal. 2009) ("It is well settled that the Unruh Act applies only within California.") (citing *Archibald v. Cinerama Hawaiian Hotels, Inc.*, 73 Cal.App.3d 152, 159, 140 Cal.Rptr. 599 (1977)).

4.    Liability under the Unruh Act is coextensive with ADA liability. *See, e.g.*, Doc. 355 at 5; Doc. 224 at 5 (quoting Cal. Civ. Code § 51(f) (stating that an ADA violation is also a violation of Section 51(f) the Unruh Act); Doc. 225 at 5 (same); *see also Munson v. Del Taco, Inc.*, 208 P.3d 623, 630 (Cal. 2009) ("Because the Unruh Act has adopted the full expanse of the ADA, it must follow, that the same standards for liability apply under both Acts." (internal quotation marks omitted)). As plaintiffs acknowledge, section 51(f) of the Unruh Act provides that "[a] violation of the right of any individual under the Americans with Disabilities Act shall also constitute a violation of this section."  Doc. 1, Compl. ¶ 8 (quoting Cal. Civ. Code § 51(f)); *see, e.g.*, Doc. 355 at 5; Doc. 224 at 5 (same); Doc. 225 at 5 (same).  And California state courts apply the Unruh Act in accordance with the burdens of proof and defenses available under the ADA.  *See, e.g.*, *Hankins v. El Torito Rests., Inc.*, 74 Cal. Rptr. 2d 684, 693 (Ct. App. 1998) (recognizing that California law imposes "at least the same requirements as are imposed by the Americans with Disabilities Act"); *see also Baughman v. Walt Disney World Co.*, 159 Cal. Rptr. 3d 825, 830-31 (Ct. App. 2013) (noting that plaintiff's Unruh Act claim relied on a violation of the ADA). Therefore, like the ADA, California law requires a plaintiff suing for a failure to accommodate to prove that his "requested accommodation [is] necessary and reasonable."  Doc. 224 at 5; Doc. 225 at 5; *see* Doc. 355 at 5; *Baughman*, 159 Cal. Rptr. 3d at 831 (holding that "Baughman's evidence does not show Disney failed to

McDermott Will & Emery LLP
Attorneys At Law
Irvine

make reasonable modifications in its policies, practice, or procedures, or that the modification she requested was necessary to afford goods, services, privileges, advantages, or accommodations to individuals with disabilities"). In effect, if plaintiffs cannot establish an ADA claim, none of their claims can be sustained.

5.     To establish a violation of Title III of the ADA and in turn a violation of the Unruh Act, plaintiffs must show that a reasonable modification of Disney's policy is *necessary to afford access* to Disneyland, unless doing so would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations offered at Disneyland.  42 U.S.C. § 12182(2)(A)(ii); *PGA Tour, Inc. v. Martin*, 532 U.S. 661, 688 (2001); *White v. Divine Invs., Inc.*, 286 F. App'x 344, 346 (9th Cir. 2008) (explaining that Title III violation requires discrimination that falls within the ambit of at least one of the five specific prohibitions set forth in 42 U.S.C. § 12182(b)(2)(A)(i)-(v)); *A.L. v. Walt Disney Parks and Resorts U.S., Inc.*, 2020 WL 3415008, at *14-15 (M.D. Fla. June 22, 2020), *appeal docketed*, No. 20-12720 (11th Cir. July 22, 2020).

6.     In order to show that changing DAS is "necessary," plaintiffs must prove that it is "beyond [K.A.C.'s] capacity" to access the rides at WDW with the DAS system in place.  *Martin*, 532 U.S. at 682; Doc. 224 at 4; Doc. 225 at 5.

