REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# Exhibit 1-FF

Evidence Packet in Support of Defendant's Motions for Summary Judgment

U.S.D.C., Central District of California, Case No.: 2:15-cv-05346-CJC-E

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

███████████

November 13, 2019                                        71

1                  UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3    T.P., BY AND THROUGH S.P.,    )
     AS NEXT FRIEND, PARENT,       )
4    AND NATURAL GUARDIAN, ET      )  Case No.:
     AL.,                          )  2:15-CV-05346-R-E
5                                  )
                 Plaintiff,        )
6                                  )  Volume II: Pages 71-263
        vs.                        )
7                                  )  Continuation from
     WALT DISNEY PARKS AND         )  11/12/2019
8    RESORTS U.S., INC. ,          )
                                   )
9                 Defendant.       )
     _____)

10

11

12

13              VIDEO DEPOSITION OF  ███████████

14                   November 13, 2019

15                      9:16 a.m.

16

17

18              415 Mission St., Ste 5600

19              San Francisco, California

20

21

22

23   REPORTED BY:

24   Tammy Moon, CSR No. 13184, CRR, RPR

25

Evidence Packet P.0606

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                                72

```
 1    APPEARANCES:

 2

 3    FOR PLAINTIFF:

 4    ARIAS SANGUINETTI WANG & TORRIJOS, LLP
      BY:  EUGENE FELDMAN, ESQ.
 5    6701 Center Drive West, #1400
      Los Angeles, California 90045
 6    310.844.9696
      Eugene@aswtlawyers.com
 7

 8    FOR DEFENDANT:

 9    MCDERMOTT WILL & EMERY
      BY:  KERRY SCANLON, ESQ.
10    BY:  JULIE H. MCCONNELL, ESQ.
      500 North Capitol Street, NW
11    Washington, DC 20001-1531
      202.756.8317
12    Kscanlon@mwe.com

13

14    ALSO PRESENT:  MICHAEL SANTY, VIDEOGRAPHER

15

16

17

18

19

20

21

22

23

24

25
```

Evidence Packet P.0607

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

███████████████

November 13, 2019                                        76

```
 1              San Francisco, California

 2              Wednesday, November 13, 2019, 9:16 a.m.

 3              THE VIDEOGRAPHER:  Good morning.  We are on the

 4   record at 9:16 a.m. on November 13th, 2019.

 5              Audio and video recording will continue to take

 6   place until all parties agree to go off the record.

 7   Please note that microphones and -- are sensitive and

 8   may pick up whispering and private conversations.

 9              This is the video recorded deposition of

10   ████████████, taken by counsel for the defendant in

11   the matter of T.P., by and through S.P, as next friend,

12   parent, and natural guardian, et al., versus Walt Disney

13   Parks and Resorts U.S., Inc. filed in the United States

14   District Court, Central District of California.

15              The deposition is being held at McDermott Will

16   & Emery located at 415 Mission Street, Suite 5600, San

17   Francisco, California.

18              My name is Michael Santy.  I'm the videographer

19   on behalf of U.S. Legal Support, located at 201 Mission

20   Street, Suite 600, San Francisco, California.

21              The court reporter is Tammy Moon, on behalf of

22   U.S. Legal Support.

23              I am not related to any party in this action,

24   nor am I financially interested in the outcome.

25              Counsel will state their appearances for the
```

Evidence Packet P.0608

███████████████

November 13, 2019                                        77

```
 1    record, after which the court reporter will swear in the

 2    witness.

 3            MR. FELDMAN:  Eugene Feldman for the plaintiff.

 4            MR. SCANLON:  Kerry Scanlon for the defendant.

 5            MS. MCCONNELL:  Julie McConnell for the

 6    defendant.

 7                    ████████████████,

 8         called as a witness, having been duly

 9         sworn, testified as follows:

10            THE WITNESS:  Yes.

11                          EXAMINATION

12            MR. SCANLON:

13       Q.   Good morning, Ms. ████████,

14       A.   Good morning.

15       Q.   You understand this is a continuation of your

16    deposition that started yesterday?

17       A.   Yes.

18       Q.   Since 2013, have you had any health issues

19    yourself that -- that required going to see a doctor?

20       A.   Yes.

21       Q.   What?

22       A.   High blood pressure.

23       Q.   Okay.  And what -- what year, approximately,

24    did you suffer from high blood pressure?

25       A.   Since the birth of my first son, 2009.
```

Evidence Packet P.0609

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                                  78

```
 1        Q.   Since 2009?

 2        A.   Mm-hmm.

 3        Q.   So that was a problem that started when?

 4        A.   With pregnancy.

 5        Q.   When?

 6        A.   With pregnancy.

 7        Q.   Okay.  So in 2009, roughly?

 8        A.   Mm-hmm, yes.

 9        Q.   And what's the name of the doctor you saw for

10   that?

11        A.   Well, since it was pregnancy related, it was

12   the OB-GYN that was attending me during pregnancy.

13        Q.   And was that a man or woman?

14        A.   A woman -- woman.

15        Q.   And did you continue to see her after --

16        A.   No, after the delivery, no.

17        Q.   Okay.  So --

18        A.   It was a regular doctor.

19        Q.   You saw a regular doctor for high blood

20   pressure after that?

21        A.   Yes.  It was controlled after the delivery, but

22   then it came back with the second pregnancy.  It came

23   back with the third pregnancy, so it's on and off.  I

24   can control it with medication or exercise and losing

25   weight.
```

1      Q.   So when you had your daughter, your second

2    child, you experienced some high blood pressure again?

3      A.   Yes.

4      Q.   And did you see your OB-GYN at that time?

5      A.   Yes, sir.

6      Q.   And that was around 2011?

7      A.   Correct.

8      Q.   And then your third child, is that a boy or

9    girl?

10     A.   A boy.

11     Q.   A boy.  Same thing happened?

12     A.   Mm-hmm.

13     Q.   And you saw your OB-GYN for high blood

14   pressure?

15     A.   Yes, sir.

16     Q.   Other than those three times connected with

17   your pregnancies, did you see any other doctors since

18   2009 for high blood pressure?

19     A.   No.  I have seen the -- doctor -- a regular

20   doctor for physical exams, and you know, also

21   blood-related high -- high blood pressure before I got

22   pregnant with my third.

23     Q.   Okay.  But that was -- so that was between

24   pregnancies?

