REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# Exhibit 1-B

Evidence Packet in Support of Defendant's Motions for Summary Judgment

U.S.D.C., Central District of California, Case No.: 2:15-cv-05346-CJC-E

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# *The Matter Of:*

### *A.L., et al.*
### *v.*
### *Walt Disney Parks and Resorts U.S., Inc.*

------------------------

### *Alison Armor VOL I*

### *July 7, 2015*

------------------------



17835 Ventura Blvd. Suite 310 Encino, CA 91316
P 888.272.0022 F 818.343.7119
www.benhyatt.com

BH CDR Job # **1032539**
number of pages 179

### *Word Index Included with this Condensed Transcript.*

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

UNITED STATES DISTRICT COURT FOR THE

MIDDLE DISTRICT OF FLORIDA

CASE NO.:  6:14-cv-1544-Orl-22GJK

A.L., by and through D.L., as

Next Friend, Parent and Natural

Guardian; D.L., Individually,

        Plaintiffs,

vs.

WALT DISNEY PARKS AND RESORTS

US, INC.,

        Defendant.

_____/


DEPOSITION OF:  Alison Armor

DATE TAKEN:     July 7, 2015

TIME:           9:43 a.m. - 6:02 p.m.

PLACE:          1375 East Buena Vista Drive

                4th Floor

                Orlando, Florida  32830

REPORTED BY:    Lori Francis, RPR, FPR and

                Notary Public


   This transcript contains confidential and highly

confidential information and is subject to the parties'

   confidentiality agreement dated May 26, 2015.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1   APPEARANCES:

 2          APPEARING ON BEHALF OF THE PLAINTIFFS:

 3             ANDY DOGALI, ESQUIRE

 4             Dogali Law Group, P.A.

 5             101 East Kennedy Boulevard

 6             Suite 1100

 7             Tampa, Florida  33602

 8             adogali@dogalilaw.com

 9

10             EUGENE FELDMAN, ESQUIRE

11             Arias, Sanguinetti, Stahle, Torrijos

12             6701 Center Drive West

13             Suite 1400

14             Los Angeles, California  90045

15             eugene@asstlawyers.com

16

          APPEARING ON BEHALF OF THE DEFENDANT:
17
               KERRY SCANLON, ESQUIRE
18
               JEREMY M. WHITE, ESQUIRE
19
               Kaye Scholer, LLP
20
               901 Fifteenth Street, N.W.
21
               Washington, D.C.  20005
22
               kerry.scanlon@kayescholer.com
23
               jeremy.white@kayescholer.com
24
25   ALSO PRESENT:      ████████████
```

Page 2

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor – 7/7/2015

```
 1              P R O C E E D I N G S

 2                   ALISON ARMOR,

 3   having been first duly sworn to tell the truth, was

 4   examined and testified upon her oath as follows:

 5                   THE WITNESS:  I do.

 6                   DIRECT EXAMINATION

 7   BY MR. DOGALI:

 8        Q     Good morning.

 9        A     Good morning.

10        Q     Can you state your full name, please?

11        A     Alison Ewasiuk Armor.

12        Q     And have you ever given a deposition before?

13        A     No.

14        Q     The general idea is I'm not supposed to ask

15   you questions that are intended to trick you or

16   anything like that but really just to elicit, in this

17   instance, the corporation's knowledge about a number of

18   events in its past and present.

19             One thing that's a little unusual in a

20   deposition like this is you're being deposed today as

21   the corporation, Walt Disney Parks and Resorts US, Inc.

22   and not as an individual.  Do you understand that?

23        A     I do.

24        Q     Where that might get a little confusing

25   during the day, if any of my questions are confusing
```

Evidence Packet P.0022

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1      Q      How did you first become involved in
 2   development of what became known as the DAS?
 3      A       When I came back from Paris, it was the
 4   summer of 2011.  My role was very different.  I was a
 5   service provider to the operators.  I served them in
 6   any aspect that would involve multi-site consistency
 7   typically from a pure operator perspective, and I was
 8   consistently receiving feedback from my clients, the
 9   operators, that the system was being abused at that
10   point.
11              So over a course of months, which culminated
12   after about six months that I had been on the job, I
13   did some shadowing myself in the operation, but it was
14   a consistent source of feedback that people are asking
15   me to look into.
16      Q      Do you recall in April of 2012 enlisting
17   others from other units of the company to participate
18   in a team to develop what became the DAS?
19      A       I think it was approximately that time
20   frame.
21      Q      How long before then had you been privy to
22   these discussions of abuse of the GAC?
23      A       Again, I came back in the summer of 2011 and
24   it was over that course of time, I would say, that I
25   was hearing about it.  I went out in February of 2012
```

Page 9

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

```
1    to do my in-costume shadowing.  I knew that was

2    something -- it was specifically something I needed to

3    be observant for, so it was that time frame.

4         Q    The in-costume shadowing was before you

5    started enlisting folks to participate on the team with

6    you?

7         A    Well, as being new to my role in supporting

8    operations, I was doing shadowing in costume for a lot

9    of functions of the operation, and so that was also

10   part of my on-board strategy.  I was doing in-costume

11   training at attractions all over.  Yes, it was in

12   February that I did my in costume.  I remember that

13   specifically.

14        Q    2012?

15        A    Yeah.

16        Q    Let me step back a bit.  For right now, to

17   whom do you report?

18        A    Mark Rucker.

19        Q    What's his title?

20        A    Vice president, parks and lodging line of

21   business.

22        Q    To whom does he report?

23        A    Joe Schott.

24        Q    Is he a senior VP or executive VP?

25        A    He's a senior VP.
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0024

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

```
 1        Q      Who decided it would be you?

