REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# Exhibit 1-F

Evidence Packet in Support of Defendant's Motions for Summary Judgment

U.S.D.C., Central District of California, Case No.: 2:15-cv-05346-CJC-E

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

T.P., by and through S.P., as
Next Friend, Parent, and
Natural Guardian, *et al.*,

    Plaintiffs,

    v.

WALT DISNEY PARKS AND
RESORTS U.S., INC.,

    Defendant.

Case No 2:15-cv-05346-R-E

Hon. Judge R. Gary Klausner

## EXPERT REPORT OF JILL KELDERMAN, PH.D., ABPP-CN

### (Contains information designated CONFIDENTIAL)

I, Jill Kelderman, declare as follows:

## I. INTRODUCTION

1.  I have been retained to testify as an expert in *T.P., et al. v. Walt Disney Parks and Resorts U.S., Inc.*, Case No. 2:15-cv-05346 (C.D. Cal.). As a result of the parties' selection of the fourth set of bellwether plaintiffs, this report addresses only the families of K.A.C., V.J.B. and Y.Z. I have been asked to provide an overview of Autism Spectrum Disorder (ASD) and to opine on whether the accommodations and services provided by Walt Disney Parks and Resorts U.S., Inc. (Disney) are reasonable and effective for guests with ASD in general, and to the disabled plaintiffs in this case, specifically. I was also asked to opine on whether the modification of Disney's Disability Access Service (DAS) program requested by plaintiffs is necessary to afford them access to Disney parks. Finally, I was asked to opine on K.A.C.'s and Y.Z.'s claims of suffering serious, severe, or extreme emotional distress.

2.  This report is based on information available to me at this time and I reserve the right to modify or supplement my report should additional information

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   become available.  I further reserve the right to respond to the opinions of plaintiffs'

2   experts.

3       3.      I am being compensated at a rate of $550 per hour for my time on this

4   matter.  My compensation is not contingent on the outcome of this litigation or on

5   the substance of the opinions in this report.

6   **II.      BACKGROUND AND QUALIFICATIONS**

7       4.      I am a pediatric neuropsychologist board certified in clinical

8   neuropsychology by the American Board of Professional Psychology (ABPP) and a

9   member of the American Academy of Clinical Neuropsychology.  I am a board

10  certified subspecialist in pediatric neuropsychology through ABPP.  At its core, the

11  field of neuropsychology is about determining functional limitations based on

12  knowledge of brain-behavior relationships, child development, research

13  methodology, and statistics.  Pediatric neuropsychologists utilize data collected from

14  interviews, parent and teacher questionnaires, medical records, educational records,

15  and standardized measures to develop a comprehensive profile of an individual's

16  strengths and weaknesses.  Based on that information, individualized and tailored

17  accommodations are determined by the neuropsychologist.  In fact, the determination

18  of effective accommodations is often why families seek out the services of a pediatric

19  neuropsychologist in the first place.

20      5.      I am the clinical director at The Center for Pediatric Neuropsychology.

21  The home clinic is located in Palm Beach Gardens, Florida, with satellite clinics

22  located in Port St. Lucie, Florida, West Des Moines, Iowa, and Grand Cayman.  Our

23  clinics provide comprehensive neuropsychological assessments for infants, children,

24  and adolescents with neurological, developmental, genetic, and psychiatric disorders.

25  My personal clinical caseload typically consists of two to four pediatric

26  neuropsychological evaluations a week, approximately 35 to 40% of which involve

27  ASD and co-morbid concerns. I supervise and/or consult on an additional five to

28  seven neuropsychological evaluations a week performed by two staff pediatric

- 2 -

neuropsychologists.  I am also contracted with the Collaborative Autism Diagnosis and Intervention (CAD) Program at the Els Center of Excellence.  I am part of a multi-disciplinary team including Board Certified Behavior Analysts and Speech-Language Pathologists.  The team completes grant funded diagnostic ASD evaluations for children age 5 and under. A percentage of my caseload is forensic in nature and constitutes approximately 25 to 40% of my time.  Prior to starting my private practice in south Florida in 2009, I spent two years as a staff pediatric neuropsychologist at Waukesha Memorial Hospital. My responsibilities and clinical caseload were quite similar in that setting.

6.     My specialization in the neuropsychological assessment of ASD is based on years of extensive training and education in this domain.  During graduate school at the University of Wisconsin – Milwaukee (UWM), I spent four years as a practicum student at the Medical College of Wisconsin administering neuropsychological tests to toddlers, children, and adolescents, many of whom had ASD.  Concurrently, I worked in the Child Neurodevelopmental Research Laboratory at UWM outlining similarities and differences between children with ASD and children with a genetic syndrome called Williams Syndrome.  During my clinical internship at the University of Chicago Medical School, I completed a one-year pediatric neuropsychology rotation and also rotated through the ASD clinic. During my two-year fellowship in pediatric neuropsychology at the University of Minnesota Medical School, I completed a year-long rotation through the Autism clinic.  My training and clinical experiences provided me the opportunity to develop my clinical skills and knowledge base of ASD.  Along the way, I have had the occasion to meet with thousands of families impacted by ASD and to hear their stories.

7.     Over the course of my 12 years of post-fellowship clinical practice as a neuropsychologist, I have made many thousands of specific recommendations for accommodation based on a child's disability.  Many of the recommendations that I

- 3 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

and other pediatric neuropsychologists provide are directed to schools and address whether a child with a disability can access the curriculum with or without particular accommodations, taking into account the needs of the child. I provide opinions as to whether an educational environment is appropriate for a child with a disability. In my practice, I also regularly advise patients and their families regarding the types of accommodations that are suitable for the child across a broad spectrum of environments. For example, I advise families in a therapeutic capacity on the challenges their disabled children may face in a variety of settings, such as playgrounds, grocery stores, churches, cruises, malls, etc.

8. I hold a Ph.D. from UWM. In the course of my undergraduate, graduate, and post-graduate training, I studied and became proficient in research statistics and methodology. Specifically, during my graduate coursework and training, I acquired the prerequisite knowledge and skills to function as a professional clinical psychologist who understands, consumes, and applies knowledge of scientific research to guide practice and who is also fully capable of conducting research. In addition to clinical practice, my coursework focused on research methodology and assessment, including advanced and multivariate statistics, which are critical to parsing and understanding empirical research. I also completed fellowship work in these areas. In my practice since my formal training, I continue to evaluate the scientific literature in my field to support my work. The ability to critically analyze and consider the utility of any peer-reviewed article in order to apply the knowledge is dependent upon a solid foundation of research design and statistics methodology. This is termed the scientist-practitioner model.

9. In addition to my clinical work, I serve on the Board of Directors for the Pediatric Oncology Support Team (POST), a 501(c)(3) non-profit organization whose primary goal is to support families with children who have cancer.

10. Since 2009, I have made over 15 visits to the Walt Disney World Resort (WDW), many of which occurred after the implementation of DAS. As a pediatric

- 4 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1 neuropsychologist, I view the world through a clinical lens. It is virtually impossible
2 for me not to do so. This is particularly true when I am in environments with children,
3 and even truer in environments such as Disney's theme parks where there is a
4 relatively high percentage of children with disabilities, e.g., my patient population.
5 My personal observations while at Disney's parks are, by definition, observations of
6 a pediatric neuropsychologist. These observations have simply added validity to my
7 opinions in this report.

8 **III. OVERVIEW OF ASD**

9     11. ASD is a condition characterized by impairment in reciprocal social
10 communication and social interaction and restricted, repetitive patterns of behavior,
11 interests or activities (American Psychiatric Association, 2013). ASD is
12 neurodevelopmental. This means a child is born with ASD, the manifestation of
13 which unfolds over time as the brain develops. From a brain-behavior perspective,
14 ASD is associated with global and diffuse brain differences at cellular, functional,
15 and structural levels (for reviews see Herbert, 2011; Posey et al., 2011). Simply
16 stated, many differences have been reported between an ASD brain and a typical
17 brain. In 2015 the Centers for Disease Control and Prevention (CDC) determined an
18 overall prevalence of ASD as 14.7 per 1,000 children age 8, or 1 in 68. This
19 represents a dramatic rise since 2002, at which time prevalence rates began to rapidly
20 increase from 1 in 150 ("Data & Statistics," 2015). In April 2018, the CDC published
21 a study updating the overall prevalence of ASD to 1 in 59 children (approximately
22 1.7%; Baio et al., 2018). Using data collected through the Early Autism
23 Developmental Disabilities Monitoring Network (Early ADDM) Christensen et al.
24 (2019) reported the overall ASD prevalence among 4-year-olds was 13.4 children per
25 1,000 in 2010, 15.3 per 1,000 children in 2012, and 17.0 per 1,000 in 2014.

26     12. Symptoms of ASD are usually observable during the first year of life,
27 although a minority of children do not exhibit clear signs of ASD until around 24
28 months (Zwaigenbaum et al., 2005). A typically developing infant will study his

Evidence Packet P.0098

1  mother's and father's faces, particularly their eyes, as he is held and talked to. Infants

2  with ASD do not look at other people's faces for expected lengths of time. They may

3  not imitate facial expressions at expected levels. If you smile at a 9-month-old, they

4  usually smile back at you. Decreased social smiling in infancy is a red flag for ASD

5  (Nichols, Ibañez, Foss-Feig, & Stone, 2014). Toddlers with ASD often exhibit

6  language delays and/or unusual language (Tager-Flusberg & Seery, 2013; Pickles,

7  Anderson, & Lord, 2014). They may not talk on time. Concurrently, they do not try

8  to compensate with gestures at expected levels. Rather than vocalizing "baa-baa!"

9  while pointing at their bottle, they may throw themselves to the ground in a tantrum,

10  or pull a chair across the room in an attempt to reach the bottle themselves. Play

11  tends to be repetitive and lack social themes (Jarrold, Boucher, & Smith, 1993; Libby,

12  Powell, Messer, & Jordan, 1998). Instead of pretending to bake a cake in the

13  Preskool kitchen or pushing a toy mower in the yard to be like daddy, they may line

14  up cars and peer at them closely or organize blocks by shape and color. Toddlers

15  with ASD tend to develop intense interests which often persist for years (DeLoache,

16  Simcock, & Macari, 2007; Richler, Huerta, Bishop, & Lord, 2010; Turner-Brown,

17  Lam, Holtzclaw, Dichter, & Bodfish, 2011). A child may read incessantly about the

18  Titanic, watch the movie literally hundreds of times, and recite the list of

19  crewmembers. Another child may be mesmerized by vacuum cleaners and recite the

20  makes and models of vacuum cleaners. Hand flapping, spinning, rocking, and pacing

21  are repetitive motor behaviors (a.k.a. stereotypies) often displayed by children with

22  ASD. An adolescent may literally wear a track in the carpet over the years from

23  pacing the same route repetitively. Rigidity, which can include insistence on

24  sameness or nonfunctional routines, is present to varying degrees. Children may

25  insist on parking the car in a very specific spot in the driveway. They may refuse to

26  eat breakfast if the syrup bottle is not in a precise place at a specific angle. Other

27  children with ASD may show no signs of rigidity. These types of behaviors can be

28  managed through behavioral strategies and interventions, as outlined below, and

- 6 -

1 | should not be confused as a requirement for persons with ASD. It is equally true that
2 | an individual's desire for immediate gratification is not a requirement of the
3 | disability.

