# Exhibit 1-R

Evidence Packet in Support of Defendant's Motions for Summary Judgment

U.S.D.C., Central District of California, Case No.: 2:15-cv-05346-CJC-E

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Johnny Galvan, Sandy Mumma, and Stavros Patsalos,<br><br>Plaintiffs,<br><br>v.<br><br>Walt Disney Parks and Resorts, U.S., Inc.,<br><br>Defendant. | Case No. SA CV 18-01721-AB (FFMx)<br>REDACTED<br>**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |

Before the Court is Defendant Walt Disney Parks and Resorts, U.S., Inc.'s ("Defendant") Motion for Summary Judgment. ("Motion," Dkt. No. 64). Plaintiffs Johnny Galvan, Sandy Mumma, and Stavros Patsalos (collectively, "Plaintiffs") filed an opposition to Defendant's Motion ("Opp'n," Dkt. No. 70), and Defendant replied ("Reply," Dkt. No. 74). The Court heard oral argument regarding this Motion on November 22, 2019 and took the matter under submission. For the following reasons, the Court **GRANTS** Defendant's Motion.

1.

## I. BACKGROUND

Plaintiffs assert the following four claims premised on allegedly not receiving priority disability access at Disneyland: (1) violation of the Unruh Civil Rights Act, California Civil Code Sections 51–52 ("Unruh Act"); (2) breach of contract; (3) negligent infliction of emotional distress; and (4) intentional infliction of emotional distress. Although Plaintiffs do not explicitly state a cause of action under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12101 et seq. ("ADA"), all of Plaintiffs' claims are predicated upon proving a violation of the statute. (*See* Complaint ("Compl."), Dkt. No. 1 ¶ 7 (The Unruh Act provides that a "violation of the right of any individual under the Americans with Disabilities Act shall also constitute a violation of this section." (quoting Cal. Civ. Code § 51(f))).

Specifically, Plaintiffs' claims arise from Defendant's alleged failure to adequately accommodate them with passes from Defendant's current disability accommodation program—Disney's Disability Access Service ("DAS")—during their respective visits to Defendant's theme park, Disneyland. In asserting their claims, Plaintiffs challenge Defendant's DAS program, which was implemented on October 9, 2013 and replaced the prior Guest Assistance Card ("GAC") system. (Motion at Ex. 2, Declaration of Jennifer Sweetman ¶ 6, Dkt. No. 64-32). The GAC program "generally provided guests with disabilities and their families unlimited, repeated and on-demand access to rides and attractions through alternative 'backdoor' entrances or FastPass lines without requiring them to wait in the regular attraction lines." (*Id.*). Defendant discontinued GAC due to "widespread fraud and abuse." (*Id.*). Defendant's present DAS system "is intended for Guests whose disability prevents them from waiting in a conventional queue environment." (*See* Disney Parks Disability Access Service Card Information, Dkt. No. 64–35). Defendant maintains that a "Guest whose disability is based on the necessity to use a wheelchair or scooter does not need a DAS Card." (*Id.*).

2.

## II. LEGAL STANDARD

### a. Rule 56 Motion for Summary Judgment

A motion for summary judgment must be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). The moving party bears the initial burden of identifying the elements of the claim or defense and evidence that it believes demonstrates the absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the nonmoving party will have the burden of proof at trial, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. *Id*. The nonmoving party then "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

"Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must draw all reasonable inferences in the nonmoving party's favor. *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Anderson,* 477 U.S. at 255). Nevertheless, inferences are not drawn out of thin air, and it is the nonmoving party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines,* 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd,* 810 F.2d 898 (9th Cir. 1987). "[M]ere disagreement or the bald assertion that a genuine issue of material fact exists" does not preclude summary judgment. *Harper v. Wallingford*, 877 F.2d 728, 731 (9th Cir. 1989).