7.     Several courts in the Ninth Circuit -- and throughout the country -- have held that a requested modification is not "necessary to afford access" to defendant's facilities under Title III if there are other available means of insuring access.  *See, e.g.*, *Coleman v. Phoenix Art Museum*, 2009 WL 1097540, at *3 (D. Ariz. Apr. 22, 2009) (citing *Martin* and holding that the plaintiff failed to meet his burden of showing that his own hip chair device was necessary to accommodate his disability when the museum offered to provide two different kinds of wheelchairs), *aff'd*, 372 F. App'x 793 (9th Cir. 2010); *Murphy v. Bridger Bowl*, 150 F. App'x 661, 663 (9th Cir. 2005) (citing *Martin*, the Ninth Circuit held that the requested modification of allowing a companion to accompany an individual with a cognitive disability on a ski

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  bike was not necessary to improve her skills because there were alternative methods

2  available); *Logan v. Am. Contract Bridge League*, 173 F. App'x 113, 117 (3d Cir.

3  2006) (applying *Martin* and finding that the plaintiff's contention that "he can't play

4  to the maximum of [his] potential" without the requested modification failed to set

5  forth a meritorious claim under Title III (internal quotation marks omitted)); *Dryer v.*

6  *Flower Hosp.*, 383 F. Supp. 2d 934, 941 (N.D. Ohio 2005) (plaintiff's requested

7  modification of the hospital's policy prohibiting visitors from using its oxygen ports

8  was not "necessary" under *Martin* because she was allowed to bring her own oxygen

9  tank into the hospital).

10      8.      Plaintiffs' request for front of the line, unrestricted "immediate access to

11  the rides at its parks" is not necessary or required by the ADA because an alternative

12  accommodation -- the DAS system -- provided K.A.C. access to WDW.  Doc. 224 at

13  5; Doc. 225 at 5.  Indeed, "DAS not only reasonably accommodates and provides

14  equal access to guests with disabilities, for whom it may be difficult to wait in a

15  traditional queue," but it provides more than equal access to such guests overall

16  "because they can experience the most popular attractions faster and, if they desire,

17  in greater number than what ████████ of guests [i.e., non-DAS guests] at

18  [Disneyland] can do without DAS."  Ex. 1-J, Laval Decl. ¶ 52.  A reasonable juror

19  could not find that plaintiffs' requested accommodation is necessary to afford K.A.C.

20  access to WDW because K.A.C. already has access.

21      9.      Under well-established legal precedent, and consistent with the Middle

22  District of Florida's recent decision in *A.L. v. Walt Disney Parks and Resorts U.S.,*

23  *Inc.*, 2020 WL 3415008 (M.D. Fla. June 22, 2020), K.A.C.'s preference for

24  immediate, repeated access does not meet his burden to establish a violation of Title

25  III of the ADA.  *See, e.g.*, *Martin*, 532 U.S. at 682; *Bird v. Lewis & Clark Coll.*, 303

26  F.3d 1015, 1021 (9th Cir. 2002) (affirming judgment for college in Title III case

27  because it "offered ample evidence of having accommodated Bird's disability" and

28  "[t]he College did not necessarily fail to make reasonable modifications simply

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

because some aspects of the program did not conform to Bird's expectations"); *A.L.*, 2020 WL 3415008, at *21 (holding that A.L.'s "proposed modification of ten readmission passes or unlimited access to the FastPass lines is not necessary to accommodate A.L.'s preference to follow a route or a pre-set list of rides," and that "[c]ompared to nondisabled guests, A.L. with the DAS card can access the same rides in less time and without physically standing in line"); *Ault v. Walt Disney World Co.*, 254 F.R.D. 680, 688 (M.D. Fla.) (explaining that a preference to use a Segway over other types of mobility devices need not be accommodated under the ADA as a matter of law), *vacated on other grounds*, 2009 WL 3242028, at *7 (M.D. Fla. Oct. 6, 2009), *vacated per curiam on other grounds*, 405 F. App'x 401 (11th Cir. 2010); *Dobard v. S.F. Bay Area Rapid Transit Dist.*, 1993 WL 372256, at *3-4 (N.D. Cal. Sept. 7, 1993) (finding that plaintiff failed to state a claim for an ADA violation because defendant was not required to provide the most advanced technology to those who are hearing-impaired if it allows for some means of effective communication).  "[T]he inability to wait or defer gratification is not in the diagnostic criteria for autism and individuals with autism are capable of deferring gratification, based on research studies finding that children with autism can defer gratification."  *A.L.*, 2020 WL 3415008, at *20.