25     A.   Mm-hmm.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                        80

1        Q.    You had high blood pressure?

2        A.    Mm-hmm.

3        Q.    And were you prescribed any medication for

4    that?

5        A.    I opted not to take medication.  I lost weight

6    and I had an exercise routine, and that controlled the

7    high blood pressure.

8        Q.    Okay.  And other than high blood pressure, you

9    know, since 2013 or so, have you had any other health

10   issues?  I mean I -- when I say "issues," I know you

11   were pregnant couple times or at least one time since

12   then, but any health problems that required you to see a

13   doctor?

14       A.    No, not that I recall.

15       Q.    Okay.  So you'd been relatively healthy then?

16       A.    Correct.

17       Q.    Is that right?

18       A.    Yes.

19       Q.    And you consider yourself a healthy 39-year-old

20   woman today?

21       A.    Pretty much.

22       Q.    And that's been true for the past six or seven

23   years?

24       A.    Yes.

25       Q.    Okay.  Was -- was meeting the new man in your

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

███████████████

November 13, 2019                                            81

```
 1    life and marrying him, was that a source of happiness

 2    for you?

 3        A.   Yeah.

 4        Q.   Okay.  And I take it you haven't seen any other

 5    doctors, then, in the past six or seven years other than

 6    what you just described.  Is that right?

 7        A.   I visited -- at the clinic I attend, they have

 8    acupuncture, so I attended twice a month for stress

 9    related.

10        Q.   When was that?

11        A.   Prior to my third pregnancy.

12        Q.   Okay.  And was -- what was the stress related

13    to then?

14        A.   Well --

15        Q.   It was in 2018?

16        A.   Correct.

17        Q.   Okay.  What was the stress related to?

18        A.   Raising two kids ███████████████) is pretty

19    stressful.

20        Q.   Okay.  And did that help with that condition?

21        A.   Yes.

22        Q.   Okay.

23        A.   Also for sciatic pain.  After my first

24    pregnancy, I suffered from sciatic pain.

25        Q.   So you saw an acupuncturist then too?
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                          86

```
 1              (Exhibit 2 was marked for identification.)

 2        Q.   Have you ever seen this document that's marked

 3   Exhibit 2 to your deposition that's been placed in front

 4   of you?

 5        A.   Yes.

 6        Q.   When did you see it?

 7        A.   It was the report given to me to diagnose my

 8   child with autism.

 9        Q.   And it was -- the evaluation was March 21,

10   2012, correct?

11        A.   Correct.

12        Q.   And how did you -- how was it that you ended up

13   at this particular clinic or the psychologist Larissa

14   Tarry?

15        A.   It -- everything back then was -- any

16   evaluation or assessment of possible disability is --

17   was done through Regional Center of the East Bay.  So

18   they told me you need to come this day, you'll have this

19   assessment.  And I showed up, and that's how it was.

20        Q.   Who was -- who said that it had to be through

21   the regional center; who said that?

22        A.   My pediatrician referred us to regional center.

23        Q.   Okay.  And was this covered by some kind of

24   insurance or who -- who paid for it?

25        A.   State funded.
```

Evidence Packet P.0614

November 13, 2019                                             97

```
1    individuals with autistic spectrum disorders through

2    early intervention.  Indeed, ████ is already showing

3    improvements in many areas, and his mother had several

4    stories of celebrated gains since starting ABA therapy."

5          Do you see that?

6    A.   Yes.

7    Q.   Okay.  Is that further -- a further example of

8    where you were telling a doctor that you felt he had

9    made significant progress from his ABA therapy?

10   A.   Yes.

11   Q.   Okay.  And what does the last sentence mean

12   when it says, "It is encouraging that he's already

13   receiving evidence-based treatments and responding

14   well."

15         Is that just referring to the ABA therapy?

16   A.   Yes.

17   Q.   Okay.  When you -- would you look at page 12 of

18   13 and -- and at 11 in paragraphs 12, they list a number

19   of books that parents may wish to read, educate

20   themselves on best practices for children with autism.

21   Do you see that -- those two lists under number 11 and

22   number 12?

23   A.   Yes.

24   Q.   Did you ever read any of those books?

25   A.   No, sir.
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                              100

1    mentions in the second paragraph of that -- top of that

2    page, it says, "Ms. ████ indicated that she and her

3    extended family have been very involved in his ABA

4    therapy -- ABA program and are doing their very best to

5    implement technique outside of therapy."

6           What other family members were involved in his

7    ABA therapy?

8       A.   By "involved," it -- it meant that I would

9    relay the techniques learned during ABA so that they

10   would apply it if they were ever around with him.  It's

11   not that they were sitting down along with me observing

12   the ABA session.

13      Q.   Right.  But who were the family members who

14   were, quote, involved or very involved in his ABA

15   program?  Who were they?

16      A.   My mom.  The people living in the house.  Not

17   my brother, but my mom mainly.

18          I would relate to her like this is how we speak

19   to him if you want him to say something.  This is -- if

20   he's pointing at something because he wants chips, you

21   make sure you say "I want chips" so he can repeat it and

22   he'll get it when he repeats the sentence.

23      Q.   Okay.  Okay.  And were they also involved in

24   the type of ABA therapy that I'm sure you learned about,

25   which is when he wanted something, that you would

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                          101

```
 1    sometimes try to redirect him if it was something that

 2    you didn't think he should be asking for or if it was

 3    something he was asking for repeatedly.  Did you tell

 4    them about that as well?

 5         A.   Yes.

 6         Q.   Okay.  And did you practice that yourself; that

 7    technique of ABA therapy?

 8         A.   Yes.

 9         Q.   Okay.  How close is the relationship between

10    your son and your mom?

11         A.   Very close.

12         Q.   And when you moved -- well, since 2010, has she

13    worked outside the home?

14         A.   Like in another city or another --

15         Q.   No.  Just -- did she have a job?

16         A.   Yes.

17         Q.   Did she -- you mentioned she was cleaning at

18    some point?

19         A.   Yes.  She still does.

20         Q.   She still does that?

21         A.   Yes.

22         Q.   Okay.  And your brother was employed.  Is that

23    right?

24         A.   Yes.

25         Q.   You mentioned that.  And was his wife employed
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

███████████████

November 13, 2019                                          118

```
 1    bottom?