 2        A      I don't know that anyone specifically

 3   decided that.

 4        Q      Who gave you the directive to start doing

 5   it?

 6        A      There wasn't a specific directive.  It was

 7   nothing so formal or specific, meaning when I was given

 8   the charge.  It was more organic in nature and how it

 9   became an increasing priority as it became an

10   increasing concern of the operators.

11      (Plaintiffs' Exhibit 1 marked for identification.)

12   BY MR. DOGALI:

13        Q      I'll show you something I marked as Exhibit

14   1.

15        A      Sure.

16        Q      After you've had a chance to look at it, the

17   first question is going to be, what is it?

18              MR. SCANLON:  We're off the record.

19         (A discussion was held off the record.)

20   BY MR. DOGALI:

21        Q      What is this?

22        A      So this was a notification I sent out to

23   some of the key partners that we would be -- we

24   initially thought we'd be integrating with letting them

25   be aware that there is a need for us to look at
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0025

CONFIDENTIAL
Alison Armor - 7/7/2015

```
1   attraction access, is what we were calling it at the

2   time.  ███████████████████████████████████████

    █ ███████████████████████████████████████████████

    █ ███████████████████████████████████████████████

    █ ███████████████████████████████████████████████

    █ █████████████████████  so we incorporated that into a much

7   broader presentation -- at the time my leader did --

8   and it was all approved to look at it at that time.

9           So we did feel like we wanted formal

10  sponsorship of it, and I think we used ███████████████

11  that we had at the time as a vehicle to make sure we

12  had visibility to this other element, which was an

13  offshoot of that work.  We felt like we could bundle

14  it, if you will, although I didn't believe all the ████

█ ████  that was all under Brian Britton -- to try to

16  bundle it at the time.

17     Q     When you mentioned your leader, was that Mr.

18  Rucker?

19     A     No.  It was Brian Britton at the time.

20     Q     That's right.  I'm sorry.

21           To what extent, up until this time, April of

22  2012, had you personally been exposed to issues

23  relating to ECV access in the parks?

24           MR. SCANLON:  Excuse me.  Is that related to

25     your 30(b)(6) notice?
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0026

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1              MR. DOGALI:  Yes.

 2              MR. SCANLON:  How?

 3              MR. DOGALI:  She just answered the question

 4       in the context of ████████████████████████

  ██         ████████

 6              MR. SCANLON:  How is the detail about the

 7         ██████████  relevant to DAS?

 8              MR. DOGALI:  Can you answer the question,

 9       ma'am?

10              THE WITNESS:  Can you repeat the question?

11              MR. SCANLON:  Objection to the question.  Go

12       ahead.

13              THE WITNESS:  If you can repeat the

14       question.

15    BY MR. DOGALI:

16       Q    Prior to April of 2012, had you personally

17    had any exposure to issues relating to ECV access in

18    the parks?

19       A    Me personally?

20       Q    Yes, ma'am.

21       A    No.

22       Q    During these first formative periods, weeks

23    say, who became the members of the team?

24       A    It was for sure Mark Jones, was the one from

25    the services guest disabilities who was most closely
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0027

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
1    involved, although he kept his leadership at the time
2    also aware.  We also worked very closely with our
3    internal legal counsel.  Scott Pacula was my assigned
4    partner from that group.  Todd Evans on my team was a
5    key contributor.  We also worked closely with Teri
6    Rosenfeld and Carla Mertz on the training and
7    documentation and components that were needed, and
8    Jacquee Wahler was our contact from a public affairs
9    perspective.  Those were the main partners.
10        Q    These individuals that you addressed the
11   initial communique to were leaders of those units, you
12   encouraged them to assign somebody to your team; is
13   that fair?
14        A    Yeah.  I was trying to get them to
15   understand it was something we needed leaders to be
16   involved in and we needed to prioritize this, was my
17   focus of this communication.
18        Q    Ms. Mertz assigned Ms. Barrett -- Mr.
19   Barrett?
20        A    Jason Barrett.  He was involved initially, I
21   believe, yes.  We had many folks from the documentation
22   team at the time but, yes, he was involved.
23        Q    Ms. Wahler at a point?  Crimmins?
24        A    Brian Crimmins would have been from a
25   communication perspective under Jacquee, yes.
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0028

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1      Q      Who is Margaret Giacalone?

 2      A      She's Scott Pacula's manager.

 3      Q      Who is Ms. Morris, Julie Morris?

 4      A      She had been the originator of the GAC

 5  system, so she -- I believe we reached out to her for

 6  history of that development, but she didn't have a lot

 7  of contribution going forward from that perspective.

 8      Q      And guest relations, did she assign Ms.

 9  Sweetman for Disneyland and Mitchell for Disney World?

10      A      She basically wasn't involved from that

11  point on.  Jenny Sweetman was involved from guest

12  relations.  At the time, Julie was leading guest

13  relations when GAC was developed, but she wasn't

14  involved in it anymore in 2012.  She was more from a

15  historical perspective to understand what efforts they

16  went through in GAC implementation.  Jenny Sweetman was

17  involved.  She was reporting to the guest relations

18  director out in California.

19      Q      Did you involve anyone from media relations?

20      A      Our communications team was -- I'm trying to

21  remember the -- basically they're integrated together,

22  so internal/external we deal with one point person from

23  a communications perspective on this.

24      Q      For purposes of this team, did that simply

25  become Ms. Prihoda?
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0029

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1        that answer back.