4 |       13.    By definition, all individuals with ASD exhibit social deficits
5 | (American Psychiatric Association, 2013). People with ASD tend to have poor
6 | nonverbal communication (Stone, Ousley, Yoder, Hogan & Hepburn, 1997;
7 | Elsabbagh et al., 2012). Eye contact is typically reduced, and may be nearly absent.
8 | Their facial expressions may be reduced, and they may talk in a monotone voice or
9 | with exaggerated intonation. Theory of mind, which refers to the ability to place
10 | yourself in someone else's shoes and infer what they might be thinking and feeling,
11 | is deficient in ASD (Baron-Cohen, Leslie, & Frith, 1985). Some individuals may
12 | appear completely disengaged from the world around them. They may not respond
13 | to their name, answer when asked a question, or initiate interactions with others.
14 | Others with ASD may initiate social interactions with complete strangers and talk
15 | rather incessantly, showing poor regard for social boundaries. Sensory hypo- and/or
16 | hyperactivity is often seen in ASD (Baranek, 2002; Kenet, 2011). This is particularly
17 | relevant to day-to-day functioning, as individuals interact with the world around them
18 | through the sensory domain. Given low pain sensitivity, they may not tell their parent
19 | their arm hurts, even if it is broken. Given high auditory sensitivity, they may "flip
20 | out" if they hear a hair dryer or vacuum. Many children and adults with ASD struggle
21 | in high commotion environments where there is a great deal of sensory input. Once
22 | more, behavioral treatments, as outlined below, are well-established as beneficial in
23 | addressing many of these symptoms.

24 | **IV.   COGNITION AND ADAPTIVE FUNCTIONING IN ASD**

25 |       14.    Intelligence and cognitive abilities are variable within ASD. Many
26 | individuals with ASD have average, if not above average, intellectual abilities, and
27 | most people with ASD do not also meet criteria for Intellectual Disability (ID;
28 | formally termed Mental Retardation). The most recent population-based study

1    published by the CDC in 2018 indicated 69% of individuals with ASD demonstrate

2    intellectual abilities above the ID cut-off (e.g., IQ>70; Baio et al., 2018).  A diagnosis

3    of ASD does not, by definition, substantially limit basic daily living skills.  As a

4    clinician, the fact that an individual meets criteria for ASD tells me nothing about his

5    or her ability to perform manual tasks, read, learn, speak, concentrate, think, or

6    perceive the concept of time.  A diagnosis of ASD means the person has social

7    deficits and repetitive or restricted behaviors or interests.  A diagnosis of ASD also

8    means the person is likely to have difficulties with communication; however, this can

9    range from being completely nonverbal, to having a verbal IQ above the 99th

10   percentile and showing a tendency to talk excessively about a preferred topic.

11       15.    The claim that a diagnosis of ASD is, by default, equivalent to a

12   substantially limited ability to engage in basic fundamental tasks of daily living is

13   insulting.  Similarly, the statement, "expecting an autistic person to comprehend the

14   concept of waiting – any kind of waiting – is an exercise in futility," is inaccurate.

15       16.    Furthermore, given my clinical experience working with well over

16   1,000 children with ASD, I can state with absolute certainty that children with ASD

17   (as well as many other neurodevelopmental disabilities) participate in many social

18   and cultural activities; they go to birthday parties, play on baseball teams, go fishing,

19   go bowling, and go to church.

20       17.    In addition to participating in social and cultural activities, many

21   children with ASD regularly visit WDW and the Disneyland Resort (Disneyland) and

22   fully access the parks. My home clinic is less than 3 hours from WDW. Parents and

23   their children, many of whom have ASD, regularly comment on their trips to WDW.

24   I estimate a parent and/or child mentions Disney in the context of my clinical practice

25   on at least a weekly basis. To date, I have yet to hear a family express discontent or

26   frustration with DAS or any other accommodations available to them. I have never

27   heard a family state that they felt discriminated against while at a Disney park.

28

-8-

1  Indeed, several families have specifically commented on the benefit of DAS and

2  other accommodations available to them in an entirely unsolicited manner.

3  **V.    MALADAPTIVE BEHAVIORS IN ASD**

4       18.    Maladaptive behaviors are those that interfere with day-to-day

5  functioning or hinder an individual's ability to effectively navigate within and adjust

6  to the environment.  Behaviors that are maladaptive, problematic, and that interfere

7  with daily functioning require treatment. Examples of maladaptive behaviors include

8  aggression, tantrums or meltdowns, self-injurious behavior, and stereotypies (i.e.

9  repetitive behaviors). Numerous strategies have been developed to manage

10  maladaptive behaviors in ASD. As outlined by Kenzer (2014), "Many aspects of

11  behavior can be "challenging" or "problematic" and, therefore, require treatment."

12       19.    Challenging behaviors in ASD represent a form of communication

13  and/or interaction with others, or a means to obtain a preferred item or activity.

14  Kenzer explains that a common function of maladaptive behavior is that, "it allows

15  the learner to have access to preferred rituals, routines, or stereotypy…. The

16  stereotypy can also be something relatively abstract, such as needing to walk along a

17  particular path when walking across a room or needing to drive along a particular

18  street when going to grandma's house. In any of these cases, the function of the

19  challenging behavior is to allow the learner to access the event in the preferred way,

20  that is, to allow her to have things the way they are 'supposed' to be. Children with

21  such challenging behavior are often described as highly inflexible because they want

22  many things to be a particular way."

23       20.    Consistent with this, individuals with ASD may prefer to engage in

24  certain behaviors repeatedly, but this preference for repetition also represents a

25  maladaptive behavior. Engaging in repetitive behaviors limits the opportunities a

26  child otherwise has to develop his or her social and communicative repertoire. A

27  child who lines up toiletry bottles on the bathtub rim, knocks them down, and lines

28  them up again for hours on end is not hearing language, responding to language,

Evidence Packet P.0102

looking at facial expressions, making eye contact, being exposed to novel information, etc. As evidenced in the records of plaintiffs below, when a child is first enrolled in treatment the primary goal is to target and reduce maladaptive behaviors using strategies such as blocking, introduction and reinforcement of replacement behaviors, and/or teaching functional alternative behaviors or skills.

21.    In addition, transitioning away from a preferred activity is an inherent aspect of life for children with and without ASD. It is impossible to function without transitioning away from preferred activities; no one is able to do whatever they want whenever they want.  Everyone has to eventually cease a desired activity, and everyone has to initiate non-preferred activities.  It is a simple fact of life, even for infants and toddlers.  Doing so may be unremarkable events for some individuals with ASD, while it may be more challenging for others and result in maladaptive behaviors.

22.    It is important to appreciate that preferences for routines and/or repetition in individuals with ASD are variable and transient; they are not static. Preferences for routines and/or repetition in children with ASD are not a need or requirement of ASD, and they will change regularly and fluctuate according to a child's preferences, as those preferences develop.

23.    Children, adolescents, and adults with ASD may engage in problematic externalizing behaviors, which are colloquially termed "meltdowns."  Especially when children are young, meltdowns can be very disruptive to families and are often the impetus to seek treatment.  As outlined above, tantrum/meltdown behavior, aggression, and noncompliance represent the ways a child or young adult with ASD seeks to gain access to a *preferred* way of doing things. These preferences are not needs, nor are they a fundamental or essential aspect of ASD.

24.    I have witnessed children with ASD engage in meltdown behavior because I did not place a block in the "right" place, because their parent is not sitting where they would like them to in the waiting room, because the elevator took too

- 10 -

1  long, because they were not allowed to play with scissors, or because I would not
2  remove my glasses. Triggers for meltdown behaviors in ASD are infinite, and many
3  triggers are completely benign. Other triggers are related to a preferred routine
4  developed by the child. Some meltdown behaviors seem unpredictable. In those
5  instances, a Functional Behavior Assessment (FBA; an extensive evaluation of
6  antecedents, behaviors, and consequences) will typically describe the antecedent in
7  terms of "internally driven behavior."

8      25.   Indeed, in more complex or severe presentations, an FBA may be
9  completed by a Board Certified Behavior Analysis (BCBA). The goal of this type of
10  assessment is to identify the antecedent (trigger) for the problematic behavior
11  (meltdown or otherwise) and the ensuing consequence. Once that data is obtained,
12  the antecedent and/or the consequences are altered in order to decrease the frequency
13  and intensity of the problematic behaviors. Concurrently, communication behaviors
14  are taught in order to provide a replacement behavior.

15      26.   Preferences for repetition or sameness, and/or engagement in meltdown
16  behavior are not mandated by ASD, nor are caregivers and educators advised to
17  adhere to such preferences. They are maladaptive, meaning they are problematic.
18  When a child presents with significant maladaptive behaviors, the behaviors are
19  typically a primary and initial target in treatment because they interfere with learning
20  and limit the child's ability to benefit from the therapies they are provided. While it
21  is understandable that parents may sometimes comply with their child's preferences
22  and allow their child to "have it their way," doing so is not in the best interest of the
23  child or the family. Not only does it limit their child's ability to make progress, it
24  increases the likelihood their child will engage in meltdown behavior in the future.

25  **VI.   SPECIFIC BEHAVIORAL TECHNIQUES AND STRATEGIES FOR
26       INDIVIDUALS WITH ASD**

27      27.   Specific behavioral interventions and strategies are directly relevant to
28  the question at hand. Self-control in young children with ASD can be increased by

- 11 -

gradually exposing the child to progressive delays, when given the choice to engage in an intervening activity during that delay (Dixon & Cummings, 2001). Visual schedules can help individuals with limited verbal abilities understand the order of events. Social Stories is a specific type of visual schedule which has consistently been shown to be effective in decreasing tantrum behavior and anxiety in ASD (Kuttler, Myles, & Carlson, 1998; Scattone, Wilczynski, Edwards, & Rabian, 2002; Ozdemir, 2008; Reynhout & Carter, 2007). Additionally, techniques utilizing visual supports to make the abstract concept of time more concrete can be helpful (Dettmer, Simpson, Myles, & Ganz, 2000). Timers that show a gradually decreasing figure (similar to the hourglass concept) or similar devices are frequently used by behavior therapists, teachers, and clinicians so children can "see" how much time is left. Introducing alternative behaviors (a technical term for distraction technique) is helpful not only for individuals with disabilities, but their typically developing peers. For example, providing a card game, movie, or video game to watch on a smart phone or iPad helps distract individuals and may keep people occupied.

28.     It can be particularly difficult to manage problematic behaviors in ASD when the individual is exposed to high commotion environments. Such environments are, by their very nature, typically nearly impossible to change. The importance of managing sensory problems in ASD is relevant. Occupational therapy targets an individual's difficulty tolerating certain sensory inputs by teaching caregivers strategies to reduce unpleasant sounds and sights (Fein, Hinnebusch, & Troyb, 2014). For example, noise canceling headphones are helpful for some individuals in reducing auditory input. Individuals may be encouraged to take a "sensory break" and visit a small, dark room, or rock in a swing. Behavior therapy typically utilizes a desensitization approach, gradually introducing the individuals to the stimuli that is challenging for the child to tolerate, while encouraging relaxation techniques and other strategies.

Evidence Packet P.0105

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

29.     As it pertains to WDW and Disneyland, strategies to cope with extreme weather conditions are obvious and include appropriate dress and increased water intake.  Planning a trip at a cooler time of year is obviously helpful, but must be balanced with the increased crowd volume during the holiday season and spring break.  Other strategies for managing disruptions in routine include preparing in advance, utilizing a visual and verbal schedule, and understanding an individual's limits.  Nearly every child has the potential to become disruptive if pushed too far; however, this is particularly true for many individuals with ASD.  In addition to using these strategies, certain medications can improve emotional and behavioral functioning in ASD.

30.     In summary, the literature base consistently outlines a combination of effective, evidence-based treatments for challenging behaviors associated with ASD including behavioral modification strategies and environmental supports.  There are factors inherent to visiting WDW and Disneyland that are unavoidable, such as high commotion, weather, and noise.  As is true for any family, it is the responsibility of parents to utilize strategies and techniques in managing their child's experience at the parks.

31.     Some families are better equipped to manage their child's behaviors because their family has been exposed to and actively involved in behavior therapies such as Applied Behavior Analysis (ABA). ABA is a specific type of behavioral intervention shown to be particularly effective in facilitating the development of desired behaviors and decreasing the presence of undesirable and maladaptive behaviors for individuals with ASD.  Through their ABA experiences, parents learn that they are, in fact, capable of managing and reducing problematic and severe behaviors.  Families who have not had the opportunity, for whatever reason, to receive ABA treatment may not understand how effective it is in controlling and managing problematic behaviors.

- 13 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

32.     Regardless of past experience, ABA strategies are effective in decreasing maladaptive behaviors in ASD.  Even if a child did not have ABA when young, he or she will still benefit from ABA strategies when older. As noted below, Behavioral Interventions are an evidenced-based intervention for adults with ASD. The basic theories and principles of behavior therapy do not expire with age, nor are they dependent upon prior experience with ABA.