### b. ADA Discrimination – Reasonable Modifications in Policies, Practices or Procedures

"Congress enacted the ADA 'to remedy widespread discrimination against disabled individuals.'" *Baughman v. Walt Disney World Co.,* 685 F.3d 1131, 1135

(9th Cir. 2012) (applying § 12182(b)(2)(A)(ii)) (quoting *PGA Tour, Inc. v. Martin,* 532 U.S. 661, 674 (2001)). Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability in the *full and equal enjoyment* of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation . . . ." (emphasis added). Places of public accommodation, like Disneyland, must "provide disabled patrons an experience comparable to that of able-bodied patrons." *Baughman,* 685 F.3d at 1135. "Facilities are not required to make any and all possible accommodations that would provide full and equal access to disabled patrons," but rather "need only make accommodations that are reasonable." *Id.* Ultimately, facilities must "help disabled guests have an experience more akin to that of nondisabled guests." *Id.*

Here, Plaintiffs contend that Defendant's alleged refusal to provide them with a DAS pass during their respective visits to Disneyland constitutes

> a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations[.]

42 U.S.C. § 12182(b)(2)(A)(ii). To prevail on a claim under that statutory provision, Plaintiffs must establish that:

> (1) [they are] disabled as that term is defined by the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; (3) the defendant employed a discriminatory policy or practice; and (4) the defendant discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability.

*Karczowski v. DHC Mission Valley, LLC,* 862 F.3d 1006, 1010 (9th Cir. 2017) (quoting *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1080 (9th Cir. 2004)).

4.

The Supreme Court has explained that § 12182(b)(2)(A)(ii) "contemplates three inquiries" for determining whether a requested modification to a public accommodation's procedures is required: (1) whether the requested modification is "reasonable"; (2) whether the requested modification is "necessary" for the disabled individual; and (3) whether the requested modification would "fundamentally alter the nature" of the public accommodation. *Martin,* 532 U.S. at 683 n.38. If Plaintiffs establish a prima facie case, namely that their requested modification was reasonable and necessary, then Defendant "must make the requested modification unless it proves that doing so would alter the fundamental nature of its business." *Karczowski,* 862 F.3d at 1010.

### III. DISCUSSION

**1. Galvan has not shown that he has a disability under the ADA, so he cannot establish an ADA violation to obtain relief under the Unruh Act.**

Johnny Galvan ("Galvan") is a 56-year-old who allegedly has a back disability and a diagnosed anxiety disorder. (Compl. ¶ 25).[1] He alleges that he "is incapable of waiting in line or biding time without cognitive and visible goal impairments occurring" (*id.*), and that he was first given a "disability pass" from Disney in 2012. (Galvan Decl. ¶ 2, Dkt. No. 69-4). Galvan states that in 2015 he and his wife Sandy Mumma ("Mumma")[2] obtained an annual Disneyland pass, and that in January, April, and May of that year, they visited the park in Anaheim, California, where they were denied "a pass to go through the entrance line of the ride at the exit," thereby

---

[1] Galvan has provided no facts to demonstrate he has a back disability, but his medical records indicate that he has ███████████████████. (Motion, Ex. 1-S, Dkt. No. 68-16).

[2] There are no allegations in the Complaint that Mumma has a disability or that her claims are anything more than derivative of Galvan's claims. During her deposition, Mumma stated that the Complaint does not allege that she has a disability and that she is only in the case "because of associational rights." (Motion, Ex. 1-B, Mumma Tr. at 106:21-25, 114:12-20, Dkt. No. 64-5).

5.

"forc[ing] them to leave the Park" and its rides. (Compl. ¶ 25). Disney personnel purportedly told them that such receiving such a pass was "no longer the policy at Disney" (*id.*), but instead offered Galvan a wheelchair. (Mumma Decl. ¶ 6, Dkt. No. 69-5). Galvan also alleges that, during one or more visits to Disneyland, he "suffered severe emotional distress due to the exacerbation by Disney of his anxiety disorder." (Compl. ¶ 31). He explained that on an unspecified "day that [he] was standing in the line" at Disneyland he had a "meltdown or anxiety attack" after "waiting for about maybe 45 minutes to an hour" in line. (Motion, Ex. 1-A, Galvan Tr. at 252:6–19, Dkt. No. 64-4). No further facts are provided about this purported meltdown or attack.