10.    Courts applying a "like experience" standard have concluded that Disney has provided disabled guests an opportunity to have an experience comparable to (if not better than) non-disabled guests.  *See*, *e.g.*, Doc. 355 at 5-6 (granting Disney's motion for summary judgment in Bellwether III and concluding that "[b]y providing a program which ensures that families of guests with cognitive disabilities can schedule ride times in advance, have near-immediate access to rides with wait times of less than 15 minutes, and never have to wait in a physical line, Defendant's DAS program adequately provides its disabled guests with a 'like experience' which is 'comparable to that of able-bodied patrons'"); *cf.* Ex. 1-R, *Galvan* Order at 12 (granting summary judgment in Disney's favor and holding that

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

plaintiff did not show that "his request for priority ride access is necessary under the ADA because he has access to Disneyland comparable to able-bodied persons"); *A.L.*, 2020 WL 3415008, at *23 (concluding based on the characteristics of plaintiff A.L.'s autism that "Disney's DAS card provides A.L. with a 'like,' if not better, experience and equal enjoyment than nondisabled guests experience").

11.    To establish a Title III violation, plaintiffs must also prove that their requested modification is "reasonable." The "reasonable" requirement goes beyond whether the modification is necessary to afford access and focuses on the totality of the circumstances, including the practicality, cost, effectiveness or feasibility of the proposed modification, among other factors, in determining reasonableness. *Larsen v. Carnival Corp.*, 242 F. Supp. 2d 1333, 1343 (S.D. Fla. 2003); *A.L.*, 2020 WL 3415008, at *16. Plaintiffs have the burden of proving reasonableness.

12.    In considering reasonableness, courts examine whether alternative accommodations have been made available to the plaintiff. For example, in *Badgett v. Alabama High School Athletic Ass'n*, the court explained that the ADA does not require an entity "to adopt the 'best' modification or the modification requested by a person with a disability;" it only requires a *reasonable* modification. 2007 WL 2461928, at *4 (N.D. Ala. May 3, 2007) (internal quotation marks omitted). And in *Dryer*, the court held that plaintiff's requested modification was not reasonable because she had other alternatives available to her but *chose not to use them*. 383 F. Supp. 2d at 940-41; *see* Ex. 1-R, *Galvan* Order at 13 (holding that because Disney had provided a disabled plaintiff with a different reasonable accommodation, he was not entitled to his preferred accommodation of "priority disability access").

13.    It is unreasonable to require Disney to return to a failed policy that resulted in the type of large-scale fraud and abuse that existed under GAC, particularly given that K.A.C. already has access to WDW under DAS, which provides the maximum accommodation required by law. *See A.L.*, 2020 WL 3415008, at *23-24 ("The Court finds that an automatic ten readmission passes for

DSUF ISO Disney's Mot. for Summ. J. on K.A.C.'s and J.L.C.'s Claims

- 18 -

(No. 2:15-CV-05346-CJC-E)

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

1    A.L. and everyone is his party—a total of up to 60 for a party of six—is not a

2    reasonable modification because it would lengthen the wait times for all other riders,

3    severely impacting the remaining non-DAS users, it would increase their wait time

4    significantly, and potentially lead to the same fraud and overuse that existed with the

5    GAC system, which required a complete overhaul to the more-controllable DAS

6    system.  A.L.'s proposed modification of ten readmission passes would essentially be

7    like returning to the unlimited access to FastPass lines similar to the GAC system.").

8         14.    Returning to a GAC-like system would be even less manageable today

9    with the opening of new high-demand rides such as the Star Wars attraction "Rise of

10   the Resistance," which required a new queuing system at WDW in response to

11   unprecedented guest demand.  *A.L.*, 2020 WL 3415008, at *24 (acknowledging that

12   "[t]he word spreading on social media that one disabled individual received an

13   accommodation of ten readmission passes will increase demand to be treated

14   similarly by every disabled individual once they find out, as well as those willing to

15   misrepresent they are disabled, until the exception for a 'reasonable' request for

16   readmission passes ends up swallowing the whole disability access system, once

17   again, as it did with GAC").