 2         A.   Mm-hmm.

 3         Q.   And it says, "55 was the scored range average;

 4    no problem indicated."  Do you see that?

 5         A.   Mm-hmm.

 6         Q.   So they found no problem whatsoever in your son

 7    in terms of any behavioral rigidity, right?

 8         A.   Correct.

 9         Q.   And on the next page, rather than contesting

10    these observations, you actually agreed with them,

11    didn't you?

12              On the first full paragraph of page six where

13    it says, and I'm quoting, "████████ mother also notes

14    the growth he has made in his language, socialization,

15    and behavior since he was first assessed.

16              "She credits his ABA therapists who have

17    supported this growth as well as the program at ██████

18    ███████████████

19              Do you see that; what I just read?  It's on

20    page six, ma'am.

21         A.   Mm-hmm.

22         Q.   In this -- first full paragraph?

23         A.   Mm-hmm.

24         Q.   So you, in a sense, were agreeing that he made

25    a lot of progress, including in his behavior, right?
```

U.S. LEGAL SUPPORT
(877) 479-2484

Evidence Packet P.0618

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                          119

```
 1       A.   Right.

 2       Q.   And what is the reference to ████████████?

 3   I hadn't heard that name.

 4       A.   It was the preschool he attended for three

 5   years before transitioning.

 6       Q.   Okay.  Before going to ██████████?

 7       A.   Yes.

 8       Q.   Okay.  It may just not have come up yesterday.

 9   I may not have asked you the name of it.  But that was

10   the preschool he went to for three years?

11       A.   Yes.

12       Q.   Okay.  And you felt that that program helped

13   with his behavior and socialization as well as the ABA

14   therapy, correct?

15       A.   Yeah, it improved, yeah.

16       Q.   Do you see down in the -- under the summary

17   paragraph, that long paragraph about two thirds of the

18   way through that says, "████████ personal daily living

19   skills are another area of personal strength.  ██████

20   has adjusted well to his new classroom and is able to

21   follow the classroom routines, easily transitioned

22   between activities."

23            It's kind of what we talked about before.  It

24   says his coping skills are another area of growth.  So

25   that's basically what we discussed before, right?
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                          120

1          A.    Mm-hmm.

2          Q.    And then it says, "while he's sometimes

3    initially non-complaint with requests, he is easily

4    redirected and will follow adult directions."

5                Do you see that?

6          A.    Mm-hmm.

7          Q.    Did you -- did you contest that conclusion?

8          A.    No, because that pretty much says what I stated

9    before that, you know, he would be noncompliant or

10   defiant but then redirected to follow direction.

11         Q.    Well, it says "while he is sometimes initially

12   noncompliant."  That means not all the time, but some of

13   the times, he'd be initially noncompliant and then it

14   says he is easily redirected and will follow adult

15   directions.  So you agreed with that, right?

16         A.    Well, like I said, that's the observation they

17   made at school, so yeah.

18         Q.    Well, you just said that this expressed your

19   view.

20         A.    At home, yes.

21         Q.    Okay.  So you agree with this conclusion that I

22   just read from this paragraph, right?

23         A.    Yes.

24         Q.    That he was acting that way?  Okay.

25               And in -- in fact, at the end of this, this

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    132

1       Q.   And that relates to something that was a

2    baseline level that was taken as of December 2013,

3    correct?

4       A.   Correct.

5       Q.   And then by 2016, if you go down a couple of

6    paragraphs, three years later or not quite three years

7    later, but in 2016 in January, he had made enough

8    progress that there was a goal as -- as described here

9    that he -- there would be an absence of yelling, crying,

10   aggression, and flopping in 80 percent of the

11   opportunities they presented to him, correct?

12      A.   Correct.

13      Q.   That was the goal?

14      A.   Yes.

15      Q.   And he had made progress toward that goal,

16   hadn't he?

17      A.   Yes.

18      Q.   So he had gotten a lot better from where it was

19   in 2013, right?

20      A.   Correct.

21      Q.   And was your experience with him at home that

22   -- back in 2013 that he -- that that -- was that

23   consistent with your experience; what this report says?

24      A.   Yes.

25      Q.   Okay.  All right.  So when you told me

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                       133

```
 1     yesterday in your deposition that -- when you tried

 2     using DAS in 2013 when you went back in November,

 3     remember, for your family visit, and that he had

 4     meltdowns?  That's what you testified to?

 5        A.   Yes.

 6        Q.   That was right during the time when he was

 7     having that kind of reaction to everything when he

 8     didn't get his way, right?  Correct?

 9        A.   Yes.

10        Q.   Okay.  And in fact, this December 13th is two

11     months after he went to Disney, right?  Almost the same

12     time, but it was a little bit later, right?

13        A.   Correct.

14        Q.   Okay.  What -- you mentioned yesterday that he

15     was -- you went on ten to 15 rides when you went to

16     Disney the first time on Memorial Day, and that was just

17     you, your husband, and your son -- was your daughter

18     there?

19        A.   Yes.

20        Q.   So the four of you; this was a test visit you

21     talked about, right?

22        A.   Yes.

23        Q.   Which rides were they; the ten to 15 rides you

24     went on, which rides were they?

25        A.   I don't recall, sir.
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                137

```
 1              MR. SCANLON:

 2         Q.   Can you answer my question, please?  Is it your

 3    testimony that someone who is -- whose effective age in

 4    terms of remembering things and communicating is a

 5    year-and-a-half old could remember after a single visit

 6    the ten or 15 rides they went on when he comes back four

 7    or five months later.  Is that your testimony?

 8         A.   Yes.

 9         Q.   Okay.  So but you don't have any way of knowing

10    whether he remembered them, do you, because you don't

11    recall what those rides are?

12         A.   No, I don't.

13         Q.   And you don't know whether he knew, because you

14    didn't know what the order was or what the rides were,

15    correct?

16         A.   No.

17         Q.   Let's take a break.  Ten minutes.

18              MR. FELDMAN:  Sure.

19              THE VIDEOGRAPHER:  Watch the mike.  The time is

20    10:37.  We're off the record.

21              (Break taken.)

22              THE VIDEOGRAPHER:  The time is 10:52, and we're

23    on the record.