 2               (The preceding answer was read

 3               back by the court reporter.)

 4          MR. SCANLON:  Thank you.

 5          THE COURT REPORTER:  You're welcome.

 6   BY MR. DOGALI:

 7     Q     Is it fair to say when the team began its

 8   work in the spring of 2012, it was already resolved and

 9   the objective was to equalize wait time across the

10   universe of guests?

11     A     The work group was pulled together at this

12   point as a collaborative process to seek everyone's

13   feedback, reaction and input; and that's what we set

14   out to do, as I mentioned here over the course of a

15   period of time.  Initially we estimated it to take six

16   months to really formalize what we were going to do.

17     Q     This idea of equalizing wait time for all

18   guests was one of the team's initial objectives, fair?

19          MR. SCANLON:  I think that misstates what

20     she just explained.

21   BY MR. DOGALI:

22     Q     The question, ma'am:  Is it fair to say --

23          MR. SCANLON:  Objection, misstates her

24     testimony.

25   BY MR. DOGALI:
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0030

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1       Q     Is it fair to say that one of the team's

 2   initial objectives from its outset was equalizing wait

 3   time for all guests?

 4       A     Our objective was to reform a system to

 5   reduce abuse to sustainable service, and this is one

 6   concept we had in that regard that would be evaluated.

 7       Q     Is there any aspect of the second bullet

 8   point of this page which is inaccurate?

 9       A     Inaccurate in what sense, I guess?

10       Q     I don't know.  It looks entirely -- I don't

11   know if something is inaccurate about it, so I'm asking

12   you.

13       A     The context of this was to bring up to speed

14   numerous stakeholders that would all have input into

15   this project and the process.  To bring them up to

16   speed was what we were doing with this entire

17   presentation, for them to start to think about some of

18   these concepts so we could, as a group, together evolve

19   to what we ultimately would want to do.

20             This was absolutely put in front of them to

21   react to, but it wasn't necessarily in the context of a

22   mandate.  It was something for them to react to as a

23   concept.

24       Q     Turn one page.

25       A     Sure.
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0031

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1    July of 2012 probably to -- when I say advisory

 2    committee, probably to the leaders of the group that

 3    was assembled for the working team.  That would be my

 4    intuition.

 5         Q    The document was created by your team?

 6         A    Yes.

 7         Q    On the second page, there's a bullet most of

 8    the way down.  Balancing legal requirement versus guest

 9    expectations, do you see that?

10         A    Sure.

11         Q    What does that mean?

12         A    Primarily we knew that guests had come to

13    expect a high level of service with the GAC and if we

14    were to modify that, it would be challenging for guests

15    to accept.

16         Q    What's that have to do with a legal

17    requirement?

18         A    ████████████████████████████████████████

      ██  ███████████████████████████  ███████████

      ██  ██████████████████████████████████████

      ██  ████████████████████████████████████████████

      ██  ████████████████████████████████████████████

      ██  ██████████████████████████

24         Q    You mentioned lawyers in the plural.  Does

25    this refresh your recollection about when the outside
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0032

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
1    attorneys became involved in the process?

2        A     Not necessarily, not specifically.

3        Q     Okay.  Go to the next page.

4        A     Sure.

5        Q     Does the first bullet accurately state one

6    of the objectives of the team?

7        A     There were multiple objectives, but one was

8    to understand was this achievable in terms of providing

9    equal access.

10       Q     What does not granting preferential wait

11   time via an expedited back door process mean?

12       A     It's a description of what the GAC service

13   was.

14       Q     By its alternate entry stamp?

15       A     Yes.

16       Q     Why was the solution to eliminating the

17   alternate entry concept equalizing wait time rather

18   than providing an expedited front door process?

19       A     I don't know that I understand the question.

20       Q     Well, you -- I understand you write the

21   alternate entry concept left the system vulnerable to

22   abuse, true?

23       A     Yes.

24       Q     And you recognize a solution to that was to

25   equalize wait times?
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0033

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1            THE WITNESS:  Well, we are not experts in
 2       disabilities as a company, so we focus on the
 3       needs of our guests and what they're saying they
 4       need and what their expectations are and how to
 5       make them happy.
 6            Even Mark alluded to in his e-mail that we
 7       like the advice of our operators.  Our operators
 8       are interacting with them every single day, so as
 9       we looked at the needs of our guests, we leveraged
10       our operators who first hand are the ones talking
11       with them and understanding the wide spectrum of
12       needs independent of a specific disability name
13       because we have guests that come up to us and say
14       they have X, Y, Z and we may have never heard of
15       that.
16            It's not our -- the expectation of our cast
17       to understand that diagnosis, and it's really
18       about what of their experience do they have
19       concerns about and how we can help them with those
20       concerns.  That's how we looked at the needs of
21       what our program needed to fulfill.
22  BY MR. DOGALI:
23       Q    With respect to autistic persons, why did
24  Disney think replacing the back door concept with a
25  virtual wait was a good idea?
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

Evidence Packet P.0034

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1          MR. SCANLON:  Can you repeat that question,