## VI.  BEHAVIORAL SYMPTOMS AND MALADAPTIVE BEHAVIORS IN ASD CAN BE DECREASED OR ELIMINATED THROUGH ABA

33.     The National Standards Projects (National Autism Center, 2015) is a seminal meta-analytical study which demonstrated the efficacy and utility of ABA strategies in Autism. The National Standards Project is briefly summarized here in order to highlight the fact that symptoms of ASD are responsive to ABA. Maladaptive behaviors can be treated and minimized, if not eliminated. This demonstrates that the behaviors are not static and inflexible; they are not a need or an immutable characteristic of autism.

34.     The National Autism Center is a nonprofit organization dedicated to providing information about evidence-based treatment for ASD.  Their National Standards Project was undertaken in 2005 under the guidance of an expert panel consisting of 27 nationally recognized scholars and researchers from across the United States.  This rigorous study aims to review and quantify research related to ASD interventions and treatments. Phase 1 of the project was launched in 2005 and was published in 2009. It examined research-based interventions for individuals with ASD under the age of 22 and included studies published between 1957 and the fall of 2007. More recently, Phase 2 of the study examined 389 peer-reviewed studies published between 2007 and 2012. Phase 3 is currently underway and includes studies published through 2018. The panel developed specific criteria to determine if an intervention was beneficial, ineffective, or unknown.  Ten developmental skills were identified as behaviors and skills to increase (e.g. Communication, Higher

Evidence Packet P.0107

1  Cognitive Functions, Interpersonal, Self-Regulation, etc.). Four areas of challenge

2  were identified as behaviors to decrease, one being Restricted, Repetitive,

3  Nonfunctional Patterns of Behavior, Interests, or Activity (RRN). RRN was defined

4  as, "limited, frequently repeated, maladaptive patterns of motor, speech, and

5  thoughts."

6      35.    After following a rigorous and standardized review process, the panel

7  concluded Behavioral Interventions (consisting of ABA interventions) was the

8  largest category of Established Interventions[1] for children, adolescents, and young

9  adults under the age of 22. Behavioral Interventions were found to increase skills

10  including higher cognitive functions, motor skills, academic, communication,

11  interpersonal, learning readiness, personal responsibility, play, and self-regulation. It

12  was also found to decrease RRN, problem behaviors, and sensory and emotional

13  regulation problems. Parent Training was also identified as an Established

14  Intervention and was found to increase interpersonal and play skills while decreasing

15  RRN, problem behaviors, and general symptoms. Additional Established

16  Interventions reported to decrease RRN included Peer Training (training peers on

17  how to initiate and respond when interacting with children with ASD), Self-

18  Management (teaching individuals to be aware of and regulate their own behavior so

19  they require less assistance from adults), and Social Skills (teaching skills such as

20  recognizing facial expression, initiating an interaction, etc.).

21      36.    The National Standards Project also identified Behavioral Interventions

22  as an established intervention for adults over the age of 22.  Phase 3 of the NSP will

23  include studies published through 2018 and is scheduled to be released in 2021.

24

25

---

26  [1] Established Interventions is defined as, "Sufficient evidence is available to
27  confidently determine that an intervention produces favorable outcomes for
    individuals on the autism spectrum. That is, these interventions are established as
28  effective."

- 15 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

37.     The National Standards Project cited other systematic meta-analytical reviews, including the National Professional Development Center on Autism Spectrum Disorder (NPDC), Centers for Medicare and Medicaid Services (CMS), and Agency for Healthcare Research and Quality (AHRQ).  The 2015 report states, "One common finding among the systematic reviews listed above is that interventions based on the principles of applied behavior analysis, or ABA, have a track record of effectiveness when incorporated in well-designed programs for individuals with ASD."  Simply put, ABA works.

38.     Clearly, symptoms in ASD can be treated.  Desired behaviors and skills can be increased.  Problematic behaviors can be decreased or eliminated altogether. This fact is further evidenced by the identification of what is termed the Optimal Outcome group.  While most children who receive a diagnosis of ASD will maintain that diagnosis throughout their life, a subset of children accurately diagnosed with ASD who receive early intervention appear to "fall off the spectrum" (Fein et al., 2013, Sutera et al., 2007), meaning they no longer meet diagnostic criteria for ASD. Children in the Optimal Outcome group were more likely to have received intensive intervention at a younger age, and were more likely to have received ABA (Orinstein et al., 2014).  While this is not a typical or reasonable goal for most children with ASD, it does occur in approximately 20% of children who are diagnosed at a young age and receive early intervention.

39.     The effectiveness of ABA in improving social communication skills and reducing problematic behaviors in ASD is also evidenced by the increased prevalence of state mandates requiring insurance companies to cover ABA treatment.  ABA is considered medically necessary to treat ASD.  As of August 2019, all 50 states and Washington, D.C. have mandates requiring ABA coverage for the treatment of ASD.

Evidence Packet P.0109

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## VII. DSM-5 CLINICAL TERMINOLOGY DOES NOT EQUAL LEGAL TERMINOLOGY

40.     It is essential to appreciate the fact that clinical terminology used within the DSM-5 criteria for ASD such as "need for sameness" does not have the same meaning as "need" as used in a legal or forensic context. The DSM-5 specifically addresses this issue and cautions against making erroneous inferences. The DSM-5 states, "[T]he definition of mental disorder included in DSM-5 was developed to meet the needs of clinicians, public health professionals, and research investigators rather than all of the technical needs of the courts and legal professionals.... When DSM-5 categories, criteria, and textual descriptions are employed for forensic purposes, there is a risk that diagnostic information will be misused or misunderstood. In most situations, the clinical diagnosis of a DSM-5 mental disorder...does not imply that an individual with such a condition meets legal criteria for the presence of a mental disorder or a specified legal standard (e.g., for competence, criminal responsibility, or disability). For the latter, additional information is usually required.... It is precisely because impairments, abilities, and disabilities vary widely within each diagnostic category that assignments of a particular diagnosis does not imply a specific level of impairment or disability."

41.     The DSM-5 cautions against making simplistic, overarching generalizations based on a diagnosis and actually includes a proscription of this exact type of extrapolation included within plaintiff's complaint. It is simply inappropriate to state that a person can or cannot engage in a specific type of behavior or cognitive task because of their membership within a DSM-5 diagnostic category. The cautionary statement provided by the DSM-5 also indicates that a legal determination will usually require additional information. Consistent with these guidelines, the following individual reviews of plaintiffs K.A.C., V.J.B., and Y.Z. demonstrate their ability to wait and defer gratification and illustrate their alleged "need" for routine or repetition is a preference.

-17-

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

## VIII. DISNEY'S DAS ACCOMMODATION AND OTHER SERVICES

42.    I reviewed Planning a Trip to the Disneyland Resort:  A Resource for Guests with Cognitive Disabilities including Autism Spectrum Disorder (ASD) and Planning a Trip to the Walt Disney World Resort:  A Resource for Guests with Cognitive Disabilities including Autism Spectrum Disorder (ASD).  Many of the suggestions and accommodations provided in these guides are consistent with the evidenced-based techniques outlined in the literature base and described above. Parents are strongly encouraged to prepare ahead of time.  The guides encourage parents to utilize a visual schedule in advance of their visit.  Use of ear plugs or headphones is encouraged for individuals with sensory aversions.  Families are encouraged to bring a device or activity to use as a distraction while waiting.  Use of a sensory toy such as a stress ball is suggested.  Detailed descriptions of each step of arrival are provided.  The guides include a detailed chart describing each ride, with the presence or absence of the following characteristics indicated:

- Scents/smells
- Flashing Lights
- Loud Noises
- Periods of Darkness
- Bumps
- Fast
- Lifts Off Ground
- Wet
- Element of Surprise
- Type of Restraint
- Amount of Time
- FASTPASS

43.    Additionally, the following options for accessing attractions are explained:

- Disney FASTPASS service:  A standard option which allows guests to check-in to a ride and receive a ticket with a return time.  Guests can only hold one FASTPASS at a time.

- Disney FastPass+:  A standard option at WDW which allows guests to sign up online for three rides or attractions prior to their arrival.  Similar to its predecessor FASTPASS, FastPass+ also allows guests to hold a

- 18 -

return time for one additional ride or attraction at a time after the initial three times have passed, which is booked from kiosks throughout the park. (I understand that FastPass+ has now replaced the FASTPASS service at WDW.)

- Disability Access Service (DAS): An option for guests with disabilities which allows guests to virtually stand in one line. Guests receive return times for DAS from Guest Relations kiosks throughout the parks at Disneyland or from the rides at WDW.

- My Disney Experience App: Allows guests to easily check the wait times for attractions at WDW and Disneyland parks on their phones to determine which rides have shorter wait times.

44.    The guides state additional accommodations are available and instruct guests to visit Guest Relations to learn more. This process is described in more detail in a booklet *Disney Parks: Disability Access Service Card.* The booklet outlines the steps necessary to request a DAS, which consist of visiting Guest Relations at the entrance to a park, talking with a cast member, and registering. A photo is taken of either the DAS guest or the guardian, and a signature is requested. Lastly, the guide outlines specific areas in the parks which are "a little less busy," and encourages parents to access these areas if someone is feeling overwhelmed.

45.    The WDW and Disneyland websites also provide specific information regarding accommodations available to guests with disabilities. They outline specific strategies and recommendations, such as planning ahead and using a visual schedule, which mirror behavioral techniques regularly used by clinicians, therapists, and educators who work with individuals with ASD. The websites (as well as the guides) also encourage guests to discuss their individual needs with guest services if they remain concerned about the available accommodations.

## IX.    THE DAS PROGRAM IS REASONABLE AND EFFECTIVE -- NOT "OUTRAGEOUS" -- FOR PLAINTIFFS AND OTHER GUESTS WITH ASD

46.    Disney's previous Guest Assistance Card (GAC) program essentially allowed children with ASD to ride any rides they wanted, as soon as they wanted, for

- 19 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  as many times as they wanted, and in any order they wanted, without any advance

2  planning. Obviously, nearly every family would *prefer* this option. While families

3  may be disappointed that GAC was replaced with DAS, their expectation that any

4  child with ASD should have immediate, unfettered access to the rides and attractions

5  of their choice at Disney's parks is not a requirement of the disability; rather, it is a

6  preference or expectation that some children with ASD and their families have when

7  visiting the parks. It is unreasonable for Disney to have to accommodate that

8  preference.

9      47.    It is my opinion, to a reasonable degree of psychological certainty, that

10  the accommodations under DAS are appropriate and reasonable for individuals with

11  autism and other cognitive disabilities. As previously stated, the accommodations

12  under DAS mirror evidence-based strategies utilized by parents, educators, and

13  clinicians working with people with ASD, which are based in the literature as

14  outlined above. Therefore, these accommodations are clearly not intolerable in a

15  civilized community as alleged in the complaint; rather they are consistent with

16  evidence-based treatments for challenging behaviors associated with ASD. My

17  opinion is also supported by the fact that Disney provides families clear and explicit

18  information about the specific components of every ride and attraction. This allows

19  families to determine ahead of time whether an experience is a suitable option for

20  their child. Disney also provides families specific information regarding the quietest

21  and calmest areas in the park, while reminding families these areas may still be busy.

22  It is worth noting that all parents, whether or not their child has ASD, must anticipate

23  their child's reaction to various aspects of the Disney experience and plan their visit

24  accordingly. Children with and without ASD may have problems handling the

25  excitement of a visit to Disney's parks and the inherent change from their daily

26  routine, and may have "meltdowns" or tantrums. These behaviors are so common

27  that it would be unusual, in my opinion, to encounter a parent who frequently visits

28

1  Disney's theme parks who has not witnessed their children engage in a tantrum or

2  meltdown at a park.