Galvan is employed as a truck driver for Iron Mountain Inc. (DSUF 6).[3] As part of his job, he performs a variety of manual tasks related to the pickup and transport of shredded paper at the client's location, (*id.*) and spends a lot of time waiting in traffic on Los Angeles freeways (DSUF 9). Galvan admits that he waits "for a lot of things in life" and is able to walk, stand, and sit for extended periods of time. (*Id.*). He stated that he had no anxiety while waiting in line at Los Angeles Dodgers or Lakers games or when he traveled by car from his home in Los Angeles to Las Vegas a couple of years ago, a trip that takes four hours, each way. (DSUF 12).[4] In 2009 and 2011, Galvan and Mumma frequently visited Disneyland and accessed rides by waiting in the normal standby lines without any accommodation. (DSUF 25). Galvan stated that he accessed and "enjoy[ed] all the attractions" at Disneyland and admits that he was "fully accommodated in 2014 with all the rides [he] went on" at Disneyland, even though he did not receive a DAS pass during his October or November 2014 visits. (DSUFs 27–29).

---

[3] DSUF refers to Defendants' Statement of Undisputed Facts. (Dkt. No. 64-1).
[4] Galvan explains that "[w]hile he waits in [his] truck, he is seated in a comfortable truck" when he does so. (Plaintiffs' Statement of Disputed and Undisputed Facts, Response to DSUF 9, Dkt. No. 70-1).

6.

Evidence Packet P.0326

When testifying, Galvan initially stated that on one of his February 2015 visits to Disneyland he "didn't go on a single ride during [his] five hours" at the park because he "couldn't get the [DAS] pass." (Opp'n, Schutzman Decl., Ex. J at 5, Galvan Tr. at 213:5–16, Dkt. No. 69-16). Later, he stated that (1) he did not make any efforts to find out if there were rides with short waits that he could go on (Motion, Ex. 1-A, Galvan Tr. at 214:5–8, Dkt. No. 64-3), and (2) he did not go on rides during that February 2015 visit because "[he] didn't want to go on any rides at that time," because he "wanted just to go shopping." (*Id.*, Galvan Tr. at 214:20–25, 215:1–3).

According to Galvan's doctor, he has a ▮▮▮▮▮▮▮▮ of anxiety which does not limit a major life activity. (DSUF 3). While Galvan's medical records show that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Motion, Ex. 1-S, Dkt. No. 68-16), ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (DSUF 4), and he ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. (DSUF 5). In his deposition, Galvan admitted that there "is [nothing] that [he] can't do in terms of major life activities because of some limitation." (Motion, Ex. 1-A, Galvan Tr. at 198:25–199:3, Dkt. No. 68-3). He also admitted that the allegations in the Complaint stating that he needs assistance with aspects of his daily life are "false" because he does not need any such assistance. (DSUF 7). Nowhere did Galvan's medical records indicate that he is unable to stand and wait in line, or has difficulty doing so.

Contrary to the conclusory allegations in the Complaint (Compl. ¶ 14), Galvan is not disabled under the ADA or the Unruh Act. Under the ADA, an individual is disabled if he has (1) "a physical or mental impairment that substantially limits one or more major life activities," (2) "a record of such an impairment," or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1). "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id*

7.

Galvan has not shown that his anxiety rises to the level of a "physical or mental impairment that substantially limits one or more major life activities," or here, the ability to stand and wait in line. 42. U.S.C. § 12102(1); *see Swinnie v. Geren,* 379 F. App'x 665, 667 (9th Cir. 2010) (affirming district court's grant of summary judgment that plaintiff was not disabled under the ADA because his anxiety and depression did not impair a major life activity). Galvan's argument in the alternative that "[his] disability comes within the 'as regarded' definition of disabled" (Opp'n at 16) is also unavailing because, under the ADA, persons who meet the "disability" definition solely because they were "regarded as having . . . an impairment" are not entitled to an accommodation. 42 U.S.C. § 12201(h). Because there is no material dispute of fact as to whether Galvan is impaired any major life activity, Galvan cannot prove he is disabled, and his ADA and Unruh Act claims are hereby **DISMISSED**.[5] Because Mumma's disability discrimination claim is derivative of Galvan's, it also fails.

### 2. Even if Galvan had shown that he is disabled under the ADA, his disability discrimination claim still fails because Defendant has shown that Galvan's requested accommodation would "fundamentally alter" the theme park experience.

Assuming *arguendo* that Galvan had shown he has a disability cognizable by the ADA, his disability discrimination claim cannot prevail if "the entity," or the public accommodation at-issue, "can demonstrate that making such modifications would *fundamentally alter* the nature of such goods, services, facilities, privileges, advantages or accommodations[.]" 42 U.S.C. § 12182(b)(2)(A)(ii) (emphasis added). Defendant has presented uncontroverted evidence to show that adopting Galvan's purportedly reasonable accommodation—a DAS pass conferring priority disability access to those with anxiety—would fundamentally alter the theme park experience at Disneyland. Galvan has not offered a shred of evidence, or rebutted any of

---

[5] The Court notes that while a plaintiff with anxiety may be able to demonstrate he or she is disabled under the ADA, Galvan has not done so.