18        15.    Plaintiffs' requested modification to DAS -- and the increased wait times

19   it would cause -- "relate directly to guest satisfaction and 'fundamentally alter'

20   Disney's business model by undermining its revenue base." *A.L.*, 2020 WL 3415008,

21   at *24.  There can be no greater financial impact on Disney than a significant number

22   of its guests deciding not to return to the parks because they were unable to

23   experience Disney's most popular attractions and thus were dissatisfied with their

24   visits.  *Id.* ("[I]f guests' intention to return to the park decreases, future attendance

25   decreases which decreases future revenue from lost attendance, hotel stays, food

26   purchases, associated merchandise, and 'everything else.'").

27        16.    The ADA does not require that an entity employ any and all means to

28   make services accessible to persons with disabilities, but rather only requires

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  "reasonable modifications" that would not "'fundamentally alter the nature of [its]

2  . . . services.'" *Scott v. W. State Univ. Coll. of Law*, 1997 WL 207599, at *1 (9th Cir.

3  Apr. 25, 1997) (alteration in original) (quoting 42 U.S.C. § 12182(b)(2)(A)(ii)).

4  Disney has a complete defense to an ADA violation because there is uncontroverted

5  evidence that reverting to a GAC system ████████████████████████████

6  ████████████████████████████████████████████████████████████████████

7  ██████████████████████████████████████████████. *A.L.*, 2020 WL

8  3415008, at *24 (concluding based on Disney's expert's Bruce Laval's

9  uncontroverted testimony that "A.L.'s requested relief of additional readmission

10 passes in the aggregate would impact park operations by increasing wait times in the

11 standby lines for most other guests without DAS (96.7%), interfere with their ability

12 to access attractions at the parks, and decrease their trip satisfaction and intention to

13 return to the park," thus "'fundamentally alter[ing]' Disney's business model by

14 undermining its revenue base") (footnote omitted); *c.f.* Ex. 1-R, *Galvan* Order at 8-9

15 (concluding there was no genuine dispute of material fact that providing a DAS pass

16 to every guest with anxiety, where "anxiety is a disorder that affects 30 percent of

17 people, would "increase the inventory of DAS passes to an unsustainable level, place

18 significant pressure on the FastPass lines, and have an adverse impact on Park

19 Operations," thus "fundamentally alter[ing] the theme park experience") (internal

20 quotation marks omitted).

21      17.    In order to prevail on her breach of contract claim, J.L.C. must establish

22 that:  (1) the parties entered into a contract; (2) Disney failed to do something the

23 contract required it to do; and (3) J.L.C. suffered damages as a result of Disney's

24 breach.  *See Richman v. Hartley*, 169 Cal. Rptr. 3d 475, 478 (Ct. App. 2014); *Troyk v.

25 Farmers Grp., Inc.*, 90 Cal. Rptr. 3d 589, 628 (Ct. App. 2009) ("Implicit in the

26 element of damage is that the defendant's breach *caused* the plaintiff's damage.").

27      18.    Disney is entitled to summary judgment on J.L.C.'s breach of contract

28 claim because plaintiffs cannot prove the first or second element of the claim -- that

McDermott Will & Emery LLP
Attorneys At Law
Irvine

the parties entered into a contract or that Disney failed to do something a contract required it to do.  During her deposition, J.L.C. admitted she has not signed any contract with Disney relating to their visits to the parks. Because it is undisputed that there is no contract, plaintiff J.L.C. cannot satisfy the first element of her breach of contract claim, and therefore summary judgment is warranted on this basis alone. Moreover, "Disney does not have an obligation to [Plaintiffs] or the millions of its other guests to provide an experience that met their personal expectations, let alone a contractual commitment, as the experience of each guest is inherently highly individualized, subjective, and unpredictable." Ex. 1-R, *Galvan* Order at 14-15.  And even if a contractual obligation did exist (which it does not), it would have to be based on the legal standard for providing accommodations under the ADA.  J.L.C. cannot meet that standard because the undisputed evidence shows that plaintiff K.A.C. and his family were provided equal access to the parks under DAS and that Disney did not violate the ADA.  *Id.* at 14 ("As a threshold matter, Plaintiffs' [breach of contract] claims is predicated upon proving an ADA violation, which they have not done."); Doc. 224 at 5; Doc. 225 at 5.