24              MR. SCANLON:

25         Q.   Just before we took a break, I just want to
```

Evidence Packet P.0623

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

███████████████

November 13, 2019                                    149

```
 1        A.   No.
 2        Q.   And do you remember anything about what
 3   happened on the first day of that three-day visit?
 4        A.   If I'm not mistaken, I believe it was --
 5        Q.   Well, before you answer, can you -- just give
 6   me this.  Tell me what your level of recollection was as
 7   to what happened.  I know you probably can tell me the
 8   people who were there.  But in terms of where you went,
 9   whether -- how long you were there, what time you
10   arrived, what rides you went on, if any, do you remember
11   any of that?
12        A.   No, nothing.
13        Q.   Nothing?
14        A.   No.
15        Q.   Of any of that?
16        A.   No.
17        Q.   Okay.  What about the second day?
18        A.   No.  Pretty much the same.  I don't -- I don't
19   have recollection.
20        Q.   You don't have any recollection?
21        A.   Huh-uh.
22        Q.   What about the third day?
23        A.   I think the third day was the hardest day
24   behavior-wise for my son, so I -- I kind of remember
25   that that was hard.  But no recollection as to -- the --
```

Evidence Packet P.0624

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                                150

1     the rides or timeframe.

2         Q.   Okay.  And so you don't recall how many rides

3     you went on any of those days, right?

4         A.   No.

5         Q.   Do you know how Disneyland is organized?

6         A.   No, sir.

7         Q.   Like do you know whether there's one park or

8     two parks or three parks or four parks?  Do you know

9     anything like that?

10        A.   Well, from my first visit in May, I knew there

11    was two parks.  It was the Disneyland and the California

12    Adventure.

13        Q.   Okay.

14        A.   Yeah.

15        Q.   Okay.  But do you remember when you went back

16    in November, which one of those you went to on any of

17    the days?

18        A.   No.  Again, for the second visit, we had the

19    hopper pass, so I don't recall which one I went in

20    first.

21        Q.   Right.

22        A.   But I -- I visited both parks.

23        Q.   Okay.  But you don't remember any specifics?

24        A.   No, sir.

25        Q.   About which rides you went on; you don't

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

████████████████

November 13, 2019                                    153

```
 1        A.   Correct.

 2        Q.   Okay.  And did you drive to get there?

 3        A.   Yes.

 4        Q.   And you drove back afterwards too?  I think I

 5   asked you about the trips down in -- in May.  I'm not

 6   sure if I asked you that, but were the trips about the

 7   same as you described yesterday?

 8        A.   Yes, sir.

 9        Q.   Okay.  Both to and from?

10        A.   Yes.

11        Q.   And whose car did you go in?

12        A.   In our car.

13        Q.   In your -- in the car you described to me?

14        A.   Yes.

15        Q.   Okay.  Did you drive or did your husband drive?

16        A.   No.

17        Q.   Or did you both drive?

18        A.   He drove.

19        Q.   The entire time?

20        A.   Yes.

21        Q.   Okay.  And did you stop anywhere along the way?

22   Did you -- did you -- was this a trip where you went

23   down there to do this or did you stop in any other

24   cities or go to any other places as part of this trip in

25   November?
```

Evidence Packet P.0626

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

███████████████

November 13, 2019                                                                156

```
 1    when we were waiting for a turn for a ride.

 2        Q.    But -- but you don't remember any -- which

 3    rides you went on, right?

 4        A.    No.

 5        Q.    You said you have no recollection of that?

 6        A.    No.

 7        Q.    So how do you know that he was having problems

 8    waiting for rides if you don't even remember which rides

 9    you went on?

10            (Brief pause.)

11        Q.    Can you answer that?

12        A.    Well, I -- I just know that it was a hard time

13    for us.

14        Q.    Well, you've already testified, Ms. ██████ that

15    at this age, remember we looked at the document two

16    months later, he would have -- he would get upset and --

17    and yell and flop and do things like that 100 percent of

18    the times if he didn't get exactly what he wanted?

19        A.    Correct.

20        Q.    Right.  You already said that.  So -- so if he

21    did that at Disneyland, it wouldn't have been anything

22    different than what he did anywhere else, right?  At

23    school, at home, or anywhere else, correct?

24        A.    Correct.

25        Q.    Okay.  So why are you suing Disney then?  If
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    159

```
 1        Q.   Okay.  So what's the problem with that?

 2        A.   Well, it was a new system.  We didn't know.  It

 3   was completely different from what he had experienced in

 4   May.

 5        Q.   Right.  And do you know anything about why they

 6   changed their system between May and November?

 7        A.   I heard it on the news.

 8        Q.   There was abuse and misuse of the system,

 9   right?

10        A.   Correct.

11        Q.   By people who were basically pretending to have

12   a disability, and they were abusing the system.  And

13   Disney could not demand medical proof of that.  You

14   heard that, didn't you?

15        A.   Not that part.  I just heard that there was

16   abuse of the system.

17        Q.   Okay.  Okay.  And they had to change the system

18   so they would no longer give everybody immediate access

19   whenever they wanted it, right?

20        A.   Correct.

21        Q.   And do you have any information to -- yourself,

22   do you personally have any information that there wasn't

23   abuse at the system that required that to be changed?

24        A.   I'm sorry.  Can you ask that again?

25        Q.   Right.  Do you have any information that that
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                      160

```
 1      -- that Disney was not doing this for legitimate

 2      reasons; that they're -- that -- do you have anything to

 3      challenge Disney's conclusion that this was abuse and

 4      they had to change it?

 5           A.    No, I don't have any information.

 6           Q.    Okay.  Okay.  So you don't think that the --

 7      the fact that they changed the system is evidence of any

 8      bad faith or -- on their part, do you?

 9           A.    I don't -- I don't know what -- I mean --

10           Q.    You don't -- you don't think that, do you?

11           A.    No.

12           Q.    Okay.  And so if they had to change the system

13      because the prior system was not sustainable, it was

14      being abused and it was affecting everybody in a

15      negative way and they adopted this new system, you would

16      admit, would you not, that the new system still meant

17      you did not have to stand in the regular line, right?

18      You could go and do other things while you waited for

19      your return time, correct?

20           A.    Correct.

21           Q.    You understood that, right?

22           A.    Yes.

23           Q.    And you also understood that you could use fast

24      pass in addition to this DAS pass as another way of

25      getting times when you would not have to stand in a
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                        162

1       Q.   Okay.

2       A.   But it wasn't like early in the morning, for

3    sure.