 2      please?
 3          (The preceding question was read back by the
 4      court reporter.)
 5          MR. SCANLON:  Do you understand the
 6      question?
 7          THE WITNESS:  I think I do.  We looked at
 8      preserving a system that would enable our guests
 9      to experience the attractions without having to be
10      in a traditional cue.  Doing other things and
11      occupying their time elsewhere was critical to
12      sustain.
13          The immediate back door entry use of the
14      GAC, which the GAC had become, was creating
15      excessive lines at times, fraud.  We saw guests
16      complaining in your exhibits here related to the
17      abuse and it was unsustainable.
18  BY MR. DOGALI:
19      Q    Why was GAC access, the back door access
20  unsustainable?
21          MR. SCANLON:  Asked and answered.  You can
22      answer the question again if you'd like to.
23          THE WITNESS:  Well, I think in your exhibits
24      it's outlined quite clearly in some regard that
25      the GAC system was intended to actually be six
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0035

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1      different tiers and stamps, and it had essentially
 2      become everyone at the top level because of
 3      increased awareness, because of social media and
 4      because of our inability to actually filter
 5      guests.
 6           Because of that, we saw excessive use, we
 7      saw exaggeration and fabrication of need and we
 8      even saw some blatant fraud.  With that inability
 9      to control access, a demand for this pass, we felt
10      it needed reform.  It proved to us that we were
11      not able to actually filter with six or seven
12      stamps based on guests stated need.
13  BY MR. DOGALI:
14      Q    Has Disney ever studied the cost of
15  providing GAC access to autistic persons?
16           MR. SCANLON:  I'm sorry.  Can you repeat
17      that?
18  BY MR. DOGALI:
19      Q    Has Disney ever studied the cost of
20  providing GAC access to autistic persons?
21           MR. SCANLON:  The monetary cost?
22           MR. DOGALI:  There's only one deponent here.
23           MR. SCANLON:  I object to the question as
24      vague.
25  BY MR. DOGALI:
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0036

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1        Q      Whether Disney has ever performed an
 2   analysis of that question is impossible to answer?
 3               MR. SCANLON:  Mr. Dogali, you know it's
 4        impossible and you know why it's impossible.
 5               MR. DOGALI:  No, I don't.
 6               MR. SCANLON:  Because you can't do it for
 7        one person.
 8   BY MR. DOGALI:
 9        Q      Has Disney ever examined the cost of
10   providing GAC access to any single guest?
11        A      That is impossible to do.
12        Q      Has Disney ever studied the extent to which
13   providing GAC access to any single guest would require
14   a fundamental alteration of the services Disney
15   provides?
16        A      We know -- to a single guest, is that what
17   you said?
18        Q      Yes.
19        A      No.
20        Q      Has Disney ever examined the extent to which
21   providing GAC access to autistic guests would require
22   fundamental alteration of the services Disney provides?
23        A      Again, we don't know how many guests are
24   autistic versus any other diagnosis, so that would be
25   impossible for us to do.
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0037

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1       Q       Disney ever examine the extent to which

 2   providing GAC access to guests with cognitive

 3   impairments would require a fundamental alteration of

 4   the services Disney provides?

 5       A       Same answer as before.

 6               MR. DOGALI:  Let's take a break.

 7               THE WITNESS:  Okay.

 8                    (A recess was taken.)

 9   BY MR. DOGALI:

10       Q       What is FLIK, F-L-I-K?

11       A       ███████████████████████████████████████

     ███  ████████████████████████████

13       Q       Proprietary software of Disney?

14       A       ██████████████████████  ████████████████

     ███  ████████████████████

16       Q       Is there a separate team called GAC card

17   abuse task team?

18       A       Not that I can recall independent of the

19   group we were working with.

20       (Plaintiffs' Exhibit 5 marked for identification.)

21   BY MR. DOGALI:

22       Q       I'll show you Exhibit 5.

23       A       Sure.

24       Q       It doesn't have any content.  I'm just going

25   to ask you about the subject line.  Does that refresh
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0038

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

1   your recollection about what this is?

2       A    I believe that this was -- given the timing

3   of it being in January, we had seen -- that holiday

4   season was my first introduction into the level of

5   abuse with operators, so we called a few meetings, same

6   players as we had done with the DAS development to

7   specifically address some card abuse knowing that we

8   still had to operate that system at this point in time.

9   We wanted to see what could we do given some of the

10  things we had been made aware of.  This was

11  specifically to try to address and curb some abuse

12  while operating GAC.

13      Q    So was there actually a team established

14  with that name?

15      A    Well, I think we had a few meetings, this

16  group, but it's essentially the same team that was

17  working on DAS earlier in 2012.  I don't recall how

18  many meetings we had.

19      Q    Is it in the aftermath of the holidays 2012

20  that you first became familiar with this phenomenon of

21  abuse of the GAC by tour guides?

22      A    Me personally, that is my recollection, and

23  it wasn't something that I remembered hearing about as

24  we were talking through different reform, but it was

25  something common within some levels within the

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0039

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
1    operation that -- they knew of it.
2         Q    So what extent did Disney ever study the
3    prevalence of that phenomenon?
4              MR. SCANLON:  Are you referring to abuse by
5         tour guides?
6              MR. DOGALI:  Yes.