3       48.    Waiting is an inherent, unavoidable aspect of our culture and it is part

4  of the daily life of children with and without ASD.  It is a necessary part of any

5  educational process, even in the most restrictive settings.  Based on my own

6  experiences, it is impossible to attend school, visit a doctor, or to make a trip to a

7  Disney park without some waiting.  Moreover, children with ASD are not incapable

8  of waiting or unable to delay gratification.  Any weaknesses in this area are targeted

9  in treatment.  Najdowski, Persicke, and Kung (2014) specifically address waiting in

10  ASD in their treatment manual, as follows:

11       "Teaching the learner to wait for a preferred item is a good place to start

12       teaching inhibition and is a common lesson in behavioral intervention

13       programs for children with ASD.  To teach this skill, start by presenting

14       preferred items or activities and instruct the learner to wait …. Across

15       trials, increase the duration of the waiting interval until the learner is

16       able to wait for the natural time length required to gain access to an

17       activity in the natural environment across settings and situations ….

18       Continue to practice waiting in all settings (e.g., home, school,

19       community) as needed to teach the learner to wait across all situations

20       relevant to her life."

21  If avoiding all waits was a necessity central to ASD, treatment manuals such as this

22  would not provide a protocol to treat the maladaptive behavior.  Clearly, the

23  allegation that Disney "treated the harm caused by waiting as if it were a skill which

24  could be acquired with repetition" reflects a fundamental lack of knowledge

25  regarding basic ASD treatment principles.  The scientific literature clearly supports

26  the concept that skills such as waiting can and should be taught through repetition

27  and reinforcement.  Acquiring skills through repetition is a fundamental concept of

28  ABA.

- 21 -

49.     While some individuals with ASD may have more difficulty than their non-disabled peers delaying gratification, they do not have a fundamental inability to defer gratification.  Faja and Dawson (2015) specifically compared the ability to delay gratification by asking 42 6- and 7-year-old children with and without ASD to sit at a table with a small treat, a large treat, and a bell.  They were told the examiner would step out of the room, and if they refrained from eating the treat or standing up they would earn the larger treat.  They were instructed to ring a bell if they would like to summon the examiner in order to eat the small treat.  The task continued until the child rang the bell, violated a rule, or the 15-minute time limit was met.  Fifty-seven percent of children with ASD waited the entire 15 minutes, and the average wait time for children with ASD was 11 minutes and 9 seconds.  Although the ASD group did not perform as well as their typically developing peers, this study provides evidence that young children with ASD can delay gratification, and can wait.

50.     The idea that symptoms in ASD are neurologically driven does not negate the fact that the symptoms are maladaptive.  The fact that a behavior is brain-based does not render that behavior appropriate or inexcusable.  Neuropsychology is the study of brain-behavior relationships.  Arguably, all behavior is neurologically driven.   Alcoholism is neurologically driven.   Pathological gambling is neurologically driven.  Suicide is neurologically driven.   The vast majority of symptoms of neurodevelopmental disorders and mental health conditions are neurologically driven.  We do not excuse maladaptive behaviors because they are neurologically based.  We treat maladaptive behaviors, regardless of the etiology.

51.     Individuals with ASD spend minimal amounts of time standing in a line under DAS.  Providing a virtual wait allows individuals with disabilities more access to park experiences, as it frees up hours of time that would otherwise be spent standing in line.  Nondisabled guests visit Disney parks expecting to spend many hours standing in line to access rides and attractions.  As such, DAS provides a higher level of access to the parks for children with ASD as compared to nondisabled guests.

- 22 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

In my opinion, to a reasonable degree of psychological certainty, Disney's replacement of GAC with DAS did not materially limit the accessibility for children with ASD.

52. It is important to note that nondisabled guests are also encouraged to plan ahead for their trips to the park. WDW's website includes planning videos for families to help assist them in preparing for their trip. An understanding of the FastPass and FastPass+ systems and other nuances of the parks that are not unique to disabled guests (e.g. Extra Magic Hours, Special Events, parade times and routes) allows disabled and nondisabled guests to maximize their experience. In my personal experience, planning an itinerary, making FastPass reservations in advance, booking dining reservations, understanding transportation options between parks and resorts, and coordinating with other members in the party is necessary in order to maximize a family's experience in the park. This is especially true during high volume days. WDW and Disneyland encourage all guests to plan ahead and understand the systems and accommodations available to them. Planning for a Disney trip is an essential component for any family hoping to maximize their time in the parks, regardless of whether or not they have a child with a disability.

53. Transitioning away from a desired activity is an inherent, prerequisite skill that all children, with or without ASD, must engage in. Society mandates as such. For example, children who do not meet height requirements are routinely turned away from rides. It is quite probable that if and when plaintiffs visited the parks at a younger age, they could have been turned away from a ride after approaching it because they did not meet the height requirement.

54. As noted above, the strategies outlined in the guides above mirror best practice strategies utilized by clinicians who work with children with ASD. It is obvious to anyone familiar with the field that Disney incorporated behavioral principles consistent with best practices in the content of the guides. The inclusion of a visual schedule and suggestions for how to prepare are the same strategies that

- 23 -

1   clinicians (including myself) provide to parents seeking assistance in planning a trip

2   to the parks, or any other major event.  The detailed description of components of

3   every attraction reflects sensitivity to the types of sensory input that may be poorly

4   tolerated by individuals with ASD.  The inclusion of these strategies is indicative of

5   a conscious effort to help maximize the positive experiences an individual with ASD

6   has at Disney's parks.

7        55.   The complaint alleges the use of the term Disability is "stigma-

8   emphasizing."  I disagree.  By that logic, the title of the American with Disabilities

9   Act is also "stigma-emphasizing," as is the DSM-V diagnosis of Intellectual

10  Disability.

11  **X.   THE DAS PROGRAM DOES NOT RESULT IN SERIOUS, SEVERE,**
12      **OR EXTREME EMOTIONAL DISTRESS FOR PLAINTIFFS AND**
        **OTHER GUESTS WITH ASD**

13       56.   It is my opinion to a reasonable degree of psychological certainty that

14  meltdowns in ASD do not constitute serious, severe, or extreme emotional distress.

15  The fact that a child with ASD may react to a benign stimulus by engaging in

16  maladaptive meltdowns does not mean the meltdowns themselves represent serious,

17  severe, or extreme emotional distress.  As noted above, maladaptive behaviors in

18  ASD are considered to represent a form of communication with others, a way to

19  obtain a desired object or activity.  Interventions do not aim to fundamentally alter

20  the environment/antecedent, especially when the trigger is unavoidable or represents

21  a basic adaptive skill.  Rather, ABA strategies focus on teaching the child to tolerate

22  the trigger while providing them coping skills and improved communication outlets.

23       57.   My extensive experience working with families who have children with

24  ASD allows me the opportunity to meet with parents of children with ASD.  They

25  have shared their triumphs, their challenges, their fears, and their hopes with me.

26  While every family's journey is unique, there are numerous commonalities.  Parents

27  of children with ASD face more challenges than most other parents.  Typically,

28  parents experience a greater degree of stress and financial hardships in their daily

- 24 -

1   lives.  Bearing that in mind, it is my professional opinion, to a reasonable degree of

2   psychological certainty, that the parents of K.A.C. and Y.Z. did not suffer serious,

3   severe, or extreme emotional distress as a result of the DAS or Disney's conduct.

4   Parents of children with ASD cope with their child's behavior, which may or may

5   not include high frequency meltdowns, every day.  Many parents of children with

6   ASD, with whom I interact daily in my practice, have learned how to effectively cope

7   with their children's behavior -- including a high frequency of meltdowns -- and have

8   become accustomed to doing so on a regular basis.

9        58.    It is a common and sometimes routine event for a parent to witness their

10  child's discomfort.  All parents must tolerate their child's distress in order to

11  effectively parent.  A parent who cannot tolerate their child's distress will almost

12  certainly raise a child with significant behavioral problems. The treatment for

13  maladaptive behaviors often involves triggering the actual behavior, and/or

14  purposefully exposing the individual to the antecedent.  As noted below, the parents

15  of K.A.C. and Y.Z. regularly witnessed the behaviors claimed to cause emotional

16  distress on a regular basis across multiple environments.   The behaviors cited

17  represent baseline behaviors for these individuals and do not represent a novel or

18  extreme reaction to a particularly stressful trigger.

19       59.    In my practice, I routinely observe children with ASD having

20  meltdowns. Indeed, at times my behavior is the trigger for the meltdown, and I allow

21  the meltdown to progress and/or escalate.  I have never known those behaviors to

22  cause serious, severe, or extreme emotional distress to the child or their parents.

23  Further, it is my opinion to a reasonable degree of psychological certainty that

24  children with ASD who engage in meltdown behavior do not suffer serious, severe,

25  or extreme emotional distress because they experience a meltdown.  As evidenced in

26  the complaint and in plaintiffs' discovery responses and deposition testimony,

27  plaintiffs remained in the parks after experiencing an outburst or meltdown.  There

28

- 25 -

1  is no evidence showing sustained or chronic distress for plaintiffs K.A.C., Y.Z., or

2  their parents[2].

3      60.    I have reviewed various records pertaining to K.A.C., V.J.B. and Y.Z.

4  in this case, as well as the parents' deposition testimony and the deposition testimony

5  of several of K.A.C.'s treating clinicians.  I discuss the particulars of each of the

6  fourth set of bellwether plaintiffs below.

7      **A.    *K.A.C. and J.L.C.***

8      61.    K.A.C. is described in the complaint as an 11-year-old with Autism,

9  Attention Deficit Hyperactive Disorder, a seizure disorder, Unspecified Intellectual

10  Disability, mood disorder, gastrointestinal issues, asthma, and other unspecified

11  sensory issues.    Medical and educational records indicate K.A.C. has limited

12  intellectual abilities which substantially limit his ability to hold information in mind

13  for extended periods of time.  He is largely nonverbal and has a very brief attention

14  span.  His mother testified that if she were to tell him, "We're going to McDonald's,

15  then we're going to the mall, and then we're going to go to the grocery store…he

16  would not understand that process or the order of things."  She said they only tell him

17  where they are going when they are actually going there.  Similarly, J.L.C. testified

18  if they are at a park and a ride is closed, they do not go to the ride, and K.A.C. does

19  not get upset.  After reviewing thousands of pages of K.A.C.'s medical records, it is

20  my impression that his intellectual abilities likely fall below a 2-year-old level.

21  Considering this profile, the family should not have any difficulty obtaining a DAS

22  return time without K.A.C.'s knowledge, and experiencing other rides or attractions

23  in the interim.

24      62.    The complaint states K.A.C. is a "repeat rider" who "will experience a

25  particular ride or attraction, such as Mad Tea Party and Buzz Lightyear's Space

26  Ranger Spin, over and over, for several hours at a time."  In her deposition testimony,

27

28  [2] V.J.B and S.L.B. do not claim emotional distress.

Evidence Packet P.0119

1  J.L.C. stated she misunderstood the term "repeat rider" and admitted that K.A.C. does

2  not prefer to ride certain rides over and over again.

3      63.    The complaint states that K.A.C.'s stimming patterns "include pacing

4  back and forth, making hand gestures and voice signals, and the inability to sit still."

5  J.L.C. testified that K.A.C. may stim if he is happy, excited, upset, or frustrated.

6  School records from 2011 also state that K.A.C. is most likely to engage in stimming

7  behavior when he is excited, has access to items, or is unengaged.  This is consistent

8  with my clinical experience; children with ASD tend to stim during emotional

9  extremes, regardless of whether they are experiencing a positive or negative emotion.

10     64.    The allegation that K.A.C. "is incapable of waiting significant periods

11 of time to enter a ride or attraction" is contradicted by evidence demonstrating that

12 K.A.C. is capable of waiting.  For example, K.A.C. has demonstrated that he can wait

13 in line for a ride at WDW for at least ten to fifteen minutes; during her deposition,

14 J.L.C. testified that K.A.C. stood in line for the Dumbo ride on March 12, 2014, and

15 F.C. acknowledged that the wait for Dumbo was approximately ten to fifteen minutes

16 all day on March 12, 2014. J.L.C. also testified that she used to take K.A.C. to church

17 services which lasted one hour and forty-five minutes.  During the service, they

18 would sit in a side room with an iPad.  Although he was "up and down" and

19 sometimes loud, J.L.C. explained, "that's just to escape an environment that he's not

20 wanting to be in."  J.L.C. also testified that K.A.C. may wait in the car with his father

21 for 15 minutes while waiting for his name to be called at a doctor's appointment.