8.

1   Defendant's evidence, to show that his requested accommodation would *not* cause a
2   fundamental alteration to the park's services.
3        Mumma's ▆▆▆▆▆▆▆▆▆▆▆▆▆▆—testified that "anxiety is a
4   disorder that affects 30 percent of people," or approximately one-third of the
5   population. (DSUF 53). Jennifer Sweetman ("Sweetman"), Disney's Senior Manager
6   of Attractions and Custodial Park Operations Experience Integration, stated that if 30
7   percent of all guests at Disneyland were provided with a DAS pass, that would
8   increase the number of DAS passes by "approximately ten times what it is today."
9   (DSUF 54). Sweetman added that, if Disney provided a DAS pass to any guest with
10  anxiety, "it would increase the inventory of DAS passes to an unsustainable level,
11  place significant pressure on the FastPass lines, and have an adverse impact on Park
12  Operations." (DSUF 55). Plaintiff does not dispute any of these facts, but only
13  objects to them on relevance and foundation grounds. (*See* Plaintiffs' Statement of
14  Disputed and Undisputed Facts, Response to DSUFs 53–55, Dkt. No. 70-1). Those
15  objections are **OVERRULED**. As a result, there is no dispute of material fact as to
16  whether Galvan's requested modification would fundamentally alter the theme park
17  experience—all evidence shows that it *would*. Accordingly, Galvan's disability
18  discrimination claim must fail.

     **3. Patsalos cannot satisfy Title III's "necessary" requirement, so he cannot establish an ADA violation to obtain relief under the Unruh Act.**

21       Patsalos is a 26-year-old with cerebral palsy who had knee surgery ▆▆▆
22  prior to his March 26, 2015 visit to Disneyland, the only visit at-issue. (DSUFs 17,
23  35).[6] He alleges that prior to this visit, on September 24, 2014, he was granted a DAS
24  pass (Patsalos Decl. ¶ 3 and Ex. A; Dkt. No. 69-3), "which allowed [him] to get an
25  appointment at a special time for each ride." (Compl. ¶ 26). He claims that because

---

[6] There is no dispute that Patsalos has a disability, and that he is an individual covered by the ADA and the Unruh Act.

9.

of his knee surgery, he was "incapable of waiting in line for an extended period of time," and because he was not given a front-of-the-line pass or allowed to set appointments for rides on March 26, 2015, he left the park. (*Id.* ¶ 27).[7] In describing the circumstances surrounding his denial of a DAS pass, Patsalos alleges that he requested a pass and was told "there just isn't that kind of accommodation." (Patsalos Decl. ¶ 5, Dkt. No. 69-3). He then purportedly left Defendant's office and returned to speak with a second representative who told him that "to receive the accommodation [he] would need a wheelchair or a walking stick that could serve as a visual cue to the Disney employees that [he has] a disability." (*Id.*).

It is undisputed that Defendant offered Patsalos assistance for his mobility issues during his March 26, 2015 visit, but he refused the offered accommodation and did not utilize a mobility aid, even though it is what his doctor would have recommended. (DSUF 34).[8] On that March 26, 2015 visit, Patsalos did not seek medical assistance or visit the nurses' station or medical area at Disneyland, nor did he "go to any medical facility or hospital" after he left the parks. (DSUF 37). He did, however, experience at least ten rides or attractions without a DAS pass on March 26, 2015, including some of the most popular rides, such as Splash Mountain, Space Mountain, Big Thunder Mountain Railroad, and Matterhorn Bobsleds. (DSUF 35). Patsalos also waited in line for up to an hour and went in the standby lines at least ten times (DSUF 21). Although he did not receive a DAS pass on his March 26, 2015 visit, Patsalos walked several miles without any problems (DSUF 22) and was at the park for eight to ten hours without an accommodation. (DSUF 33). Patsalos admits that he experienced the same number of rides and spent the same amount of time at

---

[7] Patsalos has provided no facts to support his allegation in the Complaint that he left the park because he did not obtain a DAS pass.