19.     To succeed on a claim of negligent infliction of emotional distress ("NIED"), plaintiffs must prove:  (1) Disney has a duty of care to K.A.C.; (2) Disney breached that duty; (3) plaintiffs suffered serious emotional distress; (4) Disney's breach of the duty of care threatened physical injury to K.A.C., unless Disney's negligence was of a highly unusual type or K.A.C.'s serious emotional distress was a predictable result of the breach; (5) Disney's conduct was a substantial factor in causing plaintiffs' serious emotional distress; and (6) plaintiffs suffered damages. *Potter v. Firestone Tire & Rubber Co.*, 863 P.2d 795, 807-08 (Cal. 1993); *Wong v. Tai Jing*, 117 Cal. Rptr. 3d 747, 768 (Ct. App. 2010).  In order for J.L.C. to succeed on her bystander NIED claim, she must prove that she witnessed her son, K.A.C., suffer a physical injury.  *See Akey v. Placer Cty.*, 2015 WL 5138152, at *8 (E.D. Cal. Sept.

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1, 2015) (noting that recovery for bystanders is not permitted where the bystander did not witness a physical injury).

20.    Plaintiffs must prove more than just distress or discomfort; rather, they must prove "emotional distress of such substantial quantity or enduring quality that *no reasonable man in a civilized society should be expected to endure it*."  *Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991) (emphasis added) (quoting *Fletcher v. W. Nat'l Life Ins. Co.*, 89 Cal. Rptr. 78, 90 (Ct. App. 1970)); *see Hughes v. Pair*, 209 P.3d 963, 976 (Cal. 2009) (noting the "high bar" for what constitutes severe distress); *Molien v. Kaiser Found. Hosps.*, 616 P.2d 813, 819-20 (Cal. 1980) (defining "serious emotional distress" as that which "a reasonable man, normally constituted, would be unable to adequately cope with" (internal quotation marks omitted)).  Whether severe emotional distress can be found on the evidence presented is a question of law for the court to determine.  *Wong*, 117 Cal. Rptr. 3d at 767 (citing *Fletcher*, 89 Cal. Rptr. at 91).

21.    Plaintiffs' NIED claims fail for several reasons.  First, the undisputed evidence shows that plaintiffs did not suffer serious or severe emotional distress at WDW.  They visited WDW three times under DAS, spanning 10 days at the parks (including one multi-day visit after filing this lawsuit) during which time they experienced numerous rides and attractions, and K.A.C.'s mother admitted that K.A.C. and his family used DAS every time.  Second, there is also no evidence that J.L.C. or K.A.C. received treatment for emotional distress as a result of the DAS program or Disney since DAS was implemented.  Third, they have provided no medical evidence that Disney caused their alleged emotional distress.  In cases where causation cannot be proven with such medical evidence, summary judgment is warranted as a matter of law.  *See McElroy v. Pac. Autism Ctr. for Educ.*, 2016 WL 3029782, at *5 (N.D. Cal. May 26, 2016).  Fourth, J.L.C. admits that neither she, her husband, nor her son K.A.C. were physically injured at WDW.  Finally, the undisputed evidence demonstrates that Disney has not violated the ADA, and

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

plaintiffs identify no other source for the legal duty that must underpin a negligence claim. *See* Doc. 355 at 6 ("Plaintiffs' NIED claims, particularly the elements of duty and breach, are derivative of their ADA claims. Accordingly, because Plaintiffs cannot establish any violation of the ADA, they cannot prove at least two of the essential elements of their NIED claims."); Doc. 224 at 5-6 (concluding that the Bellwether II plaintiffs' negligent infliction of emotional distress claim was specious and fails as a matter of law because "Disney's DAS program in fact provided P.F.E. with equal access to its parks as required by the ADA and Unruh Act"); Doc. 225 at 5-6 (same); Ex. 1-R, *Galvan* Order ("[B]ecause Plaintiffs' claim that Defendant's duty of care and breach of that duty is based on their allegation that Disney violated the ADA and Unruh Act by not providing a DAS pass, their NIED claim necessarily fails.").