4       Q.   It was not?

5       A.   It was not.

6       Q.   And some of those popular rides, those fast

7    passes are going to be gone later in the day, right?

8       A.   Right.  Learn the hard way.

9       Q.   And you don't blame Disney for that, do you?

10      A.   No.

11      Q.   Okay.  So but are you also aware that with a

12   DAS card that the time, your return time, is the posted

13   wait time minus ten minutes.  Did you understand that?

14      A.   No.

15      Q.   You didn't.  So how did you -- what was your

16   understanding under the DAS system when you went in

17   November, the second time to Disney, what was your

18   understanding in terms of when the return time would be

19   determined?

20           Like if you go and get a return time, how did

21   they determine when the time was that you could come

22   back and get on the ride?

23      A.   I believe there was just one kiosk in each

24   park, and when we approached the kiosk, they -- they

25   asked me what ride I wanted.  And I told them, okay.  I

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                          167

```
 1        A.    Mm-hmm.

 2        Q.    And that's -- in every one of these cases, they

 3   took the wait time, subtracted ten minutes, and -- and

 4   then that was your return time.  And if it was like when

 5   the wait time was only five minutes, they -- you could

 6   go on it right away.

 7        A.    Right.

 8        Q.    Right?  So do you see that this is -- this

 9   shows you how you -- your return time was always ten

10   minutes less than the posted wait time, right?

11        A.    Mm-hmm.

12        Q.    Okay.  And you have to say yes.

13        A.    Yes.

14        Q.    Okay.  And during those -- during that time,

15   and in fact, your return time was always fairly soon

16   after the time they gave you this time, right?  Wouldn't

17   you agree with that?

18        A.    Yes.

19        Q.    Okay.  And during that time, your husband --

20   you go on one ride, he could have gone to the kiosk to

21   get the next one.  And you could have gone with your son

22   to the bathroom, to get something to eat, to watch a

23   parade, to do anything.

24              You could have gone -- you could have gone on

25   another ride immediately as long as it was a 15-minute
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                              168

1    time or less because they would waive you in, correct?

2         A.   Mm-hmm.

3         Q.   You have to say yes.

4         A.   Yes, yes.

5         Q.   Okay.  So what's the problem with this system?

6    Even though it was different from the one before,

7    wouldn't you agree that it's still a reasonable system

8    because you would never have to take your son in the

9    regular line and wait there.

10             You know, you saw people queuing in line,

11   right?  Including families with children, right?

12        A.   Yes.

13        Q.   And if you have a two year old or a four year

14   old or a six year old, that's not easy, necessarily, for

15   them even if they don't have autism, right?

16        A.   Correct.

17        Q.   Okay.  They had to stand in line.  That's

18   something you never had to do with this DAS pass, right?

19   You could go do something else for this short period of

20   time until the return time came up, correct?

21        A.   Correct.

22             MR. FELDMAN:  Counsel, you asked her a

23   question, and you didn't let her give an answer.

24             MR. SCANLON:  What question did I ask her?

25             MR. FELDMAN:  You said "what's wrong with this

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    170

1       Q.   Okay.  So you didn't split up?

2       A.   No, we didn't.

3       Q.   You all went back there?

4       A.   Yes, I believe so.

5       Q.   And you -- you agree with me that if only he

6    had gone back, for example, you could have done

7    something with your son so that he didn't have to

8    traipse back to the -- to the -- one of the kiosks,

9    right?

10      A.   Yes.

11      Q.   Okay.  And it looks like you went on five rides

12   on -- well, the first day you got this was the 15th.  So

13   it looks like you went on five rides that day at around

14   9:50, then 2:35, then 3:05, and 3:30, and then 7:35.

15           And then it -- you can tell me if you -- you

16   said you didn't really recall, but it appears that the

17   next three were the next day.  Because you wouldn't have

18   gone on a ride with your son at 11:53 at night, would

19   you?

20      A.   No.

21      Q.   So does that --

22      A.   I --

23      Q.   Does that suggest to you that you came back the

24   next day and went on a ride at 11:53 a.m., in the

25   morning?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                          174

1    right?

2              (The witness nods.)

3        Q.    And you -- somebody went and got both of these

4    return times from the kiosk, right?

5        A.    Yes.

6        Q.    But you said you didn't have to use these

7    because your family waited in the regular line in -- in

8    Space Mountain, and it was 45 minutes.  And then when

9    you got to the front, they allowed you to get in front

10   with them?

11       A.    I believe so, yes.

12       Q.    Okay.  So -- so even though you went and got

13   these return times, you didn't actually use them because

14   you didn't need them, right?

15       A.    No.

16       Q.    Okay.  So what's your complaint about DAS,

17   given those two rides and what you've just testified?

18   Because you were able to get on the ride.  You could

19   have either gone right in --

20             MR. FELDMAN:  Counsel, can you let her answer

21   the question?  Instead of just this endless recitation

22   on your part?

23             (Simultaneous colloquy.)

24             MR. SCANLON:  I'm asking --

25             (Simultaneous colloquy.)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

```
1        A.   Because the previous day was a lot of walking

2    to go get this, that I decided just to give up on -- on

3    getting this.

4        Q.   I see.  But the previous day, you used it to go

5    on six different rides, correct?

6        A.   Correct.

7        Q.   And that prevented you from having to wait in

8    the regular standby line when you -- when you used DAS

9    in that way, didn't it?

10       A.   Yes.

11       Q.   Okay.  And you would agree, would you not, that

12   if you can go on a ride without getting in that regular

13   standby line is a big benefit, right?

14       A.   No.  Not for my child.

15       Q.   So you'd rather have your child stand in the

16   line?

17       A.   No.

18       Q.   So it's much easier for your child to avoid

19   standing in the regular line that snakes all the way

20   around for 30 minutes or more, right?

21       A.   Yes.

22       Q.   And -- and just being able to go on when the

23   return time arrives, correct?  That's a lot easier than

24   standing in the regular line, isn't it, for your child?

25       A.   Yes.
```

Evidence Packet P.0635

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    177

```
 1        Q.   So your complaint about DAS boils down to

 2   having to walk to the kiosk, right?

 3        A.   Mm-hmm.

 4        Q.   That's what you're really complaining about,

 5   right?

 6        A.   At that time when we visited, it was a lot of

 7   walking.

 8        Q.   Right.  But that's what -- basically, that's

 9   what you complained about the system was?