7              THE WITNESS:  That is one of those things
8         where -- really why we called this meeting
9         together, to be honest, was to understand it.  I
10        had seen one e-mail from both coasts over the
11        holiday period of essentially people caught in the
12        act of doing this, and it was alarming to me.
13             People had anecdotal knowledge of it, but
14        it's not something people were advertising and
15        letting us know, hi, I'm here as a tour guide to
16        pick up my GAC card to sell my services.  That was
17        not something they would tell us, nor could we
18        ask.
19   BY MR. DOGALI:
20        Q    The question was:  Did Disney ever examine
21   or study the prevalence of the problem?
22             MR. SCANLON:  Could you ask those questions
23        separately?
24   BY MR. DOGALI:
25        Q    Did Disney ever study the prevalence of this
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0040

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

1  phenomenon of tour guides abusing the GAC?

2     A     It was impossible to formally study.

3     Q     Okay.  You used a term -- I'm sorry, I

4  should remember it.  But with respect to that practice

5  being a less than scrupulous one of tour guides using a

6  GAC from outside, was that your view then when you

7  first heard about this?

8     A     That it was unscrupulous?

9     Q     Yes.

10     A     I found it -- I found it offensive to our

11  guests with disabilities.

12     Q     At that point in time, if an independent

13  tour guide indeed had a disability, why did Disney deem

14  it improper to operate a tour guide service using that

15  tour guide's GAC?

16     A     That's a lot of what we discussed with this

17  group with Scott -- as you noted, we have Scott Pacula

18  on there, as well as a lawyer from the west coast, and

19  so there's a lot of nuances to what was happening and

20  we couldn't suppose anything.  We did have some

21  alarming reports from the field as related to specific

22  incidents.  But to your point, who are we to determine

23  if someone has a disability or not?  We couldn't.

24     Q     Did Disney understand there to be something

25  improper about the conduct of a disabled person who was

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0041

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    a tour guide and used the GAC?

2        A     Not in particular.  It depends on how they

3    did it.  If they were impersonating a cast member, that

4    would be improper.  We really didn't know how they were

5    executing this service.

6        Q     Do you remember the name Dee Patrick?

7        A     I do recall that.

8        Q     Did Disney sue her?

9        A     I wouldn't know.  I don't know.

10       Q     Were the efforts of this team relating to

11   the tour guides and card abuse folded into the

12   attraction access team's efforts?

13       A     It was always our belief that there were

14   various forms of abuse.  I didn't realize that until

15   this holiday period there was one as egregious as

16   people potentially impersonating tour guides with them.

17             What we felt like, though, was the major

18   sources of abuse were coming more from guests just

19   fabricating their needs to get the pass for themselves

20   because there was really no reason to pay for a guide

21   if you were willing to just go and ask for a pass for

22   yourself.  We felt that that was the major form.

23             Of course this was something that we found

24   offensive to guests with disabilities, that there were

25   truly people using disability access cues that did not

Evidence Packet P.0042

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1    have a disability.  But we felt that this was just one

2    component of an overall need for reform, and it was not

3    the most significant in terms of abuse and excessive

4    use we were seeing.

5         Q    Did that group look up or Google all the

6    firms in Anaheim that were advertising their services

7    as independent tour guides?

8         A    I don't recall necessarily that at the time.

9    I don't recall the time.  Essentially we were under the

10   belief that because someone could legitimately have a

11   disability, we couldn't ask a question of them on that

12   and we felt this was fairly small in volume once the

13   dust settled on our shock, that this was not

14   necessarily our primary goal in life in the sense of we

15   needed to look at the overall program and all the uses

16   of the program.

17            So I don't recall if we were Googling at

18   this point in time or not, I really don't.  I know at

19   some point there was some awareness of some Craig's

20   List ads and things of that nature.  I just don't

21   recall the timing.

22        Q    Ultimately did the implementation of the DAS

23   largely eliminate the problem of tour guides competing

24   using disabled access?

25        A    We believe that the DAS system still is an

Evidence Packet P.0043

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
1        Q     What data does Disney possess regarding the

2   extent to which fraud still occurs in comparison to the

3   period of time under the GAC?

4        A     Well, speaking of fraud in general, we do

5   feel that although people are still wanting and

6   desiring the pass and potentially fabricating the need

7   for DAS, we have put some limits in place as it

8   pertains to transferability, ability to resale with the

9   photo in place now.

10              You can't sell it on the street corner.  We

11  were seeing them on eBay.  We were seeing them on

12  Craig's List, so we know that there are certain

13  channels of fraud through controls that we have through

14  the photo and tying it to people's ticket that we have

15  virtually eliminated.  I feel confident in that.  But

16  to the extent that people are still exaggerating need

17  for it, we have no way to know that.

18       Q     Did Disney ever perform an analysis of the

19  economic cost of GAC abuse?

20       A     We looked at -- as mentioned earlier -- the

21  operating impact of the GAC as a whole, as a system.

22  We did that subsequent to this holiday period when we

23  saw some egregious behavior or what we thought was

24  egregious.  ████████████████████████████████

    ██  ████████████████████████████████████
```