22 K.A.C.'s treating psychiatrist Dr. Elliott testified K.A.C. was present during his

23 initial visit in February 2016 for approximately 80 minutes without any problematic

24 behaviors.  K.A.C.'s pediatrician Dr. Meyer testified he may have to wait a long time,

25 like 30 minutes, in her waiting room.  She said her waiting room includes a TV and

26 a few books keep kids occupied while they wait, but they do not provide any

27 accommodations to patients with ASD in her office.  Dr. Meyer also testified that she

28 sees K.A.C. for sick visits and well visits, which usually last 20 to 30 minutes.

- 27 -

1  K.A.C. has never had a meltdown or outbursts in her waiting room or in her office.

2  Furthermore, F.C. testified that when waiting for a flight at an airport, they may pass

3  the time by getting a snack, walking around the area, or using the bathroom.

4      65.    Medical records document numerous instances of K.A.C. waiting. For

5  example, K.A.C. waited in an emergency room for over 6 hours to have a forehead

6  laceration treated. Medical records during this visit describe K.A.C. as "active and

7  playful in room and easily redirected by parents…. Throughout [Emergency

8  Department] stay patient's aggression at baseline easily controlled with parental

9  intervention." J.L.C. testified she did not recall that he had a meltdown during that

10  time.

11      66.    Furthermore, the complaint states that the family traveled from one park

12  to another on the same day when visiting WDW, such as leaving Animal Kingdom

13  to go to Epcot, or traveling from Hollywood Studios to Epcot. Regardless of whether

14  the family was using WDW transportation buses, riding the ferry, ordering a ride

15  share, or driving their own vehicle, K.A.C. would have had to wait in order to access

16  any of these transportation options. This further contradicts the allegation that

17  K.A.C. is incapable of waiting or deferring gratification.

18      67.    K.A.C.'s parents testified the family has used ABA techniques to help

19  improve K.A.C.'s ability to wait for preferred items. For example, the family started

20  to use the drive-thru at a fast food restaurant which involved waiting five to ten

21  minutes in the drive-thru lane. Initially, K.A.C. was allowed to eat his preferred food

22  in the car on the way home. The family began to gradually withhold his preferred

23  food and told him to wait. Currently, K.A.C. is able to wait for his preferred food

24  until they arrive home, which typically takes another five to eight minutes. F.C.

25  verified they were able to work with K.A.C. and he was able to defer the time he

26  waited for his preferred food. Further, his ABA programming includes programs and

27  goals to increase the amount of time he waits without engaging in maladaptive

28  behaviors, illustrating that this is a behavior which can and should be modified.

- 28 -

1    These examples illustrate that K.A.C. is capable of waiting, and his ability to wait
2    can be improved utilizing ABA strategies.

3         68.    Based on the records I reviewed, J.L.C. has advocated extensively to
4    secure ABA services for her son. For example, in April 2010 she wrote a letter to the
5    public school district stating, "K.A.C. has had proven results with his ABA program
6    …. Since attending this program [K.A.C.] has started to sit for longer lengths of time
7    and he has been able to communicate basic needs and wants with simple signing,
8    which is something he had not been able to do in the district since 2006."   The
9    following year, in 2011, K.A.C.'s mother wrote another letter to the school stating,
10   "He will not be secluded in a room with no distractions for the rest of his life – he
11   will be around people, children, tempting items on desk, and he will have demands
12   placed on him by numerous people. We want to makes sure these distractions are
13   always surrounding him so that he is more likely to cope with them sooner, opposed
14   to him thinking no distractions exist."

15        69.    Consistent with my expert declaration, K.A.C.'s treating psychiatrist,
16   Dr. Elliott, testified that ABA is an indicated treatment for ASD.  He said ABA can
17   help with things such as waiting and deferring gratification.  K.A.C.'s pediatrician
18   Dr. Meyer testified that ABA uses repetition to help individuals learn.   Also
19   consistent with my expert opinion, Angela Klutts, BCBA, who is the co-owner of the
20   ABA center K.A.C. currently attends, testified ABA techniques can be used to
21   decrease the intensity and frequency of aggressions and maladaptive behaviors. Ms.
22   Klutts said the goal of ABA therapy is to change behaviors.  She also testified that
23   someone cannot be too old to benefit from ABA. Ms. Klutts explained if a child with
24   Autism consistently had a meltdown when they were not provided a preferred item,
25   that she would develop a program, "and have to work on increasing the duration of
26   the amount of waiting time."  Notably, Ms. Klutts said she has situations where a
27   child with Autism has a meltdown because they don't want to do something she's
28   asked them to do, "All the time. Every day." These statements from K.A.C.'s treating

- 29 -

providers are very consistent with my opinion and provide additional evidence that ABA is effective in reducing maladaptive behaviors, and that preferences in ASD do not require accommodation.  On the contrary, they should be and typically are targeted and reduced, including for K.A.C..

70.    K.A.C.'s educational programming includes specific ABA techniques such as those identified above. F.C. testified that ABA has "definitely" been helpful in improving K.A.C.'s communication and reducing maladaptive behaviors.  The record is replete with additional examples of the family's appreciation of and faith in ABA.  Clearly, J.L.C. and F.C. recognize the behaviors are maladaptive and must be addressed.  They understand that K.A.C.'s maladaptive behaviors can improve and should be targeted and modified utilizing ABA techniques.

71.    K.A.C.'s medical and educational records cite numerous unavoidable triggers for maladaptive behavior, which his parents verified in their respectful deposition testimonies.  J.L.C. testified K.A.C. may have a meltdown in the car if they drive past a McDonald's and he is hungry.  She also testified that unexpected loud noises, coughing or sneezing, and heat may trigger behaviors. K.A.C.'s mother said he may collapse to the ground when his name is called at the doctor's office, and they have to pick him up and manually take him to the office.  K.A.C.'s father F.C. said gastrointestinal issues may trigger a meltdown, which was confirmed by Dr. Elliott within his deposition testimony.  An FBA from 2011 identified the function of K.A.C.'s maladaptive behaviors, including crying eloping, and aggression as follows: "When [K.A.C.] wants access to an item that he cannot have or that he does not know how to request, he will engage in maladaptive behavior because in the past these behaviors have been reinforced by gaining access to that item." Educational documents from March 2012 similarly state, "[T]here is a functional relationship between non-preferred task/demands being placed on [K.A.C.] and his challenging behaviors."

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

72.     Furthermore, F.C. stated they do not always know what triggers a meltdown. He testified, "Even at the school, you know, they'll say…we don't know what the antecedent (e.g. trigger) was," and that "sometimes it's out of nowhere, you know, where it's just, you know, somethings, you know, not right." F.C. also said there are times when they think one thing caused a meltdown when it was really something else.

73.     Consistent with F.C.'s testimony, Dr. Elliott said if K.A.C. were not sleeping well, that could cause him to have negative behaviors or irritability, and he could also have negative behavior because a medication was changed or because K.A.C. was overstimulated. Dr. Meyer testified that K.A.C. may be more agitated when in pain secondary to constipation.[3] The evidence thus shows there are numerous triggers for K.A.C. maladaptive behaviors, some of which are known, and some of which are unknown.

74.     K.A.C.'s problematic behaviors occur across multiple environments. They are not unique to the Disney parks. J.L.C. said K.A.C. has had meltdowns in places such as Wal-Mart, Target, or the grocery because he may have been hungry or tired of walking. F.C. also said his son has meltdowns at Target and Wal-Mart. F.C. testified K.A.C.'s last severe meltdown occurred at an airport and he had to physically restrain him. Dr. Elliott testified that K.A.C. has aggressions at many difference places including doctors' offices, home, and school. He said they can happen in any environment and can be unpredictable. Considering that K.A.C. has multiple meltdowns in numerous environments in response to known or unknown triggers, it is unreasonable to expect Disney to somehow provide accommodations that will eliminate all triggers for meltdowns.

---

[3] Notably, a July 2014 gastroenterology note states that J.L.C. reported she thought walking at Disneyland had helped with K.A.C.'s constipation.

Evidence Packet P.0124

75. K.A.C.'s parents described his meltdowns during their respective depositions. J.L.C. testified that they are able to redirect K.A.C. to do something else if he is having a "short meltdown," which may last a few seconds or a minute. She characterized a "long meltdown" as lasting "maybe five minutes." A "bad meltdown" may include kicking, falling on the ground, hitting, punching, and/or pinching. F.C. testified a "severe meltdown" may last 15 to 20 minutes. J.L.C. and F.C. both testified that K.A.C. has never seriously injured anyone in the course of a meltdown, nor has he injured himself.

76. K.A.C.'s parents F.C. and J.L.C. provided several examples in their testimony of planning ahead in order to support their son. For example, J.L.C. has asked K.A.C.'s ABA team to help prepare him for upcoming trips. F.C. also noted that the family tries to book early morning flights because K.A.C. is more likely to be tired at that time and to sleep on the plane. Moreover, both parents testified they plan ahead for family vacations, as they did for a Disney cruise to the Bahamas and a Disney cruise to Grand Cayman. They stated it is not uncommon for them to bring a respite worker along with them to help care for K.A.C.

77. Although K.A.C.'s parents understand the importance of planning ahead, they did not plan ahead or use two services available to them to avoid standby lines during the first day of their March 2014 visit to WDW. J.L.C. testified that she did not make any FastPass reservations ahead of their March 2014 trip to WDW, which they could have done 60 days prior to their Disney resort reservation. J.L.C. also stated the family did not use their DAS pass the first day in the parks. In spite of the fact that they did not use the options available to them, they were provided two readmission passes as an additional service.

78. On the second day of their March 2014 visit, J.L.C. complained to a Cast Member that her family could not get a DAS return time for It's a Bug's Life. The Cast Member escorted the family to the attraction and they were allowed to enter. She indicated that during this period, K.A.C. had a meltdown, which she described

- 32 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

as "running around." She could not remember what other rides they went on that day, nor could she remember how many hours the family spent in the park.

79. On their third day at Magic Kingdom, K.A.C. successfully waited in lines for three rides (Mad Tea Party, Dumbo, and Tomorrow Speedway). The following day the family went to Hollywood Studios and attended the American Idol Experience show. J.L.C. testified that the family had to leave the show because K.A.C. was making noise and had a meltdown, but she did not know why he had a meltdown. The family then left Hollywood Studies and traveled to Epcot, where they were given two more readmission passes. On the last day of their trip, K.A.C. stayed in the resort with his respite provider, as he has done on other family vacations.

80. K.A.C. may have engaged in meltdown behavior while at WDW, but this did not render him unable to access the parks. Based on his parent's testimony, K.A.C. actually had fewer meltdowns at the Disney parks under DAS as compared to a typical school day, where the average rate of aggressions per day is 32.38 occurrences.

81. Furthermore, in regards to the 2016 trip to WDW, the complaint includes information about WDW attractions that is factually incorrect. The complaint states, "J.L.C. [sic] could not understand the concept of arriving to It's Tough to be a Bug! fully expecting to ride It's Tough to be a Bug! at that time, only to be turned away and told to return at a later time." It's Tough to be a Bug! is not a ride. It is a 3D film presented in a theatre-like setting. Additionally, guests cannot "see the ride" or "stand at the front of the ride" at the FastPass or Stand-by entrances; beyond the entrances there is thick foliage along a path. The show itself is inside of the Tree of Life, which is centrally located in Animal Kingdom and can be seen from numerous places in the park. Regardless of entering through the FastPass line or the stand-by line, guests enter a large holding area and wait until the current show has ended. Guests then enter the theatre, find a seat, and wait for the rest of the guests to enter before the show begins. Similarly, the allegation that K.A.C. had a meltdown

- 33 -

at Mad Tea Party because he was "forced" to enter the ride through the FastPass entrance is also questionable. The FastPass entrance and the stand-by entrance are located next to one another. Considering K.A.C.'s level of intellectual functioning and the features of these rides, it is highly unlikely that K.A.C. realized which line he was entering at Mad Tea Party. K.A.C. may have had meltdowns near the entrances to Mad Tea Party and It's Tough to Be a Bug!; however, there is no evidence of what triggered those meltdowns, nor is there any evidence distinguishing his behavior as somehow different that his behavior on any other day.