[8] Patsalos states that he declined the wheelchair because "[he] worked [his] whole life to try and make [his] disability discreet and by using a wheelchair or other mobility device [he] would appear to everyone involved that [he has] a disability." (Patsalos Decl. ¶ 5, Dkt. No. 69-3).

10.

1 the parks on March 26, 2015 when he did not have any accommodation, as he did
2 during earlier visits in 2014 when he had a DAS pass. (DSUF 36).
3 ████████████████████████████ after his visit to Disneyland, Patsalos visited
4 ████████████████████████████████████ who examined him and recorded the
5 following medical note:
6 ███████████████████████████████████████████████████████
7 ███████████████████████████████████████████████████████
8 ███████████████████████████████████████████████████████
9 ████████████████████████████████
10 (Opp'n, Schutzman Decl., Ex. D at 2, Dkt. No. 69-10). ██████████████
11 ████████████████████████████████████████████████████████████████
12 ████████████████████████ (Id.). Patsalos did not visit ████████████████
13 ████████████████████████████████████████████████████████████████
14 ████████████████████ (Motion, Ex. 3-B, Patsalos Tr. at 93:25–94:11).
15    Patsalos is currently a financial associate at Ernst & Young, and is close to
16 receiving his Certified Public Accountant certificate. (DSUF 18). He testified that he
17 spends more than eight hours each day sitting at a desk at work. (Id.). When he is not
18 working, he plays basketball once a month and goes on the treadmill for 30 minutes
19 four to five days a week. (DSUF 19). He has waited for up to an hour in a line and
20 for more than five hours to reach a destination, as he did during multiple flights or
21 drives to San Francisco, Mexico, and New York City. (DSUF 20).
22    To establish a violation of Title III of the ADA, Patsalos must show that a
23 reasonable modification of Defendant's policy is *necessary* to afford him access to
24 Disneyland. 42 U.S.C. § 12182(2)(A)(ii); *Martin*, 532 U.S. at 688. For Patsalos to
25 show that a DAS pass is "necessary," Defendant argues that the Supreme Court
26 requires that Patsalos must prove that it is "beyond [his] capacity" to access rides at
27 Disneyland without a DAS, *id.* at 682, and not just that it would be "uncomfortable or
28

1  difficult" for him. *Id*. But as the Ninth Circuit has recognized in reviewing this
2  proposed standard, the *Martin* Court "had no occasion to rule on whether the
3  requested modification was necessary '[g]iven the concession by [the public
4  accommodation] that the modification sought [*was*] reasonable and necessary.'"
5  *Baughman,* 685 F.3d at 1137–38 (quoting *Martin,* 532 U.S. at 683 n.38) (emphasis
6  added). Further, "[r]ead as Disney suggests, the ADA would require very few
7  accommodations indeed," because "[a]fter all, a paraplegic *can* enter a courthouse by
8  dragging himself up the front steps . . . so lifts and ramps would not be 'necessary'
9  under Disney's reading of the term." *Baughman,* 685 F.3d at 1134. Here, the Court
10 adopts the Ninth Circuit's "necessary" standard in *Baughman*, a "like experience"
11 standard which requires that Disneyland "provide disabled patrons an experience
12 comparable to that of able-bodied patrons." *Id*. at 1135. The Court finds that
13 Defendant provided this comparable experience for Patsalos.
14       Here, Patsalos has not shown that his request for priority ride access is
15 necessary under the ADA because he has access to Disneyland comparable to able-
16 bodied persons. First, he expressly stated that he experienced *the same number of*
17 *rides* and *spent the same amount of time* at Disneyland on March 26, 2015 when he
18 did not have any accommodation, as he did during earlier visits in 2014 when he had a
19 DAS pass, indicating preliminarily that a DAS pass is not *necessary* to provide him
20 with access to the park. (DSUF 36). Further, there is no evidence that Patsalos could
21 not have accessed Disneyland without a DAS pass where here, Defendant offered him
22 a wheelchair, which he declined. While there is evidence indicating that a wheelchair
23 or other mobility device may be a necessary accommodation for Patsalos due to his
24 physical disability, he was offered one during his March 26, 2015 visit but, again, he
25 refused the offer.
26       Notably, Patsalos also did not avail himself of the "FastPass" line, which would
27 have allowed him to access rides with shorter waits such that a DAS would not be
28 "necessary" for him. (DSUF 50). A DAS is available to all Disneyland guests who