22.     To succeed on a claim of intentional infliction of emotional distress ("IIED"), plaintiffs must prove:  (1) Disney's conduct was extreme and outrageous, exceeding all bounds of that usually tolerated in a civilized community; (2) Disney intended to cause plaintiffs severe or extreme emotional distress or acted with reckless disregard of the probability that plaintiffs would suffer severe or extreme emotional distress, knowing that K.A.C. was present when the conduct occurred; (3) plaintiffs suffered severe or extreme emotional distress; (4) Disney's outrageous conduct was an actual and proximate cause of the severe or extreme emotional distress; and (5) plaintiffs suffered damages. *Nally v. Grace Cmty. Church of the Valley*, 763 P.2d 948, 961 (Cal. 1988).

23.     The conclusions that plaintiffs cannot prove they suffered severe emotional distress or that Disney's DAS system caused any such distress apply equally to their IIED claims. *See* Doc. 355 at 6-7; Doc. 224 at 6 (concluding that the Bellwether II plaintiffs' claims for intentional infliction of emotional distress fail and "are even more specious" because "Disney's DAS program in fact provided P.F.E. with equal access to its parks as required by the ADA and Unruh Act," and "[t]here is

McDermott Will & Emery LLP
Attorneys At Law
Irvine

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    simply no evidence . . . that demonstrates Defendant engaged in extreme and

2    outrageous conduct or intended to cause severe emotional distress to Plaintiffs");

3    Doc. 225 at 6 (same).

4           24.    Plaintiffs' IIED claims fail for two additional reasons. To prevail on

5    their IIED claim, plaintiffs must prove that Disney's conduct is "outrageous," and

6    "*so extreme as to exceed all bounds of that usually tolerated in a civilized*

7    *community.*" *Nally*, 763 P.2d at 961 (emphasis added) (internal quotation marks

8    omitted). A plaintiff's subjective reaction to a defendant's conduct is not evidence

9    that the conduct was outrageous. *Fowler v. Varian Assocs., Inc.*, 241 Cal. Rptr. 539,

10   546 (Ct. App. 1987). Rather, "[o]utrageousness is an objective standard applied to

11   actual conduct." *Id.* Summary judgment is proper here because Disney's conduct in

12   providing DAS to K.A.C. and his mother in order to access numerous rides and

13   attractions and avoid waiting in long lines like everyone else cannot be reasonably

14   regarded as "extreme and outrageous" as a matter of law.

15          25.    There is also no evidence that Disney intentionally or recklessly

16   inflicted emotional distress upon plaintiffs. Indeed, plaintiffs' allegations of Disney's

17   malicious intent in implementing DAS, including, *inter alia*, that Disney wanted to

18   "cleanse" its parks of guests with cognitive disabilities, are completely undermined

19   by testimony given by K.A.C.'s mother, who admitted that she has no evidence

20   whatsoever to support these allegations. Ex. 1-X, J.L.C. Dep. at 287:5-20, 287:25-

21   288:12.

22   Dated: October 9, 2020           Respectfully submitted,

23                                    **McDERMOTT WILL & EMERY LLP**

24

25

26                                    By:    /s/ Kerry Alan Scanlon
                                             Kerry Alan Scanlon

27                                    Attorney for Walt Disney Parks and
                                      Resorts U.S., Inc.
28

McDERMOTT WILL & EMERY LLP
ATTORNEYS AT LAW
IRVINE

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## CERTIFICATE OF SERVICE

I certify that on October 9, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States District Court, Central District of California, by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.


<u>/s/ Jeremy M. White</u>
Jeremy M. White

DSUF ISO Disney's Mot. for Summ. J. on K.A.C.'s
and J.L.C.'s Claims

(No. 2:15-CV-05346-CJC-E)