10        A.   A lot of back and forth, yes.

11        Q.   Okay.  And that's why you filed a federal

12   lawsuit; because you had to go to the kiosk?

13        A.   No, I told you it was because it was a very

14   traumatic experience for my family.  It was really hard

15   on us, all of us.

16        Q.   But it -- what was hard was walking to the

17   kiosk.  That's what you're complaining about?

18        A.   A lot of the meltdowns my son had was because

19   of the back and forward, yes.

20        Q.   Well, he had meltdowns any time at that age

21   when he didn't get he wanted.  We've already covered

22   that, correct?

23        A.   Okay.  Yes.

24        Q.   Right?  So why would you blame Disney for

25   something that happened every other place in his life,
```

Evidence Packet P.0636

1    whether it's home or school; whenever he didn't get a

2    preferred activity, he'd have that kind of a reaction?

3    Why would you blame Disney?

4         A.    It was a different experience from the first

5    visit.

6         Q.    Well, of course.  But you would agree that

7    anybody would prefer to go on a ride with no wait

8    whatsoever, right?  Do you know anybody on the planet

9    that would not prefer that to a different system?

10        A.    No.

11        Q.    Right.  So the ability to go to a ride and get

12   on immediately, which is what you were able to do with

13   the DAS system, that was like the best possible thing in

14   the world, right?

15        A.    Correct.

16        Q.    Right.  And then when Disney had to change that

17   because of the abuse, they came up with a different

18   system.  But it still gave you a significant advantage

19   over everybody else who had to wait in line, didn't it?

20        A.    Well, yeah.  He's not standing in line.

21        Q.    Right.  And that's a significant advantage over

22   everybody else who had kids, right?

23        A.    Yes.

24        Q.    Okay.  Let's take another quick break.

25              THE VIDEOGRAPHER:  The time is 11:39, and we

Evidence Packet P.0637

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                          179

1    are off the record.

2            (Break taken.)

3            THE VIDEOGRAPHER:  The time is 12 o'clock and

4    we're on the record.

5            MR. SCANLON:

6        Q.   Ms. ████████ continuing on with our discussion

7    about your visit in November 2013 to Disneyland, just

8    before the break, you testified that there was a

9    significant advantage to not have to stand in the actual

10   line.  But on the first day of your visit of that trip,

11   you actually did stand in the line that day, right?

12       A.   Yes.

13       Q.   And you were able to -- with your son, right?

14       A.   Mm-hmm.

15       Q.   And that was not a problem, right?

16       A.   Right.

17       Q.   And -- and those lines were about 25 minutes

18   long, right?

19       A.   I think even less than that.  It was -- our

20   first day to the park was on a Thursday, so lines were

21   fairly short.

22       Q.   Okay.  But do you remember answering an

23   interrogatory answer in which you said that the lines

24   that day were about -- they were fairly short and you

25   described them as 25 minutes long?

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    180

1        A.   About 20 to 25 minutes long, yes.

2        Q.   No.  You said 25 minutes, not 20 to 25.

3        A.   Oh, okay.

4        Q.   So let's mark this as the next exhibit.

5             (Exhibit 8 was marked for identification.)

6        Q.   So if you look at this document, and please

7    turn to the last page.  And you signed these -- you

8    signed this verification that these answers to our

9    questions, that's what an interrogatory is, just a fancy

10   word for questions.  That your answers were true.  Under

11   penalty of perjury that they were true and correct,

12   right?

13       A.   Correct.

14       Q.   And you signed this document after reading it,

15   right?

16       A.   Yes.

17       Q.   Okay.  And if you look at the answer on page

18   ten to the question about the accommodations you

19   received, this was 8A.  The answer was eight, and the

20   subpart was 8A.  And it's on page ten.

21            And it says:  Lines were around 20 -- this is

22   on line -- starting on line three.

23            "Lines were around 25 minutes, so we tried

24   waiting in them, and the family members took turns

25   helping to occupy the kids."

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    181

```
 1              Then you go on to talk about the second day.
 2      So does that -- that's where you said the lines were --
 3      were around 25 minutes, right?
 4          A.   8A, you said?
 5          Q.   It's on -- it's on page ten in the -- in the
 6      continuation in answer 8A.  It's not the beginning of
 7      8A, but it's in the middle of 8A.
 8          A.   Oh.
 9          Q.   On line three on page ten of this document.
10      Line -- the line number's over on the left-hand column.
11              MR. FELDMAN:  Where it says "lines were around
12      25 minutes"?
13              MR. SCANLON:
14          Q.   Do you see that?
15          A.   Yes.
16          Q.   Okay.  So -- so you stood in the regular lines
17      without problems for 25 minutes each line, around
18      25 minutes.  And you also described that waiting as
19      short and bearable, didn't you?
20              Not in this document, but in the complaint.
21      When you filed the complaint in this case, you described
22      that wait, the 25-minute wait in the regular line, as
23      short and bearable, right?
24          A.   Right.
25          Q.   Okay.  And so do you know -- these were
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                              183

1        Q.   Okay.  So -- so if -- if the rides that you

2    were interested in going on were 25 minutes or less, you

3    could have stood in the regular line, and -- and gone

4    through a line.  Or if they were 35 minutes or less, you

5    could have gotten a DAS return.

6            Then your -- your return time would have been

7    25 minutes later, right?  And so then the wait would

8    have been 25 minutes, but it wouldn't have been in line.

9    You could have done -- gone to another ride.  You could

10   have gone and gotten something to eat.  You could do

11   anything, right?

12           MR. FELDMAN:  Objection.  The question is

13   compound.

14           MR. SCANLON:

15       Q.   Okay.  Do you understand what the question is?

16       A.   Can you summarize it?  It's --

17       Q.   Sure.  What I'm trying to say is that because

18   you've testified that you were able to wait in line on

19   the first day for around 25 minutes, then if a ride had

20   a -- had a -- a wait time of 25 minutes or less, you

21   would have been able to stand in the regular line and

22   get on the ride, right?

23       A.   Yes.

24       Q.   What you were concerned about, I assume, was

25   rides that were an hour- or two-hour wait, right?