**Ben Hyatt Certified Deposition Reporters**
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0044

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015



18      Q     What's a ghost rider?

19      A     It is someone that we don't count in the

20  sense -- in two different ways, really.  Traditionally

21  before we had FastPass, anyone who went through the

22  back door, they weren't always counted, and so a ghost

23  rider would be uncounted.

24           Then the definition evolved somewhat with

25  the evolution of FastPass where there's someone that is

Page 59

Evidence Packet P.0045

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1        Q       Does it appear to be a comparison of US and

 2    Paris?

 3        A       It does.

 4        Q       In the right column, one of these

 5    descriptions of the DAS says this card allows back door

 6    access.  Do you know what that means?

 7        A       Again, I think this is coming from Paris and

 8    things sometimes get a little bit franglais.  It does

 9    allow them entry into the attractions given -- whatever

10    entry they were using for the alternate entrance, the

11    physical entry point is exactly the same.  The physical

12    entry point into the attraction is the same.

13                With this card, it's after they have waited

14    the virtual wait.  It doesn't clarify that here.

15    That's what makes me think this is a French document.

16    Their focuses tend to be on physical access to the

17    attraction and how you enter into the environment.

18        Q       The next line says, Guests have their

19    picture taken to avoid fraud.

20                Is that an accurate description of the DAS?

21        A       Again, I don't think these are our words.

22    The photo was intended to assist to prevent

23    transferability of the service and to ensure that the

24    person needing the service was the one using the

25    service.  I don't think we would have summarized it
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0046

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

```
1        A      Yes.

2        Q      What's the import or general message of this

3   document?

4        A      Well, we knew from the study that guests

5   with GAC cards were consuming ██████████ of the overall

6   capacity of the attraction if you had a GAC card.  We

7   felt that GAC holders were roughly ██████████ of our

8   attendance base.

9               So if it was proportionate amount of

10  consumption, ██████████ of our attendance would have

11  consumed ██████████ of the attraction capacity.  They

12  consumed ██████████ that amount, and so she was trying

13  to do a sensitivity of analysis of how many times we

14  think each guest with a GAC card rode and then impute

15  how many times everyone else would have ridden, which

16  is what she did here.

17       Q      The second page of the entire document, it's

18  an e-mail from you in the middle.  It says, Thanks

19  Shannon.

20              Do you see that?

21       A      Yeah, yeah.

22       Q      Where it says, We hope to have some

23  agreements on program recommendations from our advisory

24  committee next week; what is the advisory committee?

25       A      It would have been the task force that we
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0047

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1        Q      If you can turn to the third page, 799 at

 2   the bottom.

 3        A      Okay.

 4        Q      Apparently this is a list of items saying we

 5   have the following topics to follow up on.  The last

 6   one on the page, prearrival exceptions process by a

 7   select group; do you see that?

 8        A      Uh-huh.

 9        Q      This is a request by the guests with

10   disabilities team to use a different type of card

11   prearrival that is equivalent to the current alternate

12   entrance card.

13              What happened to that request?

14        A      All of these -- you can see it's a robust

15   list of topics.  It's an indication of the amount of

16   effort and rigor we put into every aspect of the

17   program.  We had all of these topics and we continued

18   to have discussion on them.  We continued -- sometimes

19   you have a work session and you bring a lot of people

20   together and you have a lot of debate and then you have

21   to walk away to have some additional time to reflect.

22              And I think upon additional reflection, we

23   felt strongly that providing -- continued to have a

24   tiered system and a tiered service, although that was

25   what we had done in the past and that was what we were
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0048

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

```
1    comfortable with.  Just like everyone else, when you've

2    done something for years and years, that if we did not

3    break that paradigm shift, we wouldn't be able to

4    prevent the slip back into a GAC situation.