82. There is no evidence that K.A.C. cannot experience his preferred rides at any of the parks with the accommodations the family was provided (e.g. DAS card, readmission passes) as well as access to the FastPass system. Indeed, J.L.C. testified that K.A.C. did not have a meltdown in the parks during the May 2016 visit, and she could not recall any meltdowns during the November 2014 visit. The day after the family returned from their May 2016 visit, J.L.C. called Dr. Elliott's office, however, and "report[ed] the family returned from their Disney trip and Kendall did fairly well." At another visit with Dr. Elliott on June 1, 2016, the family reported he "generally tolerated the park."

83. It is my opinion, to a reasonable degree of psychological certainty, that K.A.C. did not suffer serious, severe, or extreme emotional distress because of the DAS or Disney. No evidence is provided of such. Dr. Meyer testified that she has never had a discussion with the family about trips to WDW. The family continues to have a higher level of access as compared to the general public. Furthermore, the family has continued to visit the Disney parks. It is inconceivable that a rational and competent parent would voluntarily and repeatedly subject their child and themselves to an event that causes them serious, severe, or extreme emotional distress.

84. It is also my opinion, to a reasonable degree of psychological certainty, that the current accommodations and services provided by Disney to K.A.C. did not limit his access to the parks or unjustly discriminate against him. Given the

- 34 -

1   accommodations under DAS which are available to him and other individuals with

2   ASD, it is my opinion, to a reasonable degree of psychological certainty, that

3   providing repeated, near-immediate entry to rides and attractions (as was done under

4   the GAC policy) is not necessary to afford K.A.C. access to Disney's theme parks.

5   This alleged need for immediate gratification is not a requirement of K.A.C.'s

6   disabilities but rather is a preference for GAC over DAS which should not have to be

7   accommodated by Disney. According to F.C., K.A.C. and family were able to go on

8   "just about everything" K.A.C. wanted to go on at the Disney parks during their 2014

9   and 2016 trips to WDW, including "[q]uite a few" [rides]. As many as [they] could

10  fit in" at Magic Kingdom, as well as all of the rides K.A.C. wanted to go on at Epcot

11  and Animal Kingdom. This is not consistent with being discriminated against and

12  denied access to Disney's parks on account of his disability.

13      **B.    *V.J.B. and S.L.B.***

14      85.    The complaint describes V.J.B. as a 23-year-old with Autism and an

15  anxiety disorder. His mother S.L.B. testified that while V.J.B. is "lower functioning

16  when it comes to social interactions," he is high-functioning in other ways.

17      86.    The complaint also describes V.J.B. as having "difficulty understanding

18  the concept of time." But in contrast, a Community Volunteer Work Site Observation

19  indicates V.J.B. "demonstrate[s] an awareness of time both with and without cues to

20  look at the clock." In 2010 V.J.B. completed a social thinking assessment. As part

21  of this test, he was asked to follow the examiner's eyes and determine what she was

22  looking at, and then infer what she might be thinking about. V.J.B was successful at

23  the task. The report states, "When she looked at the clock, [V.J.B.] guessed she was

24  wondering what time it was, when the class was over, how much time was left, etc.,

25  He easily and quickly engaged in all parts of the task." This contradicts the allegation

26  that V.J.B. "has difficulty understanding the passage of time." Not only does he

27  understand the passage of time, he can also infer when other people are wondering

28  about the passage of time.

- 35 -

87.     Furthermore, V.J.B. works 4- to 8-hour shifts at a grocery store as a bagger and cashier at ▓▓▓▓▓▓▓▓▓ several days a week.  His mother testified he has the support of a job coach through the state, and the family also pays for a private job coach.  S.L.B. testified the role of the job coaches is to communicate with the employer and V.J.B. about expectations, and help V.J.B. understand what his job expectations are.  There is no evidence V.J.B. receives support with specific tasks such as handling cash, making change, or closing out his cash drawer.  V.J.B.'s employment as a bagger and cashier provides additional evidence that he is capable of understanding the passage of time.

88.     The record reveals V.J.B.'s intellectual abilities fall at the 99.7th percentile (WAIS-IV Full Scale IQ = 142).  When assessed in 2010 at the age of 18, V.J.B. earned the highest possible score on a subtest assessing his ability to solve complex "mental math" problems.  His performance on a test assessing his math calculation skills fell at the 99th percentile, and his performance on a test assessing complex sustained auditory attention fell within the superior range.  Furthermore, V.J.B. scored a 33 on the ACT and earned an undergraduate degree majoring in meteorology, graduating with honors.  Allegations in the complaint that V.J.B. has difficulty understanding the concept of time and is "incapable of understanding the concept of visiting an attraction in the present only to be told it cannot be experienced until sometime in the future" are ridiculous in light of his very superior intellectual abilities.  This information also stands as evidence that plaintiff's blanket allegation that "[a]utism substantially limits a person's ability to…speak, learn, read, concentrate, think, communicate, perceive the concept of time, pair sights and sounds that happen simultaneously, and work" is egregiously inaccurate.

89.     S.L.B. testified that V.J.B. sometimes orders and uses an Uber to get home from work, which also demonstrates that he is able to wait.  She also testified that when V.J.B. was in high school, he and his then-girlfriend would go to the movies, take walks, go for bike rides, and sometimes go out for dinner.  After

- 36 -

1   graduating with honors from Valparaiso University, he participated in a
2   commencement ceremony. B.W.B. testified that V.J.B. enjoys playing poker,
3   specifically Texas Hold 'Em, and that V.J.B. "is a pretty good player." There is
4   ample evidence that V.J.B. is capable of waiting, delaying gratification, engaging in
5   recreational activities, and accessing public places such as movie theatres and
6   restaurants without accommodations.

7       90.     V.J.B.'s parents reported they typically fly from Chicago to California
8   or Florida to visit the parks. His mother testified that when he flew from Chicago to
9   Los Angeles in 2013, he "probably" went through the standard U.S. Transportation
10  and Security Administration (TSA) security line. During their August 2014 trip to
11  Disneyland they actually stayed in San Diego, which required them to drive nearly
12  100 miles to *and* from the park during each day of their multi-day visit. This
13  represents nearly 2 hours of pure drive time, each way. This also provides evidence
14  that V.J.B. is capable of deferring gratification.

15      91.     The complaint alleges that "V.J.B. also cannot tolerate idly waiting or
16  events to develop, as this will cause him to pace and engage in negative self-talk or
17  become frustrated and anxious." In striking contrast, B.W.B. and S.L.B. testified that
18  V.J.B. has gone on four multi-day storm chasing trips, during which he waits for
19  storms which may or may not ever materialize. B.W.B. explained the meteorology
20  group studies the weather patterns, "and then they'll go there. You'll stay close to it,
21  and then you wait for it to happen...a lot of time it doesn't happen." When asked what
22  they do while waiting for a tornado or storm B.W.B. replied, "They have a variety of
23  things they do. They bring like a frisbee and a football, because sometimes you're
24  really going to wait. You're there at noon, and it ain't gonna happen until 6:00…
25  they'll sometimes station at a park, and you play sports or not, and wait for things to
26  pop up." During a July 2018 therapy session V.J.B. described his storm chasing trip,
27  "and how he really enjoyed his time." Clearly, V.J.B. has the capacity to wait and
28  defer gratification for long periods of time, even in situations when there is no

- 37 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1  guarantee of a gratification.

2      92.    V.J.B. allegedly has low muscle tone and becomes fatigued very easily.

3  According to the complaint, "[T]he new DAS creates more fatigue for V.J.B. by

4  forcing him to find things to do while waiting the allotted return time, not allowing

5  him to spend as much time in the Parks as other, non-disabled guests." This statement

6  illustrates that, in fact, DAS allows V.J.B. to experience more at Disney's parks

7  during virtual waits than non-disabled guests who had to stand and wait in line.

8  Furthermore, both of V.J.B.'s parents testified several times that V.J.B. benefits from

9  physical breaks. DAS allows V.J.B. to do exactly that. Rather than physically stand

10  in a line, he can access another ride or attraction, or sit down and rest.[4]

11      93.    The complaint alleges that during the family's August 2014 trip to

12  Disneyland while "lying on a...bench, [V.J.B.] started to experience a meltdown."

13  V.J.B.'s medical records indicate that he routinely lies or sits on the ground, at

14  inappropriate times, or in inappropriate locations. S.L.B. characterized this tendency

15  as a "maladaptive behavior. It's not appropriate for him to do it in many

16  circumstances." The fact that he allegedly engaged in a maladaptive behavior while

17  in the park is not remarkable; it is a typical behavior for V.J.B. and for the family to

18  witness and manage.

19      94.    It is worth noting that V.J.B. repeatedly won gold medals in the

20  pentathlon at the Special Olympics. His father testified that he won gold medals in

21  his division at the state championship two out of three years in which he competed

22  in the pentathlon, which consists of the shot put, high jump, 100-meter race, 400-

23  meter race, and running long jump. B.W.B. testified that "depending on the gap

24  between events, I mean some of them would be like an hour apart. So he would sit

25  on the field, maybe get something to eat." V.J.B. also participated in basketball

26  _____

27  [4] Notably, B.W.B testified there is "never anywhere to sit" at WDW. In my personal experience, people often sit on the sidewalk curbs throughout all of the parks. It is quite common.

28

Evidence Packet P.0131

tournaments.  His father said that in between games, "We'd go eat; we would you know, wander around campus. Just whatever we could do to kind of pass the time."  B.W.B. did not mention any concerns with low tone, fatigue, or needing to rest as it pertains to V.J.B.'s participation in athletic competition or storm chasing trips.

95.   In regards to the family's 2014 visit to Disneyland, S.L.B. testified that the family used the DAS card to access every ride, "with the caveat that if there was a short wait time we may have jumped on a ride."  She added on the second day they were also given three readmission passes.  Other than Tower of Terror, Space Mountain, and "Cars rides," S.L.B. could not recall which rides they accessed or how they accessed them (i.e. DAS card, FastPass, or standby line).

96.   S.L.B. said V.J.B. can only go to the parks for a few hours at a time. She admitted she has never used FastPass in conjunction with the DAS card, and did not know if using FastPass with the DAS card would work for V.J.B.  Essentially, she has not attempted to use the programs available to V.J.B. and his family.

97.   Furthermore, according to the complaint, V.J.B. "was able to ride three rides" after he allegedly "started to experience a meltdown."  The family also chose to return to the parks the next day and returned to the parks several years later.

98.   It is my opinion, to a reasonable degree of psychological certainty, that the current accommodations and services provided by Disney to V.J.B. did not limit his access to the parks or unjustly discriminate against him. Given the accommodations under DAS which are available to V.J.B. and other individuals with disabilities, it is my opinion, to a reasonable degree of psychological certainty, that providing repeated, near-immediate entry to rides and attractions (as was done under the GAC policy) is not necessary to afford access to Disney's theme parks. This need for immediate gratification is not a requirement of V.J.B.'s disability but rather is a preference for GAC over DAS -- or a preference for one ride over all others -- which should not have to be accommodated by Disney.

- 39 -

### C.   *Y.Z. and M.Y.R.*

99.    Plaintiffs allege that Y.Z. is five years old and has autism.   The complaint states, "Y.Z.'s symptoms and stimming patterns including screaming, kicking, and self-injurious behaviors such as throwing himself on the floor and hitting himself." These types of behavior are not consistent with "stimming" in ASD. They are consistent with a meltdown or tantrum, which is a maladaptive behavior.  During her deposition testimony, M.Y.R. described a typical meltdown for Y.Z. as screaming a high-pitch tone, "kind of like kicking or flopping flickering his hands. Cover his ears." She also described him rocking back and forth in his stroller while at Disneyland.  Further, M.Y.R.'s testimony contradicts the allegation in the complaint; she stated Y.Z. did not engage in self-injurious behavior until around 2018.