Evidence Packet P.0332

1   decide to take advantage of it, and Defendant specifically encourages guests with
2   disabilities to use it. (DSUFs 48–49). The FastPass system allows guests to obtain a
3   return time, which saves their place in line so they do not have to stand and wait in the
4   actual general "standby" line, but can instead stand in the FastPass line which
5   typically has a short wait. (DSUFs 47–48). Patsalos himself testified that he could
6   have gone on more rides during his March 2015 Disneyland visit if he had used
7   FastPass. (DSUF 52). It follows that he also could have been off his feet more.
8       Patsalos points to ███████████████ as creating a dispute of material
9   fact as to whether he can wait in line, but the Court disagrees. The issue Patsalos
10  complains of—an "exacerbated" knee condition (Opp'n at 11)—does not require a
11  DAS pass, but rather a mobility aid, which again, Defendant offered and Patsalos
12  rejected. Had Defendant not offered a mobility device, or any reasonable
13  accommodation to address Patsalos' demonstrated mobility issues, this would be a
14  different case. But here, Defendant provided the opportunity for Patsalos to
15  experience Disneyland like everyone else: with a mobility device. Further, Patsalos
16  has provided no authority indicating that, if a reasonable accommodation (such as a
17  wheelchair) is offered, Plaintiff is entitled under the ADA to obtain his desired
18  accommodation (or priority disability access). That is likely because, under the ADA,
19  "facilities are not required to make the preferred accommodation of plaintiffs'
20  choice." *A.L. ex rel. D.L. v. Walt Disney Parks & Resorts U.S., Inc.* 900 F.3d 1270,
21  1296 (11th Cir. 2018). Ultimately, Patsalos has provided no evidence that he is
22  unable to wait in line with a wheelchair—a reasonable accommodation offered by
23  Defendant—to survive summary judgment.
24      Because the undisputed facts show Disneyland provided access "comparable to
25  that of able-bodied patrons" to Patsalos such that a DAS pass was not "necessary" for
26  him, he cannot establish a violation of the ADA or the Unruh Act, so those claims are
27  hereby **DISMISSED**.
28

### 4. Plaintiffs cannot prove their breach of contract claims.

To prevail on a breach of contract claim, each plaintiff must establish that: (1) the parties entered into a contract; (2) Defendant failed to do something the contract required it to do; and (3) plaintiffs suffered damages as a result of Defendant's breach. *See Richman v. Hartley*, 169 Cal. App. 4th 1182, 1186 (2014); *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1353 (2009) ("Implicit in the element of damage is that the defendant's breach caused the plaintiff's damage.").

Here, Defendant acknowledges "it is undisputed that [Plaintiffs] used their annual pass[es] or ticket to gain entry into the parks . . . ." (Reply at 15). The Court finds that Plaintiffs have proven that, by purchasing these passes and ticket, they entered into a contract with Defendant. (*See* Galvan Guest Record, Dkt. No. 64-41 at 2 and Mumma Guest Record, Dkt No. 64-42 at 2 (both showing Defendant's log of Galvan and Mumma's sales history featuring columns for "Contract No.")); Patsalos Decl. ¶ 4 and Ex. B (showing the purchase of Disneyland tickets on a credit card account statement), Dkt. No. 69-3 at 11). Although Defendant emphasizes that Galvan and Patsalos both admitted in deposition they do not have any contract with Disney relating to their visits to the parks (*see* Motion, Ex. 1-A (Pt. 2), Galvan Tr. at 226:17–227:5, Dkt. No. 64-4; *see also* Motion, Ex. 1-C (Pt. 2), Patsalos Tr. at 207:14–16, Dkt. No. 64-8), this is not fatal to their claim that a contract actually exists. Thus, Plaintiffs have established the first element of their contract claim, or the existence of a contract between them and Defendant.