Evidence Packet P.0641

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

████████████████

November 13, 2019                                    191

```
1        Q.   So let's go down and look at the wait times.

2    And then what we did was we did a summary at the bottom

3    of this.  So if you look at it, ███████████████

4    that you identified or that were on your DAS card, ██

5    ██████████████████████████████████████████

6    ██████████████████████████████.  Do you

7    see that?

8        A.   Yes.

9        Q.   Okay.

10            MR. FELDMAN:  I'll object.  The document speaks

11   for itself.

12            MR. SCANLON:  Okay.

13            MR. FELDMAN:  Counsel, you just seem to be

14   reading it into the record.

15            MR. SCANLON:  Well, I -- I want to -- I want to

16   -- I'm going to get to some questions.  I just want to

17   make sure that she understands this.

18        Q.   ████████████████████████████████████

19   ████████████████        Do you see that at the bottom?

20       A.   Yes.

21       Q.   So I'll allow you to take a few minutes and

22   look at this to make sure that you think our math was

23   correct.  But if that's right, what that means was you

24   would have been able to go on that day every ride except

25   one without -- with your DAS card without waiting any
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

███████████

November 13, 2019                                    222

```
 1    In terms of how much schlepping you'd have to do back

 2    and forth?

 3        A.   I'm sorry.  What was the question?

 4        Q.   Right.  Well, you -- you thought there were

 5    only two kiosks, which is why you said you had to do so

 6    much walking.  But if there were actually nine kiosks

 7    instead of two, that would be a big difference, wouldn't

 8    it, in terms of how much walking you'd have to do?

 9        A.   Yes.

10             MR. FELDMAN:  Objection.  Assumes facts not in

11    evidence.

12             MR. SCANLON:  We can take a break now.

13             THE VIDEOGRAPHER:  The time is 1:08, and we are

14    off the record.

15             (Break taken.)

16             THE VIDEOGRAPHER:  The time is 1:19, and we are

17    on the record.

18             MR. SCANLON:

19        Q.   Ms. ██████  do you intend to keep your children

20    out of school until after the IEP decision's made in

21    December?

22        A.   Yes.  Yes.

23        Q.   Are they receiving any kind of educational

24    treatment or anything during the day now?

25        A.   No.  Just their ABA.
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    223

1        Q.   And how often does the ABA staff come?

2        A.   My son receives 20 hours a week, so his

3    schedule is 8:30 to 12:30.  Fridays is the longer day,

4    which they can come for a p.m. session or afternoon

5    session.  My daughter receives 30 hours a week, so she

6    has a little more coverage.  And Tuesdays and Thursdays

7    are her longer days.

8        Q.   Okay.  You answered one of the supplemental

9    interrogatory answers that one of the trips you took

10   after the first set of interrogatories was you went to

11   Las Vegas?

12       A.   Yes.

13       Q.   Is that about a nine- or ten-hour drive from

14   here?

15       A.   Yes, roughly.

16       Q.   And you drove there?

17       A.   Yes, sir.

18       Q.   And drove back?

19       A.   Yes, sir.

20       Q.   With your son and daughter?

21       A.   Yes.

22       Q.   Was anybody else in the car?

23       A.   No, it was just my husband and the two kids.

24       Q.   And what did you do in Las Vegas?

25       A.   Oh, we stayed at the pool.

Evidence Packet P.0644

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    237

1          A.    Right.

2          Q.    Did you just research it online or something?

3          A.    No, my nephews back in middle school and high

4    school participated in band, in the school band.  And

5    Disney has, I guess, a program where every two years

6    they do a concert of all the schools that want to

7    participate.  And they sell the tickets for extended

8    family, and that's how we purchase our tickets.

9          Q.    That -- they were there at the time you were

10   there or they just got these tickets because of the band

11   connection?

12         A.    It was the band connection, and you could use

13   the tickets up to for a year, I think.

14         Q.    Oh, I see.  Okay.  And did you get them at a

15   discount?

16         A.    Yes.

17         Q.    Or did you get them for free?

18         A.    No, no, no.  At a discount.  I think it was

19   like 20 or $30 cheaper.

20         Q.    Okay.  Okay.  And did you have any contracts

21   with Disney when you went there?  Did you have any

22   contracts that you engaged with at Disney?

23         A.    No.

24         Q.    Okay.  Did you buy any -- other than food, did

25   you buy any Disney products when you were there?

Evidence Packet P.0645

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
████████████

November 13, 2019                                    245

```
 1    blaming Disney for the fact that your son has a history

 2    of meltdowns --

 3         A.   No.

 4         Q.   -- over his -- over his life, right?

 5         A.   No.

 6         Q.   Over -- well, he has done -- had meltdowns at

 7    school, right?

 8         A.   Yes.

 9         Q.   Okay.  And he has meltdowns in other aspects of

10    life, right?

11         A.   Right.  And at school his meltdowns are -- are

12    different.  And he goes from flipping a table, a desk, a

13    chair to -- try to physically harm somebody else, like

14    throwing a punch or throwing a slap.

15         Q.   Okay.  And how many meltdowns did he experience

16    at Disneyland -- and let's -- let's talk about the

17    November visit.

18         A.   I don't recall the exact number, but it was a

19    fairly amount.  I don't know, six, eight.

20         Q.   Okay.  And did you have -- these six to eight

21    meltdowns -- do you recall how many there were each day?

22    Was there more on one day than another?

23         A.   The -- the second and the third day were -- I

24    think the second was the hardest.  The third one I

25    wasn't just pushing to -- to -- to do rides or anything.
```

Evidence Packet P.0646

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

```
 1                THE WITNESS:  He was upset.

 2                MR. FELDMAN:

 3        Q.    Okay.  And did he end up having a meltdown?

 4        A.    Yes.  On -- on most occasions, yes.

 5        Q.    So would you say that he had multiple meltdowns

 6    on either the second or third day?

 7        A.    Yes.

 8                MR. SCANLON:  Objection.  Leading.

 9                MR. FELDMAN:

10        Q.    Okay.  All right.  Now Mr. Scanlon asked you

11    about the number of kiosks that were available to -- to

12    get the -- the DAS pass, right?

13        A.    Mm-hmm.

14        Q.    Okay.  And as far as you were aware, how many

15    locations were there in Disneyland?

16        A.    I -- I was -- I only recall having to go to --

17    to one.  I don't even recall that I was informed that I

18    could go back to the -- to the first one where I had got

19    the card to get a -- a next ride.

20        Q.    Okay.  All right.  And you've already testified

21    about the fast passes.  Were there any rides that you

22    weren't able to get fast passes for?

23        A.    Yeah.  The -- the ones that I tried, they were

24    just gone.

25        Q.    Okay.  Did -- did you -- when you went into the
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    248

```
 1    park, you had a -- you had a -- a ticket of some sort,

 2    right?