5        Q    Next sentence regarding that request by the

6    guest with disabilities team is needs to be discussed

7    with senior leadership.  Do you see that?

8        A    Yes, I do.

9        Q    Did that occur?

10       A    I believe that was discussion that my leader

11   had with Greg Hale, Brian Britton.

12       Q    So for purposes of this communication, the

13   Hale/Britton level would be senior leadership?

14       A    Yes, because Mark Jones was a part of this

15   work session, and so we would have bubbled up.  I was

16   bubbling it up to my leader, Brian.

17       Q    Going back in time a little bit, when the

18   attraction access team had meetings telephonic or in

19   person, were audio recordings made?

20       A    No.

21       Q    What about at the operations consistency

22   meetings?

23       A    No.

24       Q    To your knowledge, when the senior leader

25   discussion took place at the Britton/Hale level, did it
```

Ben Hyatt Certified Deposition Reporters
888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com

Evidence Packet P.0049

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

```
1   go any higher?

2       A    I don't -- I don't recall.  I may not know.

3   I don't recall.

4     (Plaintiffs' Exhibit 19 marked for identification.)

5           THE WITNESS:  Okay.

6   BY MR. DOGALI:

7       Q    What is this document?

8       A    I remember this being a request that the

9   guest with disabilities team wanted us to think of an

10  alternative.  If we absolutely -- just to think out of

11  the box every possible scenario.  Let's say a guest

12  didn't want to use DAS; they want to use something

13  where they would know in advance their return times if

14  that were important to them but design it in such a way

15  that we could mitigate fraud.  The challenge with it

16  was we were forced to come up with some scenario, and

17  ultimately no one liked the scenario because what we

18  were saying was you would be limited.

19          You couldn't have DAS as DAS was designed,

20  and at the maximum you could have one experience every

21  two hours three times.  So to put a lot of controls on

22  it, a lot of controls.  Ultimately I don't think we

23  felt that this was a scenario that would really meet

24  anyone's needs, other than just create, again, a

25  tiered -- a tiered option that would -- would slide us
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0050

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

```
 1   potentially into having to try to filter, again, guest

 2   needs.

 3           So it was an attempt by us to push our

 4   thinking, but it wasn't anything that we ever felt

 5   passionate or sold on.  Throughout the development of

 6   this, we attempted to push ourselves in every aspect to

 7   think of many options, this being one of them.

 8           MR. SCANLON:  I'd like to take a break at

 9       some point in the next ten minutes, whenever is

10       convenient.

11           MR. DOGALI:  How about now?

12           MR. SCANLON:  Okay.

13               (A recess was taken.)

14     (Plaintiffs' Exhibit 20 marked for identification.)

15           THE WITNESS:  Okay.

16   BY MR. DOGALI:

17       Q    Who is Betty Appleton?

18       A    She's the director of claims at Disneyland,

19   I believe.  That's at least part of her function.  I

20   think she has some other scope as well, but that's her

21   title more or less.

22       Q    Is it -- I'm looking at Mr. Jones' e-mail in

23   the middle of the first page.  Was he accurate in

24   indicating that park ops wanted this to be their

25   project with all facets being their idea?
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0051

CONFIDENTIAL
Alison Armor - 7/7/2015

```
 1      A      What was the question?

 2      Q      Was that an accurate statement by him?

 3      A      Not in my opinion, no.

 4      Q      Can Disney think of any objective indicators

 5   that would have led someone to conclude that?

 6      A      No.  He was -- we had many people involved

 7   throughout the entire process.

 8      Q      Do you recall any specific communication

 9   about this topic yourself with Ms. Appleton?

10             MR. SCANLON:  Which topic?

11             MR. DOGALI:  The topic of this e-mail.

12             MR. SCANLON:  I object.

13             MR. DOGALI:  Okay.

14             MR. SCANLON:  This e-mail has at least four

15        e-mails in it from different people at different

16        times on different dates.

17   BY MR. DOGALI:

18      Q      Ma'am, did you ever have a conversation or

19   other discussion than this with Ms. Appleton about any

20   issues in this e-mail?