100.   Consistent with my opinion above regarding the efficacy of ABA in reducing maladaptive behaviors in ASD, ABA has effectively reduced many of Y.Z.'s maladaptive behaviors.  An ABA Services Progress Report dated January 2016 outlines his progress from December 2013 through December 2015.  Y.Z. exhibited a clear decline in problematic behaviors during this period. The report states, "There are no longer barriers in the areas of obsessive-compulsive behavior and sensory defensiveness."  Consistent with this report, Y.Z.'s father, F.Z., testified Y.Z. has made progress in therapy and no longer gets upset every time he cannot do something he wants to do.  He agreed it is not healthy for Y.Z. to get everything that he wants, and explained he helps redirect his son so Y.Z. knows that sometimes he has to be patient or wait for something. Similarly, M.Y.R. testified that Y.Z.'s alleged preference for a specific ride order at Disneyland is not a need like a blind person has.  She agreed that his preferences are treatable as she has learned in ABA therapy, and testified she has learned how to try to successfully redirect him away from a preferred activity through ABA therapy.

101.   In the complaint, plaintiffs contend that "Y.Z. is incapable of deviating from consistency, order, and routine," and "enters the park expecting to ride certain

Evidence Packet P.0133

1   rides." There is no evidence, however, of what Y.Z.'s alleged "preferred" routine is,

2   and M.Y.R. repeatedly stated she did not recall his preferred routine at Disneyland

3   during her deposition. Moreover, Y.Z.'s DAS card outlines two days of his multi-

4   day visit to Disneyland and shows that he experienced different rides and attractions

5   in a different order each day; he did not follow any routine.

6       102.    M.Y.R. testified that Y.Z. went on certain rides in May 2013 at the age

7   of 3[5] and he remembered what those rides were when he returned in November 2013

8   at the age of 4, despite the fact that she could not remember his preferred order.

9   According to M.Y.R., Y.Z. was in the stroller "most of the time" during the

10  November 2013 visit and he directed the rides that the group of 20 people would ride.

11  In contrast, F.Z. testified, "[M]y son can't decide on his own which one he wants to

12  go on or not. He just says he likes a certain one, but then he comes to getting on, he

13  won't go on it." There is no evidence that Y.Z. has a preferred routine, and even if

14  he does he is clearly capable of deviating from that routine.

15      103.    It is also notable that M.R. testified that in 2013 there were 9 people

16  living in her 4-bedroom, 2-bathroom house. The idea that Y.Z. would be able to

17  maintain strict preferences and routines and to never have to wait for anything at

18  home is unlikely. Indeed, M.Y.R. testified that Y.Z. sometimes has to wait just to

19  use the bathroom when at home.

20      104.    The complaint also alleges that "Y.Z. is incapable of waiting significant

21  periods of time to enter a ride or attraction." This allegation is belied by plaintiffs'

22  interrogatory responses and Y.Z.'s parents' deposition testimony. Notably, all three

23  renditions differ from one another. Contrary to the allegations in the complaint, F.Z.

24  stated they waited in the standby line at Dumbo for an hour, for Finding Nemo for

25  almost an hour, and for Winnie the Pooh for about 30 minutes. But in contrast to

26

27  [5] Records indicate Y.Z.'s developmental abilities in September 2015, nearly 2 years
    after the November 2013 visit, fell below a 3-year-old level.
28

- 41 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

1   F.Z.'s testimony and the complaint, M.Y.R. testified that other members of her party
2   waited in standby lines and she and Y.Z. essentially cut in line when those people
3   approached the end of those lines.  Additionally, F.Z. stated that on the second night
4   of their trip, the family waited for about an hour to watch a parade, and after the
5   parade they waited for another hour to watch the fireworks. F.Z. testified that
6   following the fireworks, he and M.Y.R. rode Tower of Terror while two other
7   members of their party waited with Y.Z. and Y.Z.'s sister.  Furthermore, when asked
8   if Y.Z. has to learn to adapt to loud noises and things like waiting, F.Z. replied, "Of
9   course…he's getting therapy for just that."  This demonstrates that Y.Z. is capable of
10  -- and did -- wait in lines for at least 30 minutes in line at the Disney parks and can
11  wait and defer gratification.

12      105.   According to the complaint, "If Y.Z. is unable to ride those rides, or is
13  denied the opportunity to repeat ride his handful of favorite rides, he is likely to
14  experience a meltdown."  A baseline behavior assessment in December 2013 states
15  Y.Z. "engages in yelling, crying, aggress and/or falling to floor in nearly 100% of
16  opportunities where he is denied access to preferred items or required to transition
17  away from highly preferred activities."  By January 2016 he engaged in "tantrum
18  behavior including yelling, hitting, kicking, and flopping approximately 1 time per
19  session. The duration of each episode is up to 5 minutes." This statement illustrates
20  several points. First, Y.Z. engaged in meltdown behaviors "nearly 100% of" the time
21  when he did not get something he wanted or get to do what he wanted. Hence,
22  meltdowns were not triggered by denial to something Y.Z. needs; they were triggered
23  by denial to something that he wanted. Secondly, meltdown behavior can be
24  decreased by using ABA strategies, as they were for Y.Z. Thirdly, the expectation by
25  providers who treat ASD is that the maladaptive behaviors should be changed, and
26  should not be permitted.

27      106.   Similarly, there is ample evidence that Y.Z. engages in maladaptive
28  behaviors in numerous environments. There is no evidence that any meltdown

behavior that may have occurred at Disneyland was somehow unique to that environment. F.Z. testified that Y.Z. became "agitated" anytime and in any place if something happened that he didn't like.

107. The records also show that M.Y.R. did not fully use the accommodations available to her family. The complaint alleges that during the first day of their November 2013 trip to Disneyland, M.Y.R. obtained a DAS return time for Finding Nemo Submarine Voyage. "In the meantime, other members of her family without the DAS embarked to ride Dumbo the Flying Elephant." It is unclear why M.Y.R. and Y.Z. did not accompany their family to ride Dumbo, as they could have done so and then returned to Finding Nemo. The complaint also states that she then "gave up" on trying to use the DAS and that "wait time for most of the rides were short and bearable for Y.Z." F.Z.'s deposition testimony contradicts this allegation; he stated the family walked into the park, referenced a map, waited in line for Dumbo, and then waited in line for an hour for Nemo. According to F.Z., at that time they overhead someone talking about a special needs pass. He then claimed that his family was denied a DAS card because they did not have documentation of Y.Z.'s disability. F.Z. said the family then went to Winnie the Pooh and waited in the standby line for about 30 minutes, and continued on to another ride where they waited about 30 minutes. In contrast, M.Y.R. testified that she was given a DAS card for all 20 members of their party. She said she could not remember how long she was at the parks, what rides they went on, or how long they waited. She also testified Y.Z. became upset when they approached a ride because he anticipated going on that ride, but admitted she did not know DAS return times were located at kiosks throughout the parks, as opposed to at the ride entrance. M.Y.R. also admitted she was unaware that the DAS return time is the posted stand-by wait time minus 10 minutes, despite the fact that information was clearly represented on Y.Z.'s DAS card. She stated her primary complaint with the DAS with the need to repeatedly return to one of two kiosks; she was unaware of the nine total kiosks in the parks. Lastly, Y.Z. admitted

- 43 -

1    she did not plan at all prior to the November trip.  Based on both parents' testimony

2    that Y.Z. can wait at least 25 minutes, the family is quite able to access any preferred

3    routine he may have when utilizing the accommodations available to them.

4        108.   F.Z. testified that his daughter, who is ███████████ waited

5    in line for numerous rides but did not get on the ride, so one of the parents stayed

6    with her and did not get on the ride themselves.  In this situation, the family could

7    have used the Rider Switch program which allows a member of the party to stay

8    outside of the standby or FastPass line with the child who does not want to or cannot

9    go on the ride.  After the rest of the party completes the ride, the other adult can then

10   go on the ride through the FastPass line and is able to take up to two additional people

11   with them. This represents another option the family could have utilized, but did not.

12       109.   The complaint further alleges that on the second day of their November

13   2013 trip, "DAS return times were extensive, preventing Y.Z. from riding many of

14   the rides he wanted to ride," and claims DAS return times were "sometimes hours

15   later."  In contrast, Y.Z.'s actual DAS card shows their longest return time was 30

16   minutes.  Y.Z. used the DAS card to access Alice in Wonderland, Dumbo, and Peter

17   Pan within a 75-minute window.  The following day, their longest DAS return time

18   was 35 minutes for Space Mountain, arguably one of the most popular rides at

19   Disneyland.

20       110.   Additionally, plaintiffs claim in the complaint that the DAS procedure

21   triggered Y.Z.'s meltdowns in November 2013.  During her deposition, M.Y.R.

22   stated he had 6 to 8 meltdowns a day while at Disneyland.  This represents a much

23   lower frequency as compared to his typical day at school.  Furthermore, Y.Z.'s

24   educational records document his sensitivity to bright lights and loud noises, which

25   could have contributed to his meltdowns, especially in light of M.Y.R.'s testimony

26   that he often covered his ears while at Disneyland.  There is no compelling evidence

27   that Y.Z. had meltdowns that were out of the ordinary during his visit to Disneyland

28

- 44 -

1   under DAS, and there is no compelling evidence that any meltdown he may have had

2   was triggered by DAS.

3       111. It is my opinion, to a reasonable degree of psychological certainty, that

4   Y.Z. did not suffer serious, severe, or extreme emotional distress as a result of the

5   DAS. His behavior at the parks was, if anything, better than a typical day for him.

6       112. It is also my opinion, to a reasonable degree of psychological certainty,

7   that the current accommodations and services provided by Disney to Y.Z. did not

8   limit his access to the parks or unjustly discriminate against him. Given the

9   accommodations under DAS which are available to Y.Z. and other individuals with

10  disabilities, it is my opinion, to a reasonable degree of psychological certainty, that

11  providing repeated, near-immediate entry to rides and attractions (as was done under

12  the GAC policy) is not necessary to afford access to Disney's theme parks. This need

13  for immediate gratification is not a requirement of Y.Z.'s disability but rather is a

14  preference for GAC over DAS -- or a preference for one ride over all others -- which

15  should not have to be accommodated by Disney.

16

17  I declare under penalty of perjury that the foregoing is true and correct.

18

19  Dated: December 31, 2019

20                                      Jill L. Kelderman, Ph.D., ABPP-Cn
21                                      Board Certified Clinical Neuropsychologist
                                        Board Certified Subspecialist in Pediatric
22                                      Neuropsychology
23                                      Florida Licensed Psychologist # 7965

24

25

26

27

28

- 45 -

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

# References

American Psychiatric Association. (2013).   American Psychiatric Association
(2013).   *Diagnostic and statistical manual of mental disorders* (5th ed.).
Washington, DC: Author.

Baio, J., Wiggins, L., Christensen, D. L., Maenner, M. J., Daniels, J., Warren, Z., ...
& Durkin, M. S. (2018). Prevalence of autism spectrum disorder among
children aged 8 years—Autism and Developmental Disabilities Monitoring
Network, 11 Sites, United States, 2014. *MMWR Surveillance
Summaries*, *67*(6), 1.

Baranek, G. T. (2002).  Efficacy of sensory and motor interventions for children with
autism. *Journal of Autism and Developmental Disorders*, *32*(5), 397-422.

Baron-Cohen, S., Leslie, A. M., & Frith, U. (1985).  Does the autistic child have a
"theory of mind"? *Cognition*, *21*(1), 37-46.

Data & Statistics. (2015, November 28).   Retrieved from
http://www.cdc.gov/ncbddd/autism/data.html

DeLoache, J. S., Simcock, G., & Macari, S. (2007).  Planes, trains, automobiles--and
tea sets:  Extremely intense interests in very young children. *Developmental
Psychology*, *43*(6), 1579.

Dettmer, S., Simpson, R. L., Myles, B. S., & Ganz, J. B. (2000).  The use of visual
supports to facilitate transitions of students with autism. *Focus on Autism and
Other Developmental Disabilities*, *15*(3), 163-169.