But Plaintiffs cannot prove the second element of their breach of contract claim, or that Defendant failed to do something the contract required it to do. As a threshold matter, Plaintiffs' claim is predicated on proving an ADA violation, which they have not done. Further, the Court agrees that "Disney does not have an obligation to [Plaintiffs] or millions of other guests to provide an experience that meets their personal expectations, let alone a contractual commitment, as the experience of each

guests is inherently individualized, subjective, and unpredictable." (Motion at 27). The Court also agrees that such an obligation cannot be "read into the terms and conditions of the annual pass [Plaintiffs] used to access Disneyland."[9]

Notably, however, that the Court disagrees with Defendant that "entry into the parks . . . is all [a pass or ticket] guarantees." (Reply at 15). A Disneyland ticket would not be worth the paper it is printed on if it conferred no access to the park's rides or other attractions for disabled individuals. Surely, Defendant does not mean that stepping across or rolling a wheelchair past Disneyland's front gates is all that a ticket provides. Here, because Plaintiffs had access to the park's attractions, they cannot show that Defendant failed to do something required by their respective contracts (passes and a ticket), so their breach of contract claims must fail.

**5. Plaintiffs cannot prove their Negligent Infliction of Emotional Distress claims.**

To establish a claim of negligent infliction of emotional distress ("NIED"), Plaintiffs must prove: (1) Defendant has a duty of care to Plaintiffs; (2) Defendant breached that duty; (3) Defendant's breach of the duty of care threatened physical injury to the Plaintiffs, unless Defendant's negligence was of a highly unusual type or Plaintiffs' serious emotional distress was a predictable result of the breach; (4) Plaintiffs suffered serious emotional distress; (5) Defendant's conduct was a substantial factor in causing Plaintiffs' serious emotional distress; and (6) Plaintiffs suffered damages. *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 1377–78 (Ct. App. 2010). Here, because Plaintiffs' claim that Defendant's duty of care and breach of

---

[9] *See* Ex.1-R, *T.P. v. Walt Disney Parks & Resorts U.S., Inc.*, No. 2:15-cv-05346 (C.D. Cal. May 24, 2019), Dkt. No. 355 Order Granting Disney's Motion for Summary Judgment at 6 ("*T.P.* Order 1") ("Plaintiffs have not identified a particular contractual term that has allegedly been violated, and Defendant does not promise, at the time of purchase or otherwise, that all guests will receive their preferred, best possible, or even a satisfying experience. The Court declines to read such an implied contractual term into the parties' business relationship.").

15.

that duty is based on their allegation that Disney violated the ADA and Unruh Act by not providing a DAS pass, their NIED claim necessarily fails.[10]

### 6. Plaintiffs cannot prove their Intentional Infliction of Emotional Distress claims.

An intentional infliction of emotional distress ("IIED") claim presents an even higher hurdle. To establish an IIED claim, Plaintiffs must prove that: (1) Defendant's conduct was outrageous; (2) Defendant intended to cause Plaintiffs severe or extreme emotional distress or acted with reckless disregard of the probability that Plaintiffs would suffer severe or extreme emotional distress; (3) Plaintiffs suffered severe or extreme emotional distress; (4) Defendant's outrageous conduct caused the severe emotional distress; and (5) Plaintiffs suffered damages. *Nally v. Grace Cmty. Church of the Valley*, 47 Cal.3d 278, 300 (1988). Again, because Defendant did not violate the ADA or the Unruh Act here, Plaintiff's IIED claims necessarily fail.[11] Further, there is no evidence that Defendant's denial of a DAS pass to Plaintiffs was outrageous, or "so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Davidson v. City of Westminster*, 32 Cal.3d 197, 209 (1982).

---

[10] *See* Motion, Ex. 1-Q, Dkt. No. 64-23 *T.P. v. Walt Disney Parks and Resorts U.S., Inc.*, No. 2:15-cv-05346 (C.D. Cal. July 24, 2017), Dkt. No. 224, Order Granting Disney's Motion for Summary Judgment at 5–6 (concluding that plaintiffs' negligent infliction of emotional distress claim was "specious" and fails as a matter of law because plaintiffs were "provided . . . with equal access to [Disney's] parks as required by the ADA and Unruh Act").

[11] *See* Motion, Ex. 1-R, Dkt. No. 64-24, *T.P.* Order at 6–7 (concluding that plaintiffs' IIED claims "are derivative of their claims under the ADA," and that because "Plaintiffs cannot establish an ADA violation," they "cannot possibly prevail on a claim for IIED").

Evidence Packet P.0336

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is **GRANTED** and Plaintiff's claims are hereby **DISMISSED**. Defendant is **ORDERED** to submit a Proposed Judgment to the Court within 14 days of the issuance of this Order.

Dated: November 27, 2019

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

17.