 3         A.   Right.

 4         Q.   Okay.  And did you ever look at the -- the back

 5    of the ticket?

 6         A.   The fine print?

 7         Q.   Yeah, the fine print.

 8         A.   No.

 9         Q.   Okay.  So you -- you -- you recall seeing some

10    print on the back of it -- of the ticket, but you've

11    never actually --

12         A.   Read it?

13         Q.   Seen what -- what it says?

14         A.   No.

15         Q.   So you have no idea what it says?

16         A.   No.

17         Q.   Okay.  All right.  And did you have -- were you

18    expecting that -- that the other members of your party

19    were going to take care of your son or did you view that

20    as your responsibility?

21         A.   No, it was my responsibility.

22         Q.   Okay.  Would you like to be able to go back to

23    Disneyland for a visit with your son?

24         A.   I -- don't get me wrong.  We love Disney.  My

25    son loves Disney movies.  He scripts the movies.  He has
```

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    250

```
 1              MR. SCANLON:

 2         Q.   You said that there were six to eight meltdowns

 3    at Disney.  Are you referring to the three days in

 4    November when you were there?

 5         A.   Yes.

 6         Q.   And given your prior testimony that at that

 7    time in his life, December or November of 2013, he would

 8    have that reaction; yelling, crying, aggression, or

 9    falling to the floor in nearly 100 percent of the

10    opportunities when he's denied access to preferred

11    items, six to eight times at Disney, with all the

12    opportunities he'd have for preferences there, is -- was

13    completely consistent with his life at that point,

14    right?

15              You've already -- I already asked you about

16    that.  You said yes that was true.  At that time in his

17    life, that -- this finding was accurate in the STI

18    Consultants report.  Remember that?

19         A.   Yes.

20         Q.   Okay, so this wasn't out of the ordinary, was

21    it?

22         A.   No, it wasn't, but I could tell the difference

23    from a meltdown or a tantrum.  Because he's denied

24    something, then the frustration of not being able to

25    access something that he wants and needs to experience.
```

Evidence Packet P.0649

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL
██████████████

November 13, 2019                                    251

1        Q.   Well, he -- he wanted these opportunities.  It

2    says "when he's denied access to preferred items" or

3    required a transition away from preferred items, he said

4    he would have this meltdown in 100 percent of the

5    opportunities, right?

6        A.   Right.

7        Q.   That's what they found?

8        A.   That's what they found, because ABA was fairly

9    new.  They were beginning to treat ABA.

10       Q.   Right.  And that was the same time that you

11   went to Disneyland, wasn't it?

12       A.   Mm-hmm.

13       Q.   So -- so six to eight times in three days at a

14   park like Disneyland?

15       A.   No, his -- I don't believe his answer was for

16   the three days.  I think his -- I refer to the --

17       Q.   No.  The question was how many did he have in

18   your trip to Disneyland.  You said six to eight

19   meltdowns?

20       A.   Oh, well, I meant to say per day.

21       Q.   Well, but you said -- you didn't say per day?

22       A.   Okay.

23       Q.   But either way, it -- that was not out of the

24   ordinary, was it, at that time in his life?

25       A.   No.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                          252

 1          Q.   Okay.  You also said that -- you mentioned a

 2     concept of waiting.  That your son doesn't understand

 3     the concept of waiting.  Well, that's one of the things

 4     you've worked on at -- and -- and that's one of the

 5     things you work on with ABA therapy, right?  That's one

 6     of the preferred things.  They want something right

 7     away, right?  Correct?

 8          A.   Correct.

 9          Q.   And you know that the reason they teach kids

10     with autism to not want everything right away is because

11     that's not how the world is going to be when they grow

12     up; they can't have everything right when they want it,

13     correct?

14          A.   Correct.

15          Q.   And so it's a very important principle of ABA

16     therapy, which your son has succeeded in, and you've

17     said that they learned to not think they can have

18     everything just because they want it, correct?

19          A.   Correct.

20          Q.   And so one of the things that you learned in

21     ABA therapy is that you can't have anything right when

22     you want it, and you have to wait for things sometimes,

23     right?

24          A.   Right.

25          Q.   Okay.  And he is -- he has progressed in that,

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

November 13, 2019                                    253

1    right?  He's been -- he has improved in his ability to

2    wait, hasn't he?

3         A.   He has improved somewhat.  That doesn't mean

4    that he doesn't show a meltdown or a behavior.

5         Q.   Right.  But it can happen for anything that he

6    is required to wait for, right?

7         A.   Yes.

8         Q.   Right.  And -- and in your house, he would have

9    to wait to go to the bathroom sometimes, right?  Because

10   you had two bathrooms and nine people living there?

11        A.   Correct.

12        Q.   All right.  Okay.  And you said he doesn't

13   understand the concept of time, but you already

14   testified that he could read time and understood time.

15        A.   One thing is --

16        Q.   Right?

17             MR. FELDMAN:  Objection.  That misstates her --

18   her testimony.

19             MR. SCANLON:

20        Q.   Well, I understand that, you know, that he

21   wanted to do things right away.  But to say he doesn't

22   understand the concept of time; he understands a -- a

23   clock goes around.  He could tell the time, right?

24        A.   He could tell time.  He does not understand the

25   concept -- concept of waiting.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

```
1     STATE OF CALIFORNIA )
                          )
2     COUNTY OF ALAMEDA   )

3            I, TAMMY MOON, CSR No. 13184, Certified

4     Shorthand Reporter, do hereby certify:

5            That prior to being examined, the witness in

6     the foregoing proceedings was by me duly sworn to

7     testify to the truth, the whole truth, and nothing but

8     the truth;

9            That said proceedings were taken before me at

10    the time and place therein set forth and were taken down

11    by me in shorthand and thereafter transcribed into

12    typewriting under my direction and supervision;

13           I further certify that I am neither counsel

14    for, nor related to, any party to said proceedings, nor

15    in any way interested in the outcome thereof.

16           In witness whereof, I have hereunto subscribed

17    my name.

18           Dated:  19th of November, 2019

19

20                    Tammy Moon

21

22                    Tammy Moon, CSR No. 13184

23

24

25
```