21      A      Well, I think the very fact that this e-mail

22   even exists is a testament to the fact we were

23   collaborating and trying to think of new ideas and

24   trying to take into account all the feedback and

25   thoughts from all of our partners.  We were trying to
```

Ben Hyatt Certified Deposition Reporters
888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com

Evidence Packet P.0052

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

1   think of more ideas and seek more feedback.  That's

2   exactly what we were doing.

3        Q     My question was:  Did you ever have any

4   other communications with Ms. Appleton?

5        A     I talked to Betty all the -- yes, of course.

6   Have I had communications with Betty Appleton; is that

7   the question?

8        Q     No.  You know, the question was:  Have you

9   done that with respect to the issues in this e-mail?

10       A     This specific e-mail, not that I can recall.

11   I honestly don't recall.  I wouldn't recall either way.

12       Q     Did she ever convey to you a belief that

13   park ops will only change after they personally

14   experience the issues first hand?

15       A     Not that I can recall.

16    (Plaintiffs' Exhibit 21 marked for identification.)

17   BY MR. DOGALI:

18       Q     Ma'am, from reviewing -- strike that.

19             Did there come a time in June or July of

20   2013 when Mr. Jones was no longer a part of the regular

21   circulation of the attraction access team?

22       A     Not that I can recall.  He attended our

23   two-day work session in June where we were going

24   through all of the minute details of how to execute the

25   program, and there was a period in July where we were

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022   818.343.7040   Fax 818.343.7119   www.benhyatt.com**

Evidence Packet P.0053

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

```
1                    Certificate of Reporter

2     STATE OF FLORIDA)

3     COUNTY OF ORANGE)

4         I, Lori Francis, Registered Professional Reporter

5     and Notary Public, do hereby certify that I was

6     authorized to and did stenographically report the

7     foregoing deposition of Alison Armor; that a review of

8     the transcript was requested; and that the foregoing

9     transcript, pages 3 through 173, is a true record of my

10    stenographic notes.

11        I FURTHER CERTIFY that I am not a relative,

12    employee, attorney or counsel of any of the parties'

13    attorneys or counsel connected with the action, nor am

14    I financially interested in the action.

15        Dated this 17th day of July, 2015,

16    in Orlando, Orange County, Florida.

17

18

19        _____

20        LORI FRANCIS, RPR, FPR, NOTARY

21        PUBLIC AND COURT REPORTER

22

23

24

25
```

**Ben Hyatt Certified Deposition Reporters**
**888.272.0022  818.343.7040  Fax 818.343.7119  www.benhyatt.com**

Evidence Packet P.0054

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**CONFIDENTIAL**
**Alison Armor - 7/7/2015**

```
 1                    Certificate of Oath

 2    STATE OF FLORIDA)

 3    COUNTY OF ORANGE)

 4

 5         I, LORI FRANCIS, REGISTERED PROFESSIONAL

      REPORTER, Notary Public, State of Florida, certify that
 6
      the witness, Alison Armor, personally appeared before
 7
      me on the 7th of July, 2015 and was duly sworn.
 8

 9         WITNESS my hand and official seal this 17th

10    day of July, 2015.

11

12

13

14         _____

15         Lori Francis, RPR, FPR

16         Notary Public - State of Florida

17         My Commission Number:  FF193363

18         My Commission Expires: March 17, 2019

19

20

21

22

23

24

25
```

Evidence Packet P.0055

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## ERRATA SHEET FOR THE DEPOSITION OF ALISON ARMOR

*A.L., et al. v. Walt Disney Parks and Resorts U.S., Inc.*, Case No. 6:14-cv-1544

**Date of Deposition: 7/7/2015**

| No. | Page | Line | Changes or Corrections | Reason |
|-----|------|------|------------------------|--------|
| 1 | 4 | 25 | Change "DISE" to "DIESI" | Typo |
| 2 | 5 | 3 | Change "DISE" to "DIESI" | Typo |
| 3 | 39 | 20 | Delete "there" | Typo |
| 4 | 47 | 9 | Change "a" to "and" | Typo |
| 5 | 59 | 3 | Insert hyphen after "consume" to create "consume-a" | Typo |
| 6 | 59 | 4 | "Remove hyphen after "of" | Typo |
| 7 | 80 | 24 | Remove "n't" from "wouldn't" | Typo |
| 8 | 88 | 4 | Change "in" to "and" | Typo |
| 9 | 123 | 13 | Add a period (.) after "much" | Typo |
| 10 | 123 | 13 | Add open quotation mark (") before "We can't" | Typo |
| 11 | 123 | 14 | Add close quotation mark (") after "at that" | Typo |
| 12 | 125 | 23-24 | Add "as I understood the data when initially reported to me" after "60 percent" | Clarification |
| 13 | 137 | 17 | Remove "e" in "Badine" | Typo |
| 14 | 137 | 18 | Remove "e" in "Badine" | Typo |
| 15 | 139 | 13 | Remove "an" from "Megan" | Typo |
| 16 | 146 | 20 | Remove comma "," after "service" | Typo |
| 17 | 154 | 5-7 | Add "as I understood the data when initially reported to me" after "Walt Disney World site" | Clarification |

Alison Armor

SUBSCRIBED AND SWORN TO

BEFORE ME THIS 21 DAY
OF August, 2015

Notary Public

MY COMMISSION EXPIRES:

Notary Public State of Florida
Maria McCabe
My Commission FF 082922
Expires 02/09/2018