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Dixon, M. R., and Cummings, A. (2001). Self-control in children with Autism: Response allocation during delays to reinforcement. *Journal of Applied Behavior Analysis,* 4 (34), 419-495.

Elsabbagh, M., Mercure, E., Hudry, K., Chandler, S., Pasco, G., Charman, T., ... & BASIS Team. (2012). Infant neural sensitivity to dynamic eye gaze is associated with later emerging autism. *Current Biology*, *22*(4), 338-342.

Fein, D., Hinnebusch, A., & Troyb, E. (2014) Autism Spectrum Disorders. In Stucky, K.J., Kirkwood, M. W., & Donders, J. (Eds.), *Clinical Neuropsychology Study Guide & Board Review,* (pp. 157-173). New York, NY: Oxford University Press.

Fein, D., Barton, M., Eigsti, I. M., Kelley, E., Naigles, L., Schultz, R. T., ... & Troyb, E. (2013). Optimal outcome in individuals with a history of autism. *Journal of child psychology and psychiatry*, *54*(2), 195-205.

Herbert, M. R. (2011). The neuroanatomy of ASD. In Fein, D. (Ed.), *The Neuropsychology of Autism,* (pp. 47-76). New York, NY: Oxford University Press.

Jarrold, C., Boucher, J., & Smith, P. (1993). Symbolic play in autism: A review. *Journal of Autism and Developmental Disorders*, *23*(2), 281-307.

Kenet, T. (2011). Sensory functions in ASD. In Fein, D. (Ed.), *The Neuropsychology of Autism,* (pp. 215-224). New York, NY: Oxford University Press.

- 2 -

Evidence Packet P.0140

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Kenzer, A. (2014).  A functional approach to challenging behavior. In Granpeesheh, D., Tarbox, J., Najdowski, A.C., & Kornack, J. (Eds), *Evidence-based Treatment for Children with Autism:  The CARD model,* (pp. 75-113). Waltham, MA:  Elsevier

Kuttler, S., Myles, B. S., & Carlson, J. K. (1998).  The use of social stories to reduce precursors to tantrum behavior in a student with autism. *Focus on Autism and Other Developmental Disabilities*, *13*(3), 176-182.

Libby, S., Powell, S., Messer, D., & Jordan, R. (1998).  Spontaneous play in children with autism:  A reappraisal. *Journal of Autism and Developmental Disorders*, *28*(6), 487-497.

National Autism Center.  (2015).  Findings and conclusions:  National standards project, phase 2. Randolph, MA:  Author.

Najdowski, A.C., Persicke, A., & Kung, E. (2014).  Executive functions.  In Granpeesheh, D., Tarbox, J., Najdowski, A.C., & Kornack, J. (Eds), *Evidence-based Treatment for Children with Autism: The CARD model,* (pp. 355-387). Waltham, MA:  Elsevier

Nichols, C. M., Ibañez, L. V., Foss-Feig, J. H., & Stone, W. L. (2014).  Social smiling and its components in high risk infant siblings without later ASD symptomatology. *Journal of Autism and Developmental Disorders*, *44*(4), 894-902.

Evidence Packet P.0141

1  Orinstein, A. J., Helt, M., Troyb, E., Tyson, K. E., Barton, M. L., Eigsti, I. M., ... &
2
3      Fein, D. A. (2014). Intervention for optimal outcome in children and
4      adolescents with a history of autism. *Journal of developmental and behavioral*
5      *pediatrics: JDBP*, *35*(4), 247-256.
6
7  Ozdemir, S. (2008).  The effectiveness of social stories on decreasing disruptive
8      behaviors of children with autism: Three case studies. *Journal of Autism and*
9      *Developmental Disorders*, *38*(9), 1689-1696.
10
11  Pickles, A., Anderson, D. K., & Lord, C. (2014).  Heterogeneity and plasticity in the
12      development of language: a 17 year follow-up of children referred early for
13      possible autism. *Journal of Child Psychology and Psychiatry*, *55*(12), 1354-
14      1362.
15
16  Posey, D. J., Lodin, Z., Erickson, C. A., Stigler, K. A., & McDougle, C. J. (2011).
17      The Neurochemistry of ASD.  In Fein, D. (Ed.), *The Neuropsychology of*
18      *Autism,* (pp. 77-96).  New York, NY:  Oxford University
19
20  Reynhout, G., & Carter, M. (2007).  Social Story™ efficacy with a child with autism
21      spectrum disorder and   moderate intellectual disability. *Focus on Autism*
22      *and Other Developmental Disabilities*, *22*(3), 173-181.
23
24  Richler, J., Huerta, M., Bishop, S. L., & Lord, C. (2010).  Developmental trajectories
25      of restricted and repetitive behaviors and interests in children with autism
26
27      spectrum disorders. *Development and Psychopathology*, *22*(01), 55-69.
28

Evidence Packet P.0142

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Scattone, D., Wilczynski, S. M., Edwards, R. P., & Rabian, B. (2002).  Decreasing disruptive behaviors of children with autism using social stories.  *Journal of Autism and Developmental Disorders*, *32*(6), 535-543.

Sutera, S., Pandey, J., Esser, E. L., Rosenthal, M. A., Wilson, L. B., Barton, M., ... & Fein, D. (2007). Predictors of optimal outcome in toddlers diagnosed with autism spectrum disorders. *Journal of autism and developmental disorders*, *37*(1), 98-107.

Stone, W. L., Ousley, O. Y., Yoder, P. J., Hogan, K. L., & Hepburn, S. L. (1997).  Nonverbal communication in two and three-year-old children with autism.  *Journal of Autism and Developmental Disorders*, *27*(6), 677-696.

Tager-Flusberg, H., & Seery, A. M. (2013).  Early Development of Speech and Language. *Neural Circuit   Development and Function in the Healthy and Diseased Brain: Comprehensive Developmental Neuroscience*, *3*, 315.

Turner-Brown, L. M., Lam, K. S., Holtzclaw, T. N., Dichter, G. S., & Bodfish, J. W. (2011).  Phenomenology and measurement of circumscribed interests in autism spectrum disorders. *Autism*, *15*(4), 437-456.

Wong, C., Odom, S. L., Hume, K. Cox, A. W., Fettig, A., Kucharczyk, S., ... Schultz, T. R. (2014).  Evidence-based practices for children, youth, and young adults with Autism Spectrum Disorder.  Chapel Hill:  The University of North Carolina, Frank Porter Graham Child Development Institute, Autism Evidence-Based Practice Review Group.

Evidence Packet P.0143

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

Wong, C., Odom, S. L., Hume, K. A., Cox, C. W., Fettig, A., Kurcharczyk, S., et al.
(2015).  Evidence-based practices for children, youth, and young adults with
autism spectrum disorder:  A comprehensive review.  Journal of Autism and
Developmental Disorders.  Advance online publication. doi:  10.1007/s10803-
014 2351-z.

Xu, G., Strathearn, L., Liu, B., & Bao, W. (2018). Prevalence of autism spectrum
disorder among US children and adolescents, 2014-2016. *Jama, 319*(1), 81-
82.

Zwaigenbaum, L., Bryson, S., Rogers, T., Roberts, W., Brian, J., & Szatmari, P.
(2005).  Behavioral manifestations of autism in the first year of life.
*International Journal of Developmental Neuroscience, 23*(2), 143-152.

Evidence Packet P.0144

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Appendix A**

My opinions are based on the information that I have considered in connection with the preparation of this report, including but not limited to the following documents:

- Complaint in this case
- Plaintiffs' Interrogatory Responses
- Planning a Trip to the Walt Disney World Resort: A Resource for Guests with Cognitive Disabilities including Autism Spectrum Disorder (ASD)
- Planning a Trip to the Disneyland Resort: A Resource for Guests with Cognitive Disabilities including Autism Spectrum Disorder (ASD)
- DAS Fact Sheet (Disney-AL0000002- Disney-AL0000006)
- Expert report of Bernard R. Siskin, Ph.D.
- Expert report of Bruce Laval
- July 7, 2015 Armor Deposition Transcript
- January 27, 2015 Jones Deposition Transcript
- November 11, 2019 J.L.C. Deposition Transcript and Video
- November 12, 2019 F.C. Deposition Transcript and Video
- November 12-13, 2019 M.Y.R. Deposition Transcript and Video
- November 14, 2019 F.Z. Deposition Transcript and Video
- December 3, 2019 S.L.B. Deposition Transcript and Video
- December 4, 2019 B.W.B. Deposition Transcript and Video
- December 16, 2019 Dr. Stephen Elliott Deposition Transcript and Video
- December 17, 2019 Angela Klutts, M.Ed., BCBA Deposition Transcript and Video
- December 17, 2019 Dr. Carissa Meyer Deposition Transcript
- Educational and medical records of K.A.C.
- Educational and medical records of V.J.B.
- Educational and medical records of Y.Z.

1

### Appendix B

2

The following is a list of all cases in which I testified as an expert at trial or by

3

deposition during the previous four years:

4

5
- A.L. et al. v. Walt Disney Parks and Resorts U.S., Inc. (2015)

6
- Jacob Lefton, a minor, by and through his parents and natural guardians, David Lefton and Shari Lefton v. Jeremy Daniel Francis (2015)

7

8
- Sabrina Molina and Pedro Molina Individually and as parents and natural guardians of J. R. Molina, a minor v. Charmaine E. Bennet, R.N., Elena Mary Amchik, CNM, Premier Associates for the Healthcare of Women, LLC a Florida Limited Liability Company and Bethesda Hospital, Inc., a Florida Corporation d/b/a Bethesda Hospital East. (2016)

9

10

11
- Maria Hernandez and Javier Falcon, Jr., a minor, by and through this natural parents and legal guardians, Javier Falcon, Sr., and Maria Hernandez, Plaintiff(s), vs. Riza Roghani, Defendant (2016).

12

13
- Diego Vallone and Jennifer Vallone, as parents on behalf of Luciano Vallone, a minor, v. Amoretti Pediatrics, P.A., a Florida Corporation and Alejandro F. Amoretti Ramirez, M.D. (2016)

14

15
- State of Florida v. Jay Michael Baird (2017)

16
- Peacock, Jeanne and Jeanne Peacock, as parent of Shelby Peacock v. Maria C. Mombiela and State Farm Mutual Automobile Insurance Company (2017)

17

18
- Madeline E. Kitchen, by and through her parents and natural guardians and Sarah Kitchen and Steven Kitchen, individually, Plaintiffs, vs. North Florida OB GYN, LLC, a Florida Limited Liability Company; Orange Park Medical Center, Inc., d/b/a/ Orange Parke Medical Center, a Florida Corporation, Defendants (2018)

19

20

21
- Kimberly Jackson, individually and as mother and natural guardian of Olivia Jackson, a minor v. Orlando Health, Inc., d/b/a/Winnie Palmer Hospital for Women and Babies; and Tiffany Wells, M.D., f/k/a/Tiffany Williams, M.D. (2018)

22

23

24
- T.P. et al. v. Walt Disney Parks and Resorts U.S., Inc. (2019)

25
- United States of America v. Gabor Zsolt Tapaszto (2017, 2018, 2019)

26
- Katheryn L. Bolden, as Natural Parent and Guardian of C.B., a minor Child, and Katheryn L. Bolden, individually, Plaintiffs, vs. The School Board of Pinellas County, Florida, Defendant. (2019)

27

28
- State of Iowa, Plaintiff, v. Ruben R. Deases, Defendant (2019)

REDACTED VERSION OF DOCUMENT PROPOSED TO BE FILED UNDER SEAL

**Appendix C**

The following is a list of book chapters I have authored:

- Kelderman, J. (2012).  Effects of neurotoxins on the development of executive function in children and adolescents.  In *Executive Function and Dysfunction: Identification, Assessment, and Treatment*  Cambridge:  Cambridge University Press.

- Klein-Tasman, B.P., Phillips, K.D., & Kelderman, J.L. (2007).  Genetic syndromes associated with intellectual disability.   In *Pediatric Neuropsychological Intervention.* Cambridge:  Cambridge